# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Kenneth Swenson,
Cindy Card and LaDonna Card
*Pro Se*                                                    CIVIL NO.
                                        Plaintiffs
v.

Judge Clyde Vedder
In Official Capacity
Court of Common Pleas of York County

Erik D Spurlin,
Attorney, MPL Law Firm
And in individual Capacity

Julie Stoil Fernandez,
Attorney, Finkel & Fernandez, LLP.
And in individual Capacity
Finkel & Fernandez, LLP

Raymond Card,
Disowned son and Illegal co-guardian

Kermit Card,
Disowned son and Illegal co-guardian

Brandy G Hoke,
Attorney, Ream, Carr, Markey, Woloshin & Hunter LLP
And in individual Capacity

                                        Defendants

## MOTION FOR DECLATORY RELIEF AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL

COMES NOW Cindy Card, Ladonna Card and Kenneth Swenson *Pro Ses*, and moves this Court pursuant to Rule 57 under Rule 65 to provide Declaratory Judgment and grant a Preliminary Injunction and Temporary Restraining Order to protect the Estate of Mrs. Ella Card against the order issued by the Court of Common Pleas of York County, Pennsylvania Orphans' Court dated March 21, 2022 Order.

Plaintiffs' request this Honorable Court pursuant to 42 USC § 1983. 42 USC § 1985, 42 U.S.C. § 1986 and the Hobbs Act (1934) to further protect Plaintiff's Civil Rights, which are being violated by the March 21, 2022 order.

The request for relief stems from actual controversy and in accordance with 28 U.S.C. § 1343 and§ 2201, 42 U.S.C. § 1983 - Violation of Civil action for deprivation of rights,  18 USC § 242  this court has jurisdiction and standing to issue such relief.

## **PRELIMINARY STATEMENT**

Plaintiffs appeal all parts of the order from the lower court issued on March 21, 2022 (EXHIBIT 1).

The Plaintiffs make this request for the following reasons:

The lower court Judge sequestered Plaintiffs' attorney preventing same from representing the Plaintiffs' interest or rights; disallowed any cross-examination and placing Plaintiff's attorney under a gag-order stating neither Plaintiff nor attorney "had standing" in the case before the court.

UNLICENSED, UNADMITTED ATTORNEY:

The lower court then ordered the Plaintiff, Mr. Swenson, even though he had "no standing"

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 2 of 320

in the case, to the take the witness stand and answer questions posed by the Judge, opposing counsel and a court appointed attorney. This humiliating, intimidating and threating line of questioning was conducted in the presence of New York opposing counsel the judge allowed into the hearing via "zoom" who had neither a license to practice law in the state of Pennsylvania nor admitted via *pro hoc vice.*

The court neither read Mr. Swenson his rights, nor informed him of his rights prior to, during, or after taking the stand demanding he testify.

SYSTEMIC CALCULATED ATTACKS AND THREATS AGAINST THE CIVILIAN POPULATION:

In the Complaint being filed today, we will provide this Honorable Court with *prima facie* irrefutable evidence that the Defendants engaged in a systematic, contrived violation of Plaintiff's constitutional due process rights; strip Plaintiffs of their civil rights; forced them to testify to a prejudicial court in order to perpetuate a false narrative contrived to continue exploiting Plaintiff's mother and mother-in-law, Ella Rubina Card's (now deceased) assets (now estate).

## JURISDICTION  AND VENUE

1) The Federal Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343 and§ 2201.

2) However, The York County court had no jurisdiction over neither Kenneth Swenson, Cindy Card or LaDonna Card.  (SEE: Affidavit of Residency)

3) As of January 27, 2022 Kenneth Swenson entered a contract for a home in Adams County PA, settling on the property February 28, 2022.

4) Cindy Card and LaDonna Card are residents of New York State.

*5)* Jurisdiction exists in federal court for the claims set forth as the First Cause of Action 42 U.S.C. § 1983 - Violation of Civil action for deprivation of rights, additionally supported by:

a)  *The First Amendment[1].*
b)  *The Fourth Amendment[2]*
c)  *The Fifth Amendment[3].*
d)  *The Seventh Amendment[4]*
e)  *The Eighth Amendment[5]*
f)   *The Fourteenth Amendment[6]*

6)  NO JURISDICTION IN LOWER COURT: Under 28 U.S. Code§ 1441(2), Kenneth Swenson

has lived in Pennsylvania since August of 2016.  Mrs. Ella Card has lived with Kenneth

Swenson in Pennsylvania since August of 2016.

7)  NO JURISDICTION IN LOWER COURT: Cindy Card has NEVER lived in Pennsylvania.

Cindy Card has lived in Brooklyn, NY and been a resident and citizen of New York State and

the United States of America for her entire life, however inserted into this action by petition

brought by Defendant and therefore an interested party.

8)      NO JURISDICTION IN LOWER COURT: LaDonna Card has lived in the Bronx, NY

for several decades never residing in Pennsylvania, however inserted into this action by petition

brought by Defendant and therefore an interested party.

9)      Under 28 U.S. Code § 1332(a), The claim is over $75,000.00. The Plaintiffs seek the full

---

[1] *(Amendment I) to the United States Constitution prevents the government from making laws that regulate an establishment of religion, or that prohibit the free exercise of religion, or abridge the freedom of speech, the freedom of the press, the freedom of assembly, or the right to petition the government for redress of grievances*
[2] *(Amendment IV) to the United States Constitution  prohibits unreasonable searches and seizures. In addition, it sets requirements for issuing warrants: warrants must be issued by a judge or magistrate, justified by probable cause, supported by oath or affirmation, and must particularly describe the place to be searched and the persons or things to be seized*
[3] *(Amendment V) to the United States Constitution applies to every level of the government, including the federal, state, and local levels, in regard to a US citizen or resident of the US. The Supreme Court furthered the protections of this amendment through the Due Process Clause of the Fourteenth Amendment*
[4]  *(Amendment VII) to the United States Constitution codifies the right to a jury trial in certain civil cases and inhibits courts from overturning a jury's findings of fact.*
[5]  *(Amendment VIII) to the United States Constitution prohibits the federal government from imposing excessive bail, excessive fines, or cruel and unusual punishments*
[6] *(Amendment XIV) to the United States Constitution states that; "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.."*

control of Mrs. Ella Cards estate; two apartment buildings, a store, all bank accounts, and investments Willed to Cindy Card the Executor of Mrs. Ella Card's estate which the co-guardians of record openly refuse to account for or relinquish to Cindy Card as Executor of the Estate. The Plaintiffs seek monetary awards for damages, injury, and other awards that are just in this matter.

10)     PERJURY AND FRAUD BY DEFENDANT: Defendants fraudulently represent there is no Will. The Defendants in fact have received copies of from the Brooklyn Supreme Court. The sole purpose of Mrs. Ella Card being in this guardianship is to pillage Mrs. Ella Card's estate so that there would be nothing left for the Executor, Cindy Card.

11)     PERJURY FRAUD AND DEFAMATION BY DEFENDANT: Cindy Card has been continually vilified since 2011 with Justice Barros going so far as to lie about Cindy and Ella Card's testimony in court; all of which can be shown as true.

12)     CONCEALMENT BY DEFENDANTS: The Defendants, Raymond and Kermit Card, their attorney Julie Fernandez were given and have access to Ella Card's Will since 2011.

13)     SELF-AUTHENTICATED WILL: Mrs. Ella Card states that she has a Will as supported by the exhibits attached here-to.

*14)*     SELF-AUTHENTICATED VIOLATION OF LAW: In accordance with Article § 81.29(d):
   *"The court shall not, however, invalidate or revoke a will or a codicil of an incapacitated person during the lifetime of such person."*

15)     The crimes are interstate between New York and Pennsylvania. Ken Swenson and Cindy Card are the victims of crimes that were committed by Defendants.

16)     We ask this United States District Court Middle District of Pennsylvania ensure this case remains in its jurisdiction for the following reasons: 1.) To avoid any actual or perceived conflict of interest as set forth herein as the Defendants are involved in a Racketeering Enterprise. 2) Plaintiffs could not get a fair hearing in the York County Orphans court due to alleged judicial corruption and United States Constitutional rights violations further enunciated within this petition,

as directed at and acted upon by officers of the lower Orphans Court and clear compromise of Pennsylvania's Code of Judicial Conduct by Judge Clyde Vedder and attending Officers of the court (Defendants).

17)     Extrinsic fraud and fraud upon the court, occurred on the state level, therefore, making all state judgments invalid, concluding that *res judicata* cannot apply to the federal court decisions because the state level judgments were contaminated by extrinsic fraud and fraud upon the court.

## FACTUAL BACKGROUND OF LOWER COURT ACTIVITIES WITHOUT JURISDICTION; AND CRIMINAL AND CIVIL VIOLATIONS FO DEDERAL AND STATE LAWS

1.     Prior to commencement of the March 21, 2022 hearing Plaintiff's counsel requested on camera chamber session with Judge Vedder, opposing counsel and the court appointed attorney. Counsel requesting the session to inform the parties that the reason Ella Card was not present is because she had passed in Belize Central America on 16 February 2022.

2.     After the "on camera" session,  Plaintiff's counsel returned to her position next to the Plaintiff and informed him that she had been sequestered by the court and was instructed to inform Plaintiff to anticipate answering questions as directed to him by the court. Counsel also informed Plaintiff that she was instructed by the court that she could not represent Plaintiff because neither she, nor "he [Plaintiff] had standing". Plaintiff was then subject to questioning from all parties present for the rest of the hearing without counsel.

3.     In the March 21, 2022, hearing Judge Vedder denied Plaintiff an attorney of his choice. Plaintiff had hired an attorney, the attorney presented herself to the court as Plaintiff's counsel, the attorney is a current and practicing member of the Pennsylvania bar, was in the court room seated across from opposing counsel and facing the bench from where Judge Vedder presided.

4.     Plaintiff was "required" to testify on behalf of himself as though he was a slave with no rights.

5.     When Judge Vedder sequestered Plaintiff's counsel, placed Plaintiff under oath without affording him counsel, and began an aggressive and intimidating line of questioning directed at Plaintiff from his robed position of authority of the bench. The Judge crossed the line of his sworn duty of objectivity into one of personhood thus disqualifying himself as an agent of the court.

6.     In a 5-minute time-span, Judge Vedder took the York County Orphans Court back to 1790 before the 6th Amendment of the US Constitution was ratified; back to before 1966 when Miranda was required.

7.     Judge Vedder's reason for sequestering Plaintiff's attorney was that Plaintiff had "no Standing" in the matter before the court.

8.     Plaintiff is an advocate for not only his mother-in-law, but others in the United States who have suffered untold loss and personal devastation because of Judges behavior as replicated by Clyde Vedder.

## BACKGROUND AS TO FRAUDULENT GUARDINASHIP; AND CRIMINAL AND CIVIL VIOLATIONS OF FEDERAL AND STATE LAWS

9.     In March of 2011, just after the New York Supreme Court deemed Mrs. Ella Card "incapacitated". Immediately thereafter Mrs. Ella Card fled the United States to her native country of Belize for safety.

10.     She knew and fully understood that if the Guardians secured her person they would do to her what tens of thousands of guardian's have done to those under their "care". She knew that she would be isolated from her family, medicated to the point of delirium, and have her estate fully eviscerated with most, if not all the estate ending up in the pockets of the guardian, attorneys, court evaluators, real estate agents, property managers and judges.

11.     When Mrs. Ella Card heard that there was a Senate Listening Session in Washington DC scheduled in June of 2011 she returned from Belize in hopes of finally being able to tell her story without the intervention and edits of the Brooklyn Supreme Court.

12.     Plaintiff met Mrs. Ella Card upon her return from Belize, hosting her in his home just prior

to the June event.

13.     Plaintiff and Mrs. Ella Card then attended the event in Washington DC (EXHIBIT 2) meeting up with nearly 50 other guardianship victims from around the United States.

14.     In the Hart Senate Office building Mrs. Ella Card told her story. (EXHIBIT 3)

15.     Mrs. Ella Card was then interviewed by the Washington Examiner (EXHIBIT 4)

16.     Mrs. Ella Card was also invited as a guest of the Gloria Minot radio show. (EXHIBIT 5)

17.     Mrs. Ella Card was afraid for her life and refused to return to New York, even though it had been her home for the prior 45 years. She needed a place of refuge and a safe place to live. Given this need and working with wife, Cindy Card, the Plaintiff offered Mrs. Ella Card his home as a place to stay.

18.     Mrs. Ella Card had lived with the Plaintiff for 11 years.

19.     Though out these past 11 years, Plaintiff and his wife Cindy Card worked tirelessly with other victims of guardianship abuse.

20.     They have spent thousands of hours together on the phone with victims of guardianship attempting to comfort, advise, and support their travel into this deep dark world of elder abuse, human trafficking and slavery, under the guise of guardianship.

21.     Plaintiff has personally met with Senate staff relating Mrs. Ella Cards story and the hideous incestuous nature of its perpetrators.

22.     Plaintiff has presented the Brooklyn Supreme Court's sequence of constitutional rights violations related to Mrs. Ella Card (carbon-copied in probate courts nation-wide) to General Accounting Office.

23.     Plaintiffs' have been significantly affected by this advent of guardianship. Because of the contentious nature of the case these past 11 years, Plaintiff's wife was required to remain separated from Plaintiff in order to tend to property granted to her in an Irrevocable Trust and Will of Mrs. Ella Card.

**BRAZEN VIOLATION OF LAWS REQUIRED TO ESTABLISH GUARDIANSHIP**

### § 81.11 MHL Hearing

*(a) A determination that the appointment of a guardian is necessary for a person alleged to be incapacitated shall be made only after a hearing.*

VIOLATED: Performed in *ex parte* hearing March 16, 2011 BEFORE the April 26 hearing appointing guardian

VIOLATED: Performed in *ex parte* hearing July 21, 2020 appointing successor co-guardians

### § 81.12 MHL Burden and quantum of proof

*(a) A determination that a person is incapacitated under the provisions of this article must be based on clear and convincing evidence. The burden of proof shall be on the petitioner.*

VIOLATED: Court appointed attorney stipulate to the court that Mrs Ella Card did no need a guardian

VIOLATED: Judge Betsy Barros in chambers told Mrs Ella Card; "You may not be incapacitated now, but before you leave this courtroom I will make you incapacitated.

VIOLATED: Knowing of 7 medical evaluations over a period of 9 years showing Mrs Ella Card was not incapacitated, Judge Ruchlesman continued the incapacitated ruling in the July 21, 2020 hearing.

### § 81.20 Duties of guardian

*(a)4. a guardian shall file an initial and annual reports in accordance with sections 81.30 and 81.31 of this article;*

VIOLATED: No initial or annual reports have been filed and as further required, sent to Mrs. Ella Card

*(a)\6)iii). a guardian determine whether the incapacitated person has executed a will, determine the location of any will, and the appropriate persons to be notified in the event of the death of the incapacitated person and, in the event of the death of the incapacitated person, notify those persons;*

VIOLATED: Defendants continue to allege Mrs. Ella Card has no will when in fact the will was read in open court in the April 21, 2011 hearing at which the Defendants, Raymond and Kermit Card were present.

### § 81.34 Decree on fining instruments approving accounts

*(a) Upon the death of the incapacitated person, the guardian is authorized to pay the funeral expenses of the incapacitated person and, in the absence of a duly appointed personal representative of the estate, pay estimated estate and income tax charges, as well as other charges of emergent nature.*

VIOLATED: Petitions paid for all funeral costs and have yet to be reimbursed by illegal co-guardians

**VIOLATION OF LAWS REQUIRED TO TERMINATE GUARDIANSHIP**

### § 81.44 Proceedings upon the death of an incapacitated person

Mrs. Ella Card passed on February 16, 2022. None of the following have been performed by the illegal co-guardians as required by law:

- *Provide the judge with a copy of the incapacitated individual's death certificate;*
- *Inform all other relevant parties of the death. Examples of parties who may need to be informed of an incapacitated adult's death include the Social Security Administration, Veterans Administration, and Medicaid;*
- *Paying allowable outstanding bills for services rendered while the incapacitated adult was still living;*
- *Prepare a statement of death and providing it to the court examiner and the individual responsible for administering the estate of the deceased;*
- *Prepare statement of assets and serving it to the deceased individual's personal representative or public administrator;*
- *Prepare a notice of claim and serving it to the deceased individual's personal representative or public administrator;*
- *Transfer all property to the deceased individual's public administrator or personal representative except for any property needed to satisfy known administrative fees and debts; and*
- *Complete all necessary steps to file a final account.*

24.     Because of the guardian's failure to carry out their fiduciary responsibilities the Plaintiffs

have been required to utilize their own resources to cover what the guardians failed to do. Over the

course of 11 years, Plaintiff and his wife spent thousands of dollars per year on property insurance,

maintenance, New York City Department of Building fines, wall and roof repairs.

25.     This requirement was the result of an illegal guardianship placed on Mrs. Ella Card in 2011

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 9 of 320

where-after the guardians failed to maintain the two Brooklyn, NY properties of Mrs. Ella Card forcing Plaintiff and his wife Cindy to perform and finance the maintenance from their own proceeds.

26.      Although Mrs. Ella Card's monthly retirement income was between $7,000-$8,000, the guardians (Vera Institute) forced her to live **at poverty level** from 2011 to 2017 with an "allowance" of $1,000 per month for food clothing, housing, medicine, travel and miscellaneous necessities. (EXHIBIT 6).

27.      Letters were written (EXHIBIT 7) by Mrs. Ella Card to the guardian notifying them of the lack of heat and hot water in the properties. Guardians failed to address these concerns and as a result, Mrs. Ella Card, was required to find refuge in Plaintiff's Maryland home leaving Cindy Card in Brooklyn to tend to the two properties.

28.      Although letters were written, notifying the guardian of the properties need for repair, the guardians failed to provide those funds resulting in accumulation of fines from the City of New York. (EXHIBIT 8)

29.      The guardians were given at least $80,000 (EXHIBIT 9) from the court to make repairs to the Brooklyn homes but they never made the repairs. In the stead, they retained the money and refused to show financial accounting to Mrs. Ella Card as required by law for the years 2017, 2019-2021.

30.      The guardians marshalled Mrs. Ella Card's Social Security, keeping all the proceeds until, in August of 2017, Mrs. Ella Card presented herself to the York County Social Security office who determined she was of sound mind and body and immediately redirected her social security to her account. The guardians then ceased to provide Mrs. Ella Card the $1,000 living "allowance", leaving her with only her monthly Social Security stipend to live on.

31.      This fiduciary malfeasance continued with the appointment in July of 2020 of illegal co-guardians; sons Mrs. Ella Card had disowned in 2011.

32.     On July 21, 2020, the Co- Guardians were appointed in a secret *ex-parte* hearing (EXHIBIT 10), where Mrs. Card and the Plaintiffs were never notified by the Court of that hearing and her attorney dropped out of the case, minutes before the hearing, and the estranged (disowned) sons of eleven years were appointed, against Mrs. Card' wishes. (EXHIBIT 11)

33.     Mrs. Card placed a cease and desist order against them. (EXHIBIT 12)

34.     They have a lifelong history of crack cocaine and alcohol abuse, with domestic violence, (to the extent of attempted rape, putting a gun to their sister's head demanding money for drugs) (EXHIBIT 13)  and four Bankruptcies, and do not qualify as Guardians under Article 81, Mental Hygiene laws. The Guardianship program is to preserve Mrs. Card's estate, not liquidate her estate which is contrary from Article 81 MHL. Article 81 MHL is to preserves estate and stop misappropriation.

35.     Under Article 81.32, since the Vera Institute and now the current guardians, Raymond and Kermit Card failed to give an initial report and an annual accounting in 2020, they should be removed for failure to file the annual accounting and inventory records.

36.     The illegal co-guardians continue to be negligent in not paying Ella Cards taxes (EXHIBIT 14) on her homes at 155 Saratoga Ave and 161 Saratoga Ave; The failed to pay for insurance on the homes and failed to pay the electric bills for both homes (EXHIBIT 15) when appointed as guardians resulting in receipt of an electric turn-off-notices effective September 30, 2021. The illegal co-guardians have never had a surety bond.

37.     On October 2, 2021, we received our electric bill for 155 Saratoga Ave in the mail, which has not been paid for over 8 months for a total of $2,305.36, which was supposed to  be disconnected on September 30, 2021. (EXHIBIT 16)

38.     Cindy Card had to address each and every deficiency , financing the derelict co-guardians lack of care and maintenance of the properties using her own resources to do so. The illegal co-guardians failed to perform any of their fiduciary duties.

39.     Plaintiff and his wife, Cindy Card were required to financially subsidize, as a partial attempt,

to provide for the quality-of-life Mrs. Ella Card was used to living and had planned for in retirement that the guardianship had deprived her of living

40.      In general, the appointment of the illegal co-guardians was performed in a July 21, 2020 ex parte hearing Then, three days after Judge Ruchlesman of the Brooklyn Supreme Court in Brooklyn NY was served the Federal removal (September 30, 2021), he signed an order requiring sale of both Ella Cards Brooklyn, NY properties. (EXHIBIT 17)

41.      The illegal co-guardians' efforts, since their appointment, has been, in concert with Julie Fernandez's direction, to expedite the pilfering of Mrs. Ella Cards estate with a piercing focus to sell the two properties which are both Willed by Mrs. Ella Card to Cindy Card.

42.      Julie Fernandez has even gone so far as to pose as Ella Cards attorney (EXHIBIT 18) joining attorney Paul O'Brien, Raymond and Kermit Card and attorney John Holt to enter into the Brooklyn Supreme Court a joint stipulation (EXHIBIT 19) stating only they are permitted to e-file anything in the court related to the Guardianship of Ella Card.

43.      Paul O'Brien was retained by Ella Card on January 8, 2020 to represent her interests at the July 21, 2020 hearing.

44.      Paul O'Brien did not inform Ella Card or the any of the Plaintiffs there was a hearing; that he planned to attend the hearing, which he did; that he withdrew his representation before the hearing commenced; (EXHIBIT 20-*Page 2*) or the results of the hearing.

45.      Plaintiffs filed a complaint with the Attorney Grievance Committee of New York against Paul O'Brien. (EXHIBIT 21)

## CURRENT STATE

46.      In the March 21, 2022 hearing before the Orphans Court of York County, the lower court denied Plaintiff, Kenneth Swenson, an attorney of his choice even though Plaintiff had hired an attorney, the attorney is a current and practicing member of the Pennsylvania bar, was in the court room seated across from opposing counsel and facing the bench from where Judge Vedder presided.

47.     Without the "presence" of an attorney, Judge Vedder pummeled Plaintiff with questions derived from unsubstantiated and scurrilous allegations, constructed in a regurgitated Petition (EXHIBIT 22) submitted to the York County Orphans Court by Erik D Spurlin as fed to him by Julie Fernandez, New York counsel.

48.     These allegations put before the court by Erik Spurlin were done so in spite of the ruling by the New York Appellate court (EXHIBIT 23) two weeks earlier enjoining the illegal guardians and their attorney from selling Mrs. Ella Card's homes.

49.     In spite of the Pennsylvania Middle Court having  jurisdiction over the case since July of 2021,  Mr. Spurlin placed his petition before the Orphans Court of York County on February 11, 2022.

50.     The March 21, 2022 hearing which emanated from Mr. Spurlin's February 11, 2022 Petition was not necessary as the Brooklyn Supreme Court of New York, claiming jurisdiction in this case, had given Mrs. Ella Card as a possession (guardianship over her person) to her illegal co-guardians and disowned sons on February 8, 2022. (EXHIBIT 24). Judge Ruchlesman ordered guardianship of the person without a hearing or jurisdiction.

51.     The only way for Pennsylvania to properly obtain jurisdiction over her property or person is by way of an *Article 83-(83.01-83.45)* with a "Transitional Provision". This also entails notification to ALL parties and an opportunity for anyone who did not agree to object to the transfer. These actions were never completed raising further doubt as to even proper jurisdiction as assumed by York County's Orphans Court and validity of Judge Vedder's March 21, 2022 order.

52.     Judge Vedder forced Plaintiff Kenneth Swenson to testify at the March 21, 2022 hearing. When answers from the Plaintiff did no square with what the Judge had been led to believe from opposing counsel and chamber sessions, the Judge on several occasions, turned to the Plaintiff, red-faced, stating "I will give you another chance to answer my question" clearly insinuating Plaintiff was lying, only to create a prejudicial courtroom atmosphere.

53.     Judge Vedder entertained additional allegations presented by Julie Fernandez, a New York attorney who had neither license to practice Pennsylvania law nor was she invited by *pro hoc vise*.

54.     Not once, did the Judge request evidence be presented to substantiate allegations made in the February 11 2022 Petition. The Judge conveniently relied on collegial hearsay and opinions from opposing counsel.

55.     During the questioning Judge Vedder asked if opposing counsel had any questions to-wit both Erik D Spurlin and Brandy G Hoke responded with a line of questions while Plaintiff's counsel was ordered to remain silent during the entire proceeding.

56.     Please take notice that in the February 11, 2022 Petition paragraph number 28 (EXHIBIT 25) a request for appointment of a guardian ad litem is requested. Questioning parties posed no questions to Plaintiff regarding Mrs. Ella Card's physical or mental health.

57.     When a guardian is to be appointed in Pennsylvania medical proof is required. (*20 Pa.C.S. § 5512.1(a).*)

58.     The court, nor any one present in the courtroom introduced themselves as an expert qualified to ascertain or "…establish the nature and extent of the alleged incapacities and disabilities…" of Mrs. Ella Card's "…mental, emotional and physical condition, adaptive behavior and social skills capacity" had she been present.

59.     The court made no attempt to acquire medical or psychiatric experts as required by Pennsylvania law to determine capacity at the Hearing. There was no medical Dr or expert present; no reference to a psychiatrist or even insinuation there was to be an evaluation performed on Ella Card.

60.     The court never asked for evidence from the Plaintiff that  shows that Ella Card had been evaluated by Doctors or Psychiatric specialist who determined her capacity.  This is a requirement of Pennsylvania law and if it were truly the intent of the hearing to determine Ella Cards capacity, as stated in the Petition, there would have been an expert present as required by law.

61.     No expert witness was present or was introduced during the March 21, 2022 hearing. This fact

sheds clear doubt that  intent of the hearing was to determine if Mrs. Ella Card was in-fact "incapacitated" but rather to use the March 21, 2022 court proceeding as a platform to further advance a false narrative initiated by Julie Fernandez, regurgitated by Erik Spurlin, bought into by Brandy G Hoke, orchestrated and acted upon by Judge Vedder.

62.     Plaintiff has 7 evaluations performed by MDs with both medical and psychiatric expertise attesting to the mental acuity of Mrs. Ella Card over these 12 years that at the least, Julie Fernandez is aware of. As an officer of the court, Julie Fernandez, if there were to be unbiased evaluation to have been addressed during the hearing, should have presented or in the least acknowledged their existence. In the stead, the line of questioning was all about Mrs. Ella Card's estate. (42 U.S.C. § 1986)

63.     The February 11, 2022 Petition contained false and misleading information which was presented to the court as fact, stating, among other things, that:

> *"Those who would be entitled to Ella's estate if she died intestate in the Commonwealth of Pennsylvania are her four children, namely: Kermit Card, Raymond Card, LaDonna Card, and Cindy Card"*

64.     Mrs. Ella Card has a Will.

65.     Mrs. Ella Card's Will was read in open court in the April 2011 "capacity" hearing conducted by the Brooklyn Supreme court. This is a matter of record to which Julie Fernandez has access and her clients, Raymond and Kermit Card know of the Will as they were present at the April 2011 hearing.

66.     Kermit Card clearly knew about the Will; going so far as to say that "…it was better that the State take it all, than give it to Cindy". (EXHIBIT 26)

67.     On August 14, 2018, Mrs. Ella Card had executed a durable power of attorney (EXHIBIT 27) appointing Plaintiff and Plaintiff's wife, Cindy Card, as Agents.

68.     This Power of Attorney coincided with a Psychiatric examination (EXHIBIT 28) performed in person by a highly acclaimed Manhattan based Elder Psychiatrist, Dr. Kent Shinbach, M.D.

69.     Dr. Shinbach's assessment, among other things, was that Mrs. Ella Card was

*"...an alert, well-oriented woman, displaying intact memory, both recent and remote with no suggestion of confusion at any point."*

70.   Dr. Shinbach's assessment concluded that Mrs. Ella Card,

*"...demonstrated fully intact mental capacity for the purpose of directing the maintenance and ultimate disposition of her estate in her own best interests."*

71.   It was the Plaintiff's understanding that the Power of Attorney continued posthumously up and until an Executor assumed full control of the estate.

72.   Given that understanding, Plaintiff filed a petition *via* Power of Attorney on behalf of Mrs. Ella Card posthumously requesting the York County Orphans Court dismiss the February 11, 2022 Petition For Hearing. This request was denied.

73.   Plaintiff also requested an Order To show Cause for an Emergency Injunction or a Temporary Restraining Order against Julie Fernandez, Raymond and Kermit Card. This request was granted enjoining Julie Fernandez, Raymond and Kermit Card from selling and transferring the properties of Mrs. Ella Card.

We, the Plaintiffs, Kenneth Swenson, Cindy Card, and Ladonna Card, are requesting the United

States District Court, For the Middle District of Pennsylvania, to:

Issue an injunction and temporary restraining order against

# I.    ARGUMENT
## REQUEST PRELIMINARY INJUNCTION OR TEMPORARY RESTRAINING ORDER

**74.**   Appellant appeals all parts of the July 21, 2020 ex parte hearing (EXHIBIT 10) order signed December 2, 2020 and dated December 8, 2020: AND the July 27, 2021 hearing conducted during an effective Federal Removal from the state of Pennsylvania properly served on the court (order signed September 30, 2021) (Exhibit 16) and the Order To Show Cause scheduling a January 28, 2022 hearing, all under the Supreme Court Index Number 100016/2011: The first, appointing Ella Card's estranged sons as co-guardians of whom she has cease and desist orders against (Exhibit 12); the second, requiring sale of property and requesting Ella Card pay attorney fees; the third, requesting approval of the sale for

both of Ella Card's Brooklyn, NY properties.

"GUARDIANSHIP" ENDED:

75.   The guardianship is over and ended on February 16, 2022 with Mrs. Ella Card's passing

76.   Knowing the Defendants litigious nature, the Plaintiffs have no doubt that will continue unless this court intervenes providing the Plaintiffs relief.

77.   Julie Fernandez, Raymond and Kermit Card are now required to inform the Executor, Cindy Card, and courts of Mrs Ella Cards passing and commence with transferring the estate and its records over to the rightful heir and Executor, Cindy Card.

78.   Defendants, in each and every motion referenced above and within this motion, have been insistent on promulgating false, misleading and fabricated allegations against the Plaintiffs and presenting these to the court.

79.   The February 11, 2022 Erik Spurlin presented a motion to the Pennsylvania court ((EXHIBIT 25) containing a series of allegations Julie Fernandez, Raymond and Kermit Card have been presenting to the Brooklyn Supreme Court, and this court over the past 2 years.

80.   Petitioners, here and now, take the opportunity to address, **WITH FACTS**, every allegation made in Erik Spurlin's irresponsible, incomprehensible, allegation-laden petition:

- ALLEGATION 1: "Ella Card ('Ella') was adjudicated an incapacitated person on March 16, 2011 by way of 0rder issued by the Honorable Betsy Barros of the New Y0rk Supreme Court for Kings County (the 2011 0rder").
- FACT 1:  Mrs Ella Card was not notified of the March 15, 2011 hearing. It was conducted *ex parte*. Because her due process rights were violated, the results of said hearing, and any ensuing hearing(s) resulting from that action are by *law void ab initio. Maseda v. Honda Motor Co., Ltd., 861 F.2d 1248, 1254-55 (11th Cir. 1988)*. The first time Mrs Ella Card was notified and stepped foot into Betsy Barros courtroom was April 21, 2011. Void judgment may be defined as one in which rendering court lacked subject matter jurisdiction, lacked personal jurisdiction or acted in manner inconsistent with due process of law *Eckel v. MacNeal*, 628 N.E. 2d 741 (Ill. App. Dist. 1993).

- ALLEGATION 2: "Those who would be entitled to Ella's estate if she died intestate in the Commonwealth of Pennsylvania are her four children, namely: Kermit Card, Raymond Card, La0onna Card, and Cindy Card."

- FACT 2: Ella Card has a Will. It excludes Raymond and Kermit Card from inheriting anything from Mrs. Ella Cards' estate. The Will places Cindy Card in complete control of Ella Cards assets. The Will was read is open court during a April 2011 hearing conducted by Judge Betsy Barros of the Brooklyn Supreme Court, Brooklyn NY.

- ALLEGATION 5: "The Guardianship Petition further alleged that guardianship was necessary despite the existence of a General Durable Power of Attorney that was allegedly executed by Ella appointing her daughter, Cindy Card. Cindy Card was alleged to have taken control of Ella's two residential rental properties without Ella's consent was collecting rent and using the same for her own purposes, and was sequestering her mother from family members."
- FACT 5: Cindy Card has lived at 161 Saratoga Ave, Brooklyn, NY for 34 years. She has also lived at 155 Saratoga Ave, Brooklyn, NY for 18 years. Both properties were Willed to her by Mrs. Ella Card. In light of the illegal guardians, the Vera Institute (previous illegal guardians) and current illegal co-guardians Raymond and Kermit Card dereliction of duties as guardians, and their insatiable appetite to liquidate Mrs. Ella Card's estate Cindy Card took responsibility to preserve the properties by making repairs, correcting violation, pay property taxes, insure both buildings, paid utilities and did everything she could to assure the properties were properly maintained. Mrs. Ella Card was fully apprised, and pleased that Cindy Card stepped in to preserve the properties. Mrs. Ella Card was so involved in the process that she chose the color Cindy should paint the buildings. At no time did Cindy Card ever rent out any property.  In fact, it was Kermit Card who had entered into a fraudulent lease agreement with the tenants of 161 Saratoga Ave (one of the two properties in question) directing rent to be paid to himself. He presented himself as the owner of 161 Saratoga Ave entering into a 10-year lease agreement with said tenants. (EXHIBIT 29).
- Erik Spurlin is accusing Cindy Card of Kidnapping, which is a serious Federal crime. Without his ability to prove such an allegation, he has opened himself and his firm up to a defamation of character lawsuit, as he has with these other unfounded allegations. Ella Card disowned her two sons Raymond and Kermit Card sending them both letters to that effect in 2011 stating she never wanted to see or hear from them ever again. Ella Card, on her own volition, left the United States for her home country of Belize in 2011 (she had dual citizenship in both) to preserve her dignity and life, taking refuge with her son in law, Ken Swenson, for the 11 years after returning to the US. There were numerus attempts by Julie Fernandez to "get Ella Card" (Julie Fernandez's own words) sending local police and detectives to Ken Swenson's home to investigate only to find that Ella Card was is good health and sound mind and not under any duress. Even after the Detective reported these findings to Julie Fernandez, she continued to harass Ella Card and family with further legal motions in both New York and Pennsylvania. This continued harassment compelled Ella Card to leave once again to Belize in February of 2022 where she passed due to a heart attack on 16 February 2022. Even in the March 29, 2011 email (EXHIBIT 26) LaDonna Card, a Physician's Assistant of 35 years, states "…*my Spirit, that talks to my head daily, my God, & my fear for ma's safety, & possible death from all of this stress is why I cannot continue to be a part of this process.*"

- ALLEGATION 6: The 2011 0rder appointed VERA Guardianship Project (the Professional Guardian) to serve as Guardian of the Property for Ella, based on its finding that Ella is 'a person requiring he appointment 0f a Guardian as the Court has found that said incapacitated person is likely to suffer harm because of an inability to provide for property management and is unable to adequately understand and appreciate the nature of and consequences of such inability."
- FACT 6: This is completely and totally fraudulent, misleading, fabricated and unsupported statement. On March 16, 2011 Judge Barros deemed Mrs. Ella Card "Incapacited" before Ella Card even stepped foot in the courtroom. When Mrs. Ella Card entered the courtroom for the first time under Barros in April of 2011 Barros saw Mrs. Ella Card was not "Incapacitated" but saw her as a "cash cow". During the April 21, 2021 hearing, court appointed counsel for Mrs. Ella Card stated several times, on record, that Mrs. Ella Card was not in need of a guardian. Mrs Ella Card took the stand, recited every asset she had, explaining every Directive she signed and without ambiguity, stated she did not need, desire, or ever want a guardian. In the chambers of Judge Betsy Barros, away from the court records, the judge

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

said to Ella Card, Cindy and LaDonna Card, "*Ms. Card, you may not be incapacitated now, but before you leave this court room I will make you incapacitated.*" In the transcript obtained from this 2011 hearing, even the court appointed attorney proclaimed that Mrs. Ella Card was not incapacitated and did not require a guardian. The judge ignored this proclamation and ordered the guardianship non-the-less. The Judge made a life-changing decision for an elderly black woman based on personal preference, rather than findings of fact.  During the 11 years, leading up to Mrs. Ella Card's passing, medical doctor and psychiatric evaluations supported the court appointed guardians' proclamation in 2011.

• ALLEGATION 7: "As part of its decision, the Court found that Ella is extremely susceptible to undue influence" and that Ella's estate was being rapidly diminished by Cindy Card, who persuaded Ella to execute a trust while in a mentally compromised condition, which trust effectively disinherits all other family members other than Cindy Card. The Courts decision also noted that Cindy Card, who testified in opposition to the appointment of a guardian but was found not to be credible, was maintaining a cat sanctuary in Ella's residential buildings with over thirty cats in two apartments."

• FACT 7: The reason why Ella Card made this decision is because Kermit Card, even after Ella Card revoked his power of attorney, (EXHIBIT 33), and informed Kermit to stop using the revoked POA EXHIBIT 33A). Kermit then colluded with his attorney, Bonnie Bernstein to file an irrevocable trust (EXHIBIT 33B) giving her whole estate to Raymond, Kermit and LaDonna Card, to the exclusion of Cindy Card. Cindy Card never "rapidly diminished" Ella Cards estate as Mrs. Ella Card contributed to Cindy Card's 501C3 animal sanctuary. Mrs. Ella Card was given receipts for her contributions and a tax write-off. (EXHIBIT 34) Mrs. Ella Card and Cindy both testified to this and submitted receipts to the court. Kermit Card lied to Justice Barros stating that Mrs. Ella Card told him that Cindy has "unlawfully" using her credit card. This was impossible as Mrs. Ella Card was no longer speaking to Kermit Card. This information was presented to Justice Barros who completely ignored these facts. In fact, it was Kermit Card who closed Mrs. Ella Card's bank account, moved trusts, and caused Mrs. Ella Card to take the rest of her money out of her estate. Kermit Card's third wife, Wichita, called Mrs. Ella Card exposing this information. It was approximately 4 months after Kermit stole Mrs. Ella Card's money with a revoked POA, that Mrs. Ella Card found herself in the Brooklyn Supreme Court fighting a guardianship proceeding. Mrs. Ella Card was never mentally compromised and there is no medical proof of such a finding. On the contrary, the medical examinations performed by a medical doctor in 2011 and 2012 after Mrs. Ella Card was deemed "incapacitated" proves otherwise. (EXHIBIT 35). Barros simply had to say these things to cover her own crime as the trust was a threat to her *ex parte* decision made on March 16, 2011 before Mrs. Ella Card and Cindy Card ever stepped foot in the Brooklyn Supreme court. She had to vilify and demonize Mrs. Ella Card and Cindy Card because it was the only way to justify her *ex parte* decision. She removed Cindy's, Ella Cards and LaDonna Cards attorney whom they hired to represent them. She violated LaDonna, Cindy and Ella Cards civil rights by removing their attorney of choice questioning them without an attorney, just like Clyde Vedder did to Kenneth Swenson. She then doctored up court transcripts by changing the actual testimony and then sealed the court documents that have been sealed to this point. Barros continued to practice medicine without a license and demand Mrs. Ella Card have a permanent guardian, all with the intention of draining her estate so that there would be nothing left for Cindy Card. We find it extremely interesting that only on paper, December 14, 2011, 8 months after the final hearing of April 26, 2011, that she then deemed Mrs. Ella Card incapacitated after her office informed here that a newspaper article was coming out exposing her crimes. (EXHIBIT 4).

Please take note of the Washington Examiner article. It was published December 20, 2011. Mrs. Ella Card and Cindy Card were interviewed by the Washington Examiner on December 13, 2011. The Vera Institute attorney, Karen Goldstein, was also notified to give her side of the story. She also notified Barros that the article was coming out on the same day. Instead of Barros responding to the article, and giving her side of the story, December 14, 2011 Barros deemed Mrs. Ella Card "incapacitated", taking possession of her property only-not her person and property. Mrs. Ella Card was at this time no longer a resident of New

York. If Mrs. Ella Card was truly mentally compromised, if Cindy Card was truly draining her estate, if she was susceptible to undue influence by Cindy Card, what sane judge, what judge who truly believed what she had written would ever let go of an incapacitated person, but yet retain her property. Raymond and Kermit Card were present in the courtroom when Mrs. Ella And Cindy Card testified in April of 2011. Mrs. Ella Card and Cindy Card refuted every allegation; presented clear and convincing evidence to the point where their attorney Bonnie Bernstein attempted to make a settlement. Mrs. Ella Card knew she was not incapacitated and that her daughter had done nothing wrong. According to Social Security Administration, Justice Barros deemed Mrs. Ella Card incapacitated before she or Cindy Card even stepped foot in the courtroom. (EXHIBIT 36).  She went so far as to stipulate in the Social Security document: 1.) *Mrs. Ella Card lived alone*: She did not live alone, she lived with her granddaughter Faith Card. 2.) *Had no relatives or close friends who live with or are interested in being her representative payee*: This is been refuted already. 3.) *Does not owe Vera any money and we do not expect her to in the future*: Vera took thousands of dollars from Ella Card's estate over the years.

Further Note: A "void judgment" grounds no rights, forms no defense to actions taken there under, and is vulnerable to any manner of collateral attack. No statute of limitations or repose runs on its holdings, the matters thought to be settled are not *res judicata*, and years later, any disgruntled litigant may reopen the old wound and once more probe its depths. And it is then as though trial and adjudication had never been." 10/13/58 *FRITTS v. KRUGH. SUPREME COURT OF MICHIGAN*, 92 N.W.2d 604, 354 Mich. 97. On certiorari this Court may not review questions of fact. *Brown v. Blanchard*, 39 Mich 790. It is not at liberty to determine disputed facts (*Hyde v. Nelson, 11 Mich* 353), nor to review the weight of the evidence. *Linn v. Roberts*, 15 Mich 443; *Lynch v. People*, 16 Mich 472. Certiorari is an appropriate remedy to get rid of a void judgment, one which there is no evidence to sustain. *Lake Shore & Michigan Southern Railway Co. v. Hunt*, 39 Mich 469.

Erik Spulin knew that this, and these other allegations were untrue or in the least should have performed perfunctory research of such a list of nearly unbelievable accusations that taken together make no logical sense.

• ALLEGATION 10: Petitioners have no information as to whether Ella's disappearance from her home and failure to communicate with Petitioners is voluntary, or whether Ella even has the capacity to make decisions of that nature, let alone to understand and appreciate the length of her estrangement from many members of her family.
• FACT 10: If Erik Spurling actually believed this to be the case, he, and his clients clearly perjured themselves because he just placed before the court the accusation that *"Cindy Card sequestered Ella Card keeping her from her family…"* The logic here can be only explained as *circulus in probando*, non-sensical and in the least, foolish. There were numerus attempts by Julie Fernandez to "get Ella Card" (Julie Fernandez's own words) sending local police and detectives to Ken Swenson's home to investigate only to find that Ella Card was is good health and sound mind and not under any duress. The results of these investigations were reported to Julie Fernandez by the investigating Detective from Penn Township police department, Detective Eric Zumbrum. Additionally, Ms. Fernandez has been served several petitions by the Plaintiffs with clear, incontrovertible reports from medical and psychiatric Doctors reporting that Mrs. Ella Card was of sound mind.

• ALLEGATION 11: "After several years of attempting to access the real property interiors, maintain the properties and obtain information about the tenants in the two real properties owned by Ella, the Professional Guardian moved to be discharged from the case, admitting it could not adequately perform its duties in light of Cindy Card's interference."
• FACT 11: This a bold faced lie. The reason why Vera Institute removed themselves as guardians is because they were under investigation by Social Security. After Mrs Ella Card presented herself to Social Security in August of 2017, Social Security realized that Vera Institute was collecting checks for Mrs. Ella Card stating on their annual reports that she was living in New York. Social Security opened

an investigation sending a letter to the Veral Institute's attorney John Holt, requiring Veral to return to Mrs. Ella Card all her Social Security from the inception of the guardianship since 2011 to August of 2017. Instead of doing this, they rushed to remove themselves as guardians. In addition, the new Vera Institutes director, Kimberly George stated that Mrs. Ella Card never qualified to be her guardian because she was not indigent and that her estate was too much. (Exhibit 30)  This is well established information, on the record in the Brooklyn Supreme Court, the Appellate Court and this honorable court. This is just another false, fallacious accusations to continue promoting the false narrative that Julie Fernandez enjoys touting. Once again, Erik Spurling, with Julie Fernandez and their clients, Raymond and Kermit Card joined in this chorus of lies. This activity is defamation of Plaintiffs' character. In fact, on several occasions, Vera's property manager, and the Corcoran Group, sanctioned personnel *(Julie Fernandez' and Paul O'Brien favored real estate company chosen to sell Ella Cards property)* entered the properties. The first announcing they carried a gun, destroying locks on the front and secondary doors and the second breaking into the property via the front basement entry destroying the metal fasteners and hinges secured by the entry's concrete base.

• ALLEGATION 11A: "Professional Guardian admitted that it was unable to determine Ella's whereabouts and that it was not collecting Ella's rental or Social Security income, which was instead intercepted by Cindy Card on multiple occasions, leading to a discontinuance of receipt of income."
• FACT 11A: Julie Fernandez stated that "*I will get her!*" referring to locating and securing Mrs. Ella Card's person. Ella Card personally went to the York County Social Security Office in August of 2017 where they determined she was competent to handle her own income and immediately redirect her income directly back to her. Vera and the co-guardians were well aware of this as Veral was immediately sent a letter requesting Vera repay all Ella Cards Social Security directly to her. Vera has to date failed to abide by Social Security's directive. Social Security income is Federally protected income that is not susceptible to being marshalled by a guardian. Co-guardian, Raymond Card intercepted the March 2021 Social Security check for $1,615 and has yet to account for that money. It remains missing. Cindy Card had to replace the intercepted check from her own pocket so that Mrs. Ella Card could get life-sustaining medicine, food, shelter etc. for that month.

• ALLEGATION 12: "No access has been gained to the buildings' interiors.", See 11 above. In addition, the building is the subject of two Department of Building Violations and every effort to cure the conditions is undermined or thwarted by Cindy Card in conjunction with Kenneth Swenson and LaDonna Card."
• FACT 12: Vera and Ms. Fernandez are aware that individuals of their own broke into both of Mrs. Ella Card's properties causing damage (EXHIBIT 31) that Cindy Card had to pocket the repairs for. Vera and the co-guardians not only failed to obtain property insurance on the two properties they failed to immediately address issues the DOB notified them of in a timely fashion. After letters sent by Mrs. Ella Card in 2011, requesting Vera address the fact there was neither heat nor hot water in the property, Vera ignored this request. Vera continued to ignore maintenance of the properties, allowing fines to mount with the DOB. Again, Cindy Card had to hire a contractor to repair the outside wall curing one fine. In December of 2019 the Supreme court ordered that Vera Institute provide $45,000 to a contractor to repair a **portion** of the wall. *(This repair was estimated by a local contractor to cost $5,000)*  Six months later, Cindy Card repaired the wall at a cost of $11,500 for the **entire** wall repair from her own pocket after she discovered, on her own volition, that DOB fines were accumulating. (All DOB notices were addressed to Vera, not Cindy Card.) There is yet no accounting for that $45,000 Vera extracted from Ella Card's marshalled funds. Cindy Card also had to contract in the amount of $6,900 for repairing leaking water and a water main issue. DOB issued citation against an oil furnace that Kermit Card had removed in 2010 without providing proper notification to the city. These issues were all addressed at Cindy Cards own expense requiring hiring a private company to address DOB assuring all the repairs Cindy Card made to the properties, which neither Vera nor the illegal co-guardians addressed, were recorded and appropriately addressed with the DOB. Cindy Card addressed these maintenance issues only because of Vera's and the illegal co-guardian's negligence to properly execute their court ordered fiduciary responsibilities. There have been no efforts made by the co-guardians to

address any of the DOB issues. Their sole efforts have focused on attempting to sell the two properties and marshal funds from Mrs. Ella Cards estate.

• ALLEGATION 13: "By 0rder entered December 02, 2020, the New York Supreme Court for Kings County appointed Kermit Card and Raymond Card, Petitioners herein, as Ella's Successor Co-Guardians of the Property (the 2020 0rder replacing the Professional Guardian, VERA institute."
• FACT 13: They obtained their appointment by fraud. Judge Ruchlesman, Julie Fernandez, John Holt, Raymond and Kermit Card, colluded on June 22, 2020 with Julie Fernandez posing as Ella Cards court appointed attorney, Paul Orbien as the attorney Ella Card hired to represent her in removing Vera as guardians making sure that the case was e-filed giving Mrs Card and family no access to the court and one month later having a hearing on July 21, 2020 without Mrs. Card or family even knowing that the hearing was taking place. This constitutes eliciting a void court order due to fraud on the court and lack of service including a violation of due process for Mrs Ella Card and family. Having obtained the guardianship in this fashion voids all orders relative to that instance thereafter. The guardianship of New York from its inception in 2011 was conducted under fraud and all ensuing orders generated from that order  (including any generated from this lower court)are void ab initio. *Maseda v. Honda Motor Co., Ltd.,* 861 F.2d 1248, 1254-55 (11th Cir. 1988) (internal citation omitted); see *DB50 2007-1 Tr. v. Dixon*, 723 S.E.2d 495, 496 (Ga. Ct. App. 2012)

• ALLEGATION 14: "The New York Court mindful that Ella is believed to be held outside of the State of New York and possibly without knowledge or consent."
• FACT 14: This is a wholly illogical statement showing the Defendants are grasping at straws. Defendants were present in the Orphans court one year earlier regarding a protective order hearing held in the Orphans court. Kenneth Swenson and LaDonna Card attended the hearing although Mrs. Ella Card did not attend due to COVID restrictions for elderly Pennsylvania citizens. Additionally, Julie Fernandez was explicitly informed by the Penn Township Detective, Eric Zumbrum after visiting Kenneth Swenson's home, at Julie Fernandez's request, where Mrs. Ella Card resided, that Ella Card was in good psychical  and mental health and not being held against her will or under any duress. Julie Fernandez has intentionally withheld that information from the court to advance a derogatory and negative picture of Cindy Card, LaDonna Card and Kenneth Swenson and so she could continue to pilfer Mrs. Ella Cards estate which eventually lead to the death of Mrs. Ella Card.

• ALLEGATION 15: "Much like the Professional Guardian that preceded them, the Petitioners have been unable to discharge their duties as guardians because of Cindy Cards interference. As a result of such interference, Petitioners have been unable to communicate with their mother in any way, leaving them unable to take into account her preferences where appropriate and unable to verify her health and safety."
• FACT 15: As illegal co-guardians, Raymond and Kermit Card's only activities has been to solely focus on extracting monies, marshalling assets, and filing frivolous law suits against of Mrs Ella Card and the Plaintiffs'.  They have not submitted initial accounting, nor annual accounting as required by law. They made no attempt to contact Mrs Ella Card at ANY time during their appointment because they knew she had disowned them in 2011, sought protective orders against them in 2020 and had cease and desist orders taken out against them and filed with the local police precincts and Hanover police station. (EXHIBIT 32) They have failed to pay the taxes, insurance, general maintenance, water, or gas on both properties. They have shown only disregard for Mrs. Ella Cards preferences health or safety. Given their history of financial, emotional and likely sexual abuse of Mrs. Ella Card, (EXHIBITS 11, 12, 13, 14, 25, 30, 32), Julie Fernandez's insatiable desire to exploit and abuse the person and estate of Mrs. Ella Card with full knowledge of supporting incontrovertible evidence supporting a position contrary to her desire to fund her law practice with Mrs Ella Card's estate, it is beyond any reasonable expectation that they had any desire other than the further exploitation, in collusion with Julie Fernandez, Erik Spurlin to exploit and abuse Mrs. Ella Card and her estate.

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

- ALLEGATION 16: "The 2020 0rder specifically authorizes Petitioners to bring actions in other states to enforce the 2020 0rder, including access orders with police assistance."
- FACT 16: The 2020 order was obtained by fraud and is a void court order. *Eckel v. MacNeal*, 628 N.E. 2d 741 (Ill. App. Dist. 1993).

- ALLEGATION 17: "The 2020 Order has been registered in accordance with Section 5931of the PEF Code, a certified copy which remains on file with the York County Orphans Court at Docket No. 6721-1278.
- FACT 17: The only way for this void order to have been registered in the York County Orphans Court was to transfer it via Article 83 which requires all parties to be informed and to provide an opportunity to object to the transfer. Mrs. Ella Card and the Plaintiff's were never informed of this. Who gave permission to register this order?

- ALLEGATION 18: "Section 5933(a) of the PEF Code provides that upon registration of a guardianship or protective order from another state, the guardian or conservator may exercise in this Commonwealth all power authorized in the order of appointment except as prohibited under the laws of this Commonwealth, including maintaining actions and proceedings in this Commonwealth'"
- FACT 18: The guardianship of New York from its inception in 2011, as well as the 2020 hearing, were conducted under fraud and all ensuing orders generated from that order  (including any generated from this lower court)are void ab initio. *Maseda v. Honda Motor Co., Ltd.,* 861 F.2d 1248, 1254-55 (11th Cir. 1988) (internal citation omitted); see *DB50 2007-1 Tr. v. Dixon*, 723 S.E.2d 495, 496 (Ga. Ct. App. 2012)

- ALLEGATION 19: Section 5933{b} of the PEF Code provides that'[a] court of this Commonwealth may grant any relief available under this chapter and other law of this Commonwealth to enforce a registered order.'
- FACT 19: The guardianship of New York from its inception in 2011 as well as the 2020 were conducted under fraud and all ensuing orders generated from that order (including any generated from this lower court) are *void ab initio.* A void judgment is one which, from its inception, is and forever continues to be absolutely null, without legal efficacy, ineffectual to bind the parties or to support a right, of no legal force and effect whatever, and incapable of enforcement in any manner or to any degree - *Loyd v. Director, Dept. of Public Safety*, 480 So. 2d 577 (Ala. Civ. App. 1985).

- ALLEGATION 20: "Upon information and belief, Cindy Card and Kenneth Swenson, will vehemently oppose any request made by the Petitioners. ln fact, Cindy Card and Kenneth Swenson filed an unintelligible 72-page summons with the United States District Court for the Middle District 0f Pennsylvania on September 15, 2021, (EXHIBIT 38) alleging 23 causes of action and naming 17 defendants including the two judges who issued the 2011 0rder and 2020 0rder. As such, there can be no doubt that those harboring Ella are fully aware of the 2011 0rder and the 2020 order and have been active in these proceedings thereby submitting to the New York Courts jurisdiction."
- FACT 20: It was Ella Card, LaDonna Card, Cindy Card and Kenneth Swenson who petitioned the Federal Court. Clearly Erik Spurling and company are ignorant to the fact that the Federal court does not entertain "Unintelligible" motions. Apparently, in his ignorance, he has not read the Federal motion but simply repeating Julie Fernandez's banter. Plaintiffs vehemently oppose the request made by the *("Petitioners")* Defendants. The Plaintiffs (and Mrs. Ella Card's) awareness of these orders have been great cause for concern for the Plaintiffs' ongoing safety, health, and well-being. The orders were conceived by fraud. The orders, as acted upon by Defendants have caused nothing but turmoil, thousands of hours of heart-breaking counsel with guardianship victims within the United States and Europe suffering the same judicial mistreatment. The orders and the incompetent, illegal, and devious actors the orders sanctioned have created untold heart-ache, death, un-told emotional and financial costs; undermined any degree of confidence Plaintiffs had in the lower courts' judiciary or justice by cause of reason or fact. The guardianship of New York Supreme court from its inception in 2011 and

2020 were conducted under fraud and all ensuing orders generated from that order (including any generated from this lower court) are *void ab initio* and those as part of those orders, officers of the court et al, who have contorted justice and the courtroom to be used as a platform to gain wealth are liable for the death of Mrs. Ella Card and the 12 years of agony and interference of Plaintiffs' pursuit of happiness guaranteed under the United States Constitution. The 72 page summons can be found here on PACER.

• ALLEGATION 21: The Federal Court proceeding referenced in Paragraph 20 above is meant to estop the New York Guardianship Court from permitting the sale of both of Ella's real properties, for which Co-Petitioners requested by necessity, because of the inability to control the finances and safe of the two properties. The petition to place the properties on the market was granted on September 30, 2021, the request to approve a contract of sale for an all-cash deal on both prophecies was granted on January 28, 2022 The Federal Court granted no interim relief to Cindy Card et. al" and the claims against the Guardians in New York with respect to the sale of the real property will shortly be moot.

• FACT 21: Defendant's make this allegation with apparently the same hope of the court believing what might happen rather that what actually took place. The Federal Court, at the time of the writing, has not yet ordered a remand back to New York. If that ever happens, the Plaintiffs can only cause to reason a question as to why the York County Orphans Court entertained Erik Spurlin's petition at all as transferring a guardianship to another state requires a permission of the originating state (New York) first, notice to all parties must be given and done so in accordance with Article 83.31 of the Mental Hygiene law. None of these activities took place. The March 21, 2022 hearing in York County Orphans Court was in conflict with appropriate judicial protocol and should be noted, along with any ensuing orders from that hearing as moot.

• ALLEGATION 22: "Ella, Cindy Card, Kenneth Swenson, and La0onna Card have been given notice of all the above-mentioned proceedings in New York and have had an opportunity to be heard."

• FACT 22:
   a. The March 15, 2011 hearing appointing the Vera Institute of Justice as guardians was *ex parte*.
   b. The April 26, 2011 hearing conducted by the Brooklyn Supreme Court, Cindy Card, LaDonna Card and Mrs. Ella Cards testimony were summarily dismissed by the court and rewritten to suit the Judges' wishes of proclaiming Mrs. Ella Card "incapacitated", contrary to findings of fact.
   c. The July 21, 2020 hearing appointing the disowned sons as co-guardians was *ex parte*.
   d. The July 27, 2021 hearing for the sale of Mrs. Ella Cards properties was conducted in the Brooklyn Supreme court while jurisdiction remained in the Federal Court Middle District of Pennsylvania. Had Petitioners appeared, it would have been in violation of Federal jurisdiction and an indictment of their persons.
   e. The January 28, 2022 hearing resulting in order authorizing the sale of both Mrs. Ella Card's properties was conducted in the Brooklyn Supreme court while jurisdiction remained in the Federal Court Middle District of Pennsylvania. Had Petitioners appeared, it would have been in violation of Federal jurisdiction and an indictment of their persons.

FOOTNOTE: This judicial behavior prevailed in the March 21, 2022 hearing conducted by the York County Orphans court by Judge Clyde Vedder. Therein, while proclaiming Kenneth Swenson had no "standing", he forced Kenneth Swenson to the stand to testify, not however first, proclaiming that Kenneth Swenson's hired attorney, who was present in the courtroom, was sequestered and cannot represent, defend, counsel, speak in court, cross-examine, or present evidence on behalf of Kenneth Swenson.

## KIDNAPPING and ELDER ABUSE

• ALLEGATION 24: "Petitioners believe Ella is continuously subjected to misinformation and hysterical conjecture regarding the authority of the guardianship and of the character and ability of Ella's sons to serve guardians."

• FACT 24: Mrs. Ella Card disowned her sons. She wrote them off in 2011 and by choice, never spoke to

them again. When she heard they had taken over as co-guardians, the bad dream of 2011 court hearing of Betsy Barros, was re-lived but to a greater extent. Mrs. Ella Card consistently and adamantly rejected them as sons reiterating them as dangerous, thief's, addicts and wife-beaters who she wanted nothing ever to do with again. They stole money from her, drew up irrevocable trust agreements (EXHIBIT 33) took out loans in her name, asked her to co-sign a car note, defaulting on the note forcing Mrs. Ella Card to pay the remaining balance of nearly $30,000 from her own accounts. LaDonna Card had to extract her from Kermit's home when Mrs. Ella Card was "in the care" of Kermit Card in 2010 for fear of Kermit's continual abuse of his mother. She was there 6 months held in Kermit's home, against her will.

- Mrs. Ella Card came home with vaginal bleeding stating that "she asked the Lord to help her forget what Kermit did." There was clear evidence of sexual assault on Mrs. Ella Card that occurred whjle staying with Kermit. Julie Fernandez wants the court to believe that Mrs. Ella Card's response to these atrocities is a hysterical response. The fact that Mrs. Ella Card was fully aware of the fact her 50 years of life's earning were taken from her with a stroke of a pen held by a Judge who told her "..*Guardianships are good.*" constantly wore at her psyche, her self-esteem, her drive to live and her once love of America. Medical doctors' reports from 2011 to 2018 have consistently determined that Mrs. Ella Card was of sound mind and body, who "…demonstrated fully intact mental capacity for the purpose of directing the maintenance and ultimate disposition of her estate in her own best interests." These facts the courts fully ignored. Rather, the judges and officers of the court decided over the past 11 years to practice medicine without a license determining mental and physical capacity cloaked in the pretense of judicial immunity. In 1972 Mrs. Ella Card immigrated legally to the United States to realize the "American Dream". During the 11 years embroiled in a fight to be free from the hades of guardianship, to live in retirement as she had planned, and fully aware that her livelihood and plans for those golden years were brutally, brazenly, savagely taken, finally took its toll. On 16 February 2022 Mrs. Ella Card passed in her beloved Belize, realizing only that the dream had turned to a nightmare.

- ALLEGATION 25: "Cindy Cards reaction is in fact so hysterical to her bothers, that upon Ella being served by regular mail for the first time at the Hanover PA address in relation to Court activities in New York, Cindy Card and Kenneth Swenson filed for a protection from abuse order in Pennsylvania, alleging that the very act of sending mail to Ella constituted an abuse of Ella's person. The petition also defamed Kermit and Raymond Card, accusing them of being criminals drug abuse etc. without basis. The Petition was denied  with prejudice at Docket No. 2020-FC-02523-12."

- FACT 25: Given the truth behind Raymond and Kermit Card's financial, emotional and likely sexual abuse of Mrs. Ella Card, Cindy Card's mother, one's reasonable and naturally human response would be to protect a loved one through any conceivable legal means possible. In a recent example of deception attempted by the illegal disowned co-guardians was providing a debt collector an incorrect home address to avoid payment OF OVER $4,200. (EXHIBIT 37) It is this response to the atrocities and abuse committed against an elderly mother that Erik Spurlin and Julie Fernandez believe to be "hysterical". The reaction was one solely of Mrs. Ella Cards response with Cindy Card, LaDonna Card being in full agreement. One of the human race could only conclude that the perspective Erik Spurlin and Julie Fernandez have of Cindy Card' response is that their perspective is chosen ignorance at best; knowing the deviant nature of the illegal, disowned co-guardians, it is more honestly, sub-human. Cindy's, as well as Mrs Ella Cards names are included in a referenced text supporting actual abuse, not referencing mail that was delivered to Mrs. Ella Cards PA address. The exaggerated hyperbole Erik Sprulin uses in this shameful allegation that is not even supported by court recorded documentation.

- ALLEGATION 26: "Petitioners believe that Ella may be a victim of ·Stockholm Syndrome, a condition of reliance and dependence upon persons who sequester her and provide only misinformation to deter her from seeing or knowing any other members of her family and to maintain control of her income and assets."

- FACT 26:There were numerus attempts by Julie Fernandez to "get Ella Card" (Julie Fernandez's own words) sending local police and detectives to Ken Swenson's home to investigate only to find that Ella

Card was is good health and sound mind and not under any duress. Even after the Detectives reported these findings to Julie Fernandez, she continued to harass Ella Card and family with further legal motions in both New York and Pennsylvania. This continued harassment compelled Ella Card to leave once again to Belize in February of 2022 where she passed due to a heart attack on 16 February 2022. If these Petitioners were to be so bold as the officers of the court, namely Julie Fernandez and Erik Spurlin, to practice medicine without a license as they do, our assessment is that Julie Fernandez's, Erik Spurling's and Judge Vedder's allowance of the constant harassment of Mrs. Ella Card for a period of these last 4 years directly resulted in Mrs. Ella Card's death on February 16, 2022.

• MEMORANDUM OF FACT 26: Facts in 26 are particularly compelling in that Erik Spurling's Motion of February 11, 2022 and Judge Vedder's Order of 22 February 2022 states: "Ella Card is specifically directed to attend said hearing. Police and ambulance personnel are hereby authorized to transport Ella Card to this and any future hearing in this matter, if they deem it necessary to ensure Ella's safety or the safety of others. The court is compelling an elderly widowed woman to see the sons she disowned over 11 years ago, who she ran from and never wanted to see or hear from again. (EXHIBIT 11). These officers of the court, either by ignorance, or sheer vile contempt and disregard of an 83-year-old woman's wishes, feelings, stated intent and age are compelling her to face people whom she has deemed evil, destructive and threatening. The officers of the court require county resources to enforce an order that forces Mrs. Ella Card to have individuals she fears, considers harmful and personally abhorrent, to be in her presence, not only a public setting but in a private setting at least 4 times a year. This is not only elder abuse, but a terrorist act perpetuated by officers of the court. This is inhuman behavior.

• ALLEGATION 28: "Petitioners also encourage the Court to assign a guardian monitor to this matter, such that an independent attorney may evaluate the case, provide the Court with additional information, and alert protective services if appropriate. In addition or in the alternative, Petitioners respectfully request the appointment of a guardian ad litem for Ella to determine what is in her best interest and to assist in directing any litigation occurring within Pennsylvania."
• FACT 28: Adult protective services of York county were contacted by Kenneth Swenson in 2019 to inform them of the offenses caused on Mrs Ella Card by the guardianship. They came to Kenneth Swenson's home, evaluated Ella Card and determined she was safe, not under duress, competent and appropriate. They also attempted to find an attorney who could assist Mrs. Ella Card, but because the state of Pennsylvania lacked jurisdiction and New York obtained her property, there was nothing they could have done. This allegation only exists in order to continue the false, misleading and fabricated narrative of Julie Fernandez, Erik Spurlin, Raymond and Kermit Card all entertained by Judge Vedder in order to further defamatory insults at the Petitioners, inflaming the reader, and furthering an unsubstantiated narrative so full of erroneous statements it takes 400 pages of a complaint containing incontrovertible facts to field them all. Julie Fernandez and Erik Spurlin should be dis-barred, Raymond and Kermit behind bars for elder abuse, and Judge Vedder reprimanded by the Judicial Complaint Board required to be removed from the bench for a minimum of a year and pay $200,000 in reparations to the Plaintiffs for judicial incompetency, emotional damage and suffering.

• ALLEGATION 29: "Petitioners request that this Honorable Court schedule a hearing and demand the physical production of Ella, such that she can be questioned by the attorneys, the guardians, and/or the Court as a means of (i) determining her preferences as to the management of her estate, (ii) ensuring she is safe and not being held against her will, (iii) providing a mechanism for the guardians to meet with Ella four times per year in accordance with the existing guardianship 0rder, and (iv) to determine whether Ella wishes to and/or should be returned to the State of New York.."
• FACT 29: The "demand" requested in this allegation smacks of rounding up Jews in Nazi German in 1941. "Demanding the production" of a human being goes back to securing run-away slaves in pre-revolutionary war America; securing a criminal on FBI's 10-most wanted list. In 2011 Mrs. Ella Card ran from the Brooklyn Supreme Court to save her own life knowing full well if she were "ensured safety" under the guardian's watch, she would be dead in 3 years. When she heard the York County court was

willing to deploy state or municipal personnel to secure her presence in a room containing the illegal dis-owned co-guardians who committed hideous crimes against her person, property and well-being, she ran again to the safety of her beloved Belize where she passed of heart attack due to the 11 years of constant, un-relenting oppression wielded on her person by Julie Fernandez, Erik Spurlin, Raymond and Kermit Card and Judge Vedder's orders. It was clear to Mrs Ella Card that no justice would be served up to her if she remained in the United States.

NOTE: We the Petitions and family of our beloved Ella Card, hold Judge Vedder, Julie Fernandez, Erik Spurlin, Raymond and Kermit Card and others who had a part in this fraudulent guardianship personal responsible for the death or our beloved mother, Ella Rubina Card.

81.    These allegations are known to be without any merit by Julie Fernandez who went so far as to pose as Ella Card's attorney to restrain Plaintiff's from e-filing in the Brooklyn Supreme Court. (EXHIBIT 19)

82.    **MALICIOJUS PROSECUTION:** The February 11, 2022 is a vexatious legal action brought solely to harass and or subdue the Plaintiffs. The parties, Erik Spurling, Julie Fernandez, Raymond Card and Kermit Card know them to be without merit yet continue; beginning in the Supreme Court of New York, now burdening the state of Pennsylvania in an unwarranted filing, promoted and entertained by officers of the court, as fact.

83.    Knowing the Defendants litigious nature, the Plaintiffs have no doubt that will continue unless this court intervenes providing the Plaintiffs relief.

84.    Julie Fernandez, Raymond and Kermit Card are now required to inform the Executor, Cindy Card, and courts of Mrs Ella Cards passing and commence with transferring the estate and its records over to the rightful heir and Executor, Cindy Card.

85.    If this honorable court does not place an injunction and Temporary Restraining Order on Julie Fernadez,, Erik Spurlin, Raymond and Kermit Card there will be irreparable harm caused on the Plaintiffs with the insessant litigation, squandering of the estate and emotional pain and suffering Defendants have historically caused on the Plaintiffs and the now deceased Mrs. Ella Card.

86.    Relative to the March 1, 2022 hearing and order Under 28 U.S.C.A. § 1446 (West 2015)

(boldface omitted) (emphasis added). "Hence, after removal, the jurisdiction of the state court absolutely ceases and the state court has a duty not to proceed\ any further in the case. Any subsequent proceedings in state court on the case are *void ab initio*." *Maseda v. Honda Motor Co., Ltd., 861 F.2d 1248, 1254-55 (11th Cir. 1988)* (internal citation omitted); see *DB50 2007-1 Tr. v. Dixon, 723 S.E.2d 495, 496 (Ga. Ct. App. 2012)* (" '[A]ny proceedings in a state court after removal of a case to federal court are null and void and must be vacated.' " (citation omitted)).

87.     It is further noted that the removal is automatic upon filing and no lower court action is either proper or of legal effect.

88.     28 USC§ 1446, states "Promptly after the filing of such notice of removal of a civil action the defendant or defendants shall give written notice thereof to all adverse parties and shall file a copy of the notice with the clerk of the court of such State Court, which shall effect the removal and the State Court shall proceed no further unless and until the case is remanded." *Vigil v. Mora Independent Schools,* 841 F. Supp. 2d 1238, 1240-41 (D.N.M. 2012)

89.     Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure.

ADDITIONALLY

We, the Plaintiffs, Kenneth Swenson, Cindy Card, and Ladonna Card, are requesting the United States District Court, For the Middle District of Pennsylvania, to:

Overturn the March 21, 2022 Order from the York County Orphans Court, with Prejudice and render it void on the following basis:

## II.    ARGUMENT
## DEPRIVATION OF CIVIL RIGHTS 18 USC § 242

90.    Under 18 U.S. Code § 242 - Deprivation of Rights, Kenneth Swenson has been deprived of his rights under color of law. Under section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States.

91.    Judge Clyde Vedder of the lower court summarily deprived Kenneth Swenson of his right to counsel whom he had hired, who was in the court room during the entire proceeding but ordered not to defend Kenneth Swenson or even speak during the proceeding.

92.    The Lower court forced Kenneth Swenson to testify in open court without counsel without first informing him of his rights.

93.    The lower court embroiled Cindy Card within the March 21, 2022 order knowing full well she is a resident of the state of New York. Cindy Card was served through Kenneth Swenson at his Adams County residence, not York County where the Orphans court resides. Cindy is not a resident of any county in Pennsylvania, nor was she present in the courtroom.

94.    The lower court had no jurisdiction over Cindy Card or LaDonna Card as they are both life-time resident of the State of New York, never residing in the state of Pennsylvania.

95.    For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include police officers, prisons guards and other law enforcement officials, as well as judges, care providers in public health facilities, and others who are acting as public officials.

96.     Judge Vedder deprived the Plaintiffs' rights under 18 USC § 242.

97.    Judge Vedder acted in a manner inconsistent with due process:  Fed. Rules Civ. Proc., Rule

60(b)(4), 28 U.S.C.A., U.S.C.A. Const. Amend. 5 - *Klugh v. U.S.*, 620 F.Supp. 892 (D.S.C. 1985).

98.     Judge Vedder's March 21, 2022 order is therefore void: A void judgment is one which, from its inception, is and forever continues to be absolutely null, without legal efficacy, ineffectual to bind the parties or to support a right, of no legal force and effect whatever, and incapable of enforcement in any manner or to any degree - *Loyd v. Director, Dept. of Public Safety*, 480 So. 2d 577 (Ala. Civ. App. 1985). In re *Estate of Wells*, 983 P.2d 279, (Kan. App. 1999).

99.     Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure.


### III.      ARGUMENT
### CIVIL ACTION FOR DEPRIVATION OF RIGHTS 42 U.S. CODE§ 1983

100.    Under 42 U.S. Code § 1983.Civil action for deprivation of rights. Kenneth Swenson and Cindy Card have been deprived of their Civil Rights. Accordingly every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

101.    The lower court summarily deprived Kenneth Swenson of his right to counsel whom he had hired, who was in the court room during the entire proceeding but ordered not to defend Kenneth Swenson or even speak during the proceeding.

102.    The Lower court forced Kenneth Swenson to testify in open court without counsel without first

informing him of his rights.

103.    The lower court embroiled Cindy Card within the March 21, 2022 order knowing full well she is a resident of the state of New York. Kenneth Swenson was given notice at his Adams County residence, for Cindy Card to appear in court. She was neither properly served, nor is she a resident of any county in Pennsylvania. She was neither present in the courtroom.

104.    The lower court had no jurisdiction over Cindy Card or LaDonna Card as they are both life-time resident of the State of New York, never residing in the state of Pennsylvania.

105.    Judge Vedder violated deprived the Plaintiffs of their constitutional rights pursuant to  42 U.S. CODE§ 1983.

106.    Judge Vedder's March 21, 2022 order is void as it was derived from the courts acting in a manner inconsistent with due process. Void judgment is one rendered by court which lacked personal or subject matter jurisdiction or acted in manner inconsistent with due process, U.S.C.A. Const. Amends. 5, 14 *Matter of Marriage of Hampshire*, 869 P.2d 58 ( Kan. 1997).

107.    Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure.


## IV.    ARGUMENT
## CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS 42 USC § 1985

108.    Kenneth Swenson was intentionally denied his civil rights by the Defendants.  Kenneth Swenson was personally hand delivered a notice at his Adams County residence requiring his appearance in the York County Orphans Court on March 21, 2022. After conforming to the summons and appearing in court as requested, with his attorney Joanna Toft, the Defendants and Ms. Toft removed themselves from the courtroom in an on-camera session. The demeanor of the judge and courtroom changed dramatically once they returned.  Plaintiff was told he now, after being summoned to the court, after having filed a motion to dismiss, naming  himself and Cindy Card as

parties to the action, and that the Orphans court ruled on that motion by dismissing it, was told he had "no standing". He was also told the even though he had no standing he would be required to testify.

109.   Under 42 U.S. Code § 1985.Conspiracy to interfere with civil rights. Where if two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws.

110.   Judge Vedder entertained all the Defendants in an out-of-court room setting returning only to summarily extract Plaintiff's rights to an attorney, right to not self-incriminate, tossing machine-gun style, demonstrative accusations, in an intimidating demeanor from a position of judicial authority; abusing his position as a sitting judge to promote a narrative contrived in Erik Spurling's petition, scribed by Julie Fernandez, adopted by Brandy Hoke and further promoted in a hidden back room of the court by the Defendants in order to further demonize the Plaintiff.

111.   It is alleged that Judge Vedder allowed this knowing full well that if he could extract Plaintiffs attorney from the judicial equation, position himself and the Defendants where Plaintiff's attorney could not speak, not cross examine, not admit evidence, not in any way defend the Plaintiff with incontrovertible evidence that would contradict the contrived accusations scribed by Attorney Spurlin from Julie Fernandez's New York office, that he and the Defendants would have free reign to promote a narrative elevating and justifying their criminal intent to further plunder Ella Card's estate, RE: Erik D Spurlin's February 11, 2022 Petition.

112.   The Erik D Spurlin's February 11, 2022 Petition is sheer allegations. Judge Vedder is required by the Pennsylvania Code of Judicial Conduct to be

"...unsawed by partisan interests, public clamor, or fear of criticism. To be

> *"...dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom they deal in their official capacity." He is also required to "The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court."*

113.   Plaintiff was further subjected to a conspiratorial environment during the hearing conducted on March 21, 2022.

114.   The court, nor any one present in the courtroom introduced themselves as an expert qualified to ascertain or "…establish the nature and extent of the alleged incapacities and disabilities…" of Mrs. Ella Card's "…mental, emotional and physical condition, adaptive behavior and social skills capacity" had she been present.

115.   In the February 11, 2022 Petition paragraph number 28 a request for appointment of a guardian ad litem is requested.

116.   When a guardian is to be appointed in Pennsylvania medical proof is required. (*20 Pa.C.S. § 5512.1(a).)*

117.   The court made no attempt to acquire medial or psychiatric experts as required by Pennsylvania law to determine capacity at the Hearing. There was no medical Dr or expert present; no reference to a psychiatrist or even insinuation there was to be an evaluation performed on Ella Card.

118.   The court never asked for evidence from the Plaintiff that shows that Ella Card had been evaluated by Doctors or Psychiatric specialist who determined her capacity.

119.   Although Julie Fernandez, Raymond Card and Kermit Card are fully aware that these evaluations exist, would be invaluable to the instance before the court, they intentionally omitted that information. *20 Pa.C.S. § 5512.1(a)* states very clearly that when a guardian is to be appointed in Pennsylvania medical proof is required.

120.   Had the Orphans court exercised any degree of independent thought outside the convenience of collegial hearsay, they would have discovered that Ella Card had 7 psychiatric evaluations, two of which were performed by renowned geriatric psychiatrist over the past 12 years. These medical evaluation

clearly articulated her mental acuity and judgmental competency.

121.    The effort required to exercise this discovery did not sit well with the Defendants as it would force

the court to demonstrate a semblance of judicial prudence they clearly had no interest in exercising either

prior to nor during the March 21, 2022 hearing.

122.    The March 21, 2022 hearing was allegedly set up as a single-minded march to further pilfer Ella

Card's estate.

123.    Judge Vedder, Erik Spurlin, Julie Fernandez, Raymond Card, Kermit Card and Brandy Hoke

colluded to interfere with Plaintiffs civil rights.

124.    Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule

38 of the Federal Rules of Civil Procedure


# V.    ARGUMENT
## MANDATORY REMEDY FOR LACK OF JURISDICTION

125.    According to *Lujan v. Defenders of Wildlife*, 112 S. Ct. 2130, 2136 (1992) (Lujan), there

are three requirements for Article III standing:

> *1. Injury in fact, which means an invasion of a legally protected interest that is (a)
> concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.*
> *2. A causal relationship between the injury and the challenged conduct, which
> means that the injury can be traced to the challenged action of the defendant and has not
> resulted from the independent action of some third party not before the court.*
> *3. A likelihood that the injury will be redressed by a favorable decision, which
> means the prospect of obtaining relief from the injury as a result of a favorable ruling is
> not too speculative."*


126.    Plaintiff was hand-delivered a summons at his Adams County home address requiring

his presence at the March 21, 2022 hearing.

127.    Plaintiff was named in Erik Spurlin's February 11, 2022 Petition which was submitted

to the lower court where the hearing was to be conducted.

128.   Judge Vedder's Scheduling Order, signed on 22 February 2022 had Erik Spurlin's

Petition attached.

129.   Judge Vedder's line of questioning, demeanor, theatrical facial contortions and *ex parte* out of court-room discussions with the officers of the court conveyed not only his failure to execute any degree of adherence to Canon 1 of the Pennsylvania Code of Judicial Conduct, to wit:

> "...uphold and promote the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety"

but also squared with his prejudicial and unconstitutional treatment of the Plaintiff Kenneth

Swenson. Judge Vedder clearly demonstrated that his respect for the Supremacy of the United

States Constitution took a back seat to what he determined to be the law as he would execute in the

York County Orphans Court on March 21, 2022.

130.   Had the lower court taken any time to entertain evidence, outside of what they could extract during

a verbal pummeling session of the Plaintiff, orchestrated and encouraged by Judge Vedder, and that of a

salaciously palatable extricate of the Plaintiff's alleged atrocities in his February 11, 2022 Petition, the

entire hearing would have, without further speculation, taken an impartial turn, focusing more on the

atrocities committed by the Defendants, rather that the Petition's allegations purported as truth.

131.   The fact that the Plaintiff is now required to spend endless hours defending his name and personal

integrity preparing this petition to set before this court because the injury and his challenged conduct has

not resulted "...from the independent action of some third party not before the court...", but in fact a

direct result of the action by the lower court.

132.   As additional insult to the judiciary, Judge Vedder and the Defendants are directly responsible for

consuming the District Courts time by not adhering to the rule of law they all, as agents of the court,

have been sworn to uphold, that being the Constitutional rights of the Plaintiffs.

133.   Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule

38 of the Federal Rules of Civil Procedure.

## VI.    ARGUMENT
## FEDERAL RULES OF CIVIL PROCEDURE RULE 60(b)(3)
## FRAUD ON THE COURT

134.    Fraud on the court involves willful conduct that is deceitful and obstructionist, which injects misrepresentations and false information into the judicial process "so serious that it undermines ... the integrity of the proceeding" (*Baba–Ali v. State of New York*, 19 N.Y.3d 627, 634, 951 N.Y.S.2d 94, 975 N.E.2d 475 [2012]. It strikes a discordant chord and threatens the integrity of the legal system as a whole, constituting "a wrong against the institutions set up to protect and safeguard the public" (*Hazel–Atlas Glass Co. v. Hartford–Empire Co*., 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 [1944]; see also *Koschak v. Gates Constr. Corp*., 225 A.D.2d 315, 316, 639 N.Y.S.2d 10 [1st Dept.1996] ["The paramount concern of this Court is the preservation of the integrity of the judicial process"] ). The federal courts have applied the clear and convincing standard in determining whether the offending party's actions constitute fraud on the court (see e.g. *319 *Aoude v. Mobil Oil Corp*., 892 F.2d 1115, 1118 [1st Cir.1989] ). Characteristic of federal cases finding such fraud is a systematic and pervasive scheme, designed to undermine the judicial process and thwart the non-offending party's efforts to assert a claim or defense by the offending party's repeated perjury or falsification of evidence (id. at 1118). Fraud on the court warrants heavy sanctions, including the striking of an offending party's pleadings and dismissal of the action.

135.    The March 21, 2022 hearing intent was to obtain a ruling of against Mrs. Ella Card by deeming her "incapacitated" without the advent of advancing an expert witness.

136.    Kenneth Swenson and Cindy Card ended up being collateral damage in the March 21, 2022 hearing. Their livelihood, their family's future as well as those that may follow with the lower courts' mis-steps and trampling of a citizen's rights constitutional and God given rights are in jeopardy if the lower court's ruling stands. Once civil and constitutional rights have been violated, the court and its

agents have cleared the road to target them with continued false allegations, undermining their resources with judicial proceedings, destroying their reputation with scurrilous petitions advanced by willing puppets of the court and generally depriving them of the right to the liberties and pursuit of happiness the constitution affords.

137.    It is the position of the Plaintiff's, that the March 21, 2022 hearing was a rouse, a setup by Julie Fernandez, Erik Spurlin,  Ms. Hoke, orchestrated by Judge Vedder, to save face of the NY Court; continue to pilfer Ella Card's estate and via one-sided and exclusive collegial hearsay; eviscerate constitutionally guaranteed rights of an American citizen without cause for convenience, and execute an order against the Plaintiffs without judicial prudence and lack of subject matter jurisdiction.. This whole case  to date is a Product of Fraud on the  Court and the ruling by Judge Vedder should be deemed *void ab initio*.

138.    It is well understood, that Judges and prosecutors have absolute immunity unless they totally lack subject-matter or personal jurisdiction in the case. A judge acting without subject-matter jurisdiction is acting without judicial authority. *Cohens v. Virginia*,  19 U.S. (6 Wheat) 264, 404, 5 L.Ed 257 (1821) The U.S. Supreme Court, in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 1687 (1974) stated that:

> "when a state officer acts under a state law in a manner violative of the Federal Constitution", he "comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." [Emphasis supplied in original].

139.    State officials may be sued as individuals in § 1983 actions. *Brokaw v. Mercer County*, 235 F.3d 1000 (7th Cir. 2000).

140.    Plaintiffs allege that the attorneys and judges sued in this case (officers of the court) totally lacked subject matter jurisdiction and therefore pursued this action and presided over this action without any legal authority as individuals and trespassers of the Constitution of the United States. The sham prosecutors and judge had no constitutional or statutory authority or jurisdiction to either conduct the

March 21, 2022 hearing or issue an order resulting from that hearing. The court had no subject matter jurisdiction because the judge's authority to issue the March 21, 2022 order was legally insufficient and void as a violation of the Supremacy clause.

141.   The attorney, Erik Spurlin had no authority to bring this motion into the Orphans court as it was presented on allegations inconsistent with truth.

142.   A Judge may not claim jurisdiction by fiat. All orders or judgments issued by a judge in a court of limited jurisdiction must contain the findings of the court showing that the court has subject-matter jurisdiction, not allegations that the court has jurisdiction.

143.   Erik D Spurlin, Brandy Hoke and Judge Vedder failed to  inspect the records of the case, which is the controlling factor. Erik D Spurlin's motion of February 11, 2022 contained a minimum of 11 allegations, scurrilous in nature, defamatory by fiat, debasing with tormenting and threating actions directed at the Plaintiff's but most pointily, an elderly, 83-year-old widow, who, for the second time in a period of 12 years, felt the need to retreat to her home country of Belize to escape the oppressive emotional, enslaving torment perpetuated by officers of now, the York County Orphans court.

144.   Judge Vedder failed, not only to act in accordance with the conduct becoming judge , but trampled on the Petitioners' 1, 5, 6, and 14 amendment rights.

145.   Judge Vedder failed at providing impartiality within the hearing in accordance with the Pennsylvania Judicial Code of Ethics, by refusing to allow the Plaintiff's attorney to present incontrovertible evidence contrary to the allegations presented in the February 11, 2022 Petition.

146.   Judge Vedder failed to uphold the adjudicative responsibilities according to the code of Ethics (Canon 3(A)(4)) required by the state for him to uphold by excusing Plaintiffs and their attorney with a fabricated legal excuse of having no standing:

> *"Judges should accord to all persons who are legally interested in a proceeding, or their lawyers, full right to be heard according to law, and, except as authorized by law, must not consider ex parte communications concerning a pending proceeding."*

147.   If the record of the case does not support subject-matter jurisdiction, then the judge has acted

without subject-matter jurisdiction.  "If it could not legally hear the matter upon the jurisdictional paper presented, its finding that it had the power can add nothing to its authority, – it had no authority to make that finding." *The People v. Brewer*, 328 Ill. 472, 483 (1928) Without the specific finding of jurisdiction by the court in an order or judgment, the order or judgment does not comply with the law and is void. The finding cannot be merely an unsupported allegation.

148.    The law is well-settled that a void order or judgment is void even before reversal. "Courts are constituted by authority and they cannot go beyond that power delegated to them. If they act beyond that authority, and certainly in contravention of it, their judgments and orders are regarded as nullities. They are not voidable, but simply void, and this even prior to reversal." *Vallely v. Northern Fire & Marine Ins. Co*., 254 U.S. 348, 41 S.Ct. 116 (1920).

149.    Judge Vedder, Erik Spurlin, Julie Fernandez, Raymond Card, Kermit Card and Brandy Hoke perpetuated fraud on the court by injecting, knowingly allowing, promoting, acting upon deceitful misrepresentations, unsupported allegations, and false information into the judicial process.

150.    Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure.


ADDRESSING ROOKER-FELDMAN

151.    Rooker-Feldman is void and illegal on its face. It constitutes a conspiracy against rights to even devise that Rooker-Feldman could have any semblance of application herein as there was never and will never be jurisdiction in the lower court.

152.    Rooker-Feldman wars against the Constitution. The order of the lower court is *void ab initio* and The Rooker-Feldman Doctrine does not apply due to fraud and its conflict with the supreme law of the United States.

153.    The Eleventh Circuit in *Woods v. Orange County,* 715 F.2d 1543, 1548 (11 Cir. 1983) cert denied

467 US 1210 and as later adopted by the *Eleventh Circuit, U.S. v. Napper*, 887 F.2d 1528, 1534 (11 Cir. 1989) it was held that the federal court has jurisdiction to grant relief to a litigant who in the state court was barred from arguing due process issues.

154.    Plaintiffs hold that Rooker-Feldman is not applicable in this instance.


## VII.    ARGUMENT
## INEFFECTIVE ASSISTANCE OF COUNSEL

155.    Kenneth Swenson hired a local attorney, Joanna Toft-Funk, to represent the Petitioners' and family's interests.

156.    The attorney was summarily dismissed prior to the hearing and sequestered by the court as if she were someone off the street who was in the courtroom to be entertained.

157.    She was not allowed to speak in the courtroom.

158.    She was not allowed to represent the Plaintiff or his family's interest in the courtroom.

159.    She was not allowed to cross examine or question the regurgitated allegations put forward in Erik Spurlin's Petition.

160.    She was not allowed to present factual evidence that, if admitted, would have turned the court's pointed questioning from the Plaintiff toward the Defendants and their malicious, contrived intent to continue pilfering of Mrs. Ella Card's estate.

161.    Joanna Toft-Funk is known to Judge Vedder and to the York County Orphans Court as a competent counsel.

162.    Joanna Toft-Funk is a licensed practicing Pennsylvania attorney admitted in York County Court and also in the United States District Court, Middle District of Pennsylvania.

163.    The right to counsel is guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. It has been interpreted to mean the right to effective counsel: "It has long been recognized that the right to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397

U.S. 759, 771, n.14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

164.    Judge Clyde Vedder of The Court of Common Pleas of York County Pennsylvania  did not follow the law.  He in fact relied on collegial hearsay rather that evidentiary fact to arrive at a predetermined, prejudicial and subjective opinion of Kenneth Swenson's activities as they relate to his relationship with and treatment of Mrs. Ella Card.

165.    This judge did not follow the law. He rather embraced the allegations trumped up by New York counsel Julie Fernandez, put forth by Erik Spurling and tagged onto by Brandy Hoke that were at best diminutive and scurrilous lies she had perfected in relaying to colleagues and willing sitting Judges in order to obtain her 30 shekels of silver from Mrs. Ella Card's estate.

166.    The March 21, 2022 Order issued by the York County Court should be rendered void, of no legal force or effect based on a loss of his subject-matter jurisdiction and illegal activity in the courtroom that day. U.S. Supreme Court, *Scheuer v. Rhodes,* 416 U.S. 232, 94 S. Ct. 1683, 1687 (1974)

167.    Noted by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984), "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

168.    The Plaintiff's attorney's performance was deficient because of the abject nature of a natural relationship between judge and counsel in lower court settings. Counsel will naturally adhere to the judge's edict, be it right or wrong.  This deficiency prejudiced the court.

169.    Judge Vedder trespassed the superior law of the United States by refusing to allow Plaintiff's Counsel speak to defend Plaintiff, present evidence, inform Plaintiff of his 5th amendment right against self-incrimination.  Had the Plaintiff's attorney be able to represent the Plaintiff in the professional way she has historically performed, and the judge not been a trespasser of the law , the

results of the proceeding would have been different." Id. at 694, 104 S. Ct. 2052.

170.    Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure.

## VIII.   ARGUMENT
## VIOLATION OF SIXTH AMMENDMENT

171.    Plaintiffs were denied Due Process in violation of the 6th Amendment of the United States.

172.    Plaintiffs were denied effective Assistance of Counsel from the inception of the March 21, 2022 hearing. Judge Vedder made it very clear that Plaintiff's counsel was to neither speak, present evidence, oppose any questions posed by the court or other officers of the court, defend Plaintiff in any way.

173.    The lower court intentionally denied Kenneth Swenson his own attorney even though he had signed a retainer, deposited the check and personally delivered the check and retainer to her prior to the hearing.

174.    Although right to counsel are explicitly held to apply to Criminal cases, the Supreme Court of Pennsylvania In re Adoption of R.I. states , in part;

> *"The court stated that it would be "grossly unfair to force appellant to defend against the appellees' case without the assistance of someone, trained in the law, who could test the appellees' case by the rules of evidence and the techniques of cross-examination."*

175.    It has long been established that an individual is entitled to counsel at and proceeding which may lead to the deprivation of "substantial rights." As the Federal District Court wrote in [*Cleaver v. Wilcox*, decided March 22. 1972 **(40 U.S.L.W.2658)**]. 'whether the proceeding be labelled 'civil' or 'criminal'…".

176.    Plaintiff holds that in light of the courts abruptly crude dismissal of Plaintiffs' right to counsel; the proclamation that Plaintiff had "no standing".

177.   The court had record of a hand-delivered service demanding Plaintiff's presence at the hearing; the court forcing Plaintiff to testify; the Judge's demeanor in the court-room, berating the Plaintiff and flagrant dismissal of his Oath of Judicial Conduct; Judge Vedder's full embrace of Erik Spurling's Petition containing a plethora of un-vetted, unsubstantiated and un-challenged allegations against the Plaintiffs created a clearly prejudicial and biased courtroom environment

178.   Because Judge Vedder established this prejudicial, bias, demeaning courtroom environment the Plaintiffs' concern is that any further proceedings emanating from, within or taken by this court in this instance toward the Plaintiffs, would result in further depriving the Plaintiffs of their substantial rights.

179.   An individual's ",,,*right to counsel in all stages of any proceeding*…" is further enforced in *35 Pa. Stat. Ann. § 2140.301(b)(4).*

180.   Judge Clyde Vedder denied Plaintiffs of their 6th Amendment Rights.

181.   Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure.


## IX.    ARGUMENT
## VIOLATION OF THE FOURTEENTH AMMENDMENT

182.   The Fourteenth Amendment "forbids the government to infringe ... 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301-302, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993). Further stating that: "Due Process Clause "protects individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them')"

183.   Judge Vedder stated no compelling state interest in stripping Kenneth Swenson of due process. In the weeks post-March 21, 2022, Kenneth Swenson and Plaintiffs have spent mornings and evenings unravelling the unfair, demeaning, un-constitution actions and burdens Judge Vedder

and the officers of the court present in that instance harnessed the Plaintiffs with. Deprivation from family, deprivation from entertainment, deprivation of sleep, of inner peace and more importantly the corrosive and undermining effect of a judicial system established to protect its citizens using its God-given authority to abuse, harass and defame those citizens for the sake of expediency, collegial approval and alleged self-gratification.

184.   The Supreme Court of the United States, in id., at 503 (plurality opinion); *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934) Chief Justice Rehnquist states:

> *"Our established method of substantive-due-process analysis has two primary features: First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, "deeply rooted in this Nation's history and tradition," ("so rooted in the traditions and conscience of our people as to be ranked as fundamental"), and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed," Palko v. Connecticut, 302 U.S. 319, 325, 326, 58 S. Ct. 149, 82 L.Ed. 288 (1937). Second, we have required in substantive-due-process cases a "careful description" of the asserted fundamental liberty interest. Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993); Collins v. Harker Heights.*

185.   As officers of the court, Judge Vedder, Erik Spurlin, Julie Fernandez, and Brandy Hoke infringed on Plaintiffs' fundamental liberties of due process and equal protection under the law.

ADDRESSING THE ELEVENTH AMENDMENT

186.   Even though Sovereign Immunity is granted by the Eleventh Amendment, there are four exceptions in which the Supreme Court and Federal judicial branch may hear a lawsuit levied against a state. The Eleventh Amendment does not protect a state's political subdivisions, such as counties, cities, or municipalities, which are all liable to be sued in a Federal judicial branch jurisdiction.

187.   In certain cases, Congress allows for a state to be sued and heard in a Federal court under the **Due Process Clause of the Fourteenth Amendment**. The last exception relates to the citizens seeking an injunction against state officials in a Federal court if they are in **violation of Federal law.**

188.   The Primary Holding In *Ex parte YOUNG*, 209 U.S. 123 (1908) states:

> *"If government officials attempt to enforce an unconstitutional law, sovereign immunity does not prevent people whom the law harms from suing those officials in their individual capacity for injunctive relief. This is because they are not acting on behalf of the state in*

*this situation."*

When a judge acts as a trespasser of the law, when a judge does not follow the law, the judge loses subject-matter jurisdiction and the judge's orders are void, of no legal force or effect. The U.S. Supreme Court, in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S. Ct.. states:

> *"The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States." [Emphasis supplied in original]. By law, a judge is a state officer. The judge then acts not as a judge, but as a private individual (in his person). The U.S. Supreme Court has stated that "No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it.".*

189.   Judge Vedder clearly "warred against Plaintiffs' constitutional rights by denying, the right to counsel.

190.   Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule 38 of the Federal Rules of Civil Procedure.


## X.      MANIFEST INJUSTICE

191.   Kenneth Swenson was dealt a blow of Manifest injustice from the York County Court. What the court allowed to happen to him on March 21, 2022 was, without any stretch of the imagination or common sense obviously unfair and shocking to the average American's conscience.

192.   The Court of Common Pleas of York County Pennsylvania committed numerous plain errors when it deprived Plaintiffs of their fundamental due process rights, thus, by default, denying the Plaintiffs of their life, liberty and property, *United States v. Quintana,* 300 F.3d 1227, 1232 (11th Cir.2002. A judgment is a void judgment if court that rendered judgment lacked jurisdiction of the subject matter, or of the parties, or acted in a manner inconsistent with due process, Fed. Rules Civ. Proc., Rule 60(b)(4), 28 U.S.C.A., U.S.C.A. Const. Amend. 5 - *Klugh v. U.S.,* 620 F.Supp. 892 (D.S.C. 1985).

193.   The United States Court of Appeals for the Third Circuit ("Third Circuit") has not definitively circumscribed the "manifest injustice" standard. See *Conway v. A.I. Dupont Hosp. for Children*, No. 04-

4862, 2009 WL 1492178, at *6 (E.D. Pa. May 26, 2009) (noting that there is "a dearth of case law within

the Third Circuit" defining manifest injustice). However, our Plaintiffs erroneously state this ground as

only "injustice" when citing to *N. River Ins. Co. v. 3 CIGNA Reinsurance Co*., 52 F.3d 1194, 1218 (3d

Cir. 1995).

> *"... several courts have applied the Black's Law Dictionary definition, which states that
> "manifest injustice" is an error in the trial court that is direct, obvious, and observable.... A
> party may only be granted reconsideration based on manifest injustice if the error is apparent to
> the point of being indisputable. In order for a court to reconsider a decision due to "manifest
> injustice," the record presented must be so patently unfair and tainted that the error is manifestly
> clear to all who view it"*

194.    As officers of the court, Judge Vedder, Erik Spurlin, Julie Fernandez, and Brandy Hoke subjected

the Plaintiff and by extension, his immediate and extended family to significant mis-treatment and

violations of fundamental rights granted to every citizen of the United States, that are direct and obvious

from any perspective.

195.    In *Conley v. Gibson*, David M. Roberts, Fact Pleading, *Notice Pleading and Standing*, 65

CORNELL L. REV. 390, 419 (1980) the Supreme Court stated that the 12(b) (6) motion must not be

granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief."

196.    The Plaintiffs have clearly shown the court facts supporting our claims pertinent to each

Defendant and ask it not be quick to employ or entertain 12(b) (6), or other routine clauses to dismiss, as

a matter of standard course.

197.    In Rennie & Laughlin, Inc. v. Chrysler Corp., 242 F.2d 208, 213 (9th Cir. 1957) (citing *DeLoach

v. Crowley's, Inc*., 128 F.2d 378, 380 (5th Cir. 1942)) we hear that: "*the primary objective of the law is

to obtain a decision on the merits of any claim; and that a case should be tried substantially on the merits

rather than technically on the pleading.*"

198.    Plaintiffs demand jury trial in accordance with Seventh Amendment to the Constitution and Rule

38 of the Federal Rules of Civil Procedure.

199.    Whoever, having knowledge of the actual commission of a felony cognizable by a court of the

United States, conceals and does not as soon as possible make known the same to some judge or other

person in civil or military authority under the United States, shall be fined under this title or imprisoned

not more than three years, or both. 18 U.S. Code § 4


## ADDRESSING VOID ORDERS FROM ANY COURT

Orders from the Brooklyn Supreme Court from March 16, 2011, July 21, 2020 and the York County
Orphans Court of March 21, 2022 and all ensuing orders from both courts are considered void based on
due process violations, personal and subject matter jurisdiction, and fraud upon the court. See below:

Void judgment is one where court lacked personal or subject matter jurisdiction or entry of order violated
due process, U.S.C.A. Const. Amend. 5 - *Triad Energy Corp. v. McNell* 110 F.R.D. 382 (S.D.N.Y. 1986).

Judgment is a void judgment if court that rendered judgment lacked jurisdiction of the subject matter, or
of the parties, or acted in a manner inconsistent with due process, Fed. Rules Civ. Proc., Rule 60(b)(4), 28
U.S.C.A., U.S.C.A. Const. Amend. 5 - *Klugh v. U.S.*, 620 F.Supp. 892 (D.S.C. 1985).

A void judgment is one which, from its inception, was, was a complete nullity and without legal
effect, *Rubin v. Johns*, 109 F.R.D. 174 (D. Virgin Islands 1985).

A void judgment is one which, from its inception, is and forever continues to be absolutely null, without
legal efficacy, ineffectual to bind the parties or to support a right, of no legal force and effect whatever,
and incapable of enforcement in any manner or to any degree - *Loyd v. Director, Dept. of Public Safety*,
480 So. 2d 577 (Ala. Civ. App. 1985).

A judgment shown by evidence to be invalid for want of jurisdiction is a void judgment or at all events
has all attributes of a void judgment, *City of Los Angeles v. Morgan*, 234 P.2d 319 (Cal.App. 2 Dist.
1951).

Void judgment which is subject to collateral attack, is simulated judgment devoid of any potency because
of jurisdictional defects, *Ward v. Terriere*, 386 P.2d 352 (Colo. 1963).

A void judgment is a simulated judgment devoid of any potency because of jurisdictional defects only, in
the court rendering it and defect of jurisdiction may relate to a party or parties, the subject matter, the
cause of action, the question to be determined, or relief to be granted, *Davidson Chevrolet, Inc. v. City
and County of Denver*, 330 P.2d 1116, certiorari denied 79 S.Ct. 609, 359 U.S. 926, 3 L.Ed. 2d 629 (Colo.
1958).

Void judgment is one entered by court without jurisdiction of parties or subject matter or that lacks
inherent power to make or enter particular order involved and such a judgment may be attacked at any
time, either directly or collaterally, *People v. Wade*, 506 N.W.2d 954 (Ill. 1987).

Void judgment may be defined as one in which rendering court lacked subject matter jurisdiction, lacked

personal jurisdiction or acted in manner inconsistent with due process of law *Eckel v. MacNeal*, 628 N.E. 2d 741 (Ill. App. Dist. 1993).

Void judgment is one entered by court without jurisdiction of parties or subject matter or that lacks inherent power to make or enter particular order involved; such judgment may be attacked at any time, either directly or collaterally *People v. Sales*, 551 N.E.2d 1359 (Ill.App. 2 Dist. 1990).

Res judicata consequences will not be applied to a void judgment which is one which, from its inception, is a complete nullity and without legal effect, *Allcock v. Allcock*, 437 N.E. 2d 392 (Ill. App. 3 Dist. 1982).

Void judgment is one which, from its inception is complete nullity and without legal effect In re Marriage of Parks, 630 N.E. 2d 509 (Ill.App. 5 Dist. 1994). Void judgment is one entered by court that lacks the inherent power to make or enter the particular order involved, and it may be attacked at any time, either directly or collaterally; such a judgment would be a nullity. *People v. Rolland*, 581 N.E.2d 907, (Ill.App. 4 Dist. 1991).

Void judgment under federal law is one in which rendering court lacked subject matter jurisdiction over dispute or jurisdiction over parties, or acted in manner inconsistent with due process of law or otherwise acted unconstitutionally in entering judgment, U.S.C.A. Const. Amed. 5, *Hays v. Louisiana Dock Co.*, 452 n.e.2D 1383 (Ill. App. 5 Dist. 1983).

A void judgment has no effect whatsoever and is incapable of confirmation or ratification, Lucas v. Estate of Stavos, 609 N. E. 2d 1114, rehearing denied, and transfer denied (Ind. App. 1 dist. 1993). Void judgment is one that from its inception is a complete nullity and without legal effect *Stidham V. Whelchel*, 698 N.E.2d 1152 (Ind. 1998).

Relief from void judgment is available when trial court lacked either personal or subject matter jurisdiction, Dusenberry v. Dusenberry, 625 N.E. 2d 458 (Ind.App. 1 Dist. 1993).

Void judgment is one rendered by court which lacked personal or subject matter jurisdiction or acted in manner inconsistent with due process, U.S.C.A. Const. Amends. 5, 14 *Matter of Marriage of Hampshire*, 869 P.2d 58 ( Kan. 1997).

Judgment is void if court that rendered it lacked personal or subject matter jurisdiction; void judgment is nullity and may be vacated at any time, *Matter of Marriage of Welliver*, 869 P.2d 653 (Kan. 1994).

A void judgment is one rendered by a court which lacked personal or subject matter jurisdiction or acted in a manner inconsistent with due process. In *re Estate of Wells*, 983 P.2d 279, (Kan. App. 1999).

Void judgment is one rendered in absence of jurisdiction over subject matter or parties, 310 N.W.2d 502, (Minn. 1981).

A void judgment is one rendered in absence of jurisdiction over subject matter or parties, *Lange v. Johnson*, 204 N.W.2d 205 (Minn. 1973).

A void judgment is one which has merely semblance, without some essential element, as when court purporting to render is has no jurisdiction, *Mills v. Richardson*, 81 S.E. 2d 409, (N.C. 1954).

A void judgment is one which has a mere semblance, but is lacking in some of the essential elements

which would authorize the court to proceed to judgment, *Henderson v. Henderson*, 59 S.E. 2d 227, (N.C. 1950).

Void judgment is one entered by court without jurisdiction to enter such judgment, *State v. Blankenship*, 675 N.E. 2d 1303, (Ohio App. 9 Dist. 1996).

Void judgment, such as may be vacated at any time is one whose invalidity appears on face of judgment roll, *Graff v. Kelly*, 814 P.2d 489 (Okl. 1991).

A void judgment is one that is void on face of judgment roll, *Capital Federal Savings Bank v. Bewley*, 795 P.2d 1051 (Okl. 1990).

Where condition of bail bond was that defendant would appear at present term of court, judgment forfeiting bond for defendant's bail to appear at subsequent term was a void judgment within rule that laches does not run against a void judgment, *Com. V. Miller*, 150 A.2d 585 (Pa. Super. 1959).

A void judgment is one in which the judgment is facially invalid because the court lacked jurisdiction or authority to render the judgment, *State v. Richie*, 20 S.W.3d 624 (Tenn. 2000).

Void judgment is one which shows upon face of record want of jurisdiction in court assuming to render judgment, and want of jurisdiction may be either of person, subject matter generally, particular question to be decided or relief assumed to be given, *State ex rel. Dawson v. Bomar*, 354 S.W. 2d 763, certiorari denied, (Tenn. 1962).

A void judgment is one which shows upon face of record a want of jurisdiction in court assuming to render the judgment, *Underwood v. Brown*, 244 S.W. 2d 168 (Tenn. 1951).

A void judgment is one which shows on face of record the want of jurisdiction in court assuming to render judgment, which want of jurisdiction may be either of the person, or of the subject matter generally, or of the particular question attempted to decided or relief assumed to be given, *Richardson v. Mitchell*, 237 S.W. 2d 577, (Tenn.Ct. App. 1950).

Void judgment is one which has no legal force or effect whatever, it is an absolute nullity, its invalidity may be asserted by any person whose rights are affected at any time and at any place and it need not be attacked directly but may be attacked collaterally whenever and wherever it is interposed, *City of Lufkin v. McVicker*, 510 S.W. 2d 141 (Tex. Civ. App. - Beaumont 1973).

A void judgment, insofar as it purports to be pronouncement of court, is an absolute nullity, *Thompson v. Thompson*, 238 S.W.2d 218 (Tex.Civ.App. - Waco 1951).

A void judgment is one that has been procured by extrinsic or collateral fraud, or entered by court that did to have jurisdiction over subject matter or the parties, *Rook v. Rook*, 353 S.E. 2d 756, (Va. 1987).

A void judgment is a judgment, decree, or order entered by a court which lacks jurisdiction of the parties or of the subject matter, or which lacks the inherent power to make or enter the particular order involved, *State ex rel. Turner v. Briggs*, 971 P.2d 581 (Wash. App. Div. 1999).

A void judgment or order is one that is entered by a court lacking jurisdiction over the parties or the subject matter, or lacking the inherent power to enter the particular order or judgment, or where the order

was procured by fraud, In re Adoption of E.L., 733 N.E.2d 846, (Ill.App. 1 Dist. 2000).

Void judgments are those rendered by court which lacked jurisdiction, either of subject matter or parties, Cockerham v. Zikratch, 619 P.2d 739 (Ariz. 1980).

Void judgments generally fall into two classifications, that is, judgments where there is want of jurisdiction of person or subject matter, and judgments procured through fraud, and such judgments may be attacked directly or collaterally, Irving v. Rodriquez, 169 N.E.2d 145, (Ill.app. 2 Dist. 1960).

Invalidity need to appear on face of judgment alone that judgment or order may be said to be intrinsically void or void on its face, if lack of jurisdiction appears from the record, Crockett Oil Co. v. Effie, 374 S.W.2d 154 ( Mo.App. 1964).

Decision is void on the face of the judgment roll when from four corners of that roll, it may be determined that at least one of three elements of jurisdiction was absent: (1) jurisdiction over parties, (2) jurisdiction over subject matter, or (3) jurisdictional power to pronounce particular judgment hat was rendered, B & C Investments, Inc. v. F & M Nat. Bank & Trust, 903 P.2d 339 (Okla. App. Div. 3, 1995).

Void order may be attacked, either directly or collaterally, at any time, In re Estate of Steinfield, 630 N.E.2d 801, certiorari denied, See also Steinfeld v. Hoddick, 513 U.S. 809, (Ill. 1994).

Void order which is one entered by court which lacks jurisdiction over parties or subject matter, or lacks inherent power to enter judgment, or order procured by fraud, can be attacked at any time, in any court, either directly or collaterally, provided that party is properly before court, People ex rel. Brzica v. Village of Lake Barrington, 644 N.E.2d 66 (Ill.App. 2 Dist. 1994).

While voidable orders are readily appealable and must be attacked directly, void order may be circumvented by collateral attack or remedied by mandamus, Sanchez v. Hester, 911 S.W.2d 173, (Tex.App. - Corpus Christi 1995).

When rule providing for relief from void judgments is applicable, relief is not discretionary matter, but is mandatory, Orner v. Shalala, 30 F.3d 1307, (Colo. 1994).

Judgments entered where court lacked either subject matter or personal jurisdiction, or that were otherwise entered in violation of due process of law, must be set aside, Jaffe and Asher v. Van Brunt, S.D.N.Y.1994. 158 F.R.D. 278.

"It is a fundamental precept that federal courts are courts of limited jurisdiction, constrained to exercise only authority conferred by Article III of the Constitution and affirmatively granted by federal statute." In re Bulldog Trucking, 147 F.3d 347, 352 (4th Cir.1998) (citations omitted). A federal court cannot assume jurisdiction exists. Rather, the plaintiff is required to specifically plead adequate facts in its complaint to sufficiently establish the court has jurisdiction. Norton v. Larney, 266 U.S. 511, 515-16 (1925). A defendant may move for dismissal when a complaint contains a jurisdictional defect. Fed.R.Civ.P. 12(b)(1).

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 50 of 320

*POSTSCRIPT:*

*In August of 2021 the Plaintiffs' filed for an injunction in the Appellate Division-2nd Dept of  New York to place a stay on the sale of 161 and 155 Saratoga Ave and have the illegal guardianship vacated. All Plaintiffs, including Mrs. Ella Card were part of that filing. Over the course of  months, there were at least eight corrections made at the behest of the Appellate Clerk. On March 3, 2022 we filed a final corrected motion. Because prior motions contained Mrs. Ella Cards signature, we carried this into and on this filing as it was her intent from the start of this action.*

*We carried her desire forward because she knew, as we did, that if Julie Fernandez, Raymond and Kermit Cared were not stopped, they would take everything from the rightful and designated heir of Mrs. Ella Cards estate, Cindy Rubina Card. These malicious Defendants all have an insatiable appetite for property, assets, money and valuables belonging to not themselves. They feel entitled and have shown, throughout the past three years with malicious prosecution, fraudulent and contrived allegations, all drummed up within their fraudulant and illegal guardianship, as though they are facts so they could continue to pillage and plunder whatever they could grab, truly believing it to be their right.*

*By the Grace of God Almighty, the Appellate court granted a stay for the sale of properties that Cindy Card has called home and has resided in for the last 34 years.  We honored Mrs. Ella Cards wishes as expressed in the letters she penned in stating that if she would pass, she did not want her disowned estranged sons to "…not look on my face or enter the doors of my funeral." (EXHIBIT 11) She did not want them to know where she passed, where she was laid to rest, or even want to know she had gone. She had nothing but fear and contempt for them and she told everyone that she only had two daughters. We did all we could to honor Mrs. Ella Cards requests and refuse to be vilified by crass, indignant thieves who care nothing more than to demonize what is good, taint what is true and degrade what is honorable.*

*We gave ourselves time to honor our beloved mother, Mrs. Ella Card's wishes and to begin the grieving process. Unfortunately, because we have been dealing with diabolatical thieves for the last 11 years, we knew we had to get on with the business of preserving Mrs. Ella Cards estate. We secured an attorney who began to assist us in this process, Jonna Toft, and presented her to the court on March 21, 2022. Unfortunately, as has been the process for the last 11 years, this too was tainted by the consistent greed and diabolic intentions of the judicial system that has done nothing by hurt and harm, and eventually kill Mrs. Ella Card.*

We pray this court provide Plaintiffs ample opportunity in this court's jurisdiction to provide documented evidence supporting our claims in that this honorable court may decide Plaintiffs' claims on their merits rather than technical legal maneuvers deployed, or attempted to be deployed by any of the Defendants or their representatives.

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 51 of 320

WHEREFORE, for the reasons mentioned, we pray, as victims of crimes committed against us as Plaintiffs, this court:

- Provide Declaratory Relief to Plaintiffs by voiding the March 21, 2022 Order issued by the lower court.

- Require Judge Clyde Vedder recuse himself from this instance and not be allowed to preside over any case resulting from this instance or involving any named Plaintiffs.

- Require co-guardians produce the transitional accountingfrom Vera Institute to the co-guardians in 2020 including their accounting for their Guardianship of Ella Card for the years of 2017 and 2019.

- Require the disowned sons and illegal co-guardians, Raymond Card and Kermit Card produce their initial accounting when assuming guardianship in June of 2021 and Accounting for their Guardianship of Ella card for the years of 2020, 2021 and 2022,

- Issue a Preliminary Injunction and Temporary Restraining Order on Julie Fernandez, Erik Spurlin, Raymond Card, Kermit Card and Brandy Hoke related to all activity associated with the Estate of Ella Card.

- That all rulings from March 16, 2011 hearing, including ensuing rulings, leases, contracts and awards in violation of Title 28 U.S.C. §1446(d), including the sale of Ella Card's 155 and 161 properties, and the illicit appointment of Raymond Card Jr. and Kermit Card as co-guardians over Ella Card's property and person be vacated and classified void as a nullity to protect Ella Card and her property from the immediate injury that has befallen her, thereby protecting Ella Card's property from waste, misappropriation, and loss in accordance with MHL § 81.23(a)(1).

- That all rulings from July 21, 2020 hearing, including ensuing rulings, leases, contracts and awards in violation of Title 28 U.S.C. §1446(d), including the sale of Ella Card's 155 and 161 properties, and the illicit appointment of Raymond Card Jr. and Kermit Card as co-guardians over Ella Card's property and person be vacated and classified void as a nullity to protect Ella Card and her property from the immediate injury that has befallen her, thereby protecting Ella Card's property from waste, misappropriation, and loss in accordance with MHL § 81.23(a)(1).

- Require co-guardians produce the transitional accounting to the Cindy Card, the Executor of the estate of Mrs. Ella Card.

- Order the immediately release of Mrs. Ella Card's assets and estate to Cindy Rubina Card in accordance with the Will and Irrevocable Trust of Mrs. Ella Card.

- Remedy for Plaintiffs' pain, suffering, incessant torment, malicous prosecution, unlawfully imprisonment, degradation of quality of life, wrongful death, defamation of character, excessive cruel and unusual punishment, extortion, in the amount of $500,000,000.

- Julie Fernandez[7] sanctioned Cocoran Group/co-guardians cease collecting rent from 161 Saratoga, reimburse all rent collected thereunder and retured to the executor of the Estate, Cindy Card with said lease terminated.

---

[7] *The Corcoran Group entered into a lease with the tenants renting the store yet claiming that Cindy Card was collecting said rent.*

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 52 of 320

## STATEMENTS OF ADDITIONAL CLAIMS

*We the Plaintiffs claim that:*

A.  Judge Clyde Vedder

    a.  Denied Plaintiff an attorney of his choice violating the 6th Amendment of the US Constitution

    b.  Entertained and engaged in aggressive, intimidating, line of questioning cloaking the courtroom with an aurora of disdain, subliminally adjudicating guilt upon the Plaintiff,  lack of impartiality that undermined confidence in a just decision, all in contradiction to the Pennsylvania Code of Judicial Conduct he had sworn to uphold

    c.  Deprived Plaintiffs of their Civil Rights

    d.  Conspired with Court Officials to interfere with Plaintiffs Civil Rights

    e.  Committed Fraud on the Court

    f.  Promulgated, induced, insisted, in-kind officially authorized Ineffective Assistance of Counsel for Plaintiffs

    g.  Violated Plaintiffs' Fourteenth Amendment rights

    h.  Committed, engaged in, and promoted Elder Abuse leading up to and contributing to the wrongful and untimely death of Mrs. Ella Card

    i.  Engaged in Manifest Injustice committing blatant errors of justice shocking to any of those outside the courts arena

We claim relief from this Honorable Court in accordance with fines and punishments consistent with those listed in APPENDIX A

B.  Erik D Spurlin

    a.  Conspired with Court Officials to interfere with Plaintiffs Civil Rights

    b.  Conspired with Court Officials to defraud the court by presenting allegations known to be fraudulent and without merit.

    c.  Committed Fraud on the Court advancing unfounded scurrilous accusations at the Plaintiffs

    d.  Committed, engaged in, and promoted Elder Abuse leading up to and contributing to the wrongful and untimely death of Mrs. Ella Card

    e.  Falsely accused Plaintiffs of federal crimes

    f.  Failed in his duty as an officer of the court to perform a reasonable investigation assuring the allegations put forth into the court were with merit.

    g.  Committed wanton and incessant Malicious Prosecution against Petitioners

We claim relief from this Honorable Court in accordance with fines and punishments consistent with those listed in APPENDIX A

C.  Julie Fernandez

    a.  Conspired with Court Officials to interfere with Plaintiffs Civil Rights

    b.  Conspired with Court Officials to defraud the court by presenting allegations known to be fraudulent and without merit.

    c.  Committed Fraud on the Court advancing unfounded scurrilous accusations at the Plaintiffs

    d.  Committed, engaged in, and promoted Elder Abuse leading up to and contributing to the wrongful and untimely death of Mrs. Ella Card

     e.  Falsely accused Plaintiffs of federal crimes
     f.  Falsely represented herself as Mrs. Ella Card's counsel to a court official
     g.  Failed in his duty as an officer of the court to perform a reasonable investigation assuring the allegations put forth into the court were with merit.
     h.  Willfully suppressed evidence
     i.  Committed wanton and incessant Malicious Prosecution against Petitioners

We claim relief from this Honorable Court in accordance with fines and punishments consistent with those listed in APPENDIX A

**D. Raymond Card**
     a.  Conspired with Court Officials to interfere with Plaintiffs Civil Rights
     b.  Conspired with Court Officials to defraud the court by presenting allegations known to be fraudulent and without merit.
     c.  Committed, engaged in, and promoted Elder Abuse leading up to and contributing to the wrongful and untimely death of Mrs. Ella Card.
     d.  Willfully suppressed evidence
     e.  Committed wanton and incessant Malicious Prosecution against Petitioners

We claim relief from this Honorable Court in accordance with fines and punishments consistent with those listed in APPENDIX A

**E. Kermit Card**
     a.  Conspired with Court Officials to interfere with Plaintiffs Civil Rights
     b.  Conspired with Court Officials to defraud the court by presenting allegations known to be fraudulent and without merit.
     c.  Committed, engaged in, and promoted Elder Abuse leading up to and contributing to the wrongful and untimely death of Mrs. Ella Card.
     d.  Willfully suppressed evidence
     e.  Kidnapping
     f.  Committed wanton and incessant Malicious Prosecution against Petitioners

We claim relief from this Honorable Court in accordance with fines and punishments consistent with those listed in APPENDIX A

**F. Brandy G Hoke**
     a.  Conspired with Court Officials to interfere with Plaintiffs Civil Rights

We claim relief from this Honorable Court in accordance with fines and punishments consistent with those listed in APPENDIX A

Dated:04/27/2022
Kenneth Swenson, *Pro Se*
62 Springfield Dr.
New Oxford, PA 17350

Dated:04/27/2022
Cindy Rubina Card, *Pro Se*
161 Saratoga Ave
Brooklyn, NY 11233

Dated:04/27/2022
LaDonna Card, *Pro Se*
100 Debs Place, Apt 16C
Bronx, NY  10475

# UNITED STATES DISTRICT COURT FOR
# THE MIDDLE DISTRICT OF PENNSYLVANIA

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy was served via overnight, certified mail to:

| | |
|---|---|
| David W. Sunday Jr.<br>DISTRICT Attorney's Office<br>45 North George Street<br>York, PA 17401 | |
| Erik D Spurlin,<br>Attorney, MPL Law Firm<br>And in Individual Capacity<br>96 S. George St<br>Suite 520<br>York, PA 17401<br>espurlin@mpl-law.com | Judge Clyde Vedder<br>In Individual and Official Capacity<br>Court of Common Pleas of York County<br>45 North George Street<br>York, PA 17401<br>OrphansCourt@YorkCountyPA.gov |
| Raymond Card,<br>Disowned son and Illegal co-guardian<br>124 Shetland Pl<br>Warners, NY 13164-3701<br>raycardjr@yahoo.com | Julie Stoil Fernandez,<br>Attorney, Finkel & Fernandez, LLP.<br>And in Individual Capacity<br>Finkel & Fernandez, LLP<br>Elder Law & Special Needs<br>16 Court Street, Suite 1007<br>Brooklyn, NY 11241<br>jstoilfernandez@ffelderlaw.com |
| Brandy G Hoke,<br>Attorney, Ream, Carr, Markey, Woloshin & Hunter LLP<br>And in Individual Capacity<br>Court Appointed Attorney for Ella Card (Deceased)<br>119 E Market St<br>York, PA 17401-1221 FAX: 717 630-2550 | Kermit Card,<br>Disowned son and Illegal co-guardian<br>208 Commack Rd<br>Deer Park, NY 11729-6113<br>amthai@optonline.net<br>hyperboy209@msn.com |

`

_____
Kenneth Swenson

# AFFIDAVITS OF RESIDENCY

## AFFIDAVIT OF RESIDENCY

I Kenneth Swenson hereby state the following under penalties of perjury to be true and correct to the best of my knowledge and belief.

My residency is Adams County Pennsylvania.

Print name: Kenneth Swenson

Signature _____

Date: 4/26/2022

1. Name of Insured:
   **Kenneth L. Swenson**

2. The estate or interest in the Land that is covered by this policy is:
   **FEE SIMPLE**

3. Title is vested in:

4. The Land referred to in this policy is described as follows:
   *For informational purposes only:*
   **42 Springfield Drive, New Oxford, PA 17350**
   **Hamilton**
   **City of New Oxford, County of Adams**

   **(SEE ATTACHED SCHEDULE C FOR LEGAL DESCRIPTION)**

1

f

**AFFIDAVIT OF RESIDENCY**

I Cindy R Card hereby state the following under penalties of perjury to be true and correct to the best of my knowledge and belief.

My residency is 161 Saratoga Ave, Brooklyn, NY Kings County

Print name: Cindy R Card

Signature   *Cindy Ruhana Card*

Date: 4/26/2022

conEdison   PO Box 1702
New York, NY 10116-1702

**Your Energy Bill**

CINDY CARD
161 SARATOGA AVE 2F
BROOKLYN NY 11233-2465

2

**AFFIDAVIT OF RESIDENCY**

I LaDonna Card hereby state the following under penalties of perjury to be true and correct to the best of my knowledge and belief.

My residency is 100 Debs Place, Bronx, NY 10475

Print name: LaDonna Card

Signature: _____

Date: 4/26/2022



U. S. Department of State
CONSULAR OFFICES OF THE UNITED STATES OF AMERICA

VENUE
*New York*
State

ss.
*Bronx*
City

I, *LaDonna Levaugh Card-Edelma* being duly sworn according to law, declare that I reside at
Your Name
*100 DEBS PLACE, apt 16C, Bronx, NY 10475*

# EXHIBIT 1

IN THE COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

In re. the Person and Estate of    :     No. 6721-1278
                                     :

ELLA RUBINA CARD,           :
           Deceased    :     Power of Attorney

21 MAR 2022 PM
ORPHAN'S COURT-Y

APPEARANCES:
  For Petitioners: Erik D. Spurlin, Esq.
  For AIP: Brandy G. Hoke, Esq.

## O R D E R   D I R E C T I N G   A C C O U N T I N G

AND NOW, this 21st day of March, 2022, after hearing earlier today, during which it was discovered, for the first time, that Ella Rubina Card died on February 16, 2022 in Belize City, Belize and Kenneth Swenson and Cindy Card have been serving as Ms. Card's attorneys-in-fact since at least 2018, despite knowing full well that Ms. Card was found to be incompetent by a New York State Court on December 14, 2011 and Raymond Card and Kermit Card have been serving as co-guardians of her Estate, by succession, since December 8, 2020, it is hereby

ORDERED and DIRECTED that Kenneth Swenson and Cindy Card, the Decedent's agents and attorneys-in-fact by power of attorney, shall file an account of their administration of Ms. Card's assets and Estate from the date of their appointment as attorneys-in-fact until the date of Decedent's death, including but not limited to all banking activities at Members First FCU and Santander Bank. Their account shall be filed within

forty-five (45) days from the date of this Order in the office of the Clerk of the Orphans'

Court in York County, being where Ms. Card has been residing for the last decade or so,

with copies being provided to all interested parties.

IT IS FURTHER ORDERED and DIRECTED that Kenneth Swenson shall obtain

and provide copies of all bank statements since the accounts were opened to the present to

counsel who have appeared in this action so they might perform their own forensic

accounting, as appropriate.

IT IS FURTHER ORDERED that DIRECTED that Kenneth Swenson shall

immediately take all steps necessary to provide for the security and delivery of the assets of

the Estate, together with all books, accounts and papers relating thereto, to the personal

representative of the Estate, once appointed, and he is ADVISED that he may be subject to

summary attachment of the person or other appropriate orders if he fails to do so.

The Court's rationale is as follows:

1.      The Court has jurisdiction to entertain requiring Kenneth Swenson and Cindy

to account for their activities as agent. *20 Pa.C.S. § 711(22)*.

2.      The Court has the power to direct an attorney-in-fact to give an accounting as

part of its duty of oversight pursuant to the Probate, Estates and Fiduciaries Code. Section

5610 thereof provides, in relevant part, that,

> An agent shall file an account of his administration whenever directed to do so by the
> court and may file an account at any other time.

-2-

*20 Pa.C.S. § 5610*. It can independently order a party to file an account regardless of prompting by a party with or without standing. *Reichle v. Liptak (In re Reichle)*, 156 A.3d 348 (Pa. Super. 2016).

The Clerk of the Orphans' Court is directed to serve copies of this Order upon all interested parties as required by law, including Kenneth Swenson, Cindy Card, and Joanna L. Toft, Esquire, Mr. Swenson's attorney.

BY THE COURT:

CLYDE W. VEDDER, JUDGE

-3-

# EXHIBIT 2

Ella Card also attended the Elder Abuse Session Hosted by Senator Ted Poe June 15, 2011 at the US Capital Building in Washington DC (ELLA CARD IN RED DRESS) Deemed incapacitate 3 months earlier by a judge practicing medicine without a license and before Ella Card even steped foot in the courtroom to meet Judge Betsy Barros. Does Ella Card look incapacitated to you?? Can an incapacitatged person testify before Congress? Do you see Cindy Card Speaking for Ella Card? These are the questions.

June 14, 2011

 

 






ELLA CARD IN RED DRESS at the Capital Building in Washington DC Attending the Elder Abuse Session Hosted by Senator Ted Poe June 15, 2011






Ella Card marching with NOTEGA after Attending Senator Ted Poe Elder Abuse Session.












# EXHIBIT 3

Ella Card statement (italicized below) made at The House Rayburn Building in Washington DC June 14, 2011

*"Congressman Poe, distinguished guests,*

*My name is Ella Card, and like thousands of other elderly victims in the United States, unjustly ruled incapacitated and enslaved by our judicial system's guardianship laws, I exclaim, this is the hour you must abolish them.*

*I am 72 years old. I immigrated to this country from Belize and settled in Brooklyn, New York with my husband. I earned my U.S. Citizenship. Later I earned my Master's Degree in Education. I was blessed to work as a teacher for over thirty years and I loved it. I raised four children, I saved, I made good investments, I bought property, and for a while I was very happy.*

*I am retired now. My husband died: a victim of the VIOXX drug. My two sons, both ex New York City Correction Officers, became criminals and drug addicts. They have risen against me to steal everything I worked hard for. They threatened me with guardianship if I would not succumb to their felonious behavior. I chose to fight against them.*
*I was struck by a car and suffered temporary dementia. My youngest son, Kermit, kidnapped me and tried to murder me. He forced me to sign a Power-of-Attorney and he used it to rob me by means of fraud. I recovered from my dementia and my eldest daughter LaDonna rescued me from my abduction. Soon after, my sons petitioned the Brooklyn Supreme Court for guardianship over me. The sins of Elder Abuse for Profit, Racketeering, and Enslavement that have been an integral part of our court system for many years was now placing me in a choke hold to- deny me "Life, Liberty, Property, and Happiness.*

*My son hired an attorney, Bonnie Bernstein. She knew of his crimes against me and overlooked them. She told my son "Guardianships are 90% approved." Wouldn't you like those kinds of odds with every Bill you sponsor Congressman Poe? The only way I know to guarantee those kinds of odds is if the judges were in the business of racketeering. It's easy money for judicial officers at the expense of the lives of the elderly. It must be abolished.*

*Judge Betsy Barros, a seasoned Elder Abuser for Profit, was appointed Judge over my case. If you review her cases, you will find she has a history of pronouncing innocent elderly people with money incapacitated. She found no fault with the Verified Petition for my case even though it shows my sons lied and committed criminal acts against me. Judge Barros appointed Court Evaluators, Lisa K. Friedman and Alexandra Schonfeld, to intentionally produce a report to help her rule me incapacitated. She also appointed attorney Christine Mooney to represent me. I told Judge Barros I did not want Christine Mooney to represent me. Judge Barros forced her to represent me. Is this the kind of justice our Congress wants in our nation's courtrooms? Do you agree Judges should bully us; take away our right to choose an attorney so they can manipulate the outcome of guardianship hearings to steal? I ask you to please open your eyes and realize guardianship judges are a threat to the elderly, a threat to our families, and a threat to justice.*

*Lisa Friedman interviewed me and my daughter Cindy Card. Nothing we said was incorporated into her final evaluator's report. The court appointed attorney Christine Mooney was at my interview, knew about this and allowed it. Everything my wayward sons said plus the evaluators bias remarks were found in the final report, even though it was all speculation, hearsay, and lies. The law requires clear and convincing evidence to pronounce someone incapacitated, but it never matters. It's all about fraud to get someone else's money.*

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

*Judge Betsy Barros held an ex parte meeting to appoint me a temporary guardian. I was sold like a slave to The Vera Institute; an organization with offices inside the Brooklyn Supreme Courthouse. This is a conflict of interest and conspiracy without shame. If Judge Betsy Barros does not rule me incapacitated, the Vera Institute does not make money to pay rent. Judge Barros gave no reason for the ex parte meeting, did not identify any legal reason for calling the hearing. Seven days later, I discover the Vera Institute closed all of my bank accounts, took control of my money, filed a change of address to get my mail, demanded keys to my properties, and contacted Belize to try to take control of my property and bank accounts in that country. That is arrogant and frightening. They had no right to do it. Guardianship must be abolished.*

*I effectuated a plan for my estate. If Judge Barros believed I needed a guardian, which I do not, she should have honored my Durable Power of Attorney. I named my daughter Cindy as my agent. I left everything to her in an Irrevocable Trust, my Will, and two Quit Claim Deeds. I made it very clear to Judge Barros several times in court, I wanted my daughter Cindy to manage my affairs. Judge Barros chose to vilify my daughter to give herself an excuse not to honor my wishes. My daughter Cindy did nothing wrong, Judge Barros did. She makes rules up as she goes along, plays god, and never adheres to laws or ethics. She read the contents of my will in court, my last wishes, my final voice. She might as well have spit on my grave. She told me she was going to fix up my daughter's building and sell it. Is this a Judge you would want your loved ones to stand before? If Guardianship continues, it very well may happen.*

*I needed money to pay a $7,000 retainer for my attorney of choice. Judge Betsy Barros and the Vera institute denied that request. Judges love to appoint temporary guardians before the hearing to make the alleged incapacitated person poor. I was left unable to fight my legal battle. Judge Barros and her court appointed thieves gained a victory. The Judge's court appointed attorney did not fight for me. She works for the judge. This is also part of the conspiracy.*

*I was ruled incapacitated because Judge Barros says it seems like I have some deficiencies. I have money I cannot spend unless I call them and cry like a decrepit senile old woman to tell them I need fresh underwear. Is that the way you want me to walk away from here? I pray you don't.*

*Last week I filed a motion to dismiss this bogus petition Pro Ses and now the court is rushing its own process to appoint permanent guardianship by the end of this week.*

*The handwriting is on the wall—if not stopped THIS WEEK, Judge Barros will drain my life savings.  If you do not act NOW, this very week, I will be another guardianship statistic.*

*My story is not just another incident.  It IS the incident.  It IS the story.  And this incident, this story, this tragedy, this modern day slavery is perpetuated by those who idly sit by and do nothing about it.  The judicial system designed to protect and defend, not incarcerate and destroy the innocent.  I am asking you to eviscerate this oppressive crime of guardianship.*

*Thank you."*

Ella Card Guardianship Crime-congressional listening session (DC)
https://www.youtube.com/watch?v=KRCdNVL0rK0

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

# EXHIBIT 4



washingtonexaminer.com

## Retired NYC school teacher fights for her freedom

By **Barbara Hollingsworth** | 12/20/11 8:05 PM
*Local Opinion Editor*

Retired NYC school teacher fights for her freedom

By Barbara F. Hollingsworth

Ella Card had it made in America. After emigrating to the United States from her native Belize, she earned a masters degree and taught third grade in the New York City Public School system for three decades.

She and her late husband Raymond, who died as a result of taking the recalled painkiller Vioxx, had saved and invested their money wisely, so Card was looking forward to a comfortable retirement.

But her well-laid plans took a terrible detour when she suffered temporary dementia after being struck by a car in 2010. Her two sons, whom she says lost their jobs as corrections officers due to drug abuse, petitioned the Brooklyn Supreme Court for guardianship over her affairs.

And after recovering from her injuries, the 73-year-old widow -- a naturalized U.S. citizen who retains dual citizenship in Belize -- finds herself in an ongoing guardianship nightmare that has now gone international.

On March 16, Brooklyn Judge Betsy Barros held one of five ex parte hearings on Card, appointing a temporary guardian. On April 26, Barros ignored Card's durable power of attorney, irrevocable trust, and two quit claim deeds and read the still-very-much-alive woman's will in open court before declaring her "incapacitated."

The court transcript obtained contains this Kafkaesque passage: "... the Incapacitated Person, Ella Card, vigorously contested the proceedings."

"It felt like a hanging. I was the only one sticking up for my mother," Card's 43-year-old daughter Cindy told us. "Every one of them standing there and allowing it knew my mother was not incapacitated."

Card was then placed under the near total control of a court-appointed guardian, The Vera Institute of Justice, located in the same Brooklyn courthouse. The Vera Institute of Justice's website describes it as "an independent, nonpartisan, nonprofit center for justice policy and practice." According to IRS records, $16.7 million of its $24 million annual funding comes from government grants.

# EXHIBIT 5

## ELLA CARDS VIDEOS

Ella Card---"Slavery in the Name of Guardianship" - YouTube

Ella Card--Thief's Poising as Supreme Court Judges - YouTube

# EXHIBIT 6

Schedules to the Annual Account

## SCHEDULE C-2
[Realized and Unrealized Decreases to Principal]

**Realized Decreases to Principal**

| Account/Description | Source | Amount |
|---|---|---|
| Repay Loan | Vera Institute of Justice | (1,993.06) |
| TDA Annuity Tax Withholding | Internal Revenue Service | (1,203.65) |
| | | (3,196.71) |

**Unrealized Decreases to Principal**

| Account/Description | Source | Amount |
|---|---|---|
| N/A | | |

| | Total Decreases to Principal | $ (3,196.71) |
|---|---|---|

## SCHEDULE D
[Disbursements]

| Disbursement Classification | Payee | Amount |
|---|---|---|
| **Administrative Expenses** | | |
| Attorney for IP | Christine A. Mooney, ESQ | (5,250.00) |
| Attorney for Petitioner | Polizzotto & Polizzotto, LLC | (5,250.00) |
| Bond Premium | The Blaikie Group | (2,394.00) |
| Cert. Copies | County Clerk's Office | (8.00) |
| Guardian Fees | Vera Institute of Justice | (250.00) |
| Legal Fees | John V. Janusas | (5,000.00) |
| Postage | USPS | (65.05) |
| **Medical Expenses** | | |
| N/A | | |
| **Assisted Living / Nursing Home Expenses** | | |
| N/A | | |
| **Housing Expenses** | | |
| Heat/Fuel | Boro Fuel Oil Co / National Grid | (13,313.02) |
| Homeowners Ins. | Pupkin / The Premins Company, Inc. | (4,214.27) |
| NYC Prop. Taxes | NYC Department of Finance | (3,056.85) |
| Snow Removal | Progressive General Contractor | (174.21) |
| Telephone Serv. | T-Mobile / Verizon | (1,376.15) |
| Utilities - Electric | Con Edison | (5,581.50) |
| Water/Sewer | NYC Water Board | (970.93) |
| **Other Client Expenses** | | |
| Credit Repayment | Various | (682.58) |
| Fed Income Tax | U.S. Treasury | (1,680.00) |
| Personal Allow. | Ella Card | (11,000.00) |

| | Total Disbursements | $ (60,266.56) |
|---|---|---|

## SCHEDULE E
[Recapitulation, Itemization of Transfers, Balance on Hand at End of Period]

### SCHEDULE E-1
[Recapitulation]

| | |
|---|---|
| The beginning balance with which the guardian is chargeable (Schedule A) | 14,329.02 |
| Add: Assets Marshaled (Schedule A-2) | 293,729.59 |
| Add: Total income during the period (Schedule B) | 76,968.19 |
| Add: Total increases to principal during the period (Schedule C-1) | 6,675.34 |
| Less: Total decreases to principal during the period (Schedule C-2) | (3,196.71) |
| Less: Total disbursements during the period (Schedule D) | (60,266.56) |
| Ending balance with which the guardian is chargeable: | $ 328,238.87 |

Page 2 of 3

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

# EXHIBIT 7

Ella Card
155 Saratoga Ave
Brooklyn, NY  11233


28 February 2013


Laura Negron, Director
Vera Institute
360 Adams St.
Brooklyn, NY 11201

Ms Negron
I am requesting that you, the Vera Institute, pay my insurance premium for both my homes located at 161 and 155 Saratoga Avenue, Brooklyn, NY in full.  The premium amount for both homes is $4,665.29.  Last year against my will, the Vera Institute entered into a finance agreement with the insurance company.  One lump sum of money was paid and then there were monthly payments to be made after that.  The Vera Institute consistently had to be reminded to make payments and the last two payments of the policy were completely ignored and I  had to pay them out of the meager monthly allowance of $1,000.00 that was allocated to meet my PERSONAL needs.

This occurred after approximately $5,000.00 was taken out of my estate to pay for another insurance policy with a separate insurance company that was NOT necessary as you know.  This is because I already had insurance that had been paid in full until March 7, 2012.   I have been purchasing insurance from the Pupkin Insurance Agency for approximately 15 years.  My account has always been in good standing and I wish to maintain that standing with the Pupkin Insurance Agency.  This can only be maintained if payments are made in full and on time.

Doing this will allow me to have peace of mind, security and provide proper asset management stopping "waste and misappropriation" of my estate.  I will not have to pay unnecessary interest for a policy that my finances can more than cover.  I have ALWAYS paid the entire insurance premium in full for each year.

Again, I am requesting that you pay this insurance premium to (National Union Fire Insurance Co.--policy number BBA 020455195 covering the period from March 7, 2013 to March 7, 2014) to Pupkin Insurance Agency, 1852 Flatbush Ave, Brooklyn, NY  11210 in the annual amount of $4,665.29.


Thank you

*Ella Card*

Ella Card

# EXHIBIT 8

**155 SARATOGA: These were fines accrued under Vera Institutes watch as Guardians: They allowed the fines to accrue and refused to repair the home. Cindy Card could have never hindered them from doing the work as she herself had no access. The neighbors permission was required for access because the wall was inside their gated property.**

### NYC Department of Buildings
### Actions

Page: 1

| Premises: 155 SARATOGA AVENUE BROOKLYN | BIN: 3041072 | Block: 1515 | Lot: 5 |
|---|---|---|---|

| NUMBER | TYPE | FILE DATE |
|---|---|---|
| FE 6632/04221925 | FIRE ESCAPE | 00/00/0000 |
| FE 1341/36/57 | FIRE ESCAPE | 05/20/1957 |
| FO 2755/57 | OIL BURNER APPLICATION | 09/09/1957 |
| V* 091697LL6291220886 | DOB VIOLATION - DISMISSED | 09/16/1997 |
| V* 032602LL629116735 | DOB VIOLATION - DISMISSED | 03/26/2002 |
| V 030113LBLVIO07249 | DOB VIOLATION - ACTIVE | 03/01/2013 |
| V* 101719AEUHAZ100749 | DOB VIOLATION - DISMISSED | 10/17/2019 |
| V 122619AEUHAZ100385 | DOB VIOLATION - ACTIVE | 12/26/2019 |
| VECB 022920CSPOJR03 | ECB VIOLATION - ACTIVE | 02/29/2020 |
| VECB 12162019CSPOUA07 | ECB VIOLATION - ACTIVE | 12/16/2019 |
| VECL 071719C16HP01 | VIOLATION ECB LIEN - ACTIVE | 07/17/2019 |
| VECB 09232019CSPO05 | ECB VIOLATION - ACTIVE | 09/23/2019 |

1. V 030113LBLVIO07249  LOW PRESSURE BOILER  3/1/2013
2. V 122619AEUHAZ100385  FAILURE TO MAINTAIN BUILDING WALLS OR APPURTENANCES  12/26/2019  $6,250.00  HEARING 08/20/2020
3. VECB 022920CSPOJR03  FAILURE TO MAINTAIN BLDG WALLS OR APPURTENANCES. 02/29/2020  $6,250.00  HEARING 07/01/2020
4. VECB 12162019CSPOUA07  FAILURE TO MAINTAIN BUILDING WALL(S) OR APPURTENANCES 12/16/2019  $6,250.00  HEARING 11/13/2020
5. VECB 09232019CSPO05  FAILURE TO MAINTAIN BUILDING WALLS OR APPURTENANCES  09/23/2019  $6,250.00  **HEARING** 08/20/2020

## 161 SARATOGA



# EXHIBIT 9

At an IAS Term Part 76LR of the Supreme
Court of the State of New York, held in the
County of Kings, at 360 Adams Street,
Brooklyn, New York, on the ⟨⟨ᵗʰ day of
December, 2019.

PRESENT:

HON. LEON RUCHELSMAN
J.S.C.

-------------------------------------------------------------------x

In the Matter of

ELLA CARD,                                    **ORDER**
                                              Index No.: 100016/11

An Incapacitated Person.
-------------------------------------------------------------------x

Upon all prior papers and proceedings had in this matter, and upon the Motion (Sequence

#9) having come before the Court on December 6, 2019; and upon the Notice dated November 4,

2019 from the NYC Department of Buildings, Administrative Enforcement Unit regarding the

real property located at 155 Saratoga Avenue, Brooklyn, NY (attached); and whereas an

Affidavit in Opposition, which also purported to be a Cross-Motion, was filed on December 3,

2019 by CINDY CARD; and whereas said Opposition having failed to provide the name or

contact information of her proposed licensed contractors, and failed to provide estimates for the

work to be performed on said real property; and whereas CINDY CARD failed to appear on

December 6, 2019,

NOW it is hereby

ORDERED that the Vera Institute of Justice, Inc., Guardianship Project, as Guardian of

the Property of ELLA CARD, be and is hereby authorized and permitted to expend the sum of

Page 1 of 2

$45,000.00 to Progressive General Contractors for the required repairs to 155 Saratoga Avenue,

Brooklyn, New York; and it is further

ORDERED that the application to resign as Guardian of the Property is denied without

prejudice.

This is the Decision and Order of the Court.

ENTER:

_____

Hon. Leon Ruchelsman, J.S.C.

Page 2 of 2

100016 /2011
Plaintiff :   IN THE MATTER OF
Plaintiff Attorney :   POLIZZOTTO
Defendant :   C., ELLA, AN INCAPACITATED PERSON
Defendant Attorney :
Remarks :   FILE SEALED / CT EX - L. PRICE Caption amended to Ella C.
Opened :   01/31/2011
Type :   * CONF Incomp

 Filed
Actions
Rec. Room
01/31/2011 Application For Coverpage OSC (appt of guardian)   -------
01/31/2011 Req. judicial interven. p   -------
01/31/2011 Notice of pendency bl-1515 lot-5  02/22/2011
01/31/2011 Notice of pendency block-1515 lot-1  02/22/2011
02/28/2011 Affidavit of serv.   -------
03/07/2011 Decision and order Consolidating family court actions into this action. The clerk of the family
court shall transfer papers, etc.   -------
03/07/2011 Affidavit of serv.  03/15/2011
03/18/2011 Unsigned Order endorsed   -------
03/23/2011 Notice of pendency amended bl-1515 l-5  03/24/2011
03/23/2011 Notice of pendency amended Bl-1515 lot-1  03/24/2011
03/24/2011 Order, Judgment, Commission to auth pymt and appt Vera Institute - Temporary Guardian of
AIP - Restraining orders. This order serves as Temp. Guardian's Commission.   -------
03/29/2011 Order dated 3/25/11 expanding powers of temporary guardian and continuing restraining
orders   -------
04/14/2011 Order Restraining the filing of deeds, mortgaging or transferring property.   -------
04/29/2011 Order revoking powers of attorney and health care proxies.   -------
04/29/2011 Decision and order dtd 4/26/11 ALL RECORDS SEALED, Caption amended to Ella C. JSC
Betsy Barros. Files available only to Pet. Atty: Pollizotto & Pollizotto, AIP Atty: Christine Mooney, Esq,
Temp. Guardian: VERA Inst., Court Ex: Lawrence Price
05/02/2011 Order provisions of order dated 3/25/11 remain in effect until further order of the court (re:
Quit Claim Deeds/Trusts)   -------
05/02/2011 Order to pay rent directly to Vera Institute   -------
05/04/2011 Order dismissing petition filed in Kings County Family Court O-04799-11   -------
05/04/2011 Order dismissing petition filed in Kings County Family Court O-04798-11   -------
05/04/2011 Order dismissing petition filed in Kings County Family Court O-04797-11   -------
05/06/2011 Notice of pendency  05/09/2011
05/06/2011 Notice of pendency  05/09/2011
05/25/2011 Notice coverpage   -------
06/20/2011 Affirm. of Serv W/EXHIBITS A & B   -------
06/29/2011 Affidavit of serv. 2  07/05/2011
07/26/2011 Order Amended Appointing Temporary Guardian (The Vera Institute of Justice Inc) and
Restraining Orders   -------
07/29/2011 Copy ord. notice entry, afft.svc.   -------
08/12/2011 Copy ord. notice entry, afft.svc.   -------
08/12/2011 Application For Coverpage Order to Show Cause NO FEE   -------
09/07/2011 Affidavit of serv.   -------
09/21/2011 Order Short Form, Authorizing Release of Funds   -------
09/26/2011 Copy ord. notice entry, afft.svc.   -------
10/07/2011 Order Short Form, Authorizing Guardian Key Access & to Hire Locksmith for Access, etc   ----
---
10/11/2011 Affirm. of Serv   -------
12/20/2011 Order to show cause & Afft   -------
12/23/2011  Minutes & Misc papers   -------
12/23/2011 Order & Judgment RESETTLED Apptg The VERA Institute as Guardian Property w/ Bond
$350,000.00, OSC, Prelim Rpt of Ct Evaluators, 2nd Rpt Ct Evaluators, Affrms, Affts & copy Papers  -----
--
12/23/2011 Order Short Form, Authorizing Guardian to Purchase Property Insurance   -------
12/23/2011 Order Short Form, Authorizing Guardian to Release Commercial Tenant Delta Deli Corp.   ----
---
12/23/2011 Decision and order to Appoint Property Guardian   -------
01/03/2012 Notice of Removal / Civil Action   -------
01/19/2012 Copy ord. notice entry, afft.svc.   -------

02/10/2012 Designation & Commision and Bond in the amount of $350,000.00 to Guardian Property, The Vera Institute. Liberty  -------
02/10/2012  Certified Order from US District Court E.D.N.Y remanding case back to Supreme Court  -------
03/09/2012 Affirm. of Serv  -------
03/09/2012 Affidavit of serv.  -------
03/16/2012  Minutes  -------
05/14/2012 Initial Report  -------
06/22/2012 Final Account  -------
08/07/2012 Letter Atty's\ Chambers  -------
02/05/2013 Order To PAY  -------
06/14/2013 Annual Report 2012  -------
08/08/2013 Notice of Appointment  -------
04/03/2014 Order short form, Authorizing Guardian, the Guardianship Project to Pay Accountant & Amending O/J to Allow Guardian to pay Accountant w/o further order of court  -------
08/19/2014 Annual Report - 2013  -------
02/02/2015 Order Approving Initial Report  -------
06/01/2015 Annual Report 2014  -------
10/13/2015 Incomp. Order Confirming Referee's Report (2014) dtd 9/22/15  -------
10/13/2015 Incomp. Order Confirming Referee's Report (2013) dtd 9/22/15  -------
10/13/2015 Incomp. Order Confirming Referee's Report (2012) dtd 9/22/15  -------
10/21/2015 Order to Show Cause Coverpage FEE PAID/OTHER  -------
11/16/2015 Affidavit of serv. By Mail  -------
12/08/2015 Order dtd 12/07/2015 by JSC Leon Ruchelsman Allowing Ct Evaluator, Renee Oppenheimer ACCESS to Sealed File  -------
01/27/2016 Order to Show Cause Coverpage FEE PAID/D  -------
01/29/2016 Affidavit of serv. By Mail  -------
02/22/2016 Order dtd 2/18/2016 RELIEVING COUNSEL & COURT EVALUATOR, etc  -------
03/11/2016 Copy ord. notice entry, afft.svc.  -------
03/15/2016 Notice appeal/radi, copy ord, afft svc  -------
04/12/2016 Order AMENDED dtd 3/22/2016 Approving 2013 & 2014 Annuals  -------
08/05/2016 Annual Report 2015  -------
10/05/2016 Incomp. Order Confirming Referee's Report - 1/01/2015 - 12/31/2015  -------
11/22/2016 Order dtd 10/28/16 for Guardian to retain Atty etc  -------
12/01/2016 Order to show cause dtd 1/29/16  -------
12/07/2016 Answer : OSC to Permit Attorney to Withdraw  -------
12/07/2016 Stipulation of Adjournment dtd 12/3/15  -------
12/07/2016 Stipulation of Adjournment dtd 1/21/16  -------
12/07/2016 Order to show cause dtd 11/10/16  -------
01/24/2017 Subpoena duces tecum with Subpoena 03151/2016  01/24/2017
05/30/2017 Annual Report -2016  -------
07/06/2017 Order to Show Cause Coverpage -FEE PAID/O  07/18/2017
07/20/2017 MOTION COVERPAGE FEE PAID/ P  -------
07/28/2017 Affirm. of Serv  -------
08/01/2017 MOTION COVERPAGE -FEE PAID/O  -------
08/08/2017 MOTION COVERPAGE -FEE PAID/P  -------
08/10/2017 Notice appeal/radi, copy ord, afft svc  -------
08/10/2017 Order dated 8/4/17 adjourning to 9/8/17 9:30 am...VERA key access to all properties etc  -------
08/25/2017 Incomp. Order Confirming Referee's Report dated 8/21/17 - 2016, to increase bond to $1.2M  -------
08/25/2017 MOTION COVERPAGE FEE PD. GUARD.  -------
09/07/2017 Notice of Removal (Pennsylvania)  -------
09/12/2017 Notice of Removal (Pennysylvania)  -------
09/12/2017  Copy of Motion for TRO and Prelim Inj. US District Court, MD Pennsylvania  -------
09/15/2017 Bond $1,200,000.00 Guardian's Bond  -------
09/22/2017 Order dated 9/8/17 to pay Atty retainer etc  -------
09/22/2017 Order dated 9/8/17 to pay for necessary repairs up to $35K etc  -------
09/22/2017 Motion papers (marked off)  -------
09/22/2017 Motion papers (marked off)  -------
10/02/2017 Notice appeal/radi, copy ord, afft svc  -------
10/10/2017 Copy ord. notice entry, affm. svc.  -------
10/10/2017 Copy ord. notice entry,affm. svc.  -------
 Total Row Count in Report- 99

# EXHIBIT 10

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**
-------------------------------------------------------------------X
In the Matter of the Guardianship of

ELLA CARD,

An Incapacitated Person.
-------------------------------------------------------------------X

**NOTICE OF ENTRY**

**Index No. 100016/2011**

**PLEASE TAKE NOTICE** that the within is a true copy of an Order and Judgment which was

signed by the Honorable Leon Ruchelsman on December 2, 2020 and entered in the county clerk's

office on December 8, 2020.

DATED: Brooklyn, New York
       December 8, 2020

Julie Stoil Fernandez, Esq.
**Finkel & Fernandez, LLP**
16 Court Street, Suite 1007
Brooklyn, NY 11241
T: (347)296-8200
F: (718) 965-3185
jstoilfernandez@ffelderlaw.com

To:

      Ella Card
      161 Saratoga Avenue
      Brooklyn, New York 11233

      Ella Card
      c/o K. Swenson
      445 Beck Mill Road
      Hanover, Pennsylvania 17331-9253

      Lawrence Price
      829 East 10th Street, Suite 2H
      Brooklyn, NY 11230

      Helen Hernandez
      1248 West 54th Street
      Los Angeles, CA 90037

LaDonna Card
100 Debs Place, Apt. 16C
Bronx, NY 10475

Cindy Card
161 Saratoga Avenue
Brooklyn, NY 11233

Faith Card
161 Saratoga Avenue
Brooklyn, NY 11233

The Blaikie Group
111 John Street, 16th Floor
New York, NY 10038

John Holt, Esq.
Vera Guardianship Project
320 Jay Street, Room 4.110
Brooklyn, NY 11201

At an I.A.S. Part 76LR of the Supreme Court
of the State of New York, held in and for the
County of Kings, at the Courthouse located
at  360 Adams Street, Brooklyn, New York
on the 2 day of December, 2020.

PRESENT:
HONORABLE LEON RUCHELSMAN
           J.S.C.
-------------------------------------------------------------------X

In the Matter of the Application of

RAYMOND CARD and KERMIT CARD,
        Co-Petitioners,

For their Appointment as Successor Guardians
of the Property of

ELLA CARD,

An Incapacitated Person.
-------------------------------------------------------------------X

Index No. 100016/2011

ORDER AND JUDGMENT
APPOINTING GUARDIAN

WHEREAS, AN ORDER was duly made herein at the I.A.S. Part 76LR of this Court on

the  21st  day of  July, 2020, for a hearing to be held on the application of  RAYMOND

CARD and KERMIT CARD, the Co-Petitioners/Applicants of the original underlying

guardianship proceedings, requesting their appointment as Successor Co-Guardians of

the Property of ELLA CARD, a person adjudicated Incapacitated by the Hon. Betsy

Barros in an Order Appointing Guardian, dated December 14, 2011, in which VERA

Guardianship Project was appointed Guardian of the Property; and

WHEREAS, VERA Guardianship Project wishes to resign from their position as

Guardian and have so indicated in a motion brought on November 14, 2019, which was

heard in conjunction with Co-Petitioners Raymond Card and Kermit Card's application

to serve as Successor Co-Guardians, and

1

**WHEREAS,** in the motion requesting to resign, VERA had additionally made an application for a $10,000.00 retainer fee for Falcon, Rappaport et al. Counsels alleged to represent ELLA CARD, for their retainer but withdrew the application on the date of hearing, to defer to any incoming Successor Guardian(s); and Falcon Rappaport, the Counsel purporting to represent ELLA CARD, having appeared and withdrawing any application submitted to the Court, and the Court having heard testimony from John Holt, Esq., Director, VERA Guardianship Project, regarding the difficulties of maintaining the existing guardianship and recommending a replacement guardian; and Raymond Card and Kermit Card Co-Petitioners also having testified in support of their nomination and having been allocuted as to their willingness, ability and qualifications to serve, and it appearing to the satisfaction of the Court, that Raymond Card and Kermit Card are qualified to replace the Guardian and have expressed a willingness to do whatever is necessary in furtherance of protection of ELLA CARD's property;

And proof of service having been made, and it appearing to the satisfaction of the Court that RAYMOND CARD and KERMIT CARD are qualified appointed as Successor Co-Guardians of the Property Management for ELLA CARD and upon pleadings and proceedings heretofore had herein, and due deliberation having been had, and no opposition having been made,

**NOW**, therefore, on motion of JULIE STOIL FERNANDEZ, ESQ., Attorney for Co-Petitioners RAYMOND CARD and KERMIT CARD, it is hereby

**ORDERED AND ADJUDGED**, that RAYMOND CARD, residing at 124 Shetland Place, Warners, NY 13164, Tel. (315) 254-9267; and KERMIT CARD, residing at 208 Commack Road, Deer Park, NY 11729; Tel. ( 631) 871-7419, are hereby appointed as

2

Successor Co-Guardians of the Property of ELLA CARD, conditioned that the said Co-
Guardians will in all things faithfully discharge the trust imposed herein, obey all the
directions of the Court in respect to the trust, make and render a true and just account of
all monies and other properties received pursuant to the authority granted herein and the
application thereof, and of all acts performed in the administration of the trust imposed
herein whenever required to do so by the Court, and will file the designation required by
§81.26 of the Mental Hygiene Law; and it is further

**ORDERED AND ADJUDGED**, that VERA Guardianship Project is authorized to
prepare a Final Account of their proceedings as Guardian of the Property and to move for
judicial settlement of such account, and to cooperate and fully inform the Successor
Guardians of the history and experiences of the Guardian and strategies for maintaining
the property and accessing the property of ELLA CARD; and it is further
ORDERED AND ADJUDGED that Lawrence Price is appointed Referee to review the Final Account; and it is further
**ORDERED AND ADJUDGED,** that upon the qualification of the Successor Co-
Guardians and receipt of their Commission to serve, the Successor Co-Guardians shall
take custody of the funds held in the guardianship account of VERA Guardianship
Project; leaving behind adequate funds upon the settlement of a final accounting; and it is
further

**ORDERED AND ADJUDGED**, that pursuant to 81.20 of the Mental
Hygiene Law the Co-Guardians shall:

    A. Exercise only those powers that the Guardian are authorized to exercise by
       order of the Court;

    B. Exercise the utmost care and diligence when acting on behalf of ELLA
       CARD;

3

C. Exhibit the utmost degree of trust, loyalty, and fidelity in relation to ELLA CARD;

D. Visit ELLA CARD not less than four times per year, and authority, in this matter,  to seek assistance from this Court and Courts in other jurisdictions, including Access Orders with police assistance, approved by the Court, to access the Incapacitated Person, wherever she is maintained, to personally visit with her and be able to report to this Court, her health, safety and wishes;

E. Afford ELLA CARD the greatest amount of independence and self determination with respect to property management and personal needs in light of her functional level, understanding and appreciation of her functional limitations, personal wishes, preferences and desires with regard to managing the activities of daily living; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians shall have the following powers as set forth in §81.21 of the Mental Hygiene Law, with respect to the Property Management Needs of ELLA CARD:

1. Marshal the income and assets of the Incapacitated Person, including rental income from all real property owned by the Incapacitated Person located in New York State, and establish bank, brokerage and other similar accounts in the name of the Guardian for Incapacitated Person and endorse, collect, negotiate and deposit all negotiable instruments drawn to the order of the Incapacitated Person, including but not limited to, government entitlement checks; invest funds with the same authority as a

4

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

trustee, pursuant to New York EPTL §11-2.2; inventory personal
belongings;

2.  Marshal accounts held jointly in the name of the Incapacitated Person and
    others, without the consent of the listed joint tenant(s), provided that the
    Social Security number of the Incapacitated Person has been used to
    report dividends from the asset to tax authorities;

3.  Close or retitle in the Guardian's name, as Guardian, bank time deposits
    prior to maturity, upon the finding by this Court that, for purposes of § 9-I
    and §238 of the Banking Law, the Order Appointing a Guardian shall be
    deemed a declaration of incompetence and no banking or savings
    institutions shall impose any penalty upon the transaction;

4.  Restore the Guardianship as the Representative Payee of ELLA CARD's
    social security income and request direct deposit from any income sources
    into the Guardianship Account, if possible;

5.  Collect rent from tenants with legitimate leases within the real properties,
    and deposit such rent into the Guardianship account;

6.  Pay bills necessary to maintain the buildings' habitability with funds
    available from rent collection;

7.  Retain Counsel to seek eviction proceedings against holdover and
    illegitimate persons residing in the real properties owned by ELLA
    CARD, including CINDY CARD and FAITH CARD, if necessary and
    appropriate;

5

8. Authority to hire persons necessary to maintain and protect the real property;

9. Authority to appraise the value of the real properties and apply for authority to sell the real properties, subject to prior Court approval;

10. Authority to issue new leases and/or renew leases, if appropriate.

11. Convey or release contingent and expectant interests in property, including marital property rights and any right of survivorship incidental to joint tenancy or tenancy by the entirety;

12. Exercise or release powers the person holds as a trustee, personal representative, guardian for a minor, guardian, or done of a power of appointment;

13. Enter into contracts, subject to prior court approval;

14. Create revocable or irrevocable trusts of property of the estate which may extend beyond the incapacity or life of the Incapacitated Person, subject to prior court approval;

15. Create a Supplemental Needs Trust for the benefit of Faith Card, subject to prior court approval;

16. Exercise options to purchase securities;

17. Exercise rights to elect options and change beneficiaries under insurance and annuity policies and to surrender the policies for their cash value, subject to prior court approval;

6

18. Renounce or disclaim any interest by testate or intestate succession or by inter vivos transfer consistent with EPTL 2-1.11(c), subject to prior court approval;

19. Authorize access to or release of confidential records;

20. Apply for, obtain and settle claims for government benefits;

21. Pay for health care services, health care aides and household help;

22. To be provided with keys to and be authorized to access and inspect all units in the properties located at 155 Saratoga Avenue and 161 Saratoga Avenue, Brooklyn, New York;

23. Retain accountants, and similar professionals, with payment subject to the approval of this Court;

24. Request extensions, if possible, for any tax filings if applicable, with any taxing authority. Sign and file income tax returns and all other tax documents for any and all tax obligations, and appear before federal, state and local taxing authorities on all claims, litigation, settlements and other related matters and shall be authorized without further order of the court to retain an accountant for the purposes thereof and pay said accountant per hour for each unfiled year. Said accountant fees shall be subject to prior Court approval;

25. Cancel any credit accounts held by the Incapacitated Person, as the Guardians deem appropriate;

26. Engage in Medicaid planning, subject to prior court approval of all proposed transfers, pursuant to MHL §81.21 (b);

7

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 86 of 320

27. Manage all Medicare, Medicaid and other health care claims, and appear as representative for any Medicare claims, Medicaid litigation and/or settlement of claims;

28. Investigate if it is necessary to commence a turnover proceeding to discover and recover income and assets of the Incapacitated Person, pursuant to Mental Hygiene Law Section §81.43;

**ORDERED AND ADJUDGED**, that pursuant to 22 NYCRR §36.1 (b) the Co-Guardians ~~should~~ **shall not** be a subject of Part 36 of the Rules of the Chief Judge; and it is further

**ORDERED AND ADJUDGED**, that the caption of this proceeding shall be amended to reflect the appointment of said Co-Guardians as follows:

---------------------------------------------------------

**In the Matter of the Guardianship of**

**ELLA CARD    ,**                                    **Index No. 100016/2011**

**An Incapacitated Person.**

---------------------------------------------------------

and it is further

**ORDERED AND ADJUDGED**, that pursuant to §81.27 of the Mental Hygiene Law, upon the filing of an Oath and Designation as required by the statute, a commission in the due form of law shall be issued by the Clerk of the Court; and it is further

**ORDERED AND ADJUDGED**, that pursuant to Mental Hygiene Law §81.39 no later than ninety (90) days after the issuance of a commission the Co-Guardians shall complete a training program approved by the Chief Administrator of the Courts and obtain proof that the training was completed; and it is further

8

**ORDERED AND ADJUDGED**, that pursuant to Mental Hygiene Law §81.30, no later than ninety (90) days after the issuance of the commission to the Co-Guardians, the Co-Guardians shall file with the Court an initial report in a form prescribed by the Court and proof of completion of the Guardian education requirements under the Mental Hygiene Law §81.39; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians shall file during the month of May in the Office of the Clerk of the County of Brooklyn, an Annual Report in the form required by Mental Hygiene Law §81.31; and it is further

**ORDERED AND ADJUDGED**, that the Court Examiner named herein shall inform the Court in writing that the initial report/annual account has been examined; and it is further

**ORDERED AND ADJUDGED**, that the Guardian shall be compensated pursuant to SCPA §2307; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians shall take no annual commissions and compensation for any year that year's annual account is filed, reviewed by the Court Examiner, and approved by the Court; and it is further

**ORDERED AND ADJUDGED**, that for the purpose of second section 9-I of the Banking Law, this order shall be deemed a declaration of incompetence and no banking institution or savings bank shall impose any penalty for the repayment of a time deposit prior to maturity; and it is further

**ORDERED AND ADJUDGED**, that the authority of the Co-Guardians of the Property shall extend to all of the property of ELLA CARD both real and personal, including but

9

not limited to the following: income, bank accounts and other assets and real estate; and it is further

**ORDERED AND ADJUDGED**, that all persons are hereby directed and commanded to deliver to the Co-Guardians of the Property, upon demand and presentation of a certified copy of the commission, all property of ELLA CARD, of every kind and nature which may be in their possession or under their control; and it is further

**ORDERED AND ADJUDGED** that the Co-Guardians may, without prior authorization of the Court, invest surplus funds in investments eligible by law for the investment of trust funds and may dispose of investments so made and reinvest the proceeds as so authorized; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians may, without prior authorization of the Court, maintain in their own name and official title any civil judicial proceeding which the ELLA CARD might have maintained were she competent, including any ; and it is further

**ORDERED AND ADJUDGED**, that in the event the Guardianship is to be terminated, the Co-Guardians shall apply to the Court by *Ex Parte* application for permission to bring a Final Account of the proceedings, or for direction as to the disposition of ELLA CARD's property then remaining and for any other instructions concerning said termination within sixty (60) days; and it is further

**ORDERED AND ADJUDGED**, that should ELLA CARD require residency in a nursing home or residential facility at the time of her death, the director of the facility shall notify the Court within thirty (30) days; and it is further

10

**ORDERED AND ADJUDGED**, that upon the death of the ELLA CARD, the Co-Guardians shall have the authority to pay bills which were incurred prior to the death of ELLA CARD provided the Co-Guardians would otherwise have had the right to pay such bills; and it is further

**ORDERED AND ADJUDGED,** that pursuant to §81.36 (e) of the Mental Hygiene Law, upon the death of ELLA CARD, the Co-Guardians of the Property shall have the authority to pay for the reasonable funeral expenses of ELLA CARD; and it is further

**ORDERED AND ADJUDGED**, that the following individuals shall receive notice of the ELLA CARD's death, the intended disposition of remains of the decedent, funeral arrangements and the final resting place of the ELLA CARD when that information is known or can be reasonably ascertained by the Guardians: **RAYMOND CARD; KERMIT CARD;  CINDY CARD; LADONNA CARD; HELEN HERNANDEZ; and it is further**

**ORDERED AND ADJUDGED**, that to the extent of the net estate available therefore, the Co-Guardians shall provide for the maintenance, and personal well-being of the ELLA CARD and then may, without further order of the Court, provide for the maintenance and support of persons legally dependent upon the ELLA CARD and it is further

**ORDERED AND ADJUDGED**, that any safe deposit box owned by the ELLA CARD shall be opened by the Co-Guardians in the presence of a representative of the bank and the Co-Guardians shall promptly file an inventory of the contents of the safe deposit box with the Court, subscribed by all present; and it is further

**ORDERED AND ADJUDGED**, that upon the submission and review of the

11

Affirmations of Legal Services, the following fees shall be paid from the assets of ELLA

CARD by VERA Guardianship Project as her present Guardian:

    1.    To **JULIE STOIL FERNANDEZ, ESQ.,** Co-Petitioners'

Counsel, the sum of $11,250 for her legal services as Co-

Petitioners' counsel and $90  in disbursements; and it is further

**ORDERED AND ADJUDGED,** that a copy of this Order and Judgment with the Notice

of Entry shall be served on all parties as directed in this Judgment pursuant to §81.16 (c)

(3) within fifteen (15) days of the signing of this Order.


        **ENTER:**


        _____

        **Hon. Leon Ruchelsman**
        **J.S.C.**

# EXHIBIT 11

Ella R. Card
155 Saratoga Ave
Brooklyn, NY 11233

February 2011

Kermit Raymond Harrison Card
208 Commack Road
Deer Park, NY 11729

Dear Kermit Card:

This letter is written to confirm, as a final reminder, that your authority over my affairs has been relinquished.

Although your Power of Attorney has been relinquished, you have continued to operate as though it remains in effect. At this point, I require that you immediately:

- Provide me the original lease signed by Mr. Leopoldo Estevez, owner/manager of Delta Deli, on my property at 161 Saratoga Avenue,
- Stop collecting rent on my behalf,
- Send February 1st, 2011 rent to me,
- Return to me any deposit Mr. Estevez gave to you,
- Stop checking my bank accounts, credit cards, and any other personal financials related to my affairs, (I consider this a gross violation of my privacy),
- Stop visiting me with company without my invitation,
- Stop misleading attorneys, police, detectives (or anyone) who represent my affairs that you are representing and acting on my behalf in any way,
- Stay out of my personal and private business.

I consider these actions as harassment and am informing you that if you do not comply with the terms of this letter, I will immediately take appropriate legal action against you. In addition, the law considers these actions "elder abuse" and "harassment". I will seek to protect myself and take any necessary legal action against you for these acts.

Regards,

*Ella R. Card*

Ella R. Card

Ella R. Card
155 Saratoga Ave
Brooklyn, NY  11233

February 15, 2011

Kermit Raymond Harrison Card
208 Commack Road
Deer Park, NY 11729

Dear Kermit Card:

This letter is written to inform you that I intend to press criminal charges against you for misuse of the General Power of Attorney.  Though I rescinded your power of attorney, you continued to use it as though I had not.

Your pride yourself as a business man but use the sanctity of marriage to make money.  You bring couples together in order to make them citizens of a country for profit and gain.  Marriages are not created by you but are created by God and it is an abomination to God that you use this avenue to make money.  What you do by the way is not only immoral in the sight of God, but it is illegal according to mans law and I intend to report this behavior to the proper authorities.

I also intend to call the IRS and ask the IRS to check into your taxes, as you have been trying to find ways to funnel and hid your income from the IRS.  You have also attempted to gain guardianship and take my property and I will have you know under no circumstances will I ever live with you or your crack head brother.   You both have a history of drugs and alcohol and are physically and verbally abusive.  You are a sociopath and narcissistic with entitlement issues, remember, I lived with you for months and it was like living in the pit of hell.  You were verbally abusive and many a time I thought that you would hit me.

You were constantly fighting with your wife.  You also disrespected me by telling Ladonna that when I cam e back home from Belize I would have to buy food, when I had already been buying my own food.  Your wife rummaged through my pocketbook and reported its contents to everyone.  You attempted to control me in every way shape and form including stealing money from me and holding me hostage when I told you time and time again I wanted to go home.  You can't even be a guardian to your children, how do you possibly expect to be a guardian to me? Where is your first born son Nicholas Card?  Do you know if he is even dead or alive? You abused him so much so, that he left home without telling you where he is.  I have spoken to friends of his who have informed me that Nicholas has told them stories of your abuse and hatred of him, calling him fat and "stink" time and time again knowing full well that Nicholas had heart problems that  he was previously hospitalized for.

1

I plan to subpoena him to court to testify of your parenting skills.  Your daughter Kimberly, you wanted to control who she sees.  You went so far as to put a lock on her car that she owns and she had to call the police for them to recover her property.  She left home because of your bad parenting skills.  I plan on subpoenaing her to court.  Your first wife, Terrece, you and your brother introduced her to crack.  She went and sold her body, became a prostitute to get money in order to support her habit as well as her own.  You were also physically and verbally abusive to her.  What man does this to his wife?  I plan on subpoenaing her to court to testify against you.  Your second wife, Leslie, you physically and verbally abused her while high on crack.  You cut yourself with a box cutter and said that she did it because you grabbed her arm and you were afraid that you would get in trouble since you were not suppose to be near her, and therefore had her arrested and put in prison for three days, knowing full well that you were the one who had assaulted her.  I plan on subpoenaing her to court to testify against you.

You lost your job from the department of corrections.  There was an article written against you in the newspaper about officers who continually call out sick while making the city pay them for not working.  You abused your authority as a correction officer and you were fired.  I plan on subpoenaing the department of correction to testify against you.  You also abused your "unlimited sick days" given to you by the department of corrections.  You called out sick when in fact you were in the house sleeping because you were using crack and drinking alcohol for weeks and could not get up to go to work.  When you ran out of money, you would knock on my door and wake me up at 3:00 in the morning and insist that I give you money.

You created a gas leak in Carmen's apartment and you shut the gas down knowing full well you had created a hazardous living condition because you wanted Carmen to leave.  You wanted me to get your sister Cindy out of the house, so that you could rent the house out to the people from Thailand so that they could come in this country and get sponsorship to become citizens.  You said that you owned 161 Saratoga, you said it was yours.  Then you said I paid you nothing to fix it up, and then you said "I paid you like a Mexican."  None of the above are true.  You told Ladonna that you would create a will and give 80% of 161 Saratoga to yourself and 20% to Cindy.  On whose authority were you going to do this?  Did I give you any right to do this?  No I did not.  Who gives you the right to disperse my property according to your will?  You said that you would give 50% of 155 Saratoga to Ladonna and 50% to your brother Raymond.  On whose power and whose authority were you going to do this?  Raymond is a crack head like yourself and under no circumstances would I ever give him 50% of my property.

I have worked all my life for what I have.  It was not a gift.  It came from my hard labor.  Who gives you the right to try to take it away?  Who gave you authority to deem me "incapacitated"?  You are the one "incapacitated" due to your drug and alcohol abuse and your mental problems in which you have been on Prozac and therapy for years.  Did you tell this to your attorney in the process of trying to have me deemed "incapacitated"?  You are only doing this because of your

2

plot with Carmen to take over my building, but her plot to manage it for you fell through. You are as much a thief and a liar and more than Carmen.

I gave birth to you and these are the things that you have done. I curse you in the name of Jesus Christ for dishonoring me in such a fashion. I plan on going to the news media and telling them what you and your siblings have plotted against me. This is "elder abuse" personified and I will be telling my story to the news media. Furthermore, I want nothing to do with you ever again. As long as you live, do not call me; do not come near my house. If you see me on the street, walk on by. I have made arrangements and given specific instructions that when I die, you are not to look upon my face or enter the doors of my funeral. You are no longer my son, and I forever disown you.

It's a shame that as a person gets older; their children think they have a right to take what they think belongs to them including the settlement from your father's death. You were a horrible to your father also. He had no use for you. You would come to the house and would not ever give him the time of day. While he was in the hospital dying, the only one of his children that took care of him and went to see him every day was his daughter, Cindy Rubina Card. Now even that you all are trying to take from me. I was the one that bore his children and support him. I was the one who took care of him when he was in distress. I was the one married to and was faithful to him for 42 years.

What gives you the right to think that you are entitled to ANYTHING from his estate? I w fight you and your siblings to the end with my last breath. You will take nothing from me because you have taken enough. If you want money and property, go and WORK FOR IT thing I do know that if God be for me, who can be against me. When this is all over, you your siblings will all get exactly what you deserve. God is not mocked. What so ever ev man soweth that shall he also reap.

I will see you in court.

*Ella Rubina Card*

Ella Rubina Card

Ella R. Card
155 Saratoga Ave
Brooklyn, NY 11233

February 23, 2011

Raymond H. Card
124 Shetland Place
Warners, NY 13164

Raymond,

This letter is the last piece of correspondence I will ever give to you. For I have disowned you and written you off as my son. What you are attempting to do is an abomination to God and will never come to fruition. You seek to imprison me and control me and dominate me all for the sake of money. Do you not remember the word of God says "...the love of money is the root to all evil"? This evil that is ingrained inside of you has followed you all the days of your life. You left your first wife Elaine and 4 children because you were having an affair with Ruth, your second wife. You neglected to be the husband and father that God commanded that you be. In doing this you left your children, uncovering them and leaving them to the wiles of Satan. Elaine took another man because you left her and this man ended up raping, over a period of approximately 4 years, your first born daughter. I took care of Elaine and your children. I provided shelter, I provided food, I provided clothing, and I was the only stability that they had, while you in turn adopted another man's son and gave him your name. You created another family leaving your first family behind. Your first born daughter Faith, did not even have your name. She only ended up with Card just in recent years when I changed her name for her.

You lead a life of drug abuse and alcoholism. You were fired from the department of corrections because they went to your house because you continually called out sick and found that you were not home. They called you in and tested your urine and found out "that your urine was dirty." Meaning your urine tested positive for crack. You continued on with your alcoholism and drug addiction. You had a sexual relationship with your wife's sister Arlene "your very own sister-in-law". You stole money from your son's ATM card and latter went into my bank account and stole approximately $5,000 in cash. You also put my name on a car loan and made me solely responsible for it causing my permit to be revoked and the threats of a lien placed on my house. You even went so far as putting a gun to your sister LaDonna's head demanding that if she did not give you money, you would blow her brains out.

Eventually you lost your home in Long Island and me, in spite of your siblings' pleas against it, I allowed you to come and live with me because you were my son and I felt compassion for you. While here, you pretended to "find salvation", and started attended the Brooklyn Tabernacle only to be asked to step down from you ministry of teaching in the learning center, being a security guard, singing in the men's chorus, and whatever else you were doing because you were having a sexual relationship with Sharon Moore, and your current wife all while flirting with Roberta. What a whorish way for a Christian man to behave. You became a shame and a by-word among the Brooklyn Tabernacle and no matter what you have tried to do to redeem yourself, your actions were never forgotten. All this, while participating in these events at church you still continued to abuse drugs and drink alcohol. Your mind remains twisted and seared and you hide behind "Christianity" hoping that your actions would not be exposed. But Raymond, do you not know that the word of God says, "What is done in secret shall be shouted on the highest rooftops"?

I have spoken to members from the Brooklyn Tabernacle. I told them what you and you siblings are planning. They told me that you are on face book and they plan on exposing what you are doing to me now, what you have done in the Brooklyn Tabernacle, and what you have done in the past. They say that your actions are an abomination and God will surely curse you. One of them gave me a word from the Lord to give you. I have enclosed it with this letter.

I stayed with you for a couple of weeks last year, and now you think that that entitles you to ask to be my guardian. You have never raised your own children, I did. You have never been committed to any wife. You are on wife number three and it is just a matter of time before you destroy this relationship also. I guess these actions are qualifications to be my guardian? It looks to me that YOU are the one that is incapacitated due to your alcohol and drug abuse. Did you tell your lawyer you were fired from the department of corrections because of it? Did you tell your lawyer that you were not even guardian to your own children; that I was? Did you tell your lawyer that you too, stole from me? Did you tell your lawyer, that you are a fake, a fraud, and a phony? Did you tell your lawyer, that people are still looking for you in my neighborhood because they say you owe them money for crack? Did you tell your lawyer that you are a wife beater? For example, you kicked Ruth in the stomach while she was pregnant with Alize! Did you tell your lawyer, that you tried to rape Ruth because she would not sleep with you anymore and had you arrested for it? Was this information on your questionnaire when you asked to be a nominee to get guardianship of me? I'm quite sure it was not!!!!! Did you tell your lawyer that you are incapacitated by virtue of using alcohol and drugs all your life?

# EXHIBIT 12

## NOTICE TO CEASE AND DESIST

February 14, 2020

UNITED STATES CERTIFIED MAIL,
RETURN RECEIPT REQUESTED

& REGULAR MAIL

Mr. Raymond Card Jr.
124 Shetland Pl

Warners, NY 13164

Dear Mr. Card:

This letter is to advise you that you are not permitted on the property where I am staying, or any property I own, or where I may be living or working. If you do come on my property or the property where I am working or own, the police will be notified and **criminal charges will be pursued**. In addition, any attempt to contact me at my home, place of work, or any other location where I may be, either in person, by **third party** (which includes giving messages), in writing (including e-mail and text), by telephone, or by any other means (including voicemail), as well as Facebook, will be considered **harassment** and **criminal charges will be pursued**. You are not to contact my friends or relatives about me, or to give messages, as that will be considered **Harassment, and criminal charges will be filed.**

Harassment, which includes striking, kicking, shoving, alarming, or seriously **annoying another person** is punishable by up to **90 days in prison** and a fine of $300.00. **Harassment by Communication is also a crime**. It is punishable by up to one year imprisonment, or a $2,500.00 fine. **Stalking** is engaging in a course of conduct or repeatedly committing an act toward another person, including following that person without proper authority, with the intent to place that person in fear of bodily injury or to cause substantial emotional distress to that person. An offense of stalking constitutes a **misdemeanor in the first degree.**

A copy of this letter is being sent to you by regular United States Mail and by United States Certified Mail. A copy of this is also being sent to local police departments.

This letter will be followed up by a Protection From Abuse (PFA) order.

Sincerely,

*Ella Card*

Ella Card

cc:

Onondaga County Sheriff's Office, 407 S State St, Syracuse, NY 13202
Hanover Borough Police Department, Penn Township Police Department

# NOTICE TO CEASE AND DESIST

February 14, 2020

UNITED STATES CERTIFIED MAIL
RETURN RECEIPT REQUESTED

& REGULAR MAIL

Mr. Kermit Card
208 Commack Rd

Deer Park, NY 11729

Dear Mr. Card:

This letter is to advise you that you are not permitted on the property where I am staying, or any property I own, or where I may be living or working. If you do come on my property or the property where I am working or own, the police will be notified and **criminal charges will be pursued.** In addition, any attempt to contact me at my home, place of work, or any other location where I may be, either in person, by **third party** (which includes giving messages), in writing (including e-mail and text), by telephone, or by any other means (including voicemail), as well as Facebook, will be considered **harassment** and **criminal charges will be pursued.** You are not to contact my friends or relatives about me, or to give messages, as that will be considered **Harassment, and criminal charges will be filed.**

Harassment, which includes striking, kicking, shoving, alarming, or **seriously annoying another person** is punishable by up to **90 days in prison** and a fine of $300.00. **Harassment by Communication is also a crime.** It is punishable by up to one year imprisonment, or a $2,500.00 fine. **Stalking** is engaging in a course of conduct or repeatedly committing an act toward another person, including following that person without proper authority, with the intent to place that person in fear of bodily injury or to cause substantial emotional distress to that person. An offense of stalking constitutes a **misdemeanor in the first degree**.

A copy of this letter is being sent to you by regular United States Mail and by United States Certified Mail. A copy of this is also being sent to local police departments.

This letter will be followed up by a Protection From Abuse (PFA) order.

Sincerely,

*Ella Card*

Ella Card

cc:

Suffolk County Police Department, 555 Rte 109, West Babylon, NY 11704
Hanover Borough Police Department, Penn Township Police Department

# EXHIBIT 13

Ella R. Card
155 Saratoga Ave
Brooklyn, NY 11233

March 1, 2011

To Whom It May Concern:

This letter is to certify that I Ella Rubina Card, being of sound mind and body, am giving my daughter Cindy Rubina Card total and full control of my assets which includes, but is not limited to, the two properties of 155 Saratoga Avenue, Brooklyn, NY 11233 and 161 Saratoga Avenue, Brooklyn, NY 11233.

I have issued a power of attorney on Friday February 4, 2011 which includes the management of all my assets including but not limited to paying bills, collecting rent, managing annuities, managing and conducting transactions associated with my bank accounts, handling my stocks, representing me in the wrongful death suit of Raymond Harrison Card Sr., and generally representing me in all personal, business and legal matters etcetera.

All issues relative to Ella Rubina Card are to be referred to and handled by, without reservation, to Cindy Rubina Card.

*Ella Rubina Card* 3/1/11
Ella Rubina Card

*Kimchan Malaaq*
03. 01. 2011

KIMCHAN MAHARAJ
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6146702
Qualified in Kings County
My Commission Expires May 22, 2014

*Cindy Rubina Card* 3/1/11
Cindy Rubina Card

10/16/2020   15:05 galaxycell                    (FAX)3473509417         P.006/018

Ella R. Card
155 Saratoga Ave
Brooklyn, NY 11233

February 23, 2011

Raymond H. Card
124 Shetland Place
Warners, NY 13164

Raymond,

This letter is the last piece of correspondence I will ever give to you. For I have disowned you and written you off as my son. What you are attempting to do is an abomination to God and will never come to fruition. You seek to imprison me and control me and dominate me all for the sake of money. Do you not remember the word of God says "…the love of money is the root to all evil"? This evil that is ingrained inside of you has followed you all the days of your life. You left your first wife Elaine and 4 children because you were having an affair with Ruth, your second wife. You neglected to be the husband and father that God commanded that you be. In doing this you left your children, uncovering them and leaving them to the wiles of Satan. Elaine took another man because you left her and this man ended up raping, over a period of approximately 4 years, your first born daughter. I took care of Elaine and your children. I provided shelter, I provided food, I provided clothing, and I was the only stability that they had, while you in turn adopted another man's son and gave him your name. You created another family leaving your first family behind. Your first born daughter Faith, did not even have your name. She only ended up with Card just in recent years when I changed her name for her.

You lead a life of drug abuse and alcoholism. You were fired from the department of corrections because they went to your house because you continually called out sick and found that you were not home. They called you in and tested your urine and found out "that your urine was dirty." Meaning your urine tested positive for crack. You continued on with your alcoholism and drug addiction. You had a sexual relationship with your wife's sister Arlene "your very own sister-in-law". You stole money from your son's ATM card and latter went into my bank account and stole approximately $5,000 in cash. You also put my name on a car loan and made me solely responsible for it causing my permit to be revoked and the threats of a lien placed on my house. You even went so far as putting a gun to your sister LaDonna's head demanding that if she did not give you money, you would blow her brains out.

Eventually you lost your home in Long Island and me, in spite of your siblings' pleas against it, I allowed you to come and live with me because you were my son and I felt compassion for you. While here, you pretended to "find salvation", and started attended the Brooklyn Tabernacle only to be asked to step down from you ministry of teaching in the learning center, being a security guard, singing in the men's chorus, and whatever else you were doing because you were having a sexual relationship with Sharon Moore, and your current wife all while flirting with Roberta. What a whorish way for a Christian man to behave. You became a shame and a by-word among the Brooklyn Tabernacle and no matter what you have tried to do to redeem yourself; your actions were never forgotten. All this, while participating in these events at church you still continued to abuse drugs and drink alcohol. Your mind remains twisted and seared and you hide behind "Christianity" hoping that your actions would not be exposed. But Raymond, do you not know that the word of God says, "What is done in secret shall be shouted on the highest rooftops"?

I have spoken to members from the Brooklyn Tabernacle. I told them what you and you siblings are planning. They told me that you are on face book and they plan on exposing what you are doing to me now, what you have done in the Brooklyn Tabernacle, and what you have done in the past. They say that your actions are an abomination and God will surely curse you. One of them gave me a word from the Lord to give you. I have enclosed it with this letter.

I stayed with you for a couple of weeks last year, and now you think that that entitles you to ask to be my guardian. You have never raised your own children, I did. You have never been committed to any wife. You are on wife number three and it is just a matter of time before you destroy this relationship also. I guess these actions are qualifications to be my guardian? It looks to me that YOU are the one that is incapacitated due to your alcohol and drug abuse. Did you tell your lawyer you were fired from the department of corrections because of it? Did you tell your lawyer that you were not even guardian to your own children; that I was? Did you tell your lawyer that you too, stole from me? Did you tell your lawyer, that you are a fake, a fraud, and a phony? Did you tell your lawyer, that people are still looking for you in my neighborhood because they say you owe them money for crack? Did you tell your lawyer that you are a wife beater? For example, you kicked Ruth in the stomach while she was pregnant with Alize! Did you tell your lawyer, that you tried to rape Ruth because she would not sleep with you anymore and had you arrested for it? Was this information on your questionnaire when you asked to be a nominee to get guardianship of me? I'm quite sure it was not!!!!! Did you tell your lawyer that you are incapacitated by virtue of using alcohol and drugs all your life?

10/16/2020   15:06 galaxycell                    (FAX)3473509417          P.008/018

Ella R. Card
155 Saratoga Ave
Brooklyn, NY  11233

February 11, 2011

Raymond Harrison Card Jr.

Dear Raymond:

This letter is written to inform you that I am requesting repayment of all the monies you took from me over the past years.  You had asked me to co-sign for automobile loan and to my surprise, when it came time to make payments, I found out I was solely responsible for the loan. You did not pay the loan and in order to save my house, I had to pay the loan of approximately $27,000 in total.

Additionally, while you were on your drug binge, being addicted to crack and alcohol, you took approximately $5,000 from my bank account without my permission.  Last year, you made a verbal agreement with me that you would start paying me back.  To date, I have not received a cent from you.  In total you owe me approximately $32,000.

At this point, I do not intend to press charges against you but am requesting you sign the enclosed repayment plan and return it to me by February 21, 2011.  If I do hear from you by February 21, 2011 I will then commence legal action against you to recoup all the monies due.

Regards,

*Ella R. Card*

Ella R. Card

10/16/2020   15:06 galaxycell                                    (FAX)3473509417        P.009/018

P 45  6ᵀᴴ F.

F.C.A.§§ 812, 818, 821                                                        8-2 09/2009

**FAMILY COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

In the Matter of a Family Offense Proceeding          File #:    176340
                                                      Docket #:  O-04799-11
Ella Card,

                                    Petitioner,        **FAMILY OFFENSE**
                                                       **PETITION**
        - against -

Raymond H Card Jr.,
                                    Respondent.

TO THE FAMILY COURT:

        The undersigned Petitioner respectfully states that:

        I, Ella Card reside at¹ 155 Saratoga Avenue, Apt. 3, Brooklyn, NY 11233.

        The Respondent, Raymond H Card Jr. resides at 124 Shetland Place, Warners, NY 13164.

        The Respondent and I are related in the following way: I am the mother of the Respondent.

        The Respondent committed the following family offenses against me and/or my children which constitute attempted assault, assault in the second or third degree, aggravated harassment in the second degree, harassment in the first or second degree, disorderly conduct, menacing in the second or third degree, reckless endangerment, stalking, criminal mischief, sexual abuse in the second or third degree, sexual misconduct, and forcible touching.

        The most recent incident was on February 4, 2011 at 06:00P.M. at Over the phone. : Resp called her home and yelling, screaming, cursing at petr about her forcing his daughter to leave the home.  Petr states that resp has taken money from her in the past, threatened to seek guardianship over petr or worse have petr thrown into a mental facility . Petr states that resp has a history of abused drug and alcohol and has been verbally abusive in the past and is requesting a TOP until a FOP can be determined. .

        I have not filed a criminal complaint concerning these incidents.

        I have no children and there are no other children living in my home.

        The Respondent owns or has access to guns as follows: Resp may have access to a firearm.

        The Respondent has a gun license or pistol permit for the following gun(s) as follows: Resp is a former correction officer and may have a license or permit for a firearm.

---

¹If your health or safety or that of your child or children would be put at risk by disclosure of your address or other identifying information, you may apply to the Court for an address confidentiality order by submitting General Form GF-21, which is available on-line at www.nycourts.gov . *See* Family Court Act § 154-b.

10/16/2020   15:06 galaxycell                           (FAX)3473509417          P.010/018

Page: 2 of 2
Docket No: O-04799-11
8-2

I have not made any previous application to any court or judge for the relief requested in this petition.

WHEREFORE, Petitioner respectfully requests this Court to:

- adjudge the Respondent to have committed the family offenses alleged;
- enter an order of protection, specifying conditions of behavior to be observed by the Respondent in accordance with Section 842 of the Family Court Act:
    - Petr is requesting that resp stay away from both of her homes , work or anywhere petr maybe.  Petr is also requesting that resp refrain from any and all menace, harassment, assault, threats, intimidation and that she not be contacted by a third party on resp behalf. ;
- enter a finding of aggravated circumstances;
- order such other and further relief as the Court deems just and proper.

**Dated: February 9, 2011**

_Ella Card_
Ella Card, Petitioner

VERIFICATION

STATE OF NEW YORK)
                                            :ss:
COUNTY OF KINGS)

Ella Card being duly sworn, says that he/she is the Petitioner in the above-named proceeding and that the foregoing petition is true to his/her own knowledge, except as to matters stated to be alleged on information and belief and as to those matters he/she believes them to be true.

_Ella Card_
Ella Card, Petitioner

Sworn to before me on
February 9, 2011

Chief Clerk or Designee
Notary Public

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

10/16/2020   15:06 galaxycell                              (FAX)3473509417          P.011/018

F.C.A. §§ 812, 813, 821                                                    0-2 099200

FAMILY COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS

In the Matter of a Family Offense Proceeding          **File #:**     176340
                                                      **Docket #:**   O-04797-11
Ella Card,
                              Petitioner,            **FAMILY OFFENSE**
        - against -                                      **PETITION**

Kermit Card,
                              Respondent.

TO THE FAMILY COURT:

        The undersigned Petitioner respectfully states that:

        I, Ella Card reside at[1] 155 Saratoga Avenue, Apt. 3, Brooklyn, NY 11233.

        The Respondent, Kermit Card resides at 208 Commack Road, Deer Park, NY 11729.

        The Respondent and I are related in the following way: I am the mother of the Respondent.

        The Respondent committed the following family offenses against me and/or my children
which constitute attempted assault, assault in the second or third degree, aggravated harassment in
the second degree, harassment in the first or second degree, disorderly conduct, menacing in the
second or third degree, reckless endangerment, stalking, and criminal mischief.

        The most recent incident was on January 29, 2010 at 02:00P.M. at 155 Saratoga Avenue
Brooklyn, NY 11233: Petr states that resp came to her home with police and tried to have her tenant
removed. Petr states that she told resp that her tenant was fine, she was behind in the rent but her
tenant did help her out around the house. Petr states that resp has stolen the keys to both of her
home, harassed petr about her private business and has threatened to have a mental health warrant
taken out on her. Petr states that resp is constantly yelling, screaming cursing at petr with threats of
having her but away. Resp threatened to "fu** her up" no one is going to take care of you or give
you medicine, resp calls her stupid and tries to force petr to give him money. Resp collected the rent
from her tenants and kept it for himself, petr is scared to ask resp about in fear that he would assault
her. Petr states that she doesn't feel safe in her home with resp having her keys and she fears for
her safety. Petr is requesting a TOP until a FOP can be determined.

        I have not filed a criminal complaint concerning these incidents.

        I have no children and there are no other children living in my home.

        The Respondent has acted in a way which I consider dangerous or threatening to me, my

--------------------------------------------------------------------

[1] If your health or safety or that of your child or children would be put at risk by disclosure of your address or
other identifying information, you may apply to the Court for an address confidentiality order by submitting Genere!
Form GF-21, which is available on-line at www.nycourts.gov . See Family Court Act § 154-b.

10/16/2020    15:06 galaxycell                                    (FAX)3473509417           P.012/018

children or members of my family, in addition to the incident described in above, as follows: Petr states that resp comes to her home unannounced yelling, cursing threatening her. .

    The Respondent owns or has access to guns as follows: Resp may have access to firearms.

    The Respondent has a gun license or pistol permit for the following gun(s) as follows: Resp is a former correction officer may has license or permit for a firearm.

    The Respondent has the following criminal convictions: Resp has a history of criminal history. .

    I have not made any previous application to any court or judge for the relief requested in this petition.

WHEREFORE, Petitioner respectfully requests this Court to:

- adjudge the Respondent to have committed the family offenses alleged;
- enter an order of protection, specifying conditions of behavior to be observed by the Respondent in accordance with Section 842 of the Family Court Act;
  - Petr is requesting that resp stay away from both of her homes, or anywhere petr maybe. Petr is also requesting that resp refrain from any and all menace, harassment, assault, threats and intimidation. Petr is also requesting that resp contact her via phone and that she not be contacted by a third party on resp behalf. Petr is requesting a TOP until a FOP can be determined. ;
- order such other and further relief as the Court deems just and proper.

Dated: February 9, 2011

*P. Ella Card*

Ella Card, Petitioner

10/16/2020   15:07 galaxycell                                    (FAX)3473509417        P.013/018

Page: 3 of 3
Docket No: O-04797-11
8-2

## VERIFICATION

STATE OF NEW YORK)

:ss:

COUNTY OF KINGS)

Ella Card being duly sworn, says that he/she is the Petitioner in the above-named
proceeding and that the foregoing petition is true to his/her own knowledge, except as to matters
stated to be alleged on information and belief and as to those matters he/she believes them to be
true.

_Ella Card_

Ella Card, Petitioner

Sworn to before me on
February 9, 2011

_____

Chief Clerk or Designee
Notary Public

10/16/2020   15:07 galaxycell                              (FAX)3473508417        P.014/018

12/28/2011   10:57 p   TO:+1 (718) 7568879  FROM:3013578541      Page: 1

Ella R. Card
155 Saratoga Ave
Brooklyn, NY 11233

March 1, 2011

To Whom It May Concern:

This letter is to certify that I Ella Rubina Card, being of sound mind and body, am giving my
daughter Cindy Rubina Card total and full control of my assets which includes, but is not limited
to, the two properties of 155 Saratoga Avenue, Brooklyn, NY 11233 and 161 Saratoga Avenue,
Brooklyn, NY 11233.

I have issued a power of attorney on Friday February 4, 2011 which includes the management of
all my assets including but not limited to paying bills, collecting rent, managing annuities,
managing and conducting transactions associated with my bank accounts, handling my stocks,
representing me in the wrongful death suit of Raymond Harrison Card Sr., and generally
representing me in all personal, business and legal matters etcetera.

All issues relative to Ella Rubina Card are to be referred to and handled by, without reservation,
to Cindy Rubina Card.

_Ella Rubina Card_ 3/1/11                    _Kimchan Malaray_
Ella Rubina Card                             03. 01. 2-011

                                             KIMCHAN MAHARAJ
                                             NOTARY PUBLIC-STATE OF NEW YORK
                                             No. 01MA6146702
_Cindy Rubina Card_ 3\1\11                   Qualified in Kings County
Cindy Rubina Card                            My Commission Expires May 22, 2014

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY
RESTRAINING ORDER DEMAND JURY TRIAL**

161 Saratoga Avenue
Brooklyn, NY 11233

2 March 2011

Ella Card
155 Saratoga Avenue
Brooklyn, NY 11233

Dear Ella Card;

This letter is to thank you for your generous contributions of $6,611 to ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ for the year of 2010.   It is because of people like you that help keep our organization meeting needs of animals we have taken into refuge.

Please use this letter as your 2010 tax contribution to a non-profit organization portion of your taxes.

Thank you for your continued support!

10/16/2020   15:07 galaxycell                                    (FAX)34735094/7        P.016/018

Ella R. Card
155 Saratoga Ave
Brooklyn, NY 11233

February 2011

Kermit Raymond Harrison Card
208 Commack Road
Deer Park, NY 11729

Dear Kermit Card:

This letter is written to confirm, as a final reminder, that your authority over my affairs has been relinquished.

Although your Power of Attorney has been relinquished, you have continued to operate as though it remains in effect. At this point, I require that you immediately:

- Provide me the original lease signed by Mr. Leopoldo Estevez, owner/manager of Delta Deli, on my property at 161 Saratoga Avenue,
- Stop collecting rent on my behalf,
- Send February 1st, 2011 rent to me,
- Return to me any deposit Mr. Estevez gave to you,
- Stop checking my bank accounts, credit cards, and any other personal financials related to my affairs, (I consider this a gross violation of my privacy),
- Stop visiting me with company without my invitation,
- Stop misleading attorneys, police, detectives (or anyone) who represent my affairs that you are representing and acting on my behalf in any way,
- Stay out of my personal and private business.

I consider these actions as harassment and am informing you that if you do not comply with the terms of this letter, I will immediately take appropriate legal action against you. In addition, the law considers these actions "elder abuse" and "harassment". I will seek to protect myself and take any necessary legal action against you for these acts.

Regards,

*Ella R. Card*

Ella R. Card

10/16/2020   15:07 galaxycell                              (FAX)34/350941/        P.017/018

SEPTEMBER 29TH, 2010

THIS IS TO GIVE NOTICE THAT EFFECTIVE IMMEDIATELY THAT KERMIT
CARD OF 208 COMMACK ROAD, DEER PARK NEW YORK 11729 IS NO
LONGER IN CHARGE OF ANY BUSINESS IN ACCORDANCE WITH 161
SARATOGA AVENUE. ALL CORRESPONDENCES, OR AGREEMENT ARE
DEEMED INVALID AS OF SEPTEMBER 29TH, 2010 IN ACCORDANCE WITH THE
ENCLOSED DOCUMENTS.
ANY & ALL FURTHER RENTS, OTHER MONETARY AGREEMENTS,
CORRESPONDENCES OR DISCUSSIONS REGARDING THIS PROPERTY
SHOULD BE ADDRESSED DIRECTLY TO ME, ELLA CARD, OF 155 SARATOGA
AVENUE, BROOKLYN, NY, 11233, OR ANY OTHER AGENT I DEEM
NECESSARY AS PER ANY VERBAL OR WRITTEN AUTHORIZATIONS.
FAILURE TO COMPLY WITH THIS NOTICE, AS OWNER OF SAID PROPERTY
AT 161 SARTOGA, WILL BE DEEMED AS NULLIFICATION OF ANY PREVIOUS
AGREEMENTS BY LAW.

SINCERELY,

*Ella Card*

ELLA CARD

JACQUELINE L. GARRETT
NOTARY PUBLIC-STATE OF NEW YORK
No. 01GA6189330
Qualified in New York County
My Commission Expires June 23, 2012

10/16/2020   15:07 galaxycell                                    (FAX)3473508417                P.018/018

June 9th, 2011

Mrs Laura Negron, Esq., Director
The Vera Institute of Justice
360 Adams Street
Brooklyn, NY 11201

Dear Ms Negron,
I have repeatedly asked your associates, including Zach, Jason Hyde, & Aisha
Glover, to relinquish funds to me from my own personal accounts so that I may
obtain my own private attorney. I made this request at the inception of this hearing,
and have done so on a multitude of occasions in my verbal correspondences with the
workers at Vera, and have been flat out denied or told this was not possible; I last
spoke with Zach last week who relayed to me that this could not be done.

My daughter LaDonna Card had a meeting with you and Ms Glover on May 17th,
2011, where she said she also asked about monies for an attorney for me, and was
told that this would have to be approved by the judge. To date, I have not been
afforded my legal right to an appeal. My daughter LaDonna also stated she spoke
with Zach & Ms Glover on June 6th regarding my need for funds and again asked
about relinquishing my money for an attorney, that I may appeal the ruling made
by Judge Barros, with no definitive response.

Everyone I have come in contact with at Vera acknowledges that I am not an
incapacitated person, but no one will stand up to do what is the legal, moral &
ethical thing which is to allow me to fight a bogus decision by Judge Barros.

I will continue to ask for my money as well as speaking to everyone about what the
Vera Institute is involved in, by continuing to deny my right to the legal council of
my choosing as well as "policing" my funds. The money I worked many hard years
to accumulate that my retirement could be fulfilling & peaceful, not to have to beg
for my money or treated as if I am a child, further enhancing the feelings as if I am
in the throws of hell.

I need monies to obtain an attorney to fight for my rights. Your continual denial of
allowing me this legal process will be noted by all, and I promise that someone will
listen and eventually help me. I have lived my live righteously, honorably,
generously, & ensured I gave back to God by way of the church which is HIS
requirement thru Christian faith, hence my continued blessings, before I was put
thru this hell by Judge Barros.

I implore to you Mrs Negron, to release my money so that I can seek true justice for
myself. We all have to answer to a higher authority other than the courtroom or the
judges chambers, for as humans, we are flawed beings. Please do the right thing.

Sincerely,

*Ella Card*

JACQUELINE L. GARRETT
NOTARY PUBLIC-STATE-OF-NEW YORK
No. 01GA6189330
Qualified in New York County
My Commission Expires June 23, 2012

10/16/2020   15:05 galaxycell                                    (FAX)3473509417            P.001/018

02/15/2011   10:07 p   TO:+1 (718) 7568879  FROM:3013578541      Page: 1

Ella R. Card
155 Saratoga Ave
Brooklyn, NY 11233

February 15, 2011

Kermit Raymond Harrison Card
208 Commack Road
Deer Park, NY 11729

Dear Kermit Card:

This letter is written to inform you that I intend to press criminal charges against you for misuse of the General Power of Attorney. Though I rescinded your power of attorney, you continued to use it as though I had not.

Your pride yourself as a business man but use the sanctity of marriage to make money. You bring couples together in order to make them citizens of a country for profit and gain. Marriages are not created by you but are created by God and it is an abomination to God that you use this avenue to make money. What you do by the way is not only immoral in the sight of God, but it is illegal according to mans law and I intend to report this behavior to the proper authorities.

I also intend to call the IRS and ask the IRS to check into your taxes, as you have been trying to find ways to funnel and hid your income from the IRS. You have also attempted to gain guardianship and take my property and I will have you know under no circumstances will I ever live with you or your crack head brother. You both have a history of drugs and alcohol and are physically and verbally abusive. You are a sociopath and narcissistic with entitlement issues, remember, I lived with you for months and it was like living in the pit of hell. You were verbally abusive and many a time I thought that you would hit me.

You were constantly fighting with your wife. You also disrespected me by telling Ladonna that when I cam e back home from Belize I would have to buy food, when I had already been buying my own food. Your wife rummaged through my pocketbook and reported its contents to everyone. You attempted to control me in every way shape and form including stealing money from me and holding me hostage when I told you time and time again I wanted to go home. You can't even be a guardian to your children, how do you possibly expect to be a guardian to me? Where is your first born son Nicholas Card? Do you know if he is even dead or alive? You abused him so much so, that he left home without telling you where he is. I have spoken to friends of his who have informed me that Nicholas has told them stories of your abuse and hatred of him, calling him fat and "stink" time and time again knowing full well that Nicholas had heart problems that  he was previously hospitalized for.

1

10/16/2020   15:05 galaxycell                                    (FAX)3473509417          P.002/018

10:07 p     TO:+1 (718) 7568879   FROM:3013578541      Page: 2

I plan to subpoena him to court to testify of your parenting skills. Your daughter Kimberly, you wanted to control who she sees. You went so far as to put a look on her car that she owns and she had to call the police for them to recover her property. She left home because of your bad parenting skills. I plan on subpoening her to court. Your first wife, Terrece, you and your brother introduced her to crack. She went and sold her body, became a prostitute to get money in order to support your habit as well as her own. You were also physically and verbally abusive to her. What man does this to his wife? I plan on subpoening her to court to testify against you. Your second wife, Leslie, you physically and verbally abused her while high on crack. You cut yourself with a box cutter and said that she did it because you grabbed her arm and you were afraid that you would get in trouble since you were not suppose to be near her, and therefore had her arrested and put in prison for three days, knowing full well that you were the one who had assaulted her. I plan on subpoening her to court to testify against you.

You lost your job from the department of corrections. There was an article written against you in the newspaper about officers who continually call out sick while making the city pay them for not working. You abused your authority as a correction officer and you were fired. I plan on subpoening the department of correction to testify against you. You also abused your "unlimited sick days" given to you by the department of corrections. You called out sick when in fact you were in the house sleeping because you were using crack and drinking alcohol for weeks and could not get up to go to work. When you ran out of money, you would knock on my door and wake me up at 3:00 in the morning and insist that I give you money.

You created a gas leak in Carmen's apartment and you shut the gas down knowing full well you had created a hazardous living condition because you wanted Carmen to leave. You wanted me to get your sister Cindy out of the house, so that you could rent the house out to the people from Thailand so that they could come in this country and get sponsorship to become citizens. You said that you owned 161 Saratoga, you said it was yours. Then you said I paid you nothing to fix it up, and then you said "I paid you like a Mexican." None of the above are true. You told Ladonna that you would create a will and give 80% of 161 Saratoga to yourself and 20% to Cindy. On whose authority were you going to do this? Did I give you any right to do this? No I did not. Who gives you the right to disperse my property according to your will? You said that you would give 50% of 155 Saratoga to Ladonna and 50% to your brother Raymond. On whose power and whose authority were you going to do this? Raymond is a crack head like yourself and under no circumstances would I ever give him 50% of my property.

I have worked all my life for what I have. It was not a gift. It came from my hard labor. Who gives you the right to try to take it away? Who gave you authority to deem me "incapacitated"? You are the one "incapacitated" due to your drug and alcohol abuse and your mental problems in which you have been on Prozac and therapy for years. Did you tell this to your attorney in the process of trying to have me deemed "incapacitated"? You are only doing this because of your

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-----------------------------------------------------------------X
In the Matter of the Guardianship of ELLA          Index No.:
CARD,

CINDY CARD, LADONNA CARD,                          **AFFIDAVIT IN**
and KENNETH SWENSON,                               **SUPPORT**

                    Petitioners,

        v.

RAYMOND CARD and KERMIT CARD,

            Respondents.
-----------------------------------------------------------------X

STATE OF NEW YORK    )
                    ) ss.:
COUNTY OF BRONX     )

      LADONNA CARD, being duly sworn, deposes and says:

      1. I am a Petitioner in the above referenced action.  I am fully familiar with

the facts and circumstances set forth in this affidavit, which is respectfully

submitted in support of the application of Petitioners for the non-appointment

and/or removal of RAYMOND CARD and KERMIT CARD as Successor Co-

Guardians of the Property Management for ELLA CARD pursuant to Article 81.35

of the NY Mental Hygiene Law and the appointment of CINDY CARD, LADONNA

CARD and KENNETH SWENSON as Successor Co-Guardians of the Property

Management for ELLA CARD pursuant article 81 of the NY Mental Hygiene Law,

and for such other and further relief as may be just, proper and equitable.

2.  I together with my sister and co-Petitioner submit this affidavit to the court to show that Respondents are unfit to act as co-Guardians and/or they should be terminated for cause, for a myriad of reasons set forth herein.

3. Both Respondents have committed unlawful and illegal conduct in that they have committed assault, against their ex-wives and/or children. A copy of a handwritten letter of Respondent Raymond Card admitting that he abused his ex-wife and children is annexed hereto as Exhibit B. Upon information and belief, Respondent Kermit Card was also arrested for making a false police report against his ex-wife and was subjected to disciplinary action by his employer for doing so.

4.  Both Respondents are lifetime abusers of alcohol and cocaine.  In fact, in 2011, when the initial proceedings were held, Raymond was visibly drunk in court and smelled of alcohol.  The addiction has so severe that one day Respondent Raymond Card pulled a gun on Petitioner LaDonna Card high on crack and demanded money for drugs.

5.  In 2010, a power of attorney was prepared where there was a shared power granted by Ella Card to Petitioner Ladonna Card and Respondent Kermit Card, Respondent Kermit Card shortly thereafter told Ms. Ella Card that the power of attorney was done "incorrectly" and changed the power of attorney so that he had sole power.  Upon information and belief, shortly thereafter he used the power to move monies out of her accounts in the United States and Belize.

2

6.  Upon information and belief, both Respondents are former correction officers, and both are on social security disability under questionable circumstances.  While Respondent Kermit Card was working as a correction officer, the NY Post did an article about false abuses of sick time, showing him doing construction work when he had called in sick and upon information and belief received disciplinary action for his sick time abuses.  Upon information and belief, Respondent Kermit Card is running an immigration and unlawful marital partnering business in violation of his social security disability and possibly also constitutes the unlawful practice of law.  The real reason for his wanting to be co-guardian is so he can use Ms. Ella Card property to house immigration clients of his business.   A copy of the immigration business with an office at his residence is annexed hereto as Exhibit C.

7.  Ms. Ella Card has disowned Respondents, remains afraid of them and has not spoken to them since 2011.  A copy of letters evidencing same are annexed hereto as Exhibit D.

8.  Both I and my sister have completed accredited guardianship training. A copy of the certificates are annexed hereto as Exhibit E.

9.  Due to the failure of the Vera Guardianship project to properly maintain the Brooklyn properties owned my Ms. Ella Card, Petitioners had to expend $75,000.00 of their own monies to repair and maintain said properties.

10.  Ms. Ella Card has been living with co-Petitioner Ken Swenson for the last nine (9) years, and collectively Petitioners have been close to Ms. Ella Card

3

during such period, and are the best suited to continue to act as co-successor

property management guardians with the same powers as the previous guardian.

LaDonna Card

LADONNA CARD

Sworn to before me this
20th day of November 2020

Steven E Hiller

Notary Public

Steven E Hiller
Notary Public, State of New York
No. 01HI4507658
Qualified in New York County
My Commission Expires November 30, 2021

# EXHIBIT 14


**Department of Finance**

## Property Tax Bill
## Quarterly Statement
Activity through August 28, 2021

**Owner name:** ELLA CARD
**Property address:** 155 SARATOGA AVENUE APT. 6
**Borough, block & lot:** BROOKLYN (3), 01515, 0005

**Mailing address:**
THE GUARDIANSHIP PROJECT
ELLA CARD
P.O. BOX 25106
BROOKLYN NY 11202-5106

| | |
|---|---|
| Outstanding Charges | $2,825.84 |
| New Charges | $1,396.81 |
| **Amount Due** | **$4,222.65** |

*Please pay by October 1, 2021. To avoid interest pay on or before October 15th.*

Most Department of Finance services are available online:
· To pay your bill, visit nyc.gov/payonline.
· For general information, visit nyc.gov/finance.
· To submit a question to the Department of Finance, visit nyc.gov/dofaccount.

# EXHIBIT 15



**Cooper Station P.O. Box 138
New York, NY 10276-0138**

conEdison
a con Edison, Inc. company

Summary Statement
Account #: 63-3276-3675-0000-7
Date: 10/4/2021

Deposit Amt: $95

RAYMOND CARD
C/O: VERA INSTITUTE
P.O. BOX 2-5106
BROOKLYN, NY 11202

Dear Customer:

The statement of your charges and credits that you requested is detailed below:

| DATE POSTED | # DA YS | Bill Date | ELECTRIC | | GAS | | Total Billing Charges | Other Charges, Adj & Credits | $ PAYMENT | $ BALANCE |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | KWHR Usage | Con Edison Charges | THERM Usage | Con Edison Charges | | | | |
| 09/22/21 | 32 | 09/21/21 | 340 | 132.13 | | | 132.13 | 14.24 | | 1,095.40 |
| 08/23/21 | | | | | | | | | | 949.03 |
| 08/23/21 | 29 | 08/20/21 | 310 | 120.52 | | | 120.52 | | | 949.37 |
| 07/23/21 | 30 | 07/22/21 | 320 | 123.00 | | | 123.00 | | | 828.85 |
| 06/23/21 | 32 | 06/22/21 | 340 | 123.24 | | | 123.24 | | | 705.85 |
| 05/24/21 | 29 | 05/21/21 | 310 | 117.72 | | | 117.72 | | | 582.61 |
| 04/26/21 | 28 | 04/22/21 | 290 | 108.47 | | | 108.47 | | | 464.89 |
| 03/26/21 | 29 | 03/25/21 | 310 | 100.48 | | | 100.48 | | | 356.42 |
| 02/25/21 | 30 | 02/24/21 | 320 | 128.46 | | | 128.46 | | | 255.94 |
| 01/26/21 | 34 | 01/25/21 | 360 | 127.48 | | | 127.48 | | | 127.48 |
| 01/25/21 | | | | | | | | | -339.76 | 0.00 |
| 12/23/20 | 33 | 12/22/20 | 350 | 121.15 | | | 121.15 | | | 339.76 |
| 11/20/20 | 59 | 11/19/20 | 630 | 218.61 | | | 218.61 | | | 218.61 |
| 11/12/20 | | | | | | | | | -229.53 | -0.00 |
| 09/22/20 | 32 | 09/21/20 | 340 | 120.60 | | | 120.60 | | | 229.53 |
| 08/21/20 | | | | | | | | | | 108.93 |
| 08/21/20 | 29 | 08/20/20 | 310 | 110.31 | | | 110.31 | | | 110.31 |
| 08/12/20 | | | | | | | | | -437.88 | -0.00 |
| 07/23/20 | 30 | 07/22/20 | 320 | 114.46 | | | 114.46 | | | 437.88 |
| 06/23/20 | 32 | 06/22/20 | 340 | 127.65 | | | 127.65 | | | 323.42 |
| 05/22/20 | 29 | 05/21/20 | 310 | 99.28 | | | 99.28 | | | 195.77 |
| 04/29/20 | | | | | | | | | -98.78 | 96.49 |
| 04/23/20 | 29 | 04/22/20 | 310 | 96.49 | | | 96.49 | | | 195.27 |
| 03/25/20 | 29 | 03/24/20 | 310 | 98.78 | | | 98.78 | | | 98.78 |
| 03/10/20 | | | | | | | | | -210.82 | 0.00 |
| 02/25/20 | 32 | 02/24/20 | 340 | 110.82 | | | 110.82 | | | 210.82 |
| 02/25/20 | | | | | | | | | 100.00 | 100.00 |
| 02/12/20 | | | | | | | | | -136.95 | 0.00 |
| 01/24/20 | 34 | 01/23/20 | 360 | 111.95 | | | 111.95 | | | 136.95 |
| 01/14/20 | | | | | | | | | 25.00 | 25.00 |
| 01/03/20 | | | | | | | | | -96.30 | 0.00 |
| 12/24/19 | 30 | 12/20/19 | 320 | 96.30 | | | 96.30 | | | 96.30 |

Page 1 of 2

# EXHIBIT 16



**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 122 of 320

# EXHIBIT 17

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

---------------------------------------------------------------X

In the Matter of

Index No. 100016/2011

**ELLA CARD,**

**NOTICE OF ENTRY**

An Incapacitated Person.

---------------------------------------------------------------X

**PLEASE TAKE NOTICE** that the within is a true copy of an Order which was signed by the

Honorable Leon Ruchelsman on September 30, 2021 and entered in the county clerk's office on

October 7, 2021.

DATED: Brooklyn, New York
      October 11, 2021

Julio Stoll Fernandez, Esq.
**Finkel & Fernandez, LLP**
16 Court Street, Suite 1007
Brooklyn, NY 11241
T: (347)296-8200
F: (718) 965-3185
jstoilfernandez@ffelderlaw.com

To:

Ella Card
c/o K. Swenson
445 Beck Mill Road
Hanover, Pennsylvania 17331-9253

Kenneth Swenson
445 Beck Mill Road
Hanover, Pennsylvania 17331-9253

LaDonna Card
100 Debs Place, Apt. 16C
Bronx, NY 10475

Cindy Card
161 Saratoga Avenue
Brooklyn, NY 11233

Faith Card
161 Saratoga Avenue
Brooklyn, NY 11233

Lawrence Price
829 East 10th Street, Suite 2H
Brooklyn, NY 11230

Angela Flouras Rieck, Esq.
135B East Grant Street
Lancaster, Pennsylvania 17602

Dana Panagopoulos
33 N. Duke Street
Lancaster, PA 17602

Barton Schwartz
2753 Coney Island Avenue
Brooklyn, New York 11235

Helen Martinez
1248 West 54th Street
Los Angeles, CA 90037

The Blaikie Group
111 John Street, 16th Floor
New York, NY 10038

John Holt, Esq.
Vera Guardianship Project
320 Jay Street, Room 4.110
Brooklyn, NY 11201

David Van Leeuwen, Esq.
62 William Street, 8th Floor
New York, New York 10005

Patrick Marc, Esq.
Marc Law Associates PLLC
48 Wall Street, 5th Floor
New York, NY 10005

At an IAS Part 76LR of the Supreme Court, State of New York, County of Kings, at the Supreme Courthouse located at 360 Adams Street, Brooklyn, New York on the ___30th___ day of September, 2021.

**PRESENT:**

    **HON: LEON RUCHELSMAN**
         **J. S. C.**

-------------------------------------------------------------X

In the Matter of

**ELLA CARD,**

**An Incapacitated Person.**

-------------------------------------------------------------X

Index No. 100016/2011

**ORDER**

WHEREAS, an application was filed by Julie Stoil Fernandez, Esq., Counsel to the Successor Co-Guardians on May 6, 2021, seeking various relief, including a request to immediately list the properties belonging to ELLA CARD, located in Brooklyn, for sale in an "as is" condition, and authority to commence taking other actions in furtherance of protecting ELLA CARD's income, assets and authority to assess her condition in the State of Pennsylvania; and

WHEREAS, an Order to Show Cause was duly made herein at the I.A.S Part 76LR of this Court on the 17th day of June, 2021 for a hearing to be held; and

WHEREAS, upon the scheduled hearing date, PATRICK MARC, Esq., Counsel allegedly representing ELLA CARD, CINDY CARD, KENNETH SWENSON and LADONNA CARD, failed to appear and instead indicated by email an intent to withdraw their cross motion to file instead in the District Court of Pennsylvania; and having failed to produce ELLA CARD as Counsel had promised the Court; and

WHEREAS, the Court finds that a pattern of disregard for the Court's directives and Orders has been exhibited by CINDY CARD, KENNETH SWENSON and LADONNA CARD, in that they have consistently failed to appear virtually before the Court on several occasions, and

they have consistently failed to produce ELLA CARD virtually on several occasions, despite the Court's instructions to do so; and

WHEREAS, this Court finds that the sale of the real properties is in ELLA CARD's best interests and is necessary to preserve and protect her assets, and to prevent waste, as the significant repairs on the properties which this Court deemed necessary and authorized by Order dated December 11, 2019, could not completed, and in light of the violation issued by the New York City Department of Buildings which upon information and belief has not been cured, and as the rental income associated with said real properties has been continuously diverted from this Court's appointed Property Guardians, and as the guardianship estate is exposed to untenable risk and liability due to the continued thwarting of the Co-Guardians' authority to exercise control over the real properties;

NOW THEREFORE, it is hereby

ORDERED, that the relief sought in the application by Julie Stoil Fernandez, Esq. is hereby granted on the papers presented; and it is further

ORDERED, that RAYMOND CARD and KERMIT CARD are authorized to retain Dana Panagopoulos, Esq., as guardianship counsel in the State of Pennsylvania, for the purpose of registering this Court's December 2, 2020 Order appointing Successor Co-Guardians of the Property in the State of Pennsylvania, and to take any other actions necessary to enable RAYMOND CARD and KERMIT CARD to fulfill their guardianship duties in the State of Pennsylvania, and fees shall be subject to prior Court approval; and it is further

ORDERED, that any and all advance directives believed to have been executed by ELLA CARD shall be produced forthwith to the Co-Guardians of the Property by any Counsel

alleging to represent ELLA CARD, CINDY CARD, KENNETH SWENSON and/or LADONNA CARD; and it is further

**ORDERED**, that CINDY CARD produce, forthwith, any and all information regarding any lease agreements and/or tenants and names and unit numbers of the tenants in any of the units at 155 Saratoga Avenue Brooklyn, New York 11233 and/or 161 Saratoga Avenue, Brooklyn, New York 11233; and it is further

**ORDERED**, that CINDY CARD cease and desist from any further unlawful collection of the rental income from the properties located at 155 Saratoga Avenue and/or 161 Saratoga Avenue, Brooklyn, New York 11233, and/or Social Security income and/or pension income due to ELLA CARD,: and it is further

**ORDERED**, that Cindy Card shall prepare an accounting of the rental income, social security income and/or pension and any other income due to ELLA CARD which the prior Guardian and Successor Co-Guardians of the Property have been unable to marshal due to diversion by CINDY CARD, and provide such accounting to this Court within sixty (60) days from the entry of this Order; and it is further

**ORDERED**, that CINDY CARD shall forthwith turn over all income collected belonging to ELLA CARD; and it is further

**ORDERED**, that RAYMOND CARD and KERMIT CARD are authorized to commence licensee holdover and/or eviction proceedings against any tenants of the properties belonging to ELLA CARD located at 155 Saratoga Avenue and 161 Saratoga Avenue, Brooklyn, New York 11233; and it is further

**ORDERED**, that unless access is provided to the interiors of the properties located at 155 Saratoga Avenue and 161 Saratoga Avenue, Brooklyn, New York 11233, on or before

October 8, 2021, then Barton Schwartz, the previously appointed Part 36 Appraiser, is authorized to prepare an appraisal report on the basis of value, based on an exterior only inspection, which shall be provided to the Court and Co-Guardians in either instance on or before October 18, 2021; and it is further

**ORDERED**, that upon receipt of the appraisal report, RAYMOND CARD and KERMIT CARD are simultaneously authorized to take steps necessary to immediately list the properties belonging to ELLA CARD located at 155 Saratoga Avenue and 161 Saratoga Avenue, Brooklyn, New York 11233, for sale in "as is" condition pursuant to Article 17 of the Real Property Actions and Proceedings Law; and it is further

**ORDERED**, that Shannon Insanna, of 794 Union St., 2nd Floor, Brooklyn, NY 11215, telephone 646-287-5538, be and is hereby appointed as Part 36 Real Estate Broker, to list, market and/or post for sale the real properties located at 155 Saratoga Avenue and 161 Saratoga Avenue, Brooklyn, New York 11233, and whose commission shall be set by the Court; and it is further

**ORDERED**, that the broker shall list the said property on the New York Multiple Listing Service, or comparable listing service, for a minimum of four consecutive weeks, for a minimum purchase price of the appraised values, and such listing shall be deemed sufficient publication under RPAPL §231(2)(a) and §1722(5); and it is further

**ORDERED**, that after the required listing period, the Co-Guardians are permitted to enter contract(s) of sale for the real properties, provided the Contract(s) shall be contingent upon and subject to Court approval. Upon Contract execution, the Co-Guardains shall move by motion on notice to all parties for Court approval of the contract and for the sale of the property; and is further

**ORDERED**, that RAYMOND CARD and KERMIT CARD be reimbursed for funds

previously paid to Angela Flouras Rieck, Esq., in the sum of $750.00 each ($1,500.00) total, for

her representation of RAYMOND CARD and KERMIT CARD, in dismissing the abuse

Petitions wrongfully initiated by KENNETH SWENSON in the State of Pennsylvania.

    This is the Decision and Order of the Court; the Co-Guardians shall serve a copy of this Order with notice of entry on all parties entitled to notice within 10 days of the entry of this Order.

**E N T E R:**

_____

**Hon. Leon Ruchelsman, J.S.C**

At an IAS Part 76LR of the Supreme Court, State of New York, County of Kings, at the Supreme Courthouse located at 360 Adams Street, Brooklyn, New York on the 30th day of September, 2021.

PRESENT:

    **HON: LEON RUCHELSMAN**
          **J. S. C.**

----------------------------------------------------------------X

In the Matter of                               Index No. 100016/2011

**ELLA CARD,**                               **ORDER**

An Incapacitated Person.

----------------------------------------------------------------X

    Upon all prior papers and proceedings had in this matter, and upon the "Notice of Cross-

And Affirmation Opposition/Support" (Motion sequence #16) and supporting documents which

were e-filed by Patrick Marc, Esq. on July 25, 2021, as the purported attorney for Ella Card,

Cindy Card, LaDonna Card, and Ken Swenson, and which was returnable on July 27, 2021, and

Ella Card, Cindy Card, LaDonna Card, and Ken Swenson having failed to appear on July 27,

2021, it is hereby

    ORDERED that the Cross Motion (#16) is hereby denied for cross-movants' failure to

appear before the Court on the return date as directed.

                         ENTER:

                         HON. LEON RUCHELSMAN, J.S.C.

Faith Card
161 Saratoga Avenue
Brooklyn, NY 11233

Lawrence Price
829 East 10th Street, Suite 2H
Brooklyn, NY 11230

Angela Flouras Rieck, Esq.
135B East Grant Street
Lancaster, Pennsylvania 17602

Dana Panagopoulos
33 N. Duke Street
Lancaster, PA 17602

Barton Schwartz
2753 Coney Island Avenue
Brooklyn, New York 11235

Helen Martinez
1248 West 54th Street
Los Angeles, CA 90037

The Blaikie Group
111 John Street, 16th Floor
New York, NY 10038

John Holt, Esq.
Vera Guardianship Project
320 Jay Street, Room 4.110
Brooklyn, NY 11201

David Van Leeuwen, Esq.
62 William Street, 8th Floor
New York, New York 10005

Patrick Marc, Esq.
Marc Law Associates PLLC
48 Wall Street, 5th Floor
New York, NY 10005

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------X

In the Matter of

**Index No. 100016/2011**

**ELLA CARD,**

**NOTICE OF ENTRY**

An Incapacitated Person.
-------------------------------------------------------------------X

**PLEASE TAKE NOTICE** that the within is a true copy of an Order which was signed by the

Honorable Leon Ruchelsman on September 30, 2021 and entered in the county clerk's office on

October 7, 2021.

DATED: Brooklyn, New York
            October 11, 2021

Julie-Stoil Fernandez, Esq.
**Finkel & Fernandez, LLP**
16 Court Street, Suite 1007
Brooklyn, NY 11241
T: (347)296-8200
F: (718) 965-3185
jstoilfernandez@ffelderlaw.com

To:

Ella Card
c/o K. Swenson
445 Beck Mill Road
Hanover, Pennsylvania 17331-9253

Kenneth Swenson
445 Beck Mill Road
Hanover, Pennsylvania 17331-9253

LaDonna Card
100 Debs Place, Apt. 16C
Bronx, NY 10475

Cindy Card
161 Saratoga Avenue
Brooklyn, NY 11233

# EXHIBIT 18

## AFFIDAVIT

STATE OF __New York____

COUNTY OF ___Kings___

I, Mitchell Simms, do MAKE an OATH, and state:

On October 27, 2021, I went to the Brooklyn Supreme Court, located on 360 Adams Street, to serve two copies of a Federal Notice of Removal in State Index Number 100016/11 and United States District Court for the Middle District of Pennsylvania Case NO. 1:21-CV-01288.

When I arrived at the Clerk's Office to serve the documents, the lone lady in the office asked me how she could help me. I explained to her that I was there to serve the Notice of Removal on behalf of Ella Card and family. She looked at it, sighed as though frustrated, slapped the documents on the counter and said, "What is this?" I felt uncomfortable. I explained to her again what the documents were and for whom I was serving them.

The lady sighed again. She shook her head as if to say "this is crazy." She called to a lone gentleman sitting in the back. She took the documents over to him and said, "Look. We know this case, but what is this?" The man looked the case up in the computer. He then stated the I could not serve the papers. I asked, "How is that possible?" The lady said the court doesn't accept any personal service of papers for Ella Card's case. If the family wants to serve or file any documents, they have to do it electronically. We can't do anything for her here."

I was baffled. I never heard of such a thing. The Clerk of the Court's office was refusing to accept a legitimate Service of Process. I asked the lady how the family was supposed to file their Notice of Federal Removal electronically. She said they had to get access. I asked her how the family was supposed to get access. She repeatedly told me Ella Card can't file anything at the courthouse, and she or anyone in her family must do everything electronically. The court cannot help them when if they show up to file documents in person. If anyone does show up, the court is not allowed to take anything from her. She said the family has to get electronic access and do it electronically. She was irritated and dismissive when I asked her about getting access and about why they couldn't take the Notice of Removal or any other document that Ella Card might have

1

to be served. The lady sent me to another counter in a different filing area to speak with someone over there. She said someone there may be able to help me.

When I arrived at the counter the lady sent me to, a gentleman eventually came to help me. I showed him the documents I had, told him I was there to serve them on the Clerk of the Court but the lady in the office keeps saying she cannot take them because they have to be filed electronically, if that makes sense. The man looked at the documents and had no idea what to do with them. The lady from my initial encounter walked into the area where I was. She looked at me as I was speaking to the gentleman at the counter. She interjected and yelled, "I told him there ain't nothing we can do for him. They have to file it electronically. We can't take that." The lady left after saying that. The gentleman told me to wait, and that he was going to get me someone else to help me.

After a matter of minutes, Deputy County Clerk of Court James Blain came to assist me. I explained to him I was there to serve the two documents on behalf of Ella Card and her family. He looked the documents over. I told him it was a Notice of Removal, and that the State case was now in the hands of the Federal Courts. I let him know the family was properly serving the papers so the State court understands they may take no further action in Ella's State case. Deputy Clerk Blain made some phone calls. He looked in the computer and then he printed out some information.

Deputy Clerk Blain said all filing by Ella Card had to be done electronically. I asked how come. He stated that's what it says in the system. I asked him how the family is supposed to make electronic filings. He said all they have to do is get access. I told him they asked for access from Judge Ruchelsman already and he won't give it to them. Deputy Clerk Blain said Ella Card has to get access from her attorney. I told him Ella does not have an attorney. I told him no one has an attorney, and that they are pro se. Again, he said they can get access for electronic filings from their attorney. I told Deputy Clerk Blain, Ella and family do not have an attorney. Deputy Clerk Blain showed me the sheet of paper he printed out, but would not give it to me. He said it shows that Ella Card's attorney is Julie Fernandez. He said anything that needs to be done for Ella Card goes through her. That's what the computer shows. So if Ella Card wants access to file electronically, she has to ask Julie Fernandez. Deputy Clerk Blain then told me that Attorney Julie Fernandez, Attorney John Holt of the Vera Institute, Raymond Card Jr., and Kermit Card,

2

with the permission of Judge Leon Ruchelsman, all got together and decided Ella Card's case should be strictly electronic filing. That's why they do not accept any paper filings for her.

I told Deputy Clerk Blain Julie Fernandez is not Ella Card's attorney. She has never been Ella Card's attorney. I told him Julie Fernandez is the attorney for Raymond Card Jr. and Kermit Card, the two who filed the action against Ella Card. I told him Ella Card does not live in New York City. She has not lived in New York City since 2011, which is why she filed a Federal action of which she is now serving this court with. I told him all matters for the family are being handled pro se at the moment and the documents I have need to be served. I told him Julie Fernandez is not going to assist Ella Card in this matter, so how are they possibly going to get access to any electronic filing?

It appears Ella Card is locked out of all rights to legally personally file or serve the State Court with any document necessary to defend herself. Deputy Clerk James Blain asked me if the two documents I had were the only ones to be served. I told him "yes." He took the documents to file them. He also time and date stamped copies for me.

What started as a simple Process of Service that should have taken all of five minutes was protracted into about an hour. It was a very deliberate and antagonistic hour.

3

**AFFIDAVIT OF SERVICE**

State of New York          )
County of Kings            )

The undersigned being duly sworn, deposes and says:

Mitchell Simms _____ is not a party to the action, is over
(name of person serving papers)

18 years of age and resides at 776 MacDonough Street, Brooklyn, N.Y. 11233

_____
(complete address of person serving papers)

That on October 27, 2021 _____, deponent served the within
(date of service)
Notice Of Removal Action in Case No. 1:21-CV-01288, U.S. District Court, Middle District PA.
(10 pages), and Notice Of Removal in Brooklyn Supreme Court in Index# 10006/11 (5 pages).
(name of document(s) served)

upon The Supreme Court, County Of Kings _____ located at
(name of person/corporation served)

360 Adams Street, Brooklyn, New York, 11201 - James Blaine - Deputy Clerk
(complete address where other party/corporation served)

(Select method of service)

XXX  Personal Service: by delivering a true copy of the aforesaid documents personally;
deponent knew said person/corporation so served to be the person/corporation described.
To James Blaine - Deputy Clerk

_____ Service by Mail: by depositing a true copy of the aforesaid documents in a postpaid
properly addressed envelope m a post office or official depository under the exclusive care
and custody of the United States Postal Service.

Signature of person serving papers

MiTCHELL SiMMS
Printed Name

Sworn to before me this  27th

day of October  2021

Notary Public

PIYUSH B. SONI
Notary Public, State of New York
No. 01SO6039847
Qualified in Kings County
Commission Expires March 20, 2022

4

# EXHIBIT 19

6/2011 Stipulation CONSENT TO EFILE filed 6/23/2020

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF** KINGS

-----------------------------------------------------x

IN THE MATTER OF

~~Plaintiff(s)/Petitioner(s)~~,          Index No. 100016-11

~~-against-~~

ELLA CARD                                STIPULATION AND
                                         CONSENT TO E-FILING

~~Defendant/Respondent(s)~~.

-----------------------------------------------------x

We the undersigned, counsel in good standing representing parties in this matter, counsel admitted pro hac vice, and/or a self-represented party in this matter, hereby stipulate and consent to the use of the New York State Courts Electronic Filing System ("NYSCEF") in this matter. We agree to be bound by the rules governing the NYSCEF System (Section 202.5-b of the Uniform Rules for the Trial Courts) and the procedures of the NYSCEF system as reflected in the *User's Manual* approved by the Chief Administrator of the Courts and posted on the NYSCEF website.

Any of the undersigned who indicate below that they are not currently an authorized e-filing user in the NYSCEF System understand that they must first obtain a user ID and password before they may file any documents with NYSCEF and that they may do so by accessing the Create an Account button on the NYSCEF Login screen (https://iapps.courts.state.ny.us/nyscef/Login). They also understand that once they receive their credentials, their primary e-mail addresses, listed below, will be used for service of documents.

Dated: 6-22-2020

| | | |
|---|---|---|
| Registered User: [ × ] Yes [ ] No | | Registered User: [ × ] Yes [ ] No |
| Attorney [ × ] Pro Hac [ ] Pro Se [ ] | | Attorney [ × ] Pro Hac [ ] Pro Se [ ] |
| *Julie Stoil Fernandez* _____ Signature | | *John Holt* _____ Signature |
| Julie Stoil Fernandez, Esq. _ Print Name | | John Holt, Esq. _ Print Name |
| Raymond Card & Kermit Card | | Guardian |
| Attorney for (Identity of Parties) | | Attorney for (Identity of Parties) |
| 2574325 | | 4916656 |
| UCS Attorney Registration # | | UCS Attorney Registration # |
| Finkel & Fernandez, LLP _ Firm Name | | The Guardianship Project _ Firm Name |
| 16 Court Street, Suite 1007 _ Address | | 320 Jay Street, Rm. 4110 _ Address |
| Brooklyn, NY 11241 | | Brooklyn, NY 11201 |
| 347-269-8200 _ Phone # | | 347 296-1874 _ Phone # |
| jstoilfernandez@ffelderlaw.com _ E-Mail | | jnholt@nycourts.gov _ E-Mail |
| (Primary) | | (Primary) |
| _____ 2d E-Mail | | _____ 2d E-Mail |

Printed: 1/4

E COURT OF THE STATE OF NEW YORK
OF KINGS

Page

200018/2011 Stipulation CONSENT TO EFILE filed 8/23/2020

(Optional)                                      (Optional)

_____ 3d E-Mail        _____ 3d E-Mail
(Optional)                                      (Optional)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Registered User: [✓] Yes [  ] No          Registered User: [  ] Yes [  ] No
Attorney [ ] | Pro Hac [  ˙ Pro Se [  ]    Attorney [  ] Pro Hac [  ˙ Pro Se [  ]

_____ Signature        _____ Signature

Paul O'Brien, Esq          Print Name     _____ Print Name

Proposed incoming attorney for Ella Card
Attorney for (Identity of Parties)         Attorney for (Identity of Parties)

UCS Attorney Registration #                UCS Attorney Registration #
Falcon Rappaport&Berkman,PLLC Firm Name   _____ Firm Name

1185 Avenue of the Americas   Address      _____ Address

New York, NY 10017                         _____

_____ Phone #          _____ Phone #

pobrien@frblaw.com        E-Mail          _____ E-Mail
(Primary)                                      (Primary)

_____ 2d E-Mail        _____ 2d E-Mail
(Optional)                                      (Optional)

_____ 3d E-Mail        _____ 3d E-Mail
(Optional)                                      (Optional)

6/5/13

:oming attorney for Ella Card

entity of Parties)

Attorney for (Identity of Parties)

egistration #

UCS Attorney Registration #

ort&Berkman,PLLC Firm Name

the Americas

Address

0017

Ph____

:om

Pvt# 347-404-9766
Rm 189

**James Blain**
Deputy County Clerk

Nancy T. Sunshine
County Clerk of Kings County
Clerk of the Supreme Court

360 Adams St.
Brooklyn, N.Y. 11201
Fax 212-520-6903
E-mail: jblain@nycourts.gov

# EXHIBIT 20

At an I.A.S. Part 76LR of the Supreme Court
of the State of New York, held in and for the
County of Kings, at the Courthouse located
at 360 Adams Street, Brooklyn, New York
on the 2 day of December, 2020.

PRESENT:
**HONORABLE LEON RUCHELSMAN**
     **J.S.C.**
-----------------------------------------------------------------------X

In the Matter of the Application of

**RAYMOND CARD and KERMIT CARD,**
     **Co-Petitioners,**

**For their Appointment as Successor Guardians**
**of the Property of**

**ELLA CARD,**

**An Incapacitated Person.**
-----------------------------------------------------------------------X

Index No. 100016/2011

**ORDER AND JUDGMENT**
**APPOINTING GUARDIAN**

**WHEREAS, AN ORDER** was duly made herein at the I.A.S. Part 76LR of this Court on

the 21st day of July, 2020, for a hearing to be held on the application of RAYMOND

CARD and KERMIT CARD, the Co-Petitioners/Applicants of the original underlying

guardianship proceedings, requesting their appointment as Successor Co-Guardians of

the Property of ELLA CARD, a person adjudicated Incapacitated by the Hon. Betsy

Barros in an Order Appointing Guardian, dated December 14, 2011, in which VERA

Guardianship Project was appointed Guardian of the Property; and

**WHEREAS,** VERA Guardianship Project wishes to resign from their position as

Guardian and have so indicated in a motion brought on November 14, 2019, which was

heard in conjunction with Co-Petitioners Raymond Card and Kermit Card's application

to serve as Successor Co-Guardians, and

**WHEREAS,** in the motion requesting to resign, VERA had additionally made an application for a $10,000.00 retainer fee for Falcon, Rappaport et al. Counsels alleged to represent ELLA CARD, for their retainer but withdrew the application on the date of hearing, to defer to any incoming Successor Guardian(s); and Falcon Rappaport, the Counsel purporting to represent ELLA CARD, having appeared and withdrawing any application submitted to the Court, and the Court having heard testimony from John Holt, Esq., Director, VERA Guardianship Project, regarding the difficulties of maintaining the existing guardianship and recommending a replacement guardian; and Raymond Card and Kermit Card Co-Petitioners also having testified in support of their nomination and having been allocuted as to their willingness, ability and qualifications to serve, and it appearing to the satisfaction of the Court, that Raymond Card and Kermit Card are qualified to replace the Guardian and have expressed a willingness to do whatever is necessary in furtherance of protection of ELLA CARD's property;

And proof of service having been made, and it appearing to the satisfaction of the Court that RAYMOND CARD and KERMIT CARD are qualified appointed as Successor Co-Guardians of the Property Management for ELLA CARD and upon pleadings and proceedings heretofore had herein, and due deliberation having been had, and no opposition having been made,

**NOW,** therefore, on motion of JULIE STOIL FERNANDEZ, ESQ., Attorney for Co-Petitioners RAYMOND CARD and KERMIT CARD, it is hereby

**ORDERED AND ADJUDGED,** that RAYMOND CARD, residing at 124 Shetland Place, Warners, NY 13164, Tel. (315) 254-9267; and KERMIT CARD, residing at 208 Commack Road, Deer Park, NY 11729; Tel. ( 631) 871-7419, are hereby appointed as

2

Successor Co-Guardians of the Property of ELLA CARD, conditioned that the said Co-Guardians will in all things faithfully discharge the trust imposed herein, obey all the directions of the Court in respect to the trust, make and render a true and just account of all monies and other properties received pursuant to the authority granted herein and the application thereof, and of all acts performed in the administration of the trust imposed herein whenever required to do so by the Court, and will file the designation required by §81.26 of the Mental Hygiene Law; and it is further

**ORDERED AND ADJUDGED**, that VERA Guardianship Project is authorized to prepare a Final Account of their proceedings as Guardian of the Property and to move for judicial settlement of such account, and to cooperate and fully inform the Successor Guardians of the history and experiences of the Guardian and strategies for maintaining the property and accessing the property of ELLA CARD; and it is further

ORDERED AND ADJUDGED that Lawrence Price is appointed Referee to review the Final Account; and it is further

**ORDERED AND ADJUDGED**, that upon the qualification of the Successor Co-Guardians and receipt of their Commission to serve, the Successor Co-Guardians shall take custody of the funds held in the guardianship account of VERA Guardianship Project; leaving behind adequate funds upon the settlement of a final accounting; and it is further

**ORDERED AND ADJUDGED**, that pursuant to 81.20 of the Mental Hygiene Law the Co-Guardians shall:

   A. Exercise only those powers that the Guardian are authorized to exercise by order of the Court;

   B. Exercise the utmost care and diligence when acting on behalf of ELLA CARD;

3

C. Exhibit the utmost degree of trust, loyalty, and fidelity in relation to ELLA CARD;

D. Visit ELLA CARD not less than four times per year, and authority, in this matter, to seek assistance from this Court and Courts in other jurisdictions, including Access Orders with police assistance, approved by the Court, to access the Incapacitated Person, wherever she is maintained, to personally visit with her and be able to report to this Court, her health, safety and wishes;

E. Afford ELLA CARD the greatest amount of independence and self determination with respect to property management and personal needs in light of her functional level, understanding and appreciation of her functional limitations, personal wishes, preferences and desires with regard to managing the activities of daily living; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians shall have the following powers as set forth in §81.21 of the Mental Hygiene Law, with respect to the Property Management Needs of ELLA CARD:

1. Marshal the income and assets of the Incapacitated Person, including rental income from all real property owned by the Incapacitated Person located in New York State, and establish bank, brokerage and other similar accounts in the name of the Guardian for Incapacitated Person and endorse, collect, negotiate and deposit all negotiable instruments drawn to the order of the Incapacitated Person, including but not limited to, government entitlement checks; invest funds with the same authority as a

4

trustee, pursuant to New York EPTL §11-2.2; inventory personal belongings;

2. Marshal accounts held jointly in the name of the Incapacitated Person and others, without the consent of the listed joint tenant(s), provided that the Social Security number of the Incapacitated Person has been used to report dividends from the asset to tax authorities;

3. Close or retitle in the Guardian's name, as Guardian, bank time deposits prior to maturity, upon the finding by this Court that, for purposes of § 9-I and §238 of the Banking Law, the Order Appointing a Guardian shall be deemed a declaration of incompetence and no banking or savings institutions shall impose any penalty upon the transaction;

4. Restore the Guardianship as the Representative Payee of ELLA CARD's social security income and request direct deposit from any income sources into the Guardianship Account, if possible;

5. Collect rent from tenants with legitimate leases within the real properties, and deposit such rent into the Guardianship account;

6. Pay bills necessary to maintain the buildings' habitability with funds available from rent collection;

7. Retain Counsel to seek eviction proceedings against holdover and illegitimate persons residing in the real properties owned by ELLA CARD, including CINDY CARD and FAITH CARD, if necessary and appropriate;

5

8.  Authority to hire persons necessary to maintain and protect the real property;

9.  Authority to appraise the value of the real properties and apply for authority to sell the real properties, subject to prior Court approval;

10. Authority to issue new leases and/or renew leases, if appropriate.

11. Convey or release contingent and expectant interests in property, including marital property rights and any right of survivorship incidental to joint tenancy or tenancy by the entirety;

12. Exercise or release powers the person holds as a trustee, personal representative, guardian for a minor, guardian, or done of a power of appointment;

13. Enter into contracts, subject to prior court approval;

14. Create revocable or irrevocable trusts of property of the estate which may extend beyond the incapacity or life of the Incapacitated Person, subject to prior court approval;

15. Create a Supplemental Needs Trust for the benefit of Faith Card, subject to prior court approval;

16. Exercise options to purchase securities;

17. Exercise rights to elect options and change beneficiaries under insurance and annuity policies and to surrender the policies for their cash value, subject to prior court approval;

6

18. Renounce or disclaim any interest by testate or intestate succession or by inter vivos transfer consistent with EPTL 2-1.11(c), subject to prior court approval;

19. Authorize access to or release of confidential records;

20. Apply for, obtain and settle claims for government benefits;

21. Pay for health care services, health care aides and household help;

22. To be provided with keys to and be authorized to access and inspect all units in the properties located at 155 Saratoga Avenue and 161 Saratoga Avenue, Brooklyn, New York;

23. Retain accountants, and similar professionals, with payment subject to the approval of this Court;

24. Request extensions, if possible, for any tax filings if applicable, with any taxing authority. Sign and file income tax returns and all other tax documents for any and all tax obligations, and appear before federal, state and local taxing authorities on all claims, litigation, settlements and other related matters and shall be authorized without further order of the court to retain an accountant for the purposes thereof and pay said accountant per hour for each unfiled year. Said accountant fees shall be subject to prior Court approval;

25. Cancel any credit accounts held by the Incapacitated Person, as the Guardians deem appropriate;

26. Engage in Medicaid planning, subject to prior court approval of all proposed transfers, pursuant to MHL §81.21 (b);

7

27. Manage all Medicare, Medicaid and other health care claims, and appear as representative for any Medicare claims, Medicaid litigation and/or settlement of claims;

28. Investigate if it is necessary to commence a turnover proceeding to discover and recover income and assets of the Incapacitated Person, pursuant to Mental Hygiene Law Section §81.43;

**ORDERED AND ADJUDGED**, that pursuant to 22 NYCRR §36.1 (b) the Co-Guardians ~~shall~~ **shall not** be a subject of Part 36 of the Rules of the Chief Judge; and it is further

**ORDERED AND ADJUDGED**, that the caption of this proceeding shall be amended to reflect the appointment of said Co-Guardians as follows:

---------------------------------------------------

**In the Matter of the Guardianship of**

**ELLA CARD**      ,                                    **Index No. 100016/2011**

**An Incapacitated Person.**

---------------------------------------------------

and it is further

**ORDERED AND ADJUDGED**, that pursuant to §81.27 of the Mental Hygiene Law, upon the filing of an Oath and Designation as required by the statute, a commission in the due form of law shall be issued by the Clerk of the Court; and it is further

**ORDERED AND ADJUDGED**, that pursuant to Mental Hygiene Law §81.39 no later than ninety (90) days after the issuance of a commission the Co-Guardians shall complete a training program approved by the Chief Administrator of the Courts and obtain proof that the training was completed; and it is further

8

**ORDERED AND ADJUDGED**, that pursuant to Mental Hygiene Law §81.30, no later than ninety (90) days after the issuance of the commission to the Co-Guardians, the Co-Guardians shall file with the Court an initial report in a form prescribed by the Court and proof of completion of the Guardian education requirements under the Mental Hygiene Law §81.39; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians shall file during the month of May in the Office of the Clerk of the County of Brooklyn, an Annual Report in the form required by Mental Hygiene Law §81.31; and it is further

**ORDERED AND ADJUDGED**, that the Court Examiner named herein shall inform the Court in writing that the initial report/annual account has been examined; and it is further

**ORDERED AND ADJUDGED**, that the Guardian shall be compensated pursuant to SCPA §2307; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians shall take no annual commissions and compensation for any year that year's annual account is filed, reviewed by the Court Examiner, and approved by the Court; and it is further

**ORDERED AND ADJUDGED**, that for the purpose of second section 9-I of the Banking Law, this order shall be deemed a declaration of incompetence and no banking institution or savings bank shall impose any penalty for the repayment of a time deposit prior to maturity; and it is further

**ORDERED AND ADJUDGED**, that the authority of the Co-Guardians of the Property shall extend to all of the property of ELLA CARD both real and personal, including but

9

not limited to the following: income, bank accounts and other assets and real estate; and it is further

**ORDERED AND ADJUDGED**, that all persons are hereby directed and commanded to deliver to the Co-Guardians of the Property, upon demand and presentation of a certified copy of the commission, all property of ELLA CARD, of every kind and nature which may be in their possession or under their control; and it is further

**ORDERED AND ADJUDGED** that the Co-Guardians may, without prior authorization of the Court, invest surplus funds in investments eligible by law for the investment of trust funds and may dispose of investments so made and reinvest the proceeds as so authorized; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians may, without prior authorization of the Court, maintain in their own name and official title any civil judicial proceeding which the ELLA CARD might have maintained were she competent, including any ; and it is further

**ORDERED AND ADJUDGED**, that in the event the Guardianship is to be terminated, the Co-Guardians shall apply to the Court by *Ex Parte* application for permission to bring a Final Account of the proceedings, or for direction as to the disposition of ELLA CARD's property then remaining and for any other instructions concerning said termination within sixty (60) days; and it is further

**ORDERED AND ADJUDGED**, that should ELLA CARD require residency in a nursing home or residential facility at the time of her death, the director of the facility shall notify the Court within thirty (30) days; and it is further

10

**ORDERED AND ADJUDGED**, that upon the death of the ELLA CARD, the Co-Guardians shall have the authority to pay bills which were incurred prior to the death of ELLA CARD provided the Co-Guardians would otherwise have had the right to pay such bills; and it is further

**ORDERED AND ADJUDGED,** that pursuant to §81.36 (e) of the Mental Hygiene Law, upon the death of ELLA CARD, the Co-Guardians of the Property shall have the authority to pay for the reasonable funeral expenses of ELLA CARD; and it is further

**ORDERED AND ADJUDGED**, that the following individuals shall receive notice of the ELLA CARD's death, the intended disposition of remains of the decedent, funeral arrangements and the final resting place of the ELLA CARD when that information is known or can be reasonably ascertained by the Guardians: **RAYMOND CARD; KERMIT CARD;  CINDY CARD; LADONNA CARD; HELEN HERNANDEZ; and it is further**

**ORDERED AND ADJUDGED**, that to the extent of the net estate available therefore, the Co-Guardians shall provide for the maintenance, and personal well-being of the ELLA CARD and then may, without further order of the Court, provide for the maintenance and support of persons legally dependent upon the ELLA CARD and it is further

**ORDERED AND ADJUDGED**, that any safe deposit box owned by the ELLA CARD shall be opened by the Co-Guardians in the presence of a representative of the bank and the Co-Guardians shall promptly file an inventory of the contents of the safe deposit box with the Court, subscribed by all present; and it is further

**ORDERED AND ADJUDGED**, that upon the submission and review of the

11

Affirmations of Legal Services, the following fees shall be paid from the assets of ELLA CARD by VERA Guardianship Project as her present Guardian:

        1.    To **JULIE STOIL FERNANDEZ, ESQ.**, Co-Petitioners' Counsel, the sum of $11,250 for her legal services as Co-Petitioners' counsel and $90 in disbursements; and it is further

**ORDERED AND ADJUDGED**, that a copy of this Order and Judgment with the Notice of Entry shall be served on all parties as directed in this Judgment pursuant to §81.16 (c) (3) within fifteen (15) days of the signing of this Order.

**ENTER:**

_____

**Hon. Leon Ruchelsman**
**J.S.C.**

# EXHIBIT 21

Ken Swenson for Ella Card
Petitioner & Power of Attorney
P.O. Box 328
Hanover , PA 17331
Tel.No. 202-262-0820
kenswenson75@yahoo.com

May 24, 2021

**Complaint Against:**

Attorney Grievance Committee
Supreme Court, Appellate Division
First Judicial Department
180 Maiden Lane
New York, New York 10038
Telephone (212) 401-0800
Email:
AD1-AGC-newcomplaints@nycourts.gov

Paul M. O'Brien
Falcon, Rappaport & Berkman
1185 Avenue of the Americas
New York, NY 10036
Tel.No. 212-203-3255
Tel.No. 516-599-0888
Email: pobrien@frblaw.com

Dear Grievance Committee,

On January 8, 2020, Mrs. Card entered into an attorney-client relationship with Paul O'Brien with the Law Firm of Falcon, Rappaport & Berkman, pursuant to a written retainer agreement or engagement letter. The retainer agreement between Mrs. Card and Paul O'Brien was in effect at the time of the events at issue ("Retainer") provided in pertinent part:

> Scope of Engagement: The firm will represent you regarding your litigation matter against the Vera Institute and in connection with the related guardianship proceedings and accounting rendered by Vera.

Paul O'Brien agreed to render and perform all claims/litigation services necessary for the protection of Mrs. Card's properties and her best interest, which was terminate the Guardianship of her property. Mrs. Card wanted Paul O'Brien to terminate the Guardianship of her property, where the Vera Institute were stealing all her money, New York School Teachers Pension, Social Security, life savings, and robbing her of her life's work, with no money to travel and enjoy life. Mrs. Card wanted her property out of the Guardianship and did not want her two sons near her property, much less become guardians of her property. Retainer Agreement **Exhibit A**

1

On July 21, 2020, Paul O'Brien was supposed to represent Mrs. Card in a hearing for Guardianship over her property, but withdrew on July 21, 2020 prior to the hearing, giving no notice to Mrs. Card. In fact, Paul O'Brien never informed Mrs. Card or her family, that on July 21, 2020, there would be a hearing on the Guardianship of her property. Mrs. Card became aware of this hearing three months later, when opposing counsel, Julie Fernandez sent this identical order on October 9, 2020, but was unsigned, the signed order would come on December 8, 2020. Julie Fernandez, Esq Orders of Guardianship **Exhibit B**

Therefore, the Court held an *ex-parte* hearing on the Guardianship of Mrs. Card's Property and granted Guardianship of Mrs. Card's Property to Raymond and Kermit Card, against Mrs. Card wishes and exactly why she hired Paul O'Brien, to prevent this from happening. If the Court would refuse termination of the Guardianship of Mrs. Card's property, Mrs. Card wanted her Son in Law Ken Swenson, with whom she has lived with for the past ten years in the State of Pennsylvania, daughter Cindy Card and daughter LaDonna Card, who are all three licensed Guardians in the State of New York to be Guardians over her property.

On December 8, 2020, a signed Order by the Court and Julie Stoil Fernandez, attorney for the co-successor Guardians stated:

> "WHERAS, in the motion requesting to resign, Vera had additionally made an application for a $10,000.00 retainer fee for Falcon, Rappaport et al. Counsels alleged to represent ELLA CARD, for their retainer but withdrew their application on the date of hearing, to defer to any oncoming Successor Guardian(s); and Falcon, Rappaport, the Counsel purporting to represent ELLA CARD, having appeared and withdrawing any application submitted to the Court," and the Court having heard testimony from John Holt, Esq. Director of the VERA Guardianship Project, regarding the difficulties of maintain the existing guardianship and recommending a replacement guardian; and Raymond and Kermit Card Co-Petitioners also having testified in support of their nomination and having been allocated as their willingness, ability and qualifications to serve, and appearing to the satisfaction of the Court, that Raymond Card and Kermit Card are qualified to replace the Guardian and have expressed a willingness to do whatever is necessary in furtherance of protection of ELLA CRAD and upon pleading and proceedings

2

hereto had herein, and due to deliberation having been had **no opposition having been made**, **NOW,** therefore, on motion of Julie Stoil Fernandez Esq. attorney for Petitioners Raymond and Kermit Card, it is hereby Ordered and adjudged, that Raymond Card residing at 124 Shetland Place, Warners, NY 13164 Tel. (315)254-9267 and Kermit Card , residing at 208 Commack Road, Deer Park, NY 11729, Tel.(631)871—7419 are hereby appointed as Successor Guardians of the Property of Ella Card……….."

It is therefore very clear that Paul O'Brien did not object and did not participate in the July 21, 2020 hearing on the Guardianship of Mrs. Card's Property and it was clearly stated in the underlined above that "<u>No Opposition Having Been Made,</u>" to Raymond and Kermit Card from becoming Guardians of Mrs. Card's property. Paul O'Brien's failure to call, email or send a letter to Mrs. Card and family, that a hearing would be taking place on July 21, 2020 and participate in the hearing to protect Mrs. Card's basic fundamental due process rights, was a serious breach of fiduciary duty, extrinsic fraud, racketeering and many other crimes and attorney misconduct.

Furthermore, any reasonable person would believe, there is clear and convincing evidence that Paul O'Brien breached his fiduciary duty to Mrs. Card, joined and conspired with Julie Fernandez, where she would be attorney over Mrs. Card's Property and continue to strip Mrs. Card of her wealth by billing Mrs. Card attorney fees. Where Ken Swenson, Cindy Card and LaDonna Card over the last ten years maintain and spent their own money on repairs in excess of $75,000 on Mrs. Cards homes, and would be Guardians of her property for free.

Mrs. Card's sons, Raymond and Kermit Card are both life-long crack cocaine drug addicts, alcoholics, charged with domestic violence, rape, filed Bankruptcy four times, and only want to steal Mrs. Card's money and property and do not qualify as Guardians in the State of New York under Article § 81 Mental Hygiene Law.

After a car accident and prior to the Guardianship of Mrs. Card's Property "Only" (with no Guardianship over the Person), Kermit Card kept Mrs. Card at his home against her will, forced

3

her to sign power of attorney, removed her money from her bank accounts, gave Mrs. Card wrong dose of medication and forced her to drink cups of tang, to increase her blood sugar to go into a diabetic coma, (she is a diabetic and takes insulin), while he steals the rest of her money, basically attempted murder of his own mother. LaDonna Card called her mother Mrs. Card cell phone, with no answer, Kermit took her cell phone, so she could not contact anyone for help. Kermit was isolating Mrs. Card to steal her money, finally LaDonna and her husband went and got her mother and took her home. Mrs. Card was bleeding vaginally for many months after she was rescued but would not speak about what took place. After her escape, Raymond and Kermit Card would then file for Guardianship over their mother, anything to get her money and valuable real estate property located in Brooklyn New York. Kermit stated in Ladonna Card's affidavit, "I do not care if the Vera Institute takes every dime as long as Cindy Card would get nothing." Mrs. Card left everything to her daughter Cindy Card, the one person that is most responsible to care for her money and properties. Please See **Exhibit C LaDonna Card's Affidavit**.

In April 2011, Judge Betsy Barros, without a medical doctor evaluation, ruled Mrs. Card incapacitated and stated in chambers to daughter Cindy and Ella Card, "Why don't you want a Guardianship? Guardianships are Good," Mrs. Card stated, "because I am not incapacitated," Barros stated, "You may not be incapacitated now, but when I get done with you, you will be incapacitated." However,  eight months later on December 14, 2011, Judge Betsy Barros signed the order of incapacity, which is in violation of Article § 81, the signing of this order must be within 7 days not eight months later, which is a violation of due process and when Mrs. Card was no longer a resident of New York, and therefore this Guardianship of the Property of Mrs. Card is Void Ab Initio, where the Guardianship of the Property of Mrs. Card should be vacated.

4

However, in August 2017, Mrs. Card went to the Social Security Administration in Pennsylvania where she lives and the Social Security Administration began investigating the Vera Institute for stealing Mrs. Card Social Security money since March of 2011. Not only did the Social Security Administration find Mrs. Card to be very Competent but also ordered attorney John Holt, attorney for the Vera Institute to return all money stolen by the Vera Institute to be returned to Mrs. Card, he has not returned her money to this day.

In June of 2011, Mrs. Card would leave New York and never return. The Court did not have jurisdiction over the person, since Mrs. Card was a resident of Maryland, living with her Son in Law, Ken Swenson. Mrs. Card also signed a **Cease-and-Desist** order against Raymond and Kermit Card, never wanting to see them ever again, she is terrified of these two men that abuse their wives, while on alcohol and crack cocaine. Therefore, Raymond and Kermit do not qualify as Guardians under Article § 81 MHL and will never meet with Mrs. Card ever again.

Mrs. Card hired Paul O'Brien to protect her property from the Vera Institute and Raymond and Kermit Card. As a result of Paul O'Brien failure to represent Mrs. Card, Mrs. Card has suffered tremendously, financially, and emotionally and Paul O'Brien has created a negative impact in this case and Mrs. Card is in a worst position now, then prior to hiring Paul O'Brien. Paul O'Brien was not legally allowed to terminate himself as Mrs. Card's attorney.

An attorney, however, may not freely terminate the attorney-client relationship. When retained in a legal proceeding, an attorney is generally required to represent the client until its conclusion. *Marine Midland Tr. Co. of Mohawk Valley v. Penberthy, DeIorio & Rayhill*, 60 Misc.2d 11, 13, 301 N.Y.S.2d 221, 224 (Sup. Ct. Oneida County 1969). An attorney can only terminate the attorney-client relationship upon good cause and reasonable notice. *Willis v. Holder,*

5

43 A.D.3d 1441, 1441, 842 N.Y.S.2d 841, 842 (4th Dep't 2007); *Mason v. MTA New York City Transit,* 38 A.D.3d 258, 832 N.Y.S.2d 153, 154 (1st Dep't 2007).

"An attorney may withdraw as counsel of record only upon a showing of good and sufficient cause and upon reasonable notice to the client (see *Matter of Dunn,* 205 N.Y. 398, 403 [98 N.E. 914]; see also CPLR 321[b] (2))" (*Matter of Williams v. Lewis,* 258 A.D.2d 974, 685 N.Y.S.2d 382 [4th Dept.1999] ).

There were absolutely no verbal or written communication between Paul O'Brien and Mrs. Card or family of Mrs. Card. Mrs. Card and family found out Paul O'Brien's withdrew three months after the July 21, 2020 hearing, in which Raymond and Kermit Card were appointed Guardians of the Property of Mrs. Card, against Mrs. Card's wishes and against New York Article § 81 Mental Hygiene Laws.

It is well established that although a client may discharge an attorney at any time, even without cause, there must be a showing of good cause and reasonable notice before an attorney will be permitted to terminate his relationship with a client (*Bathgate v. Haskin,* 59 N.Y. 533; *Isser v. Berg,* 38 Misc.2d 957, 239 N.Y.S.2d 370). What is sufficient cause to justify an attorney in abandoning a case depends upon the circumstances present in each individual matter (*Tenney v. Berger,* 93 N.Y. 524). A determination of whether or not to grant an attorney's motion to withdraw rests within the sound discretion of the trial court (*People v. Salquerro,* 107 Misc.2d 155, 433 N.Y.S.2d 711).

<u>Notice to the client should be reasonable to allow the opportunity to hire new counsel. See *McKelvey v. Oltmann,* 16 A.D.2d 957, 957, 229 N.Y.S.2d 814, 816 (2nd Dep't 1962).</u>

A decision by a lawyer to withdraw should be made only on the basis of compelling circumstances, and in a matter pending before a tribunal he must comply with the rules of the

6

tribunal regarding withdrawal. A lawyer should not withdraw without considering carefully and endeavoring to minimize the possible adverse effect on the rights of his client and the possibility of prejudice to his client as a result of his withdrawal. (Code of Professional Responsibility EC 2–32)

An attorney cannot leave his client in the middle of a matter because he does not supply him with money, or by reason of any other difficulty, without running the risk of losing the benefit of that relation (*Matter of Faithfull, L.R.*, 6 Eq. 325; cited in *Eisenberg v. Brand*, 144 Misc. 878, 259 N.Y.S. 57).

In the instant case, Mrs. Card entire property, her husband and her life's work was being stolen by the Vera Institute and then by Cocaine Drug Addicts and Julie Fernandez.

Upon termination of the attorney-client relationship, steps should be taken to avoid prejudice to the former client. It is best practice to send a written communication to the former client: (1) clearly indicating what representation is being terminated; (2) setting forth the reason for the termination; (3) outlining all future critical deadlines; (4) recommending a process by which the attorney will confer with incoming counsel; (5) delivering papers and property to the former client to which it is entitled; and (6) promptly refunding any fees not earned. This was not done.

To allow Paul O'Brien to withdraw prior to the hearing of Guardianship of the property proceeding would be both prejudicial to Mrs. Card and harmful to judicial economy. The court in *Suffolk Roadways Inc. v. T. Bayles Mimuse* et al, 56 Misc.2d 6, 10, 287 N.Y.S.2d 965 stated:

> The court is loath to deny an attorney compensation for services performed. However, the court also recognizes that he is aware of his obligation and duties to a client. He is given the choice of assuming these obligations. His admission to the Bar is a clear indication that he has chosen to fulfill these obligations. The law recognizes that these obligations to a client are difficult and severe. Therefore, these obligations are only imposed once an attorney decides to acquiesce in the establishment of the attorney-client relationship as evidenced by a retainer agreement, whether oral or written. Now the attorney cannot turn back. He is duty

7

bound to represent the client to the best of his ability. He cannot voluntarily withdraw without just cause. If he does so, then he must pay the penalty, forfeiture of his right to compensation.

### <u>VIOLATION OF THE FOLLOWING RULES OF PROFESSIONAL CONDUCT</u>

We conclude that Paul O'Brien and Falcon, Rappaport & Berkman has violated the

following Rules of Professional Conduct

(22 NYCRR 1200.0):

1. **Rule 1.3 (a)**—Paul O'Brien failed to act with reasonable diligence and promptness in representing Mrs. Card, in fact Paul O'Brien was hired and failed to represent Mrs. Card.
2. **Rule 1.3 (b)**- Paul O'Brien neglected Mrs. Card's legal matter entrusted to him.
3. **Rule 1.3 (c)** – Paul O'Brien intentionally failed to carry out a contract of employment entered into with Mrs. Card for professional services, however, Paul O'Brien was not permitted to withdraw minutes before the hearing or prior to and on the day of the hearing
4. **Rule 1.4 (3)** Paul O'Brien failed to keep Mrs. Card reasonably informed about the status of the matter, Mrs. Card found out that Paul O'Brien withdrew three months after his withdrawal.
5. **Rule 1.7 (a)(2)**—representing a client in a matter in which there will be a significant risk that the lawyer's professional judgment on behalf of a client, will be adversely affected by the lawyer's own financial, business, property, or other personal interests, without obtaining from the affected client informed consent, confirmed in writing.
   (It is believed that Paul O'Brien sold out his client Mrs. Card to assist Ms. Fernandez in the theft of Mrs. Card's property. Where Paul O'Brien conspired with Ms. Fernandez to sell out his own client to assist Ms. Fernandez in the theft of Mrs. Card estate.
6. **Rule 5.1 (a)** Falcon, Rappaport & Berkman shall make reasonable efforts to ensure that all lawyers in the firm conform to these **Rules (b)(1)** A lawyer with management responsibility in a law firm shall make reasonable efforts to ensure that other lawyers in the law firm conform to these Rules**. Rule (b)(2)** A lawyer with direct supervisory authority over another lawyer shall make reasonable efforts to ensure that the supervised lawyer conforms to these. **Rule 5.1(c)** Falcon, Rappaport & Berkman should have ensured that the work of partners, Paul O'Brien and associates were adequately supervised, as appropriate. A lawyer with direct supervisory authority over another lawyer shall adequately supervise the work of the other lawyer, as appropriate. In either case, the degree of supervision required is that which is reasonable under the circumstances, taking into account factors such as the experience of the person whose work is being supervised, the amount of work involved in a particular matter, and the likelihood that ethical problems might arise in the course of working on the matter.
7. **Rule 8.4(a)**- A lawyer or law firm shall not violate or attempt to violate the Rules of Professional Conduct, knowingly assist, or induce another to do so, or do so through the acts of another. Where Paul O'Brien acted with Julie Fernandez to withdraw to destroy Mrs. Card Guardianship of the Property case.

8

8. **Rule 8.4 (b)**—Paul O'Brian engaged in illegal conduct that adversely reflects on his honesty, trustworthiness, or fitness as a lawyer.
9. **Rule 8.4 (c)**—Paul O'Brien engaged in conduct involving dishonesty, fraud, deceit, and misrepresentation.
10. **Rule 8.4 (d)**—Paul O'Brien engaged in conduct that is prejudicial to the administration of justice.
11. **Rule 8.4(g)-Paul O'Brien engaged in Race Discrimination**, Mrs. Ella Rubina Card is a **Successful Black Businesswoman** and the Vera Institute made statements about "for a Black woman  you have so much," it is our belief that Paul O'Brien went along with others because he is a racists and was jealous of Mrs. Card's success and may not believe that Black people should be so wealthy.
12. **Rule 8.4 (h)**—Paul O'Brien engaged in conduct that adversely reflects on his fitness as a lawyer and intentionally destroyed Mrs. Ella Card's Guardianship case.

Paul O'Brien and Falcon, Rappaport & Berkman Breach their Fiduciary Duty to Mrs. Card. In New York, "In order to establish a breach of fiduciary duties, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." *Kurtzman v. Bergstol*, 40 A.D.3d 588, 590, 835 N.Y.S.2d 644 (2nd Dep't 2007); see also *Pokoik v. Pokoik*, 982 N.Y.S.2d 67, 70, 115 A.D.3d 428 (1st Dep't 2014). Mrs. Card has a signed contract with Counsel to protect her property and return her property to rightful owner, Mrs. Card. Paul O"Brien withdrew as Counsel for Mrs. Card prior to the hearing giving no notice to Mrs. Card. In **Exhibit B**, Attorney Julie Stoil Fernandez admits that Paul O'Brien withdrew prior to and on the same day of the hearing. This Case is about the entire life's work of Mrs. Card and her husband, this case is about Elder Abuse and Exploitation of Mrs. Card, first by the Court and the Vera Institute and then by the Court and Julie Fernandez.

"A fiduciary relationship exists between an agent and principal, signifying a relationship of trust and confidence whereby the agent is bound to exercise the utmost good faith and undivided loyalty toward the principal throughout the relationship." *Leon C. Lazer, et al*., New York Pattern Jury Instructions – Civil § 3.59 (2d ed. 2006); see also *Sokoloff v. Harriman Estates Development Corp.,* 96 N.Y.2d 409, 416, 754 N.E.2d 184, 729 N.Y.S.2d 425 (N.Y. 2001); *Lamdin v. Broadway*

9

*Surface Advertising Corp.*, 272 N.Y. 133, 138, 5 N.E.2d 66, 67 (N.Y. 1936); *In re Estate of Naumoff*, 301 A.D.2d 802, 803, 754 N.Y.S.2d 70 (3rd Dep't 2003).

Among the agents who, in New York, owe fiduciary duties to a principal are an attorney to the client; a trustee to the trust beneficiary; and an escrow agent to the beneficiary. *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 118, 629 N.Y.S.2d 1009, 653 N.E.2d 1179 (N.Y. 1995) (attorney to client); *Keller v. Loews Corp.*, 69 A.D.3d 451, 451, 894 N.Y.S.2d 376 (1st Dep't 2010) (same); *In re Mankin*, 88 A.D.3d 717, 718, 930 N.Y.S.2d 79 (2nd Dep't 2010) (trustee to the trust beneficiaries); *Talansky v. Schulman*, 2 A.D.3d 355, 359, 770 N.Y.S.2d 48 (1st Dep't 2003) (escrow agent to his or her beneficiary).

It is well settled that the relationship of client and counsel is one of "unique fiduciary reliance" (*Cooperman*, 83 N.Y.2d at 472, 611 N.Y.S.2d 465, 633 N.E.2d 1069) and that the relationship imposes on the attorney "[t]he duty to deal fairly, honestly and with undivided loyalty including maintaining confidentiality, avoiding conflicts of interest, operating competently, safeguarding client property, and honoring the clients' interests over the lawyer's" (id.). Thus, any act of disloyalty by counsel will also comprise a breach of the fiduciary duty owed to the client.

In *Greene*, 47 N.Y.2d at 451, 418 N.Y.S.2d 379, 391 N.E.2d 1355, the Court of Appeals noted that "attorneys historically have been strictly forbidden from placing themselves in a position where they must advance, or even appear to advance, conflicting interests," a rule that is intended to preclude breach of the attorney's duty of loyalty. As this Court has recognized, a law firm may simultaneously represent the competing interests of two opposing clients only with the client's consent after full disclosure of the dual representation and its consequences (see e.g. *Matter of Metropolitan Transp.* Auth. (Cohen), 222 A.D.2d 340, 341, 635 N.Y.S.2d 604 [1995]; Code of Professional Responsibility DR 5–105 [22 NYCRR 1200.24] ).

10

Paul O'Brien's conspired with Julie Fernandez long in advance before his planned withdrawal on the same day and prior to the hearing. Since Paul O'Brien never noticed Mrs. Card or family of the July 21, 2020 hearing date and withdrew as Mrs. Card attorney,  Mrs. Card had no legal representation to protect her property, a serious breach of fiduciary duty and violation of due process. Paul O'Brien's withdrawal, would ensure that Julie Stoil Fernandez would become attorney over the estate of Mrs. Card.  This is a violation of Due Process, Extrinsic Fraud by keeping Mrs. Card and family away from the Court, Racketeering, Elder Abuse and Exploitation and many other crimes including Racism, Mrs. Card is a Successful Black Woman, her and her husband invested wisely, why should a Black Woman have so much, stated by Lisa Friedman Court Evaluator. Paul O'Brien kept Mrs. Card and family away from the Court, a collateral attack to assist Julie Fernandez gain control of Mrs. Card's Property. With the Court going forward with this *ex-parte* hearing, without Mrs. Card being represented by Counsel, was a violation of due process and the Guardianship of the Property is Void Ab Initio.

Under 42 USC § 1985(3), and 14th Amendment to the United States Constitution, Paul O'Brien and Julie Stoil Fernandez and Judge Rucheslman deprived Mrs. Cards rights and privileges to have counsel and equal Protection of the laws. If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully

11

qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

Pursuant to Judiciary Law § 487, "an attorney who is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party is guilty of a misdemeanor, and forfeits to the party injured treble damages, to be recovered in a civil action" (*Rozen v. Russ & Russ, P.C.*, 76 A.D.3d 965, 968, 908 N.Y.S.2d 217 [internal quotation marks omitted] ). A cause of action to recover damages for violation of Judiciary Law § 487 must be pleaded with specificity (*Sammy v. Haupel,* 170 A.D.3d at 1225, 97 N.Y.S.3d 269). Here, the plaintiff alleged intent to deceive in a conclusory fashion (see *Sammy v. Haupel,* 170 A.D.3d at 1226, 97 N.Y.S.3d 269), and failed to allege that either he or a court in fact were deceived by the alleged collusion between the defendants and certain others, or that he suffered damages that were proximately caused by the alleged deceit (see *O'Connor v. Dime Sav. Bank of N.Y.*, 265 A.D.2d 313, 314, 696 N.Y.S.2d 477).

The provisions of Article 81, including notice, hearing, right to counsel, proof by clear and convincing evidence, tailored guardianship, and extensive reporting and review, recognize the due process required when liberty and/or property interests are at stake; our courts, similarly, have not hesitated to add additional protection where necessary to satisfy constitutional requirements (see e.g. Matter of St Luke's–Roosevelt Hospital Center (Marie H.), N.Y.L.J., Dec. 8, 1992, at 22, col.

12

2 [Sup. Ct. New York County], mod. and remanded 215 A.D.2d 337, 627 N.Y.S.2d 357 [1st Dept. 1995], affd. 226 A.D.2d 106, 640 N.Y.S.2d 73 [1st Dept. 1996] ), affd. 89 N.Y.2d 889, 653 N.Y.S.2d 257, 675 N.E.2d 1209 [1996] [holding that indigent Alleged Incapacitated Person has the right to state paid counsel where involuntary transfer to a nursing home is requested] ).

Given that due process clearly applies, the question becomes precisely, "What process is due," a question answered by reference to Mathews' three-pronged test:

As the Supreme Court recognized almost a century ago, the liberty protected by the constitution encompasses "not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children ... and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men" (*Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 [1923]; see also *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 [1954] ). (Although *777 the Court has not assumed to define " liberty" with any great precision, the term is not confined to mere freedom from bodily restraint. Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective [id. at 499–500, 74 S.Ct. 693].)

Appointment of a guardian of the property divests the ward of any control over that property and apparently deprives the ward of the right to contract, implicating protected property interests. The Risk of an Erroneous Deprivation of Such Interests through Procedures Used and the Probable Value, If Any, of Additional or Substitute Procedural Safeguards

As a matter of fundamental due process, the state may not impose the "extensive loss of personal liberty [inherent] in the guardianship process" (Norman Fell, Guardianship and the

13

Elderly: Oversight Not Overlooked, 25 U Tol. L. Rev. 189, 190 [1994] ) without some guarantee that the person or persons to whom it has granted guardianship of the person continues to act in her ward's best interests, and that the ward is, at the very least, no worse off than before the guardianship was awarded.

Utilizing the "what process is due" analysis of Mathews v. Eldridge, supra, it is clear that a court granting guardianship of the mentally retarded and developmentally disabled must require periodic reporting and review—or "monitoring." A guardians of the person, even as it does, by statute, of 17–A guardians of the property. This monitoring requirement is inherent not only in the Fourteenth Amendment guarantee of due process of law, but also under the international human rights norms contained in the Disability Convention and the ICCPR.

Paul O'Brien, Julie Stoil Fernandez, Judge Leon Ruchelsman, Judge Betsy Barros, John Holt, and many others are all guilty of Extrinsic Fraud and Racketeering.

**<u>EXTRINSIC FRAUD</u>**

"Extrinsic fraud," in context of motion to set aside judgment, may be defined as fraud practiced in obtaining judgment such that party may have been prevented from fully and fairly litigating the matter, and includes the turning of someone away from the courthouse to prevent any possibility of adverse result. *McKinney's* CPLR 5015(a).

Where Mrs. Card thought she was being represented by counsel and would ensure that she would get her property back, Paul O'Brien gave her a false sense of security, taking her case and with his representation we could vacate the Guardianship of the Property. However Mrs. Card was lulled into a false sense of security with respect to his representation, in essence an allegation of extrinsic fraud (see Tamimi v. Tamimi, 38 A.D.2d 197, 328 N.Y.S.2d 477), is brought pursuant to paragraph 3 of subdivision (a) of CPLR 5015. That paragraph allows a judgment to be vacated

14

upon the ground of "fraud, misrepresentation, or other misconduct" (see *Oppenheimer v. Westcott*, 47 N.Y.2d 595, 603, 419 N.Y.S.2d 908, 393 N.E.2d 982). In our opinion, a movant seeking relief from a judgment under this paragraph, at least on the ground of extrinsic fraud, need not show that he has a meritorious defense or cause of action.

Extrinsic fraud may be defined as a fraud practiced in obtaining a judgment such that a party may have been prevented from fully and fairly litigating the matter (see *Tamimi v. Tamimi*, supra, and authorities cited therein). While it certainly could be said that extrinsic fraud is a ground for excusing a default, the Legislature has distinguished it from other grounds which serve as bases for excusing defaults (CPLR 5015, subd. [a], par. 1). Likewise, a failure to be properly served with process might be considered a reasonable excuse, justifying the vacatur of a default. Nonetheless, the Legislature has set aside a distinct paragraph for such motions (see CPLR 5015, subd. [a], par. 4). In fact, the Legislature has gone so far as to create a special subdivision allowing an administrative judge to bring a proceeding to vacate default judgments en masse where "obtained by fraud, misrepresentation, illegality, unconscionability, lack of due service, violations of law, or other illegalities" (CPLR 5015, subd. [c]; see Judiciary Law, former § 217–a).

It is quite clear, that Paul Obrien Never informed his client Mrs. Card of a hearing date, something so important, her life's work and her husbands life's work were on the line. By not informing Mrs. Card of the hearing date and withdrew is Extrinsic Fraud. It is just like failure to serve process. For the last ten years the Vera Institute denied Mrs. Card the basic necessities of life keeping her broke, denying her Social Security, her Pension, living in poverty while Vera Institute and now Julie Fernandez steal and spend all her money.

There is a good reason to treat motions to vacate default judgments differently, dependent on whether extrinsic fraud, lack of jurisdiction, or some other ground is alleged. Nowhere is this

15

clearer than in the case of a lack of proper service. Absent proper service, a default judgment is a nullity, and, once it is shown that there was no service, the judgment must be unconditionally vacated (see *McMullen v. Arnone*, 79 A.D.2d 496, 437 N.Y.S.2d 373). Whether or not the defendant has a meritorious **234 defense is irrelevant to the question of whether the judgment should be vacated for a lack of jurisdiction (*Pine v. Town of Hoosick*, 56 A.D.2d 692, 391 N.Y.S.2d 738; *Queensboro Leasing v. Resnick*, 78 Misc.2d 919, 358 N.Y.S.2d 939). The existence of a meritorious defense only becomes significant in determining whether to open a default once it is clear that service has properly been made (*Mayers v. Cadman Towers*, 89 A.D.2d 844, 453 N.Y.S.2d 25).

Extrinsic fraud, which includes the touting of someone away from the courthouse to prevent any possibility of an adverse result, is another *(Siegel, Supplementary Practice Commentaries, McKinney's Cons. Laws of N.Y.*, Book 7B, CPLR 5015, p. 365, 1964–1982 Supplementary Pamphlet). In fact, from a policy point of view, there is little if any difference between a default judgment obtained by "sewer service" and one obtained where the defendant might be properly served, but then, through some device, trick, or deceit, is led to believe that he or she need not defend the suit. Both are frauds on the court and on the defendant (see *Matter of Holden*, 271 N.Y. 212, 218, 2 N.E.2d 631). It is not surprising, therefore, that a judgment obtained through extrinsic fraud, like one obtained without proper service, is considered a nullity (*Tamimi v. Tamimi*, 38 A.D.2d 197, 328 N.Y.S.2d 477, supra ). The court will have no part in enforcing a judgment which was procured by a fraud practiced on it (Matter of Holden, supra ).

The inescapable conclusion, in our view, is that, just as in the case where there is improper service or no service, a default judgment obtained through extrinsic fraud should be vacated

16

without any requirement that the movant show a meritorious defense. Such a judgment is a nullity, irrespective of the question of merit.

## RACKETEERING

Paul O'Brien, Julie Stoil Fernandez, Judge Leon Ruchelsman, Judge Betsy Barros, Lisa Friedman, John Holt, David Van Leeuwen, Raymond Card, Kermit Card, and many others just in this case alone, have committed crimes of Racketeering under 18 USC § 1961 **sections 664** (relating to embezzlement of Mrs. Card's Pension and Social Security funds); **section 1028** (the above stole the identity of Mrs. Card to steal her money in her bank accounts, her income of $8000 per month for the last 10 years); **section 1343** (the above used the Courts, phone service to communicate their crimes and sent emails to commit these criminal acts of wire fraud); **section 1344** (the above went into Mrs. Card's Bank accounts to steal her money this is financial institution fraud); **section 1503** (family complained of the fraud and the judges covered up these claims to commit obstruction of justice); **sections 1581-1592** (Mrs. Card is a Successful BLACK WOMAN and the Above Racist attorneys, judges and others treated Mrs. Card like a Slave, Robbing her of her Rights and Property, who is this Black Woman that has So Much stated Lisa Friedman Court Evaluator, when the whole Courtroom knew Mrs. Card was very Competent, like many years ago when Slaves were not allowed to own Property relating to peonage, slavery, and trafficking in persons. Maybe this Court should go after Oprah Winfrey, she is a Black Woman that Has To Much, worth over 2.7 billion dollars); **section 1951** (All the money to date stolen from Mrs. Card was robbery and extortion and to interference with commerce, robbery, or extortion); **section 1952** (relating to racketeering); **section 1957** (relating to engaging in monetary transactions in property derived from specified unlawful activity); **sections 2421-24** (Human Trafficking Mrs. Card to white slave traffic); **section 501(c)** (relating to embezzlement from union funds), where a person

17

is guilty of the felony of enterprise corruption in violation of New York Penal Law § 460.20 when, "having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, he [ ] intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity."

A person is guilty of the felony of enterprise corruption in violation of New York Penal Law § 460.20 when, "having knowledge of the existence of a criminal enterprise and the nature of its activities, and being employed by or associated with such enterprise, he [ ] intentionally conducts or participates in the affairs of an enterprise by participating in a pattern of criminal activity."

Paul O'Brien involving himself under New York Penal Law § 460.20, the following defines the offense while explaining the criminal elements.

Once Mr. O'Brien decided to join with John Holt, Julie Fernandez, and Judge Ruchelsman who are guilty of Enterprise Corruption, he knowingly involved himself and associated with an enterprise or "organization" that he knew to be criminal in its design, scheme, purpose, and foundation to defraud Mrs. Card and many others, of Mrs. Card's Property and Entire Life Savings and Assets. Additionally, more than being aware, Paul participated in the activities and of the organization or enterprise as it relates to criminal conduct. Even if you are not actively involved in the wrongdoing, the long arm of the criminal code can still pull you into the scheme if you invest proceeds in in the alleged criminal enterprise or you have an interest in the same. Here Paul O'Brien withdrew from representing Mrs. Card knowingly, he was breaking the law.

18

**LEGAL MALPRACTICE**

Mr. O'Brien meets all the elements of legal malpractice. A cause of action to recover damages for legal malpractice requires proof of three elements: (1) that the defendant failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by an ordinary member of the legal community, (2) that such negligence was the proximate cause of the actual damages sustained by the plaintiff, and (3) that, but for the defendant's negligence, the plaintiff would have been successful in the underlying action.

A cause of action to recover damages for legal malpractice requires proof of three elements: **(1)** That the defendant failed to exercise that degree of care, skill, and diligence commonly possessed and exercised by an ordinary member of the legal community:

Paul O'Brien withdrew on the day of and prior to the hearing, without informing Mrs. Card and or her daughter, Cindy Card and Son in Law and Ken Swenson with whom she lives with for the past ten years. Paul O'Brien never told Mrs. Card that there would be a hearing on July 21, 2020 over the Guardianship of her property. And if Paul O'Brien would have represented Mrs. Card as her attorney in which he was hired to remove the Guardians, he would have argued with the Court, that Raymond and Kermit Card do not qualify as Guardians under Article § 81 MHL and Kimberly George (Director of Vera Institutes The Guardianship Project) was going to terminate the Guardianship. Also Mrs. Card signed a Ceased and Desist order against both Raymond and Kermit Card and does not want them in her life, they are adverse parties to one another and Paul O'Brien, John Holt, Julie Fernandez, and Judge Ruchelsman knew this and why legally, Raymond and Kermit could not become Guardians, they filed Bankruptcy four times, they are on Crack Cocaine, Alcohol Abuse, Domestic Violence, Rape, and have been arrested, had stolen money from their mother and the only reason Raymond and Kermit Card filed Guardianship

19

for their mother is to get to her money and John Holt told this to Paul O'Brien, John Holt stated: "Raymond and Kermit Card just want her money."

Paul O'Brien was supposed to get accounting from the Vera Institute, five years of back accounting, the Social Security amount that was taken by the Vera Institute from 2011 to 2017, he was supposed to transfer the case to Pennsylvania, he was supposed to get Court records and he did nothing over six months.

To recover damages for legal malpractice, a plaintiff must establish that the defendant attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession, and that the breach of this duty proximately caused the plaintiff to sustain actual and ascertainable damages' " (*Atiencia v. Pinczewski*, 148 A.D.3d 860, 860, 49 N.Y.S.3d 521, quoting *Rojas v. Paine*, 125 A.D.3d 745, 746, 4 N.Y.S.3d 223; see *Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d 438, 442, 835 N.Y.S.2d 534, 867 N.E.2d 385; *McCoy v. Feinman*, 99 N.Y.2d 295, 301–302, 755 N.Y.S.2d 693, 785 N.E.2d 714).

**(2)** That such negligence was the proximate cause of the actual damages sustained by the plaintiff, Where Paul O'Brien went to Court, then withdrew as Counsel for Mrs. Card, prior to the start of the hearing and his failure to argue that Raymond and Kermit Card do not Qualify as Guardians of the property under Article § 81 and the record states that there were **"No Opposition Having Been Made,"** Raymond and Kermit Card became Guardians of the Property. Paul was negligent by not informing Mrs. Card that there was a hearing July 21, 2020 and not telling Mrs. Card that he was going to withdrawal and now left us in a worst position then we were prior to hiring Paul O'Brien. Kimberley George was terminating the Guardianship of Mrs. Card and that is what Paul O'Brien was supposed to argue. **Exhibit B & Exhibit D**

20

**(3)** That, but for the defendant's negligence, the plaintiff would have been successful in the underlying action. All's Paul O'Brien had to argue that Kimberly George, the Director of the Vera Institute was terminating the Guardianship of Mrs. Card and releasing her estate back to Mrs. Card, **Exhibit D** Kimberly George's email. We would have been freed from the Court after ten years, where Mrs. Card was NEVER Incapacitated, because of Paul O'Brien, we have to start all over again. "To establish causation, a plaintiff must show that he or she would have prevailed in the underlying action or would not have incurred any damages, but for the lawyer's negligence" (*Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 8 N.Y.3d at 442, 835 N.Y.S.2d 534, 867 N.E.2d 385; see *Davis v. Klein*, 88 N.Y.2d 1008, 1009–1010, 648 N.Y.S.2d 871, 671 N.E.2d 1268; *Keness v. Feldman, Kramer & Monaco, P.C.*, 105 A.D.3d 812, 813, 963 N.Y.S.2d 313).

To the Grievance Committee, Paul O'Brien committed many crimes here but the worst crime is to make Mrs. Card believe that Mr. O'Brien would fight for her and behind her back Mr. O'Brien would betray her, buddy up with Judge Leon Ruchelsman and play ball with John Holt and Julie Fernandez. For whatever reason, Paul O'Brien, Falcon, Rappaport & Berkman betrayed Mrs. Card, Breached their Fiduciary Duty, committed Extrinsic Fraud, Racketeering, Elder Abuse and Exploitation and committed all the crimes above and more. Where Paul O'Brien should have reported these crimes to the proper authorities to protect Mrs. Card, instead he would join with them to get their hands on her property.

Dated this 24th day of May 2021

_____
Ken Swenson & Ella Card
Petitioner & POA
P.O. Box 328
Hanover , PA 17331
kenswenson75@yahoo.com

21

EXHIBIT A



655 Third Avenue | Suite 1400       265 Sunrise Highway | Suite 50
New York, New York 10017       Rockville Centre, New York 11570
P. 212 203 3255 | F. 212 203 3215       P. 516 599 0888 | F. 516 599 0889

January 7, 2020

Ms. Ella Card
P.O. Box 328
Hanover, PA 17331

Re:     **Engagement Letter – Litigation**

Dear Ms. Card:

This engagement letter confirms the agreement (this "Agreement") between you, individually (the "Client") and Falcon Rappaport & Berkman PLLC ("FRB" or the "Firm") as set forth below.

1.      **Scope of Engagement.**      The Firm will represent you regarding your litigation matter against the Vera Institute and in connection with the related guardianship proceedings and accountings rendered by Vera.

2.      **Consideration for Services Rendered.**      The legal fee for services rendered will be tabulated hourly based on the attached standard schedule of hourly rates, as same may be updated from time to time. To commence representation, the Firm requires a return of the signed version of this Agreement and a deposit of **$10,000** to the Firm's offices.

The following are the additional, important terms of our Agreement:

A. All checks should be made payable to "**Falcon Rappaport & Berkman PLLC**" and include reference number "**A305**" in the memo section.

B. Scope Strictly Limited.      The scope of this engagement is exclusively limited to those matters and issues specifically enumerated in Paragraph 1, and shall terminate after fulfillment of the scope of engagement. Should services outside the scope of the engagement be performed by FRB on your behalf, such services shall be billed at the rates set forth on the attached schedule of hourly rates, as same may be updated from time to time.

C. You have decided to obtain our assistance in researching and preparing all necessary documentation, and to take all steps in the New York State Courts to achieve whatever relief may be available to you in this matter. This retainer does not include or contemplate

22

**Card – A305 – Litigation**                                                              2

appeals or post judgment enforcement efforts, which must be the subject of separate retainer agreements.

D. <u>Deposit Replenishment</u>.   FRB reserves the right, in our sole discretion, to request an additional deposit at any time to continue representing you.

E. **<u>No Guarantee of Results</u>.     Client is aware that despite FRB's best efforts on Client's behalf, there is no assurance or guarantee of the outcome of this matter, nor has FRB made any representations to you concerning same.  FRB's fee is not contingent on the success of this matter**.

F. You have retained the services of the Firm, as an entity, therefore no one particular member of the Firm is being retained. Services may therefore be performed by, and pertinent information disclosed to, employees, secretaries, independent contractors, and associates and employees of the Firm.

G. <u>Timing.</u> This Agreement is valid only if signed and returned to FRB's Long Island offices within 10 days of the date set forth above, and will commence upon FRB's receipt of the Deposit and an executed version of this Agreement.

H. <u>Billing Practices</u>. Invoices will be sent to Client at least every 60 days, with payment due 15 days from the date of such invoice. At FRB's discretion, invoices may be sent less frequently if no significant activity has occurred, or more frequently if particularly significant activity has occurred in a period of time spanning less than one month.

I. <u>Wire Instructions</u>. If consideration is paid through a wire transfer, such transfer must be confirmed verbally by phone with FRB.

J. <u>Charging Lien; Retaining Lien</u>.   FRB is hereby granted a lien on any claim(s), distribution(s) or cause(s) of action related to the subject matter of this Agreement, on any sum recovered by way of settlement, and on any judgment that may be recovered thereon, and it is further agreed that FRB shall be entitled to all general, possessory, or retaining liens, and all special or charging liens as permitted under New York State law. FRB is authorized to apply any sums received by it on Client's behalf to any outstanding balance for legal fees or other expenses incurred on Client's behalf or at Client's direction.

K. <u>Termination.</u>   You have the unrestricted right to terminate this Agreement at any time, and for any reason, upon written notice by regular mail, e-mail, or both to FRB.  FRB may terminate this Agreement on account of an impasse between FRB and Client, a material breach of this Agreement (including non-payment of consideration for services rendered), or for any other permissible reason under this Agreement or as otherwise permitted under the New York Rules of Professional Conduct. Upon termination of this Agreement by either party, FRB has the right to collect from Client (i) any consideration due for services rendered and (ii) any disbursements or outside charges incurred but not yet paid. At the time of termination, consideration for services rendered will be determined based on the attached Schedule of Hourly Rates. FRB may seek any remedy permitted by law and the

455 Third Avenue : Suite 1400     265 Sunrise Highway : Suite 50
New York, New York 10017     Rockville Centre, New York 11570
P. 212 203 3255 : F. 212 203 3215     P. 516 599 0888 : F. 516 599 0889

23

**Card – A305 – Litigation**

3

New York State Rules of Professional Conduct. If a party terminates this Agreement, any unearned consideration paid to FRB shall be returned to Client within 30 days of demand by Client.

L. <u>No Statements to Third Parties</u>.  You have been advised not to discuss this matter with any third parties, as this may cause you to waive attorney-client privilege.  You have been advised not to make any statements, whether verbal or written, via media of any sort – whether social media, or news media, without first consulting with, and obtaining, the express, **written** authorization of an attorney at FRB.

M. <u>Cooperation</u>.  FRB represents that all legal advice will be rendered in the best professional judgment of FRB's representatives and in your best interests.  Your refusal to follow or cooperate with such legal and tax advice may be considered an impasse giving FRB good cause to terminate this Agreement.

N. <u>Participating Attorneys</u>.  Client acknowledges that FRB may have been referred this matter by a participating attorney.  In such eventuality, the participating attorney assumes joint and proportionate responsibility for Client's matter and shall be entitled to a portion of the fee. This shall not increase the total fee charged to the Client.

O. <u>Electronically Stored Data & Paper Copies</u>.  Electronically stored data and paper documents are an important and irreplaceable source of discovery and/or evidence in Court proceedings. Legal precedent requires preservation of all paper documents as well as information from your computer systems, removable electronic media and other locations relating to this matter.  This includes, but is not limited to, email and other electronic communication, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, Internet usage files, and network access information. You and your employees must take every reasonable step to preserve this information until further notice. *Failure to do so could result in severe penalties against you.*

P. <u>Insurance</u>.  If you are being sued (including the filing of counterclaims), we advise you to alert and seek coverage from all insurance carriers with whom you or your businesses contract. Failure to do so may result in denial of coverage. FRB does not provide insurance coverage advice unless specifically stated in the scope of services above.

Q. <u>Court Awards</u>.  In the event that a court sets the amount of fees payable to FRB in connection with a given matter (whether from a third party, estate, or incapacitated person), said amount shall not be the limit of fees properly chargeable to Client, and Client shall be personally responsible for the payment of any difference between the court award and the amount invoiced by FRB.

R. <u>Attorney's Fees</u>.   In the event that Client fails to pay its invoices in a timely manner, and FRB resorts to arbitration or litigation, FRB shall be entitled to seek recovery in such arbitration or litigation, in addition to any legal fees due and owing, all costs and reasonable attorney's fees incurred in connection therewith.

655 Third Avenue : Suite 1400   265 Sunrise Highway : Suite 50
New York, New York 10017   Rockville Centre, New York 11570
P. 212 203 3255 : F. 212 203 3215   P. 516 599 0888 / F. 516 599 0889

24

**Card – A305 – Litigation**                                                                4

S. <u>Arbitration and Governing Law.</u>     Any dispute under this Agreement will be governed by the laws of the State of New York. In the event a dispute arises with respect to fees between $1,000 and $50,000, Client shall have the right to seek arbitration with respect to such fees. Any such arbitration shall be governed by 22 NYCRR Part 137. FRB may also, with the consent of Client, request arbitration of any fee dispute. Arbitration is considered to be a more efficient and less costly method of resolving disputes and results in a final and binding determination.

T. <u>Counterparts and Electronic Signatures Binding.</u>  This Agreement may be executed and delivered in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument. Facsimile, scanned, photocopied, or electronically submitted signatures shall be deemed binding, original signatures for all purposes.

U. <u>Credit Card Administrative Fee.</u>  Any payments made by Client via credit card shall be assessed an administrative fee of three percent (3%).

V. <u>Interest.</u>  Invoices that are past due more than 30 days shall be assessed interest charges at the rate of 12% annually, compounded monthly.

W. <u>Disbursements and Outside Charges.</u> In addition to payment for the legal services rendered, you are responsible to pay all disbursements and outside charges incurred either by your or FRB in connection under the engagement contemplated by this Agreement, including (but not limited to) filing fees, investigator fees, postage, service of process, deposition fees, stenographer fees, transcription fees, expert witness fees, and other miscellaneous charges applicable to this matter if same is necessary; such disbursements and outside charges will be the sole responsibility of Client. Disbursements shall be set forth on client's periodic invoices.

*[This space intentionally left blank; signature page to follow.]*

655 Third Avenue | Suite 1400      265 Sunrise Highway | Suite 50
New York, New York 10017      Rockville Centre, New York 11570
P. 212 203 3255 | F. 212 203 3215      P. 516 599 0888 | F. 516 599 0889

25

**Card – A305 – Litigation**                                                          5

By signing where indicated below, you are confirming that you have read this Agreement and understand and accept all of the terms and conditions of the Agreement and the attached Statement of Clients' Rights and Responsibilities. **If you have any questions about this Agreement, you are strongly encouraged to contact me at your convenience before you sign.**

Very truly yours,

Paul M. O'Brien, Esq.
Partner

I have read the above Agreement and all attachments.  I have received a copy of same, and agree to all of the terms of the Agreement.

_Ella Card_
Ms. Ella Card

Date: 1/8/2020

26

RETAINER FEE SECTION INTENTIONALLY REMOVED

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

**Card – A305 – Litigation**                                                    7

### <u>Statement of Clients' Rights and Responsibilities</u>

**Your attorney is providing you with this statement to inform you of what you, as a client, are entitled to by law or by custom. To help prevent any misunderstanding between you and your attorney, please read this statement carefully.**

**If you ever have any questions about these rights, or about the way your case is being handled, do not hesitate to ask your attorney. He or she should be readily available to represent your best interests and keep you informed about your case.**

An attorney may not refuse to represent you on the basis of race, creed, color, sex, sexual orientation, age, national origin or disability.

You are entitled to an attorney who will be capable of handling your case; show you courtesy and consideration at all times; represent you zealously; and preserve your confidences and secrets that are revealed in the course of the relationship.

You are entitled to a written retainer agreement which must set forth, in plain language, the nature of the relationship and the details of the fee arrangement. At your request, and before you sign the agreement, you are entitled to have your attorney clarify in writing any of its terms, or include additional provisions.

You are entitled to fully understand the proposed rates and retainer fee before you sign a retainer agreement, as in any other contract.

You may refuse to enter into any fee arrangement that you find unsatisfactory.

Your attorney may not request a fee that is contingent on the securing of a divorce or on the amount of money or property that may be obtained.

Your attorney may not request a retainer fee that is nonrefundable. That is, should you discharge your attorney, or should your attorney withdraw from the case, before the retainer is used up, he or she is entitled to be paid commensurate with the work performed on your case and any expenses, but must return the balance of the retainer to you. However, your attorney may enter into a minimum fee arrangement with you that provides for the payment of a specific amount below which the fee will not fall based upon the handling of the case to its conclusion.

You are entitled to know the approximate number of attorneys and other legal staff members who will be working on your case at any given time and what you will be charged for the services of each.

You are entitled to know in advance how you will be asked to pay legal fees and expenses, and how the retainer, if any, will be spent.

At your request, and after your attorney has had a reasonable opportunity to investigate your case, you are entitled to be given an estimate of approximate future costs of your case, which estimate

655 Third Avenue | Suite 1400     265 Sunrise Highway | Suite 50
New York, New York 10017     Rockville Centre, New York 11570
P: 212 203 3255 | F: 212 203 3215     P: 516 599 0888 | F: 516 599 0889

28

**Card – A305 – Litigation**                                                                    8

shall be made in good faith but may be subject to change due to facts and circumstances affecting the case.

You are entitled to receive a written, itemized bill on a regular basis, at least every 60 days.

You are expected to review the itemized bills sent by counsel, and to raise any objections or errors in a timely manner. Time spent in discussion or explanation of bills will not be charged to you.

You are expected to be truthful in all discussions with your attorney, and to provide all relevant information and documentation to enable him or her to competently prepare your case.

You are entitled to be kept informed of the status of your case, and to be provided with copies of correspondence and documents prepared on your behalf or received from the court or your adversary.

You have the right to be present in court at the time that conferences are held.

You are entitled to make the ultimate decision on the objectives to be pursued in your case, and to make the final decision regarding the settlement of your case.

Your attorney's written retainer agreement must specify under what circumstances he or she might seek to withdraw as your attorney for nonpayment of legal fees. If an action or proceeding is pending, the court may give your attorney a "charging lien," which entitles your attorney to payment for services already rendered at the end of the case out of the proceeds of the final order or judgment.

You are under no legal obligation to sign a confession of judgment or promissory note, or to agree to a lien or mortgage on your home to cover legal fees. Your attorney's written retainer agreement must specify whether, and under what circumstances, such security may be requested. In no event may such security interest be obtained by your attorney without prior court approval and notice to your adversary. An attorney's security interest in the marital residence cannot be foreclosed against you.

You are entitled to have your attorney's best efforts exerted on your behalf, but no particular results can be guaranteed.

If you entrust money with an attorney for an escrow deposit in your case, the attorney must safeguard the escrow in a special bank account. You are entitled to a written escrow agreement, a written receipt, and a complete record concerning the escrow. When the terms of the escrow agreement have been performed, the attorney must promptly make payment of the escrow to all persons who are entitled to it.

In the event of a fee dispute, you may have the right to seek arbitration. Your attorney will provide you with the necessary information regarding arbitration in the event of a fee dispute, or upon your request.

655 Third Avenue | Suite 1400    265 Sunrise Highway | Suite 58
New York, New York 10017    Rockville Centre, New York 11570
P: 212 203 3255 | F: 212 203 3215    P: 516 599 0888 | F: 516 599 0889

**EXHIBIT B**

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**
-------------------------------------------------------------------X
In the Matter of the Guardianship of

**ELLA CARD,**

An Incapacitated Person.
-------------------------------------------------------------------X

**NOTICE OF ENTRY**

**Index No. 100016/2011**

**PLEASE TAKE NOTICE** that the within is a true copy of an Order and Judgment which was

signed by the Honorable Leon Ruchelsman on December 2, 2020 and entered in the county clerk's

office on December 8, 2020.

DATED: Brooklyn, New York
      December 8, 2020

Julie Stoil Fernandez, Esq.
**Finkel & Fernandez, LLP**
16 Court Street, Suite 1007
Brooklyn, NY 11241
T. (347)296-8200
F: (718) 965-3185
jstoilfernandez@ffelderlaw.com

To:

Ella Card
161 Saratoga Avenue
Brooklyn, New York 11233

Ella Card
c/o K. Swenson
445 Beck Mill Road
Hanover, Pennsylvania 17331-9253

Lawrence Price
829 East 10th Street, Suite 2H
Brooklyn, NY 11230

Helen Hernandez
1248 West 54th Street
Los Angeles, CA 90037

30

LaDonna Card
100 Debs Place, Apt. 16C
Bronx, NY 10475

Cindy Card
161 Saratoga Avenue
Brooklyn, NY 11233

Faith Card
161 Saratoga Avenue
Brooklyn, NY 11233

The Blaikie Group
111 John Street, 16th Floor
New York, NY 10038

John Holt, Esq.
Vera Guardianship Project
320 Jay Street, Room 4.110
Brooklyn, NY 11201

31

At an I.A.S. Part 76LR of the Supreme Court
of the State of New York, held in and for the
County of Kings, at the Courthouse located
at 360 Adams Street, Brooklyn, New York
on the 2 day of December, 2020.

PRESENT:
HONORABLE LEON RUCHELSMAN
        J.S.C.
-----------------------------------------------------------------------X

In the Matter of the Application of

RAYMOND CARD and KERMIT CARD,              Index No. 100016/2011
           Co-Petitioners,

                                                      ORDER AND JUDGMENT
For their Appointment as Successor Guardians       APPOINTING GUARDIAN
of the Property of

ELLA CARD,

An Incapacitated Person.
-----------------------------------------------------------------------X
WHEREAS, AN ORDER was duly made herein at the I.A.S. Part 76LR of this Court on

the 21ˢᵗ day of July, 2020, for a hearing to be held on the application of RAYMOND

CARD and KERMIT CARD, the Co-Petitioners/Applicants of the original underlying

guardianship proceedings, requesting their appointment as Successor Co-Guardians of

the Property of ELLA CARD, a person adjudicated Incapacitated by the Hon. Betsy

Barros in an Order Appointing Guardian, dated December 14, 2011, in which VERA

Guardianship Project was appointed Guardian of the Property; and

WHEREAS, VERA Guardianship Project wishes to resign from their position as

Guardian and have so indicated in a motion brought on November 14, 2019, which was

heard in conjunction with Co-Petitioners Raymond Card and Kermit Card's application

to serve as Successor Co-Guardians, and

32

**WHEREAS,** in the motion requesting to resign, VERA had additionally made an application for a $10,000.00 retainer fee for Falcon, Rappaport et al. Counsels alleged to represent ELLA CARD, for their retainer but withdrew the application on the date of hearing, to defer to any incoming Successor Guardian(s); and Falcon Rappaport, the Counsel purporting to represent ELLA CARD, having appeared and withdrawing any application submitted to the Court, and the Court having heard testimony from John Holt, Esq., Director, VERA Guardianship Project, regarding the difficulties of maintaining the existing guardianship and recommending a replacement guardian; and Raymond Card and Kermit Card Co-Petitioners also having testified in support of their nomination and having been allocuted as to their willingness, ability and qualifications to serve, and it appearing to the satisfaction of the Court, that Raymond Card and Kermit Card are qualified to replace the Guardian and have expressed a willingness to do whatever is necessary in furtherance of protection of ELLA CARD's property;

And proof of service having been made, and it appearing to the satisfaction of the Court that RAYMOND CARD and KERMIT CARD are qualified appointed as Successor Co-Guardians of the Property Management for ELLA CARD and upon pleadings and proceedings heretofore had herein, and due deliberation having been had, and no opposition having been made,

**NOW,** therefore, on motion of JULIE STOIL FERNANDEZ, ESQ., Attorney for Co-Petitioners RAYMOND CARD and KERMIT CARD, it is hereby

**ORDERED AND ADJUDGED,** that RAYMOND CARD, residing at 124 Shetland Place, Warners, NY 13164, Tel. (315) 254-9267; and KERMIT CARD, residing at 208 Commack Road, Deer Park, NY 11729; Tel. ( 631) 871-7419, are hereby appointed as

2

33

Successor Co-Guardians of the Property of ELLA CARD, conditioned that the said Co-Guardians will in all things faithfully discharge the trust imposed herein, obey all the directions of the Court in respect to the trust, make and render a true and just account of all monies and other properties received pursuant to the authority granted herein and the application thereof, and of all acts performed in the administration of the trust imposed herein whenever required to do so by the Court, and will file the designation required by §81.26 of the Mental Hygiene Law; and it is further

**ORDERED AND ADJUDGED**, that VERA Guardianship Project is authorized to prepare a Final Account of their proceedings as Guardian of the Property and to move for judicial settlement of such account, and to cooperate and fully inform the Successor Guardians of the history and experiences of the Guardian and strategies for maintaining the property and accessing the property of ELLA CARD; and it is further

ORDERED AND ADJUDGED that Lawrence Price is appointed Referee to review the Final Account; and it is further
**ORDERED AND ADJUDGED,** that upon the qualification of the Successor Co-Guardians and receipt of their Commission to serve, the Successor Co-Guardians shall take custody of the funds held in the guardianship account of VERA Guardianship Project; leaving behind adequate funds upon the settlement of a final accounting; and it is further

**ORDERED AND ADJUDGED**, that pursuant to §1.20 of the Mental Hygiene Law the Co-Guardians shall:

    A. Exercise only those powers that the Guardian are authorized to exercise by order of the Court;

    B. Exercise the utmost care and diligence when acting on behalf of ELLA CARD;

3

34

C. Exhibit the utmost degree of trust, loyalty, and fidelity in relation to ELLA CARD;

D. Visit ELLA CARD not less than four times per year, and authority, in this matter, to seek assistance from this Court and Courts in other jurisdictions, including Access Orders with police assistance, approved by the Court, to access the Incapacitated Person, wherever she is maintained, to personally visit with her and be able to report to this Court, her health, safety and wishes;

E. Afford ELLA CARD the greatest amount of independence and self determination with respect to property management and personal needs in light of her functional level, understanding and appreciation of her functional limitations, personal wishes, preferences and desires with regard to managing the activities of daily living; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians shall have the following powers as set forth in §81.21 of the Mental Hygiene Law, with respect to the Property Management Needs of ELLA CARD:

1. Marshal the income and assets of the Incapacitated Person, including rental income from all real property owned by the Incapacitated Person located in New York State, and establish bank, brokerage and other similar accounts in the name of the Guardian for Incapacitated Person and endorse, collect, negotiate and deposit all negotiable instruments drawn to the order of the Incapacitated Person, including but not limited to, government entitlement checks; invest funds with the same authority as a

4

35

trustee, pursuant to New York EPTL §11-2.2; inventory personal belongings;

2. Marshal accounts held jointly in the name of the Incapacitated Person and others, without the consent of the listed joint tenant(s), provided that the Social Security number of the Incapacitated Person has been used to report dividends from the asset to tax authorities;

3. Close or retitle in the Guardian's name, as Guardian, bank time deposits prior to maturity, upon the finding by this Court that, for purposes of § 9-I and §238 of the Banking Law, the Order Appointing a Guardian shall be deemed a declaration of incompetence and no banking or savings institutions shall impose any penalty upon the transaction;

4. Restore the Guardianship as the Representative Payee of ELLA CARD's social security income and request direct deposit from any income sources into the Guardianship Account, if possible;

5. Collect rent from tenants with legitimate leases within the real properties, and deposit such rent into the Guardianship account;

6. Pay bills necessary to maintain the buildings' habitability with funds available from rent collection;

7. Retain Counsel to seek eviction proceedings against holdover and illegitimate persons residing in the real properties owned by ELLA CARD, including CINDY CARD and FAITH CARD, if necessary and appropriate;

5

36

8. Authority to hire persons necessary to maintain and protect the real property;

9. Authority to appraise the value of the real properties and apply for authority to sell the real properties, subject to prior Court approval;

10. Authority to issue new leases and/or renew leases, if appropriate.

11. Convey or release contingent and expectant interests in property, including marital property rights and any right of survivorship incidental to joint tenancy or tenancy by the entirety;

12. Exercise or release powers the person holds as a trustee, personal representative, guardian for a minor, guardian, or done of a power of appointment;

13. Enter into contracts, subject to prior court approval;

14. Create revocable or irrevocable trusts of property of the estate which may extend beyond the incapacity or life of the Incapacitated Person, subject to prior court approval;

15. Create a Supplemental Needs Trust for the benefit of Faith Card, subject to prior court approval;

16. Exercise options to purchase securities;

17. Exercise rights to elect options and change beneficiaries under insurance and annuity policies and to surrender the policies for their cash value, subject to prior court approval;

6

37

18. Renounce or disclaim any interest by testate or intestate succession or by inter vivos transfer consistent with EPTL 2-1.11(c), subject to prior court approval;

19. Authorize access to or release of confidential records;

20. Apply for, obtain and settle claims for government benefits;

21. Pay for health care services, health care aides and household help;

22. To be provided with keys to and be authorized to access and inspect all units in the properties located at 155 Saratoga Avenue and 161 Saratoga Avenue, Brooklyn, New York;

23. Retain accountants, and similar professionals, with payment subject to the approval of this Court;

24. Request extensions, if possible, for any tax filings if applicable, with any taxing authority. Sign and file income tax returns and all other tax documents for any and all tax obligations, and appear before federal, state and local taxing authorities on all claims, litigation, settlements and other related matters and shall be authorized without further order of the court to retain an accountant for the purposes thereof and pay said accountant per hour for each unfiled year. Said accountant fees shall be subject to prior Court approval;

25. Cancel any credit accounts held by the Incapacitated Person, as the Guardians deem appropriate;

26. Engage in Medicaid planning, subject to prior court approval of all proposed transfers, pursuant to MHL §81.21 (b);

7

38

27. Manage all Medicare, Medicaid and other health care claims, and appear as representative for any Medicare claims, Medicaid litigation and/or settlement of claims;

28. Investigate if it is necessary to commence a turnover proceeding to discover and recover income and assets of the Incapacitated Person, pursuant to Mental Hygiene Law Section §81.43;

**ORDERED AND ADJUDGED**, that pursuant to 22 NYCRR §36.1 (b) the Co-Guardians ~~should~~ **shall not** be a subject of Part 36 of the Rules of the Chief Judge; and it is further

**ORDERED AND ADJUDGED**, that the caption of this proceeding shall be amended to reflect the appointment of said Co-Guardians as follows:

----------------------------------------------------

**In the Matter of the Guardianship of**

**ELLA CARD**    ,                                   **Index No. 100016/2011**

**An Incapacitated Person.**
----------------------------------------------------

and it is further

**ORDERED AND ADJUDGED**, that pursuant to §81.27 of the Mental Hygiene Law, upon the filing of an Oath and Designation as required by the statute, a commission in the due form of law shall be issued by the Clerk of the Court; and it is further

**ORDERED AND ADJUDGED**, that pursuant to Mental Hygiene Law §81.39 no later than ninety (90) days after the issuance of a commission the Co-Guardians shall complete a training program approved by the Chief Administrator of the Courts and obtain proof that the training was completed; and it is further

8

39

**ORDERED AND ADJUDGED**, that pursuant to Mental Hygiene Law

§81.30, no later than ninety (90) days after the issuance of the commission to the Co-Guardians, the Co-Guardians shall file with the Court an initial report in a form prescribed by the Court and proof of completion of the Guardian education requirements under the Mental Hygiene Law §81.39; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians shall file during the month of May in the Office of the Clerk of the County of Brooklyn, an Annual Report in the form required by Mental Hygiene Law §81.31; and it is further

**ORDERED AND ADJUDGED**, that the Court Examiner named herein shall inform the Court in writing that the initial report/annual account has been examined; and it is further

**ORDERED AND ADJUDGED**, that the Guardian shall be compensated pursuant to SCPA §2307; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians shall take no annual commissions and compensation for any year that year's annual account is filed, reviewed by the Court Examiner, and approved by the Court; and it is further

**ORDERED AND ADJUDGED**, that for the purpose of second section 9-I of the Banking Law, this order shall be deemed a declaration of incompetence and no banking institution or savings bank shall impose any penalty for the repayment of a time deposit prior to maturity; and it is further

**ORDERED AND ADJUDGED**, that the authority of the Co-Guardians of the Property shall extend to all of the property of ELLA CARD both real and personal, including but

9

not limited to the following: income, bank accounts and other assets and real estate; and it is further

**ORDERED AND ADJUDGED**, that all persons are hereby directed and commanded to deliver to the Co-Guardians of the Property, upon demand and presentation of a certified copy of the commission, all property of ELLA CARD, of every kind and nature which may be in their possession or under their control; and it is further

**ORDERED AND ADJUDGED** that the Co-Guardians may, without prior authorization of the Court, invest surplus funds in investments eligible by law for the investment of trust funds and may dispose of investments so made and reinvest the proceeds as so authorized; and it is further

**ORDERED AND ADJUDGED**, that the Co-Guardians may, without prior authorization of the Court, maintain in their own name and official title any civil judicial proceeding which the ELLA CARD might have maintained were she competent, including any ; and it is further

**ORDERED AND ADJUDGED**, that in the event the Guardianship is to be terminated, the Co-Guardians shall apply to the Court by *Ex Parte* application for permission to bring a Final Account of the proceedings, or for direction as to the disposition of ELLA CARD's property then remaining and for any other instructions concerning said termination within sixty (60) days; and it is further

**ORDERED AND ADJUDGED**, that should ELLA CARD require residency in a nursing home or residential facility at the time of her death, the director of the facility shall notify the Court within thirty (30) days; and it is further

10

41

**ORDERED AND ADJUDGED**, that upon the death of the ELLA CARD, the Co-Guardians shall have the authority to pay bills which were incurred prior to the death of ELLA CARD provided the Co-Guardians would otherwise have had the right to pay such bills; and it is further

**ORDERED AND ADJUDGED,** that pursuant to §81.36 (e) of the Mental Hygiene Law, upon the death of ELLA CARD, the Co-Guardians of the Property shall have the authority to pay for the reasonable funeral expenses of ELLA CARD; and it is further

**ORDERED AND ADJUDGED**, that the following individuals shall receive notice of the ELLA CARD's death, the intended disposition of remains of the decedent, funeral arrangements and the final resting place of the ELLA CARD when that information is known or can be reasonably ascertained by the Guardians: **RAYMOND CARD; KERMIT CARD; CINDY CARD; LADONNA CARD; HELEN HERNANDEZ; and it is further**

**ORDERED AND ADJUDGED**, that to the extent of the net estate available therefore, the Co-Guardians shall provide for the maintenance, and personal well-being of the ELLA CARD and then may, without further order of the Court, provide for the maintenance and support of persons legally dependent upon the ELLA CARD and it is further

**ORDERED AND ADJUDGED**, that any safe deposit box owned by the ELLA CARD shall be opened by the Co-Guardians in the presence of a representative of the bank and the Co-Guardians shall promptly file an inventory of the contents of the safe deposit box with the Court, subscribed by all present; and it is further

**ORDERED AND ADJUDGED**, that upon the submission and review of the

11

42

Affirmations of Legal Services, the following fees shall be paid from the assets of ELLA CARD by VERA Guardianship Project as her present Guardian:

    1.    To **JULIE STOIL FERNANDEZ, ESQ.,** Co-Petitioners'

Counsel, the sum of $11,250 for her legal services as Co-

Petitioners' counsel and $90 in disbursements; and it is further

**ORDERED AND ADJUDGED,** that a copy of this Order and Judgment with the Notice of Entry shall be served on all parties as directed in this Judgment pursuant to §81.16 (c) (3) within fifteen (15) days of the signing of this Order.

**ENTER:**

_____

**Hon. Leon Ruchelsman**
J.S.C.

43

## EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
----------------------------------------------------------------X
In the Matter of the Guardianship of ELLA                    Index No.:
CARD,

CINDY CARD, LADONNA CARD,                          **AFFIDAVIT IN**
and KENNETH SWENSON,                               **SUPPORT**

                    Petitioners,

        v.

RAYMOND CARD and KERMIT CARD,

                    Respondents.
----------------------------------------------------------------X

STATE OF NEW YORK         )
                          ) ss.:
COUNTY OF BRONX           )

        LADONNA CARD, being duly sworn, deposes and says:

        1. I am a Petitioner in the above referenced action.  I am fully familiar with

the facts and circumstances set forth in this affidavit, which is respectfully

submitted in support of the application of Petitioners for the non-appointment

and/or removal of RAYMOND CARD and KERMIT CARD as Successor Co-

Guardians of the Property Management for ELLA CARD pursuant to Article 81.35

of the NY Mental Hygiene Law and the appointment of CINDY CARD, LADONNA

CARD and KENNETH SWENSON as Successor Co-Guardians of the Property

Management for ELLA CARD pursuant article 81 of the NY Mental Hygiene Law,

and for such other and further relief as may be just, proper and equitable.

44

2. I together with my sister and co-Petitioner submit this affidavit to the court to show that Respondents are unfit to act as co-Guardians and/or they should be terminated for cause, for a myriad of reasons set forth herein.

3. Both Respondents have committed unlawful and illegal conduct in that they have committed assault, against their ex-wives and/or children. A copy of a handwritten letter of Respondent Raymond Card admitting that he abused his ex-wife and children is annexed hereto as Exhibit B. Upon information and belief, Respondent Kermit Card was also arrested for making a false police report against his ex-wife and was subjected to disciplinary action by his employer for doing so.

4. Both Respondents are lifetime abusers of alcohol and cocaine. In fact, in 2011, when the initial proceedings were held, Raymond was visibly drunk in court and smelled of alcohol. The addiction has so severe that one day Respondent Raymond Card pulled a gun on Petitioner LaDonna Card high on crack and demanded money for drugs.

5. In 2010, a power of attorney was prepared where there was a shared power granted by Ella Card to Petitioner Ladonna Card and Respondent Kermit Card, Respondent Kermit Card shortly thereafter told Ms. Ella Card that the power of attorney was done "incorrectly" and changed the power of attorney so that he had sole power. Upon information and belief, shortly thereafter he used the power to move monies out of her accounts in the United States and Belize.

45

6. Upon information and belief, both Respondents are former correction officers, and both are on social security disability under questionable circumstances. While Respondent Kermit Card was working as a correction officer, the NY Post did an article about false abuses of sick time, showing him doing construction work when he had called in sick and upon information and belief received disciplinary action for his sick time abuses. Upon information and belief, Respondent Kermit Card is running an immigration and unlawful marital partnering business in violation of his social security disability and possibly also constitutes the unlawful practice of law. The real reason for his wanting to be co-guardian is so he can use Ms. Ella Card property to house immigration clients of his business. A copy of the immigration business with an office at his residence is annexed hereto as Exhibit C.

7. Ms. Ella Card has disowned Respondents, remains afraid of them and has not spoken to them since 2011. A copy of letters evidencing same are annexed hereto as Exhibit D.

8. Both I and my sister have completed accredited guardianship training. A copy of the certificates are annexed hereto as Exhibit E.

9. Due to the failure of the Vera Guardianship project to properly maintain the Brooklyn properties owned my Ms. Ella Card, Petitioners had to expend $75,000.00 of their own monies to repair and maintain said properties.

10. Ms. Ella Card has been living with co-Petitioner Ken Swenson for the last nine (9) years, and collectively Petitioners have been close to Ms. Ella Card

3

46

during such period, and are the best suited to continue to act as co-successor

property management guardians with the same powers as the previous guardian.

LADONNA CARD

Sworn to before me this
9 day of November 2020
December

Notary Public

NICOLE N VUKOSAVLJEVIC
Notary Public - State of New York
NO. 01VU6184910
Qualified in Queens County
My Commission Expires 4/7/24

4

47

**EXHIBIT D**

 **Rick Black** <cearrick@gmail.com>
To: Kimberly George
Cc: Erica Wood, Lorie Slutsky, Michelle Chen, Pamela Teaster

 Sat, Dec 21, 2019 at 9:50 AM



Dear Ms. George,

Thank you for the wonderful update on all the altruistic things The Vera Institute's "The Guardianship Project" is doing for the incapacitated, indigent, and alone in New York City.  I am following up on your offer made to me at your event in September that you would be releasing ward Ella Card.

A hearing was held in early December where TGP attorneys indicated a willingness to transfer the guardianship and her assets to an alternative professional guardian but The Vera Institute continues to hold her assets and billed another $45,000 in fees against her estate.  Since the family has provided all care for Ella for years and maintained her assets at their expense Ella, her family and my expectation was a dismissal.

The Vera Institute has not seen Ella Card in 8 years.  You have not allowed her to enjoy her pension, income, or assets in 8 years.  She has not been a New York resident in 8 years. A $1,000/month payment does not qualify as care and is completely inappropriate given Ella's net worth and income and that The Vera Institute and Ms. Card's guardianship has only brought pain and suffering to Ella and her family.

During this Holiday season I hope as the director of TGP you see it in your heart to finally release Ella Card to enjoy the rest of her days without interference from Vera Institute and the courts of New York.  Ella is not incapacitated, indigent(yet), or alone so she shouldn't be in your program anyway.

Please consider what is in Ella Card's expressed and best interests during this Holiday Season and finally do the right thing.

Regards,
Rick Black
Exec. Dir. – CEAR
(804) 564-5330
501(c)(3)
https://www.cearjustice.org
https://m.facebook.com CEARRICK

48

**From:** Kimberly George <sdemaio@nycourts.gov>
**Date:** December 16, 2019 at 5:13:54 PM EST
**To:** cearrick@gmail.com
**Subject:** Home for the Holidays !
**Reply-To:** sdemaio@nycourts.gov



49

# EXHIBIT 22

| COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA ORPHANS' COURT DIVISION | |
|---|---|
| IN RE:<br><br>**ELLA CARD,**<br>an incapacitated person | No. 6721-1278 |

## PETITION FOR HEARING AND ENFORCEMENT OF GUARDIANSHIP ORDER

TO THE HONORABLE JUDGES OF SAID DIVISION:

Petitioners, Kermit Card and Raymond Card, by and through their attorney, Erik D. Spurlin, Esquire, of MPL Law Firm, LLP, respectfully represent:

1.  Ella Card ("Ella") was adjudicated an incapacitated person on March 16, 2011 by way of Order issued by the Honorable Betsy Barros of the New York Supreme Court for Kings County (the "2011 Order").

2.  Those who would be entitled to Ella's estate if she died intestate in the Commonwealth of Pennsylvania are her four children, namely:  Kermit Card, Raymond Card, LaDonna Card, and Cindy Card.

3.  The 2011 Order was the result of a hearing on a guardianship petition filed by three of Ella's four children—Kermit Card, Raymond Card, and LaDonna Card—alleging the appointment of a guardian was necessary (the "Guardianship Petition").

4.  The Guardianship Petition alleged Ella suffered injuries from being hit by a car in 2010 and was experiencing mini-strokes, which caused confusion, impaired her judgment, and caused her to exhibit bizarre behavior.

5.  The Guardianship Petition further alleged that guardianship was necessary despite the existence of a General Durable Power of Attorney that was allegedly executed by Ella appointing her daughter, Cindy Card.  Cindy Card was alleged to have taken control of Ella's two residential rental properties without Ella's consent, was collecting rent and using the same for her own purposes, and was sequestering her mother from family members.

6. The 2011 Order appointed VERA Guardianship Project (the "Professional Guardian") to serve as Guardian of the Property for Ella, based on its finding that Ella is "a person requiring the appointment of a Guardian as the Court has found that said incapacitated person is likely to suffer harm because of an inability to provide for property management and is unable to adequately understand and appreciate the nature of and consequences of such inability."

7. As part of its decision, the Court found that Ella is "extremely susceptible to undue influence" and that Ella's estate was being rapidly diminished by Cindy Card, who persuaded Ella to execute a trust while in a mentally compromised condition, which trust effectively disinherits all other family members other than Cindy Card. The Court's decision also noted that Cindy Card, who testified in opposition to the appointment of a guardian but was found not to be credible, was maintaining a cat sanctuary in Ella's residential buildings with over thirty cats in two apartments.

8. The Court, in spite of its finding regarding Ella's susceptibility to her daughter, nonetheless elected NOT to appoint a guardian of the person at that time. The decision of Judge Barros indicates that, because Ella was alleged to have left the U.S. for Belize immediately after the guardianship proceedings and had not returned at the time of the decision, that the Court would appoint a guardian of the property to safeguard it from mismanagement and theft of income.  The Court did not appoint a guardian of the person because the Court believed Ella had family in Belize helping to provide for her care.  The Court did not address what would become of Ella if she were to return to her building, where Cindy Card was taking control of the premises.

9. Neither of Ella's sons Kermit and Raymond Card, nor their children or grandchildren, nor Ella's sister Helen Martinez, nor  anyone representing VERA Guardianship as the Professional Guardian of Ella's property, has ever seen Ella since the 2011 hearing.  Petitioners believe and aver that Ella was taken out of New York by Cindy Card, and has harbored her in a house in Hanover, Pennsylvania, owned by a man named Kenneth Swenson, who at times, alleges to be Cindy Card's husband.  This discovery took years.

10. Petitioners have no information as to whether Ella's disappearance from her home and failure to communicate with Petitioners is voluntary, or whether Ella even has the capacity to make decisions of that nature, let alone to understand and appreciate the length of her estrangement from many members of her family.

11. After several years of attempting to access the real property interiors, maintain the properties and obtain information about the tenants in the two real properties owned by Ella, the Professional Guardian moved to be discharged from the case, admitting it could not adequately perform its duties in light of Cindy Card's interference. More specifically, the Professional Guardian admitted that it was unable to determine Ella's whereabouts and that it was not collecting Ella's rental or Social Security income, which was instead intercepted by Cindy Card on multiple occasions, leading to a discontinuance of receipt of income.

12. No access has been gained to the buildings' interiors. The tenants refuse to provide information, and upon information and belief, pay rent to Cindy Card, fraudulently claiming authority to do so. In addition, the building is the subject of two Department of Building Violations and every effort to cure the conditions is undermined or thwarted by Cindy Card in conjunction with Kenneth Swenson and LaDonna Card.

13. By Order entered December 02, 2020, the New York Supreme Court for Kings County appointed Kermit Card and Raymond Card, Petitioners herein, as Ella's Successor Co-Guardians of the Property (the "2020 Order") – replacing the Professional Guardian, VERA institute.

14. The New York Court, mindful that Ella is believed to be held outside of the State of New York and possibly without knowledge or consent, requires the Court appointed Guardians to visit Ella "not less than four times per year, and authority, in this matter, to seek assistance from this Court *and Courts in other jurisdictions, including Access Orders with police assistance*, approved by the Court, to access the Incapacitated Person, wherever she is maintained, to personally visit with her and be able to report to this Court, her health, safety and wishes" (emphasis added).

15.  Much like the Professional Guardian that preceded them, the Petitioners have been unable to discharge their duties as guardians because of Cindy Card's interference.  As a result of such interference, Petitioners have been unable to communicate with their mother in any way, leaving them unable to take into account her preferences where appropriate and unable to verify her health and safety.

16.  The 2020 Order specifically authorizes Petitioners to bring actions in other states to enforce the 2020 Order, including access orders with police assistance.

17.  The 2020 Order has been registered in accordance with Section 5931 of the PEF Code, a certified copy of which remains on file with the York County Orphans' Court at Docket No. 6721-1278.

18.  Section 5933(a) of the PEF Code provides that, "Upon registration of a guardianship or protective order from another state, the guardian or conservator may exercise in this Commonwealth all powers authorized in the order of appointment except as prohibited under the laws of this Commonwealth, including maintaining actions and proceedings in this Commonwealth."

19.  Section 5933(b) of the PEF Code provides that "[a] court of this Commonwealth may grant any relief available under this chapter and other law of this Commonwealth to enforce a registered order."

20.  Upon information and belief, Cindy Card and Kenneth Swenson, will vehemently oppose any request made by the Petitioners.  In fact, Cindy Card and Kenneth Swenson filed an unintelligible 72-page summons with the United States District Court for the Middle District of Pennsylvania on September 15, 2021, alleging 23 causes of action and naming 17 defendants, including the two judges who issued the 2011 Order and 2020 Order.  As such, there can be no doubt that those harboring Ella are fully aware of the 2011 Order and the 2020 Order and have been active in these proceedings, thereby submitting to the New York Court's jurisdiction.

21.  The Federal Court proceeding referenced in Paragraph 20 above is meant to estop the New York Guardianship Court from permitting the sale of both of Ella's real properties, for which Co-Petitioners requested by necessity, because of the inability to control the finances and safety of the two properties. The petition to

place the properties on the market was granted on September 30, 2021, the request to approve a contract of sale for an all cash deal on both properties was granted on January 28, 2022. The Federal Court granted no interim relief to Cindy Card et. al., and the claims against the Guardians in New York with respect to the sale of the real property will shortly be moot.

22.    Ella, Cindy Card, Kenneth Swenson, and LaDonna Card have been given notice of all the above-mentioned proceedings in New York and have had an opportunity to be heard.

23.    Given the history of this matter, it appears likely that those harboring Ella will continue to disregard court orders, exercise self-help, and frustrate the guardians' attempts to discharge their legal duties.

24.    Petitioners believe Ella is continuously subjected to misinformation and hysterical conjecture regarding the authority of the guardianship and of the character and ability of Ella's sons to serve guardians.

25.    Cindy Card's reaction is in fact so hysterical to her brothers, that upon Ella being served by regular mail for the first time at the Hanover PA address in relation to Court activities in New York, Cindy Card and Kenneth Swenson filed for a protection from abuse order in Pennsylvania, alleging that the very act of sending mail to Ella constituted an abuse of Ella's person. The petition also defamed Kermit and Raymond Card, accusing them of being criminals, drug abusers, etc. without basis.  The Petition was denied with prejudice at Docket No. 2020-FC-002523-12.

26.    Petitioners believe that Ella may be a victim of "Stockholm Syndrome", a condition of reliance and dependence upon persons who sequester her and provide only misinformation to deter her from seeing or knowing any other members of her family and to maintain control of her income and assets.  Petitioners therefore fear and anticipate that, even if they are permitted to visit with their mother, those harboring Ella will work to ensure she cannot communicate freely.

27.    Section 5904 of the PEF Code provides this Honorable Court with statutory authority to contact a court of another state to discuss issues related to guardianship.  Further, Section 5905 provides for interstate

cooperation regarding testimony, evidence, and court proceedings related to guardianship.   Petitioners believe communication between the Pennsylvania and New York Courts would promote judicial economy in this matter.

28.   Petitioners also encourage the Court to assign a guardian monitor to this matter, such that an independent attorney may evaluate the case, provide the Court with additional information, and alert protective services if appropriate.  In addition or in the alternative, Petitioners respectfully request the appointment of a guardian ad litem for Ella to determine what is in her best interest and to assist in directing any litigation occurring within Pennsylvania.

29.   Petitioners request that this Honorable Court schedule a hearing and demand the physical production of Ella, such that she can be questioned by the attorneys, the guardians, and/or the Court as a means of (i) determining her preferences as to the management of her estate, (ii) ensuring she is safe and not being held against her will, (iii) providing a mechanism for the guardians to meet with Ella four times per year in accordance with the existing guardianship order, and (iv) to determine whether Ella wishes to and/or should be returned to the State of New York.

**WHEREFORE,** Petitioners respectfully request this Honorable Court issue a Scheduling Order scheduling a hearing on the instant Petition and directing that Ella be produced at such hearing.

Date:   FEB 11, 2022

Erik D. Spurlin, Esquire
Supreme Ct. I.D. #309900
MPL Law Firm, LLP
96 S. George St., Ste. 520
York, PA 17401
p: (717) 845-1524
f: (717) 854-6999
espurlin@mpl-law.com

| COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA<br>ORPHANS' COURT DIVISION | |
| --- | --- |
| IN RE:<br><br>ELLA CARD,<br>      an incapacitated person | No. 6721-1278 |

## VERIFICATION

We, Kermit Card and Raymond Card, hereby acknowledge that we have read the foregoing petition and verify that the facts stated therein are true and correct to the best of our knowledge, information and belief. We understand that false statements made herein are subject to the penalties of 18 Pa.C.S.A. §4904, relating to unsworn falsification to authorities.

Date: _2/9/2022_ , 2022

                                               Kermit Card

                                               Raymond Card

## STATEMENT OF COMPLIANCE

I, Erik O. Spurlin, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential Information and documents differently than non-confidential information and documents.

Date: _02/11_ , 2022

                                               Erik O. Spurlin, Esquire

| COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA ORPHANS' COURT DIVISION | |
|---|---|
| IN RE:<br><br>ELLA CARD,<br>    an incapacitated person | No. 6721-1278 |

## CERTIFICATE OF SERVICE

I, Erik D. Spurlin, Esq., do hereby certify that on _FEBRUARY 11_, 2022, I caused one (1) copy of the within

Petition to be served via first-class mail, postage prepaid, to the following individuals at the following addresses:

Ella Card
445 Beck Mill Road
Hanover, PA 17331

Cindy Card
445 Beck Mill Road
Hanover, PA 17331

Cindy Card
161 Saratoga Ave
Brooklyn NY 11233.
*Alternate Mailing Address*

Kenneth Swenson
445 Beck Mill Road
Hanover, PA 17331

LaDonna Card
100 Debs Place – Apt 16C
Bronx, NY 10475.

Date: _FEB 11_, 2022

Erik D. Spurlin, Esquire
Supreme Ct. I.D. #309900
MPL Law Firm, LLP
96 S. George St., Ste. 520
York, PA 17401
p: (717) 845-1524
f: (717) 854-6999
espurlin@mpl-law.com

**COURT OF COMMON PLEAS OF YORK COUNTY, PENNSYLVANIA**
**ORPHANS' COURT DIVISION**

| IN RE: | |
| --- | --- |
| **ELLA CARD,** | No. 6721-1278 |
| an incapacitated person | |

2022 FEB 23  AM 10: 32
YORK, PA

**SCHEDULING ORDER**

AND NOW, this _22nd_ day of _February_, 2022, in consideration of the attached Petition filed on behalf of Kermit Card and Raymond Card, Guardians of the Property of Ella Card, it is hereby ORDERED that:

1. A Hearing on the Petition is scheduled for _Monday_, _March_ _21_, 2022 at _10:00_ a.m. / ~~p.m.~~ in Court Room _7003_ _7th_ Floor, of the York County Judicial Center, 45 N. George St., York, PA 17401.

2. Ella Card is specifically directed to attend said hearing. Police and ambulance personnel are hereby authorized to transport Ella Card to this and any future hearing in this matter, if they deem it necessary to ensure Ella's safety or the safety of others.

3. Kermit Card and Raymond Card shall have ongoing access to Ella Card's financial records. All financial institutions having accounts or financial matters pertaining to Ella Card shall release information to the Kermit Card and Raymond Card or their attorney. These institutions shall include but not be limited to banks, pension administrators, insurance companies, stock or bond holder, investment companies, and the Social Security Administration.

4. Erik D. Spurlin, Esquire is directed to provide notice of this Order to Ella Card, Cindy Card, and Kenneth Swenson.

BY THE COURT:

_Clyde W. Vedder_ J.

# EXHIBIT 23

**SUPREME COURT OF THE STATE OF NEW YORK**
**APPELLATE DIVISION: SECOND JUDICIAL DEPARTMENT**

_____

                                                    ORDER TO SHOW CAUSE

          In the Matter of Ella C. (Anonymous)          Appellate Division
                                                    Docket No: 2022-00076

                                                    (Index No: 100016/11)

_____

          Upon the annexed affidavit of Respondent-Appellants Cindy Card, LaDonna Card, Ella C. Card and Ken Swenson dated March 3, 2022, and the ~~present~~ papers annexed thereto,

          LET Kermit Card and Raymond Card, and Julie Fernandez SHOW CAUSE BEFORE THE COURT, at the courthouse thereof, located at 45 Monroe Place, Brooklyn, New York, 11201, on the ~~14th~~ day of ___March___, 2022, at ~~3:00 o'clock in the PM (Afternoon)~~ 9:30 o'clock in the forenoon of that date or as soon thereafter as counsel may be heard, why an order may not be heard and entered;

1. That all rulings hearings, rulings, leases, contracts and awards in violation of Title 28 U.S.C. §1446(d), including the sale of Ella Card's 155 and 161 properties, and the illicit appointment of Raymond Card Jr. and Kermit Card as co-guardians over Ella Card's property and person be vacated and classified void as a nullity to protect Ella Card and her property from the immediate injury that has befallen her, thereby protecting Ella Card's property from waste, misappropriation, and loss in accordance with MHL § 81.23(a)(1).

2. For an Emergency Injunction or a Temporary Restraining Order Kermit Card, Raymond Card, and Julie Fernandez; to be granted to keep Kermit Card, Raymond Card, and Julie Fernandez away from, off of, and from entering Ella Card's properties at 155 Saratoga Avenue, 161 Saratoga Avenue, and the store on the corner of 161 Saratoga Avenue.

3. For Permanent Protective Orders for the Appellants protection from further abuse by Defendants Julie Fernandez, Raymond Card and Kermit Card.

4. That an accounting of all Ella Card's assets and monies be provided by co-guardians as required by MHL Article 81.

5. That Defendants pay for their own legal representation from their own proceeds and reimburse Ella Card for all other hearings and legal representation from the inception of their appointment i.e.: July 21, 2020.

6. Granting such other and further relief as this Court may deem just and equitable.

SUFFICIENT CAUSE THERFORE APPEARING, it is

ORDERED, that pending the determination of this motion, Kermit Card, Raymond Card, and Julie Fernandez are ~~temporarily restrained~~ enjoined from selling and transferring the ~~Ella Card's~~ properties of incapacitated person Ella C. ~~as stated in the February 17, 2022 Order from the Brooklyn Supreme Court;~~ and it is

ORDERED that service of a copy of this Order To Show Cause and the papers upon which it was made upon ~~defendants' by:~~ counsel for the Respondents by email

Email: Julie Fernandez By Email: jstoilfernandez@ffelderlaw.com
And counsel for:
Raymond Card: By Email: raycardjr@yahoo.com
Kermit Card: By Email: hyperboy209@msn.com.

and by uploading on NYSCEF on                7,
~~On~~ or before March 3, 2022, shall be deemed sufficient service thereof.

Dated: ~~March ___, 2022~~

Brooklyn, New York
March 4, 2022

_____
Associate Justice
Appellate Division: 2nd Department
Hon. Reinaldo E. Rivera

NOTE: On the return date all motions and proceedings are deemed submitted. Oral argument is not permitted (22 NYCRR 1250.4[a][8])

# EXHIBIT 24

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**
--------------------------------------------------------------X

In the Matter of                                   Index No. 100016/2011

**ELLA CARD,**                                     **NOTICE OF ENTRY**

An Incapacitated Person.
--------------------------------------------------------------X

**PLEASE TAKE NOTICE** that the within is a true copy of an Order which was signed by the

Honorable Leon Ruchelsman on February 8, 2022 and entered in the county clerk's office on

February 15, 2022.

DATED: Brooklyn, New York
            February 17, 2022

Julie Stoil Fernandez, Esq.
**Finkel & Fernandez, LLP**
16 Court Street, Suite 1007
Brooklyn, NY 11241
T: (347)296-8200
F: (718) 965-3185
jstoilfernandez@ffelderlaw.com

To:

Ella Card
445 Beck Mill Road
Hanover, Pennsylvania 17331-9253

Kenneth Swenson
445 Beck Mill Road
Hanover, Pennsylvania 17331-9253

LaDonna Card
100 Debs Place, Apt. 16C
Bronx, NY 10475

Cindy Card
161 Saratoga Avenue
Brooklyn, NY 11233

Faith Card
161 Saratoga Avenue
Brooklyn, NY 11233

Lawrence Price
829 East 10th Street, Suite 2H
Brooklyn, NY 11230

Barton Schwartz
2753 Coney Island Avenue
Brooklyn, New York 11235

Helen Martinez
1248 West 54th Street
Los Angeles, CA 90037

The Blaikie Group
111 John Street, 16th Floor
New York, NY 10038

John Holt, Esq.
Vera Guardianship Project
320 Jay Street, Room 4.110
Brooklyn, NY 11201

Ernest Wilson, Esq.
111 Court Street, #21
Brooklyn, New York 11201

Shannon Insana
794 Union Street, 2nd Floor
Brooklyn, NY 11215

At an IAS Part 76LR of the Supreme Court of
the State of New York, held in and for the
County of Kings, at the Courthouse at 360
Adams St., Brooklyn, NY, on the 8th day of
February, 2022.

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF KINGS**

----------------------------------------------------------------X

In the Matter of KERMIT CARD and RAYMOND CARD,
As Co-Guardians of the Person and Property of         **ORDER AUTHORIZING**
                                                       **SALE OF REAL PROPERTY**

**ELLA CARD,**

**An Incapacitated Person,**                          **Index No. 100016/2011**

For an Order Approving a Contract of Sale
For Real Properties Located at 155 Saratoga Avenue, Brooklyn New York, and 161
Saratoga Avenue, Brooklyn, New York

----------------------------------------------------------------X

An Order to Show Cause having been brought by KERMIT CARD and RAYMOND CARD as

Co-Guardians of the Person and Property of ELLA CARD, an Incapacitated Person, wherein the

Co-Guardians in a verified petition dated December 27, 2021, with an Affidavit of Support by

Shannon Insana, Court appointed real estate broker, seek the authority to sell the real properties

of ELLA CARD located at 155 Saratoga Avenue, Brooklyn, New York, and 161 Saratoga

Avenue, Brooklyn, New York, subject to contracts of sale, prepared by Real Estate Attorney to

the Co-Guardians of the Property, Ernest Wilson, Esq., by and between KERMIT CARD and

RAYMOND CARD, as Co-Guardians, and the Purchasers, 155 LLC, for a sale of the property

located at 155 Saratoga Avenue, Brooklyn, New York in the amount of $960,000.00, and 161

LLC for a sale of the property located at 161 Saratoga Avenue, Brooklyn, New York in the

amount of $1,310,000.00; and

This Court, having considered the motion papers, supporting affidavit and had all parties appear

on January 28, 2022, in which the Court heard testimony by Shannon Insana, Court Appointed

Real Estate Broker and from Ernest Wilson, real estate attorney to Kermit Card and Raymond

Card as Co-Guardians of the property of ELLA CARD, and no opposition having been filed or

made,

NOW upon all of the papers and proceedings held heretofore, it is hereby

ORDERED, that KERMIT CARD and RAYMOND CARD, Co-Guardians of the Person and

Property of ELLA CARD, are authorized to sell the real properties located at 155 Saratoga

Avenue, County of Kings, State of New York, at the contract price of $960,000.00 owned by

ELLA CARD to the Purchaser 155 LLC, and 161 Saratoga Avenue, County of Kings, State of

New York, at the contract price of $1,310,000.00, owned by ELLA CARD, to the Purchaser 161

LLC, pursuant to the Contracts of Sale presented to the Court and executed by the proposed

purchaser, and it is further

ORDERED, that upon the sale of the real property, the Co-Guardians shall bring a proceeding

before the Court for a confirmation of sale, and an application to set a bond and any other and

further relief that this Court shall deem just, and it is further

ORDERED that a copy of this Order be served on all parties entitled to notice with Notice of Entry
within 10 days of the entry of this Order.

ENTER

_____
J.S.C.
HON. LEON RUCHELSMAN

# EXHIBIT 25
## *(highlighted for emphasis)*

cooperation regarding testimony, evidence, and court proceedings related to guardianship.  Petitioners believe communication between the Pennsylvania and New York Courts would promote judicial economy in this matter.

28.  Petitioners also encourage the Court to assign a guardian monitor to this matter, such that an independent attorney may evaluate the case, provide the Court with additional information, and alert protective services if appropriate.  In addition or in the alternative, Petitioners respectfully request the appointment of a guardian ad litem for Ella to determine what is in her best interest and to assist in directing any litigation occurring within Pennsylvania.

29.  Petitioners request that this Honorable Court schedule a hearing and demand the physical production of Ella, such that she can be questioned by the attorneys, the guardians, and/or the Court as a means of (i) determining her preferences as to the management of her estate, (ii) ensuring she is safe and not being held against her will, (iii) providing a mechanism for the guardians to meet with Ella four times per year in accordance with the existing guardianship order, and (iv) to determine whether Ella wishes to and/or should be returned to the State of New York.

**WHEREFORE,** Petitioners respectfully request this Honorable Court issue a Scheduling Order scheduling a hearing on the instant Petition and directing that Ella be produced at such hearing.

Date:  FEB 11, 2022

Erik D. Spurlin, Esquire
Supreme Ct. I.D. #309900
MPL Law Firm, LLP
96 S. George St., Ste. 520
York, PA 17401
p: (717) 845-1524
f: (717) 854-6999
espurlin@mpl-law.com

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

# EXHIBIT 26

From: Fastinfinity@aol.com
To: raycardjr@yahoo.com
Sent: Tue, Mar 29, 2011 10:20 pm
Subject: Re: Check out Guardian Abuse - Financial Exploitation ... - Oprah.com

Jun,

We cannot my brother!!!! That is the problem. One of the articles talks about how the judge intentionally put an order of protection against a daughter who wanted to visit her mother, without an "appointment" & she was found in contempt!! Besides freezing ALL of Ma's assettes, they have forwarded all her mail to the temporary guardian's facility, and up until today, NO ONE has even contacted her!!

I said to Kermit in court that day that this was a BIG mistake and we should stop this NOW! His response was that better the state take it all, than give it to Cindy! Is this what we wanted? Everything our mother has worked for, w/o Dad to be squandered away by Lisa Friedman & her bogus claims? We all felt she was making poor decisions regarding the Carmen fiasco, but I only agreed to this to keep her assetts away from the Rios". I do not believe Cindy will do this. We have all had feelings in the past about our sister, but do you think it is wrong for Ma to try to protect herslf? She didn't give these powers to Carmen or Seraphin, but to her blood child. If ma was this "incapacitated" how would she have gone down to the courts by herself to put these things in place w/o Cindy and before knowing about the guardianship?

Ma did this to protect her assets, so they wouldn't squeeze her dry, and in (1) short week, they have put ALL these processes in place. This is a collusive process within this whole corrupt system, even Steve screwed her today with a letter saying she wouldn't cooperate! After Pastor Quintine highly recommended him?!! He sent copies to Friedman & Mooney, and never returned even (1) of ma's calls!! She had a long talk with the pastor yet Steve wrote she refused to talk to him also??!!

They will sell off ma's assets to pay their fees, not hers. You heard Friedman talk about some pending final notice of her electric bill; NO One from the Vera Institute contacted her before TODAY to see about this issue. Was the urgency that she would end up in darkness, or to pad their pockets? Today she went to her account, it had a zero balance with ALL these extra fees the agency charged. They took her money w/o finding out if she had outstanding checks, auto payments or any other deductions from what she may have paid out. Just took it!! Ma has NO HEAT OR HOT WATER AS OF TODAY! Is this how the Vera Institute protects the people they have sworn to take care of, or is the normal operating procedure for them. Grab first, figure it out later?? It has begun. Kermit can say whatever he wants about me. I was on a path to protect OUR family against Carmen, I NEVER intended that this would go this far. If you read my response on the site, you will be able to see the progression of what has happened to date. I feel sick my brother, crying with my mother, in despair. She has not been a perfect person, nor made the best decisions, but she does not deserve this.

I do not speak to Kermit about these things. He has continued to try to hurt ma by any means, & I promise you, when this ALL comes out, as it will, you will not believe all of the things that have transpired behind the scenes. You will grow hair!!

I have always been the wild card, but brother my Spirit, that talks to my head daily, my God, & my fear for ma's safety, & possible death from all of this stress is why I cannot continue to be a part of this process.  I could never live with my part in it.  I want us to be able to communicate my brother as I know you have a mind of your own, and will not follow an unjust process blindly.

If ma said, she was leaving all to her grand kids, so be it! You, so be it! Cindy, so be it!  I will NEVER fight my siblings for things that were not mine to begin with.  You know she worked hard & struggled to get whatever she has, didn't steal, or get an inheritance, earned this on her OWN!   Who are we, even if the squandering was the case, to judge what she should do with HER money!  SHE GAVE US LIFE, SHE TRIED TO TEACH US HOW TO BE GOOD CHRISTIANS, AND HAS HELPED EVERY SINGLE ONE OF US IN OUR LIFE, WHEN IN NEED.  You know this to be true.


Lastly, none of us can shackle our mother to the bed frame!  When she was at Kermits' she felt as if she was in jail.  No ability to go to the city, shop, all of the things she was doing as a vital independent person. She talked about running away! People used to think Bed Sty was the dungeon of hell terrified to come here so?  All I cared about was if she was taking her medication, eating, and taking care of herself.  She wasn't getting her bills, they were going to 208 Commack road, so how could she pay them? This came out on 2/25/11 @ the evaluator's meeting.


Kermit is the only one who believe he never got anything from ma, which is part of his resentment.  If she gave him money to help for his children, is that not taking some of his burden off?  Short memory, or conditional memory loss?  Do you think he has dementia??!! ! Lastly, please research Judge Betsy Barrows and her questionable decisions.  I have.


I care about this family & do not want us to end up on eye witness news!  You & I were disqualified from the guardianship procedure as we have filed bankruptcy in the past. This would have left Kermit only, by default.



Your sister in Christ in Justice,

LaDonna Card

7

P586 — Assignment of lease by tenant, with assumption, plain english format: 11-98          Blumberg Excelsior, Inc., Publisher, NYC 1001
www.blumberg.com

## ASSIGNMENT AND ASSUMPTION OF LEASE

The parties agree as follows:

Date:
Parties: March 23rd, 2012
Assignor: Delta Deli NY Corp
Address: 161 Saratoga Ave, Brooklyn NY 11233

Assignee: Saratoga Deli & Grocery Corp
Address: 161 Saratoga Avenue, Brooklyn NY 11233

If there are more than one Assignor or Assignee, the words "Assignor" and "Assignee" shall include them.

Lease
assigned: The Lease which is assigned herein is indentified as follows:
Landlord : Kermit Card
Tenant : Delta Deli NY Corp
Date :   May 4th, 2010   Premises: 161 Saratoga Ave, Brooklyn NY 11233

(This Lease was recorded on _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _in the office of the _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
of the County of _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _in liber _ _ _ _ _ _ _ _ _ _ _ _ of conveyances  at page_ _ _ _ _ _ _ _     .)

ideration: Assignor has received    Ten and 00/100- - - - - - - - - - - - - - - - - - - - -
($ 10.00    ) dollars
and other good and valuable consideration for this Assignment.

signment: Assignor assigns to the Assignee all the Assignor's right, title and interest in  a) the Lease and  b) the security deposit,
if any, stated in the Lease.

sumption: Assignee agrees to pay the rent promptly and perform all of the terms of the Lease as of the date of this Assignment.
Assignee assumes full responsibility for the Lease as if Assignee signed the Lease originally as Tenant.

ndemnity: Assignee agrees to indemnify and hold Assignor harmless from any legal actions, damages and expenses, including legal
fees that the Assignor may incur arising out of the Lease.

Benefit to
landlord: Assignee agrees that the obligations assumed shall benefit the landlord named in the Lease as well as the Assignor.

Assignor's
statements: Assignor states that Assignor has the right to assign this Lease and that the premises are free and clear of any judgments,
executions, liens, taxes and assessments.

Assignee's
statement: Assignee states that Assignee has read the Lease and has received the original or an exact copy of the Lease.

uccessors. This assignment is binding on all parties who lawfully succeed to the rights or take the place of the Assignor or Assignee.

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY
RESTRAINING ORDER DEMAND JURY TRIAL**

*This Lease* Made the  4Th  day of  May ,2010 between Kermit Card  of 155 Saratoga Avenue Brooklyn NY 11233  herein referred to as LANDLORD , and  DELTA DELI NY CORPORATION  a domestic corporation having its principal place of business at 161 Saratoga Avenue, Brooklyn NY 11233  herein jointly ,severally and collectively referred as TENANT

*Witnesseth:* The Landlord hereby leases to the Tenant the following premises: the store known as 161 Saratoga Avenue Brooklyn NY 11233  togeather with one half of the cellar underneath

for the term of  TEN (10) YEARS

to commence from the        1st  day of  June,    2010      and to end on the 31St day of May  2020 to be used and occupied only for a grocery store .The store shall not advertize itself other than a grocery  store nor promote the sale of other than groceries

upon the conditions and covenants

following

1st That the Tenant shall pay the annual rent of

**SEE RIDER ATTACHED HERETO FOR RENTAL PROVISIONS**

said rent to be paid in equal monthly payment in advance on the  1st  day of each and every month during the term aforesaid, as follows:

**SEE RIDER ATTACHED HERETO FOR RENTAL PROVISIONS**

2nd. That the Tenant shall take good care of the premises and shall ,at the Tenant's own cost and expense make all repairs

to inside of premises

and at the end or other expiration of the term, shall deliver up the demised premises in good order or condition, damages by the elements excepted.

3rd. That the Tenant shall promptly execute and comply with all statutes, ordinances, rules, orders, regulations and requirements of the Federal, State and Local Governments and of any and all their Departments and Bureaus applicable to said premises, for the correction, prevention, and abatement of nuisances or other grievances, in, upon, or connected with said premises during said term; and shall also promptly comply with and execute all rules, orders and regulations of the New York Board of Fire Underwriters, or any other similar body, at the Tenant's own cost and expense,

4th. That the Tenant, successors, heirs, executors or administrators shall not assign this agreement, or underlet or underlease the premises, or any part thereof, or make any alterations on the premises, without the Landlord's consent in writing; or occupy, or permit or suffer the same to be occupied for any business or purpose deemed disreputable or extra-hazardous on account of fire, under the penalty of damages and forfeiture, and in the event of a breach thereof, the term herein shall immediately cease and determine at the option of the Landlord as if it were the expiration of the original term.

5th. Tenant must give Landlord prompt notice of fire, accident, damage or dangerous or

rent with no adjustment. The cost of the repairs will be added rent.

Landlord has the right to demolish or rebuild the Building if there is substantial damage by fire or other casualty. Landlord may cancel this Lease within 30 days after the substantial fire or casualty by giving Tenant notice of Landlord's intention to demolish or rebuild. The Lease will end 30 days after Landlord's cancellation notice to Tenant. Tenant must deliver the Premises to Landlord on or before the cancellation date in the notice and pay all rent due to the date of the fire or casualty. If the Lease is cancelled Landlord is not required to repair the Premises or Building. The cancellation does not release Tenant of liability in connection with the fire or casualty. This Section is intended to replace the terms of New York Real Property Law Section 227.

6th. The said Tenant agrees that the said Landlord and the Landlord's agents and other representatives shall have the right to enter into and upon said premises, or any part thereof, at all reasonable hours for the purpose of examining the same, or making such repairs or alterations therein as may be necessary for the safety and preservation thereof.

7th. The Tenant also agrees to permit the Landlord or the Landlord's agents to show the premises to persons wishing to hire' or purchase the same; and the Tenant further agrees that on and after the sixth month, next preceding the expiration of the term hereby granted, the Landlord or the Landlord's agents shall have the right to place notices on the front of said premises, or any part thereof, offering the premises "To Let" or "For Sale", and the Tenant hereby agrees to permit the same to remain thereon without hindrance or molestation.

8th. That if the said premises, or any part thereof shall be deserted or become vacant during said term, or if any default be made in the payment of the said rent or any part thereof, or if any default be made in the performance of any of the covenants herein contained, the Landlord or representatives may re-enter the said premises by force, summary proceedings or otherwise, and remove all persons therefrom, without being liable to prosecution therefor, and the Tenant hereby expressly waives the service of any notice in writing of intention to re-enter, and the Tenant shall pay at the same time as the rent becomes payable under the terms hereof a sum equivalent to the rent reserved herein, and the Landlord may rent the premises on behalf of the Tenant, reserving the right to rent the premises for *a* longer period of time than fixed in the original lease without releasing the original Tenant from any liability, applying any moneys collected, first to the expense of resuming or obtaining possession, second to restoring the premises to a rentable condition, and then to the payment of the rent and all other charges due and to grow due to the Landlord, any surplus to be paid to the Tenant, who shall remain liable for any deficiency.

9th. Landlord may replace, at the expense *of* Tenant, any and all broken glass in and about the demised premises. Landlord may insure, and keep insured, all plate glass in the demised premises for and in the name of Landlord. Bills, for the premiums therefor shall be rendered by Landlord to Tenant at such times as Landlord may elect, and shall be due from, and payable by Tenant when rendered, and the amount thereof shall be deemed to be, and be paid as, additional rental. Damage and injury to the said premises, caused by the carelessness, negligence or improper conduct on the part of the said Tenant or the Tenant's agents or employees shall be repaired as speedily as possible by the Tenant at the Tenant's own cost and expense.

10th. That *the* Tenant shall neither encumber nor obstruct the sidewalk in front of, entrance to, or halls and stairs of said premises, nor allow the same to be obstructed or encumbered in any manner.

11th. The Tenant shall neither place or cause or allow to be placed ,any sign or signs whatsoever at ,in or about to the entrance to said premises or any other part of same ,except in or at such place or places as may be indicated by the Landlord and consented by the Landlord in writing.'"

12th. That the Landlord is exempt from any and all liability for any damage or injury to

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 220 of 320

and be superior and prior in lien of this lease, irrespective of the date of recording and the Tenant agrees to execute without cost, any such instrument which may be deemed necessary or desirable to further effect the subordination of this lease to any such mortgage or mortgages, and a refusal to execute such instrument shall entitle the Landlord, or the Landlord's assigns and legal representatives to the option of cancelling this lease without incurring any expense or damage and the term hereby granted is expressly limited accordingly.

**15**th. The Tenant has this day deposited with the Landlord the sum of **$ 2000.00** as security for the full faithful performance by the Tenant of all the terms, covenants and conditions of this lease 'upon the Tenant's part to be performed, which said sum shall be returned to the Tenant after the time fixed as the expiration of the term herein, provided the Tenant has fully and faithfully carried out all of said terms, covenants and conditions on Tenant's part to be performed. In the event of a bona fide sale, subject to this lease, the Landlord shall have the right to transfer the security to the vendee for the benefit of the Tenant and the Landlord shall be considered released by the Tenant from all liability for the return of such security; and the Tenant agrees to look to the new Landlord solely for the return of the said security, and it is agreed that this shall apply to every transfer or assignment made of the security to a new Landlord.

**16**th. That the security deposited under this lease shall not be mortgaged, assigned or encumbered by the Tenant without the written consent of the Landlord.

**17**th. It is expressly understood and agreed that in case the demised premises shall be deserted or vacated, or if default be made in the payment of the rent or any part thereof as herein specified, or if, without the consent of the Landlord, the Tenant shall sell, assign, or mortgage this lease or if default be made in the performance of any of the covenants and agreements in this lease contained on the part of the Tenant to be kept and performed, or if the Tenant shall fail to comply with any of the statutes, ordinances, rules, orders, regulations and requirements of the Federal, State and Local Governments or of any and all their Departments and Bureaus, applicable to said premises, or if the Tenant shall file or there be filed against Tenant a petition in bankruptcy or arrangement, or Tenant be adjudicated a bankrupt or make an assignment for the benefit of creditors or take advantage of any insolvency act, the Landlord may, if the Landlord so elects, at any time thereafter terminate this lease and the term hereof, on giving^ to the Tenant five days' notice in writing of the Landlord's intention so to do, and this lease and the term hereof shall expire and come to an end on the date fixed in such notice as if the said date were the date originally fixed in this lease for the expiration hereof. Such notice may be given by mail to the Tenant addressed to the demised premises.

**18**th. Tenant shall pay to Landlord the rent or charge, which may, during the demised terra, be assessed or imposed for the water used or consumed in or on the said premises, whether determined by meter or otherwise, as soon as and when the same may be assessed or imposed, and will also pay the expenses for the setting of a water meter in the said premises should the latter be required. Tenant shall pay Tenant's proportionate part of the sewer rent or charge imposed upon the building. All such rents or charges or expenses shall be paid as additional rent and shall be added to the next month's rent thereafter to become due.

**19**th. That the Tenant will not nor will the Tenant permit undertenants or other persons to do anything in said premises, or bring anything into said premises, or permit anything to be brought into said premises or to be kept therein, which will in any way increase the rate of fire insurance on said demised premises, nor use the demised premises or any part thereof, nor suffer or permit their use for any business or purpose which would cause an increase in the rate of fire insurance on said building, and the Tenant agrees to pay on demand any such increase.

**20**th. The failure of the Landlord to insist upon a strict performance of any of the terms, conditions and covenants herein, shall not be deemed a waiver of any rights or

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 221 of 320

22nd. If after default in payment of rent or violation of any other provision of this lease, or upon the expiration of this lease, the Tenant moves out or is dispossessed and fails to remove any trade fixtures or other property prior to such said default, removal, expiration of lease, or prior to the issuance of the Gnat order or execution of the warrant, then and in that event, the said fixtures and property shall be deemed abandoned by the said Tenant and shall become the property of the Landlord.

23rd. In the event that the relation of the Landlord and Tenant may cease or terminate by reason of the re-entry of the Landlord under the terms and covenants contained in this lease or by the ejectment of the Tenant by summary proceedings or otherwise, or after the abandonment of the premises by the Tenant, it is hereby agreed that the Tenant shall remain liable and shall pay in monthly payments the rent which accrues subsequent to the re-entry by the Landlord, and the Tenant expressly agrees to pay as damages for the breach of the covenants herein contained, the difference between the rent reserved and the rent collected and received, if any, by the Landlord during the remainder of the unexpired term, such difference or deficiency between the rent herein reserved and the rent collected if any, shall become due and payable in monthly payments during the remainder of the unexpired term, as the amounts of such difference or deficiency shall from time to time be ascertained; and it is mutually agreed between Landlord and Tenant that the respective parties hereto shall and hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties against the other on any matters whatsoever arising out of or in any way connected with this lease, the Tenant's use or occupancy of said premises, and/or any claim of injury or damage.

24th.   The Tenant waives all rights to redeem under any law of the State of New York.

25th. This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in nowise be affected, impaired or excused because Landlord is unable to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repairs, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of governmental preemption in connection with a National Emergency or in connection with any rule, order or regulation of any department or subdivision thereof of any governmental agency or by reason of the condition of supply and demand which have been or are affected by war or other emergency.

26th. No diminution or abatement of rent, or other compensation, shall be claimed or allowed for inconvenience or discomfort arising from the making of repairs or improvements to the building or to its appliances, nor for any space taken to comply with any law, ordinance or order of a governmental authority. In respect to the various "services," if any, herein expressly or impliedly agreed to be furnished by the Landlord to the Tenant, it is agreed that there shall be no diminution or abatement of the rent, or any other compensation, for interruption or curtailment of such "service" when such interruption or curtailment shall be due to accident, alterations or repairs desirable or necessary to be made or to inability or difficulty in securing supplies or labor for the maintenance of such "service" or to some other cause, not gross negligence on the part of the Landlord. No such interruption or curtailment of any such "service" shall be deemed a constructive eviction. The Landlord shall not be required to furnish, and the Tenant shall not be entitled to receive, any of such "services" during any period wherein the Tenant shall be in default in respect to the payment of rent. Neither shall there be any abatement or diminution of rent because of making of repairs, improvements or decorations to the demised premises after the date above fixed for the commencement of the term, it being understood that rent shall, in any event, commence to run at such date so above fixed.

27th. Landlord shall not be liable for failure to give possession of the premises upon commencement date by reason of the fact that premises are not ready for occupancy or because a prior Tenant or any other person is wrongfully holding over or is in wrongful possession, or for any other reason. The rent shall not commence until possession is given or is available, but the term herein shall not be extended.

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 222 of 320

*Rider*

1ˢᵗ.  Rental Provisions

That the Tenant shall pay the annual rent of

$ 24,000.00  commencing June 1, 2010 and terminating May 31,2011
$ 24,000.00  commencing June 1,2011 and terminating May 31,2012
$ 25,200.00  commencing June 1,2012  and terminating May 31,2013
$ 26,460.00  commencing June 1,2013  and terminating May 31,2014
$ 27,783.00  commencing June 1,2014  and terminating May 31,2015
$ 29,172.00  commencing June 1,2015  and terminating May 31,2016
$ 30,630.60  commencing June 1,2016  and terminating May 31,2017
$ 32,161.80  commencing June 1,2017  and terminating May 31,2018
$ 33,768.00  commencing June 1,2018  and terminating May 31,2019
$ 35,448.00  commencing June 1,2019  and terminating May 31,2020
$ 37,224.00  commencing June 1,2020 and terminating May 31,2021

said rent to be paid in equal monthly payments in advance on the first day of each and every month during the term aforesaid, as follows:

$ 2,000.00  commencing June 1, 2010 and terminating May 31,2011
$ 2,000.00  commencing June 1,2011 and terminating May 31,2012
$ 2,100.00  commencing June 1,2012  and terminating May 31,2013
$ 2,205.00  commencing June 1,2013  and terminating May 31,2014
$ 2,315.25  commencing June 1,2014  and terminating May 31,2015
$ 2,431.00  commencing June 1,2015 and terminating May 31,2016
$ 2,552.55  commencing June 1,2016 and terminating May 31,2017
$ 2,680.15  commencing  June 1,2017 and terminating May 31,2018
$ 2,814.00  commencing  June 1,2018 and terminating May 31,2019
$ 2,954.00  commencing June 1,2019  and terminating May 31,2020
$ 3,102.00  commencing  June 1,2020 and terminating  May 31,2021

For the first two years of the rental agreement the base rent will remain at $ 2000.00 monthly. Commencing on June 1,2012 the rent will increase at the rate of 5% per annum as outlined in the above particulars.

28ᵗʰ. Tenant agrees to exonerate, save harmless, protect, defend and indemnify the Landlord or any owner of the demised premises from and against any and all losses, damages, claims, suits or actions, judgments and costs, which may arise or grow out of any injury to or death of persons or damage to property in any manner whatsoever arising out of the acts or omissions of, or use by Tenant, Tenant's agents, servants, employees, guests or customers of the demised premises.

29ᵗʰ. Tenant agrees to procure and keep in force during the term of this Lease for Tenant's own benefit and for the benefit of Landlord, a comprehensive general public liability insurance policy in standard form protecting Tenant and Landlord against any liability whatsoever occasioned by accident or disaster on or about the demised premises or any appurtenances thereto. Such comprehensive general public liability insurance policy shall be written by a good and solvent company, licensed by the Superintendent of Insurance of the State of New York, with limits of liability of not less than $1,000,000.00 bodily injury for one (1) person in one (1) accident, occurrence and/or $1,000,000.00 bodily injury for two (2) or more persons in one (1) accident or occurrence, and property damage insurance in the amount of $400,000.00. The Landlord and Tenant shall be named as insured in such policy. Should additional liability insurance be obtained by

next rent day after such payment.

Tenant shall observe and comply with the requirements of all policies of general public liability insurance and shall not violate or permit to be violated any of the conditions of the said general public liability insurance policy.

**30th.** Tenant agrees to procure and keep in force during the term of this Lease an insurance policy in standard form covering all the plate glass in and about the demised premises. Such plate glass insurance policy shall be written by a good and solvent company, licensed by the Superintendent of Insurance of the State of New York. The Landlord and Tenant shall be named as insured in such policy. A copy of said plate glass insurance policy shall be delivered to Landlord by Tenant prior to the commencement date of this Lease and thereafter at least fifteen (15) days prior to the expiration of any such insurance policy.

All premiums on such policies shall be paid by the Tenant when due. In the event, however, that the Tenant should fail to pay any such premium when due and exhibit proof of such payment to the Landlord within ten (10) days after the due date, if requested to do so by the Landlord, the Landlord may pay the amount of such premium and the amount so advanced by the Landlord with interest thereon at the then legal rate from the date of payment shall be considered additional rent, and shall be due and payable with said interest with the next installment of rent becoming due on the next rent day after such payment.

Tenant shall observe and comply with the requirements of all policies of plate glass insurance and shall not violate or permit to be violated any of the conditions of the said plate glass insurance policy.

**31st.** All policies of insurance provided for in this Lease shall contain, if available, a provision. that the insurance company at least ten (10) days prior to cancellation and/or renewals must notify the Landlord accordingly.

**32nd.** Tenant shall throughout the term of this Lease pay all and any utility charges for utilities used at the demise premises, including, but not limited to, electricity, telephone, gas, fuel, etc. It is the understanding and intention of the parties hereto that Landlord leases the demised premises to Tenant without any services of any kind.

**33rd.** Tenant shall, at Tenant's own cost and expense and upon Tenant's own responsibility, apply for and obtain any necessary permits and other licenses for the use, conduct and maintenance of the business to be conducted in the demised premises. The Tenant shall also pay all fees in connection with any licenses or permits required by the local municipal authority for any equipment or machinery at the demised premises whether owned by Landlord or the Tenant.

**34th.** Tenant shall, at all times during the term of this Lease, at Tenant's sole cost and expense, promptly comply with all present and future laws, orders and regulations issued or promulgated by the Environmental Protection Administration and of any other governmental or quasi governmental agency, whether of federal, state, city, county, town, village or other municipal level, regulating or otherwise asserting jurisdiction over air or other ecological environmental pollutants.

**35th.** Any notice by either party to the other shall be in writing and shall be deemed to be duly given only if mailed by certified mail in a postpaid envelope, return receipt requested, addressed; (a) If to Tenant, at the demised premises; (b) If to Landlord, at the address set forth hereinabove, or at any such other address as Landlord may from time to time designate by notice given to Tenant.

**36th.** The Tenant shall pay an annual common area maintenance charge of $0.00 per annum.

**37th.** Neither Landlord nor Landlord's agents have made any representations or promises with respect to the physical condition of the building, the land upon which it is erected or the demised premises, the rents, leases, expenses of operation or any other matter or nothing affecting or

38th. In the event that the New York Board of Fire Underwriters or the Insurance Services Office of New York or any bureau, department or official of the federal, state, city, county, town or village government requires or recommends the installation of a Sprinkler System either in the cellar and/or grade floor of the building known as 161 Saratoga Avenue Brooklyn NY 11233  the Tenant herein expressly agrees to pay all cost associated with such installation and hookup . Such charge is hereby fixed at (100%) percent.

In the event that the Landlord decides to install a Sprinkler System either in the cellar and/or grade floor of the building known as 161 Saratoga Avenue Brooklyn NY 11233  the Tenant herein expressly agrees to pay fifty percent of cost associated with such installation and hookup . Such charge is hereby fixed at (50%) percent.

Anything elsewhere in this Lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or the Insurance Services Office of New York or any bureau, department or official of the federal, state, city, county, town or village government requires or recommends any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents in the demised premises, or if any sprinkler system changes, modifications, alterations, additional sprinkler heads or other such equipment, become necessary to prevent the imposition of a penalty or change against the full allowance for a sprinkler system in the fire insurance rate set by the Insurance Services Office of New York or by any fire insurance company, Tenant shall, at Tenant's own cost and expense, promptly make such sprinkler system installations, changes, modifications, alterations, and supply additional sprinkler heads or other equipment as required whether the work involved shall be structural or non-structural in nature.

39th. The Tenant shall pay an annual water charge of $-0- in advance. The Tenant acknowledges that he is responsible to  install a sub-meter at the demised premises at Tenants own cost and expense if required by landlord . In the event that the Landlord shall install a sub-meter at the demised premises the Tenant shall pay for all associated installation charges .If tenant pays water charges based on a sub-meter the Tenant shall in addition at the time the water charges are paid, pay the applicable New York City sewer charged to the Landlord then being charged by the City of New York on its water bill. All sewer charges, whether they be an annual sewer water charge of $-0- or water charges registered on a sub-meter and the accompanying sewer charge, shall be deemed additional rent.

40th. Landlord agrees not to unreasonably withhold Landlord's consent to the assignment of the within Lease upon the following terms and conditions:

    a)  That at the time of such assignment Tenant is not in default under any of the terms and
        conditions required to be performed by Tenant under this Lease.

    b)  That there is forwarded to Landlord an executed duplicate original of the Assignment of
        Lease in proper form for recording, together with an agreement by the assignee assuming
        all of the terms, covenants and conditions of this Lease to be performed by Tenant.

    c)  That there is deposited with Landlord an additional two month's security for each and every
        assignment of this lease.  Two (2) month's additional security deposit shall be deemed to
        be $ 4,000.00.

    d)  That Landlord shall be paid by the assignor the sum of $500.00 as a processing fee.

41st  a) The term "real estate taxes" shall mean all taxes and assessments levied, assessed or

period thereof, , which amount shall be considered the base year real estate tax for the purposes of this paragraph.   The provisions of this paragraph shall apply whether the increase in taxation results from a higher tax rate or an increase in the assessed valuation of the entire premises, or both.   A copy of the real estate tax bill shall be sufficient evidence to establish the amount of such real estate taxes and for calculation of the amount to be paid by Tenant. Said sum due Landlord shall be paid as additional rent and shall be collectible as such in the month following the submission of Landlord's bill therefor.

   c)   The amount of the base year real estate taxes paid by Landlord during the base year shall be used in the computation of the amount of additional rent until the amount of the base year
real estate taxes payable by Landlord during the base year shall be finalized by legal proceedings,
settlement or otherwise.   In the event of a reduction of the base year real estate taxes by legal
proceedings, settlement or otherwise, the reduced amount of such base year real estate taxes shall
thereafter determine the amount of additional rent payable by Tenant, pursuant to subdivision b).   The
additional rent theretofore paid or payable hereunder shall be recomputed on the basis of such
reduction of the base year real estate taxes.   The Tenant shall pay to Landlord any deficiency
between the amount of such additional rent as theretofore computed and the amount thereof due as a
result of such reduction of the base year real estate taxes. Such sum shall be collectible as additional
rent in the month following the submission of Landlord's bill therefore.

   d)   If Landlord shall have the real estate taxes reduced for any year prior to the Tenant making
payment of additional rent for that year, the Tenant shall include in such payment of additional rent
fifty  (50%) percent of the expenses (including attorney's and appraiser's fees) incurred by Landlord in connection with any such application, proceeding, settlement or otherwise.

42nd. Notwithstanding any expiration or termination of this Lease prior to the lease expiration date (except in the case of a cancellation by mutual agreement) Tenant's obligation to pay any and all additional rent under this Lease shall continue and shall cover all periods up to the lease expiration date.

43rd. In addition to the regular rent payments, any sum to which the Landlord may be entitled, pursuant to any provision of this Lease, or as a result of the operation of any provision of this Lease from the Tenant, shall be payable as additional rent and shall be collectible with the next succeeding month's rent. If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under or by virtue of any of the terms or provisions in any paragraph of this Lease, then, unless otherwise provided elsewhere in this Lease, Landlord may immediately or at any time thereafter and without notice perform the same for the account of Tenant, and if Landlord makes any expenditures or incurs any obligations for the payment of money in connection therewith including, but not limited to, attorneys' fees in instituting, prosecuting or defending any action or proceeding such sums paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Landlord within five (5) days of rendition of any bill or statement to Tenant therefore.

44th. The Tenant shall keep fire extinguishers at the demised premises in conformity with the requirements and recommendations of the Insurance Services Office of New York.

45th  If  by reason of the use of the demised premises by Tenant, the rates for the insurance of the

47th. Tenant agrees that Tenant shall keep the sidewalk adjacent to the demised premises clean at all times and shall remove therefrom all rubbish, snow and ice whenever same is present, it being understood that the same is not the obligation of Landlord.

48th. Tenant agrees that Tenant shall keep the cellar at the demised premises free from any accumulation of rubbish, paper and other refuse and shall use same only for the storage of machinery , as is permitted by law.

In the event that the Tenant uses the cellar for the storage of machinery  said machinery and shall be placed on pallets, which pallets shall have a clearance of at least 8" from the cellar floor. All machinery  stored in the cellar shall be at least 18" from the cellar ceiling.

49th. In the event that any legal proceedings are hereafter instituted by Landlord against Tenant, Tenant assumes and agrees to pay to Landlord any expenses, costs, reasonable attorney's fees, marshal's fees, etc. that may be incurred by Landlord incidental to and arising out of such legal proceedings.

50th  Land lord shall not be required to furnish any service or equipment for the removal of rubbish or refuse from the demised premises, but may, nevertheless require Tenant to have such rubbish and refuse removed.

51st. No merchandise, boxes, receptacles or articles or fixtures of any kind, nature or description are to be placed or stored at or upon the front, side or rear of the demised premises, it being the intention of Landlord to require Tenant to conduct Tenant's business solely within the demised premises.

52nd. Landlord shall not be held liable for any damage or injury to any property, merchandise, stock of goods, fixtures, furniture or decorations, or to any person or persons at any time in the demised premises or building, from steam, gas, electricity or from water, rain, snow or ice, which may escape, leak or seep into, issue or flow from any part of said building of which the demised premises are a part of or from the pipes or plumbing works of the same or from the street or cellar or sub-surface or from any other place or quarter unless Landlord has received written notice from Tenant and has not remedied the problem within a reasonable period of time; and Tenant hereby agrees not to hold Landlord liable in any way therefore whatsoever.

53rd. Tenant hereby represents and agrees that Tenant will not at any time bring into, keep, store, use or permit anywhere in the demised premises any loose, exposed or open fluid, chemical substance or material of an inflammable or volatile, combustible or explosive character or having or creating any noxious or objectionable odors or fumes and this provision is hereby expressly made a conditional limitation of this Lease.

54th. Should the demised premises become infested with vermin or rodents, Tenant agrees, at Tenant's own cost and expense, to have such condition remedied within five (5) days after written notice and demand shall have been made by Landlord. In the event that Tenant fails to comply with such notice, Landlord shall have the right (but not be obligated to do so) to have this work performed by a fumigating or exterminating concern and to charge the cost of such work to Tenant, which shall be collectible as additional rent and shall be payable with the next succeeding month's rent.

55th. In the event any payment under this Lease shall be made in the form of a check from any other person, firm or corporation other than named in this Lease, the acceptance of same by Landlord shall not, under any circumstances, be deemed recognition of a sub-letting or an assignment of this Lease regardless of the number of times that such payment shall be made by such other person, firm or corporation.

56th. It is mutually agreed by and between Landlord and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by

shall be construed as requiring Landlord to make interior repairs or to impose any additional obligations upon Landlord not specifically provided for in this Lease.

58th. It is understood and agreed that Tenant shall, at Tenant's own cost and expense, provide and pay for Tenant's own heat. Tenant shall also install his own heating system in the demised premises and shall be solely responsible for and make all repairs and replacements thereto , whenever same are needed. However, the heating system and all its component parts shall, at all times, remain the property of Landlord including all replacements made thereto by Tenant.

 Where oil or gas is the energy source used to fire the boiler to heat the demised premises, Tenant shall, at Tenant's own cost and expense, at the end of each heating season arrange to have the boiler, flue pipe and chimney cleaned and vacuumed to remove all accumulated ash and carbon deposits.

 Where a forced hot air furnace is used to heat the demised premises, the Tenant, at Tenant's own cost and expense ,shall change all air filters on  a regular basis during the heating season.

59th. Tenant represents that Tenant has not dealt with any broker, agent or finder on Tenants behalf in consummating the transaction described in this Lease or in introducing the parties to each other in connection therewith and Tenant has no knowledge of any broker, agent or finder or any person or entity who is entitled or may claim to be entitled to a commission or fee in connection with the transaction described in this Lease. (Unless Landlord and Tenant have acknowledged that an agent was used)The Tenant agrees to indemnify and hold the Landlord harmless from and against any claims, demands, causes of action, losses, damages, liabilities, obligations, costs, charges and attorney's fees or expenses which arise by reason of a claim for commission or fee on account of this transaction described in this Lease made by any broker provided it is finally adjudicated by a Court of competent jurisdiction that a commission or fee is due to such broker, agent, finder or other person by reason of their having dealt with the Tenant or having introduced the Tenant to the Landlord in connection with the transaction described in this Lease.

60th. All installations, additions, hardware, non-trade fixtures and improvements, temporary or permanent, which may be made or installed by either of the parties hereto in or upon the demised premises and which are in any manner attached to the floors, walls, roof, ceilings, doors, or windows shall be the Landlord's property and shall, upon termination of the term by lapse of time, or otherwise, remain upon and be surrendered with the demised premises as part thereof, all without compensation, allowance or credit to Tenant provided, however, that if prior to such termination or within ten (10) days thereafter Landlord so directs by notice to Tenant, Tenant shall promptly remove the installations, additions, hardware, non-trade fixtures and improvements which were placed in the demised premises by Tenant and which are designated in the notice failing which Landlord may remove the same and Tenant shall pay the cost and expense thereof. Upon termination of the term of this Lease or of Tenant's right to possession, Tenant shall surrender to Landlord at the place where rent is payable all keys for the demised premises. Tenant shall prior to any such termination of the term of this Lease or of Tenant's right to possession, remove from the demised premises all Tenant's furniture, trade fixtures and other personal property of every kind whatsoever not becoming Landlord's property as hereinbefore specified, and in default of such removal by Tenant, all such property, and every interest Tenant in the same, shall be conclusively presumed to have been conveyed by Tenant to Landlord under this Lease as a bill of sale without compensation, allowance, or credit to Tenant. Tenant shall, upon such termination of the term of this Lease or of Tenant's right to possession, return to Landlord the demised premises in a "broom clean" condition, ordinary wear and tear excepted and all equipment and fixtures comprising a part therein in good repair and condition, ordinary wear and tear excepted.

61st. The Tenant covenants not to use the buildings on the demised premises for any illegal or unlawful purpose. Tenant shall not at any time use or occupy the demised premises in violation of the Certificate of Occupancy issued for the building.

and deliver to Landlord, written and unconditional waivers of mechanic's liens upon the real property
in which the demised premises are located, for all work, labor and services to be performed and materials to be furnished in connection with such work, signed by all contractors, sub-contractors, material men and laborers to become involved in such work. Notwithstanding the foregoing, if any mechanic's lien is filed against the demised premises, or the building of which the same forms a part,
for work claimed to have been done for, or materials furnished to Tenant, whether or not done pursuant to this paragraph the same shall be discharged by Tenant within ten(10) days therafter ,at Tenants own cost and expense, by filing the bond required by law.

63rd. This lease is subject and subordinate to all ground or underlining leases and to all mortgages which may now or hereafter affect such leases or the real estate property of which the demised premises are part and to all renewals, modifications ,consolidations ,replacements and extension of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lease or by any mortgagee, affecting any lease or the real property of which the demised premises are a part. In confirmation of such subordination, Tenant shall execute promptly any certificate that owner may request.

64th. Tenant covenants and agrees that at all times Tenant's use of electric current shall not exceed the capacity of the existing main electric service to the building, or lines, meters and circuit panels directly relating to and feeding the demised premises. The Tenant may not use any electrical equipment which, in Landlord's opinion, reasonably exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no wise make Landlord liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain.

65th. This Lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no wise be affected, impaired or excused because Landlord is unable to fulfill any of Landlord's obligations under this Lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of strike or labor troubles or any cause whatsoever including, but not limited to, government preemption in connection with a National Emergency or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency.

66th. If the Tenant continues in possession of the demised premises after the expiration of this Lease without having renewed the same or without having entered into a new lease, the Tenant shall thereafter be deemed to be a Tenant from month to month on all of the terms and conditions set forth in this Lease, except as to the duration thereof.

67th. The Tenant shall take appropriate action to eliminate any criticism or comply with any recommendation with respect to Tenant's use of the demised premises which any of Landlord's insurance carriers may reasonably make to keep Landlord's insurance in effect. In the event Tenant shall fail to comply herewith, after written notice from Landlord, within the time allowed by said insurance company to keep Landlord's insurance in effect and/or to keep the then current rate, Landlord may take action under Paragraph No. 17 of this Lease to enforce Landlord's rights and/or in the alternative or as additional relief, may do what is necessary to eliminate or comply therewith and in such event, may charge Tenant with the cost of same as additional rent.

68th. Tenant shall, without charge at any time and from time to time, within ten (10) days after request by Landlord:

    a) Certify by written instrument, duly executed, acknowledged and delivered, to any

iii)    the date, if any, to which the rental and other charges hereunder have been paid in advance.

69th.  If the landlord or any successor in interest  be an individual, joint venture , tenancy in common, co-partnership, unincorporated association ,or other unincorporated aggregate of individuals ( all of which are referred to below ,individually and collectively, as an "unincorporated landlord" ) ,then ,anything elsewhere to the contrary notwithstanding ,Tenant shall look solely to the estate and property of such unincorporated landlord in the Entire Taxpayer for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of the Lease to be observed and/or performed by Landlord, and no other property or assets of such unincorporated Landlord shall be subject to the levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies.

70th. Should there be any conflict between any provisions in the printed portion of this Lease and those contained in the typewritten portion thereof, then the terms, covenants and conditions in the typewritten portion shall be controlling hereunder.

71st.    a) In amplification of Paragraph No. 2 of this Lease, and in addition thereto, the Tenant agrees that, at Tenant's sole cost and expense, and in a manner satisfactory to the Landlord, the Tenant shall keep, put, replace and maintain the demised premises and all Tenant's equipment, fixtures, motors, appurtenances, installations and improvements, and every part thereof (except for repairs which the Landlord is required to make as hereinafter set forth) in good repair, good working order and good condition and which shall be deemed to include, but not exclusively, plumbing, the drains, the heating system and piping, air-conditioning system, electrical fixtures and systems, whether the same be interior, exterior, ordinary as well as extraordinary, foreseen or unforeseen.

b) It is the intention of the parties and the parties do hereby agree that the sole repairs which the Landlord shall make to the demised premises shall be structural repairs to the exterior walls of the building, the foundation, and the roof, provided, however, that the said repairs are not occasioned, caused or required by reason of the Tenant's operation of Tenant's business in the demised premises, or by Tenant's fixtures and/or equipment, or by a break-in or an attempted break-in to the demised premises, or by reason of any act or acts of commission or omission of the Tenant, Tenant's employees or any licensees, or visitor of the Tenant; in which event such repairs shall be made by the Tenant. All other repairs and replacements shall be made by the Tenant at Tenant's own cost and expense. Doors, glass windows and storefronts shall not be deemed to be part of the exterior walls, and any repairs or replacements thereto shall be made by the Tenant.

72nd. This provision omitted

73rd. Tenant shall have the right to erect a sign upon the parapet at the front of the demised premises, provided, however, that the plans for the size, location and type of sign shall first be submitted to Landlord for Landlord's consent, which consent Landlord agrees not to unreasonably withhold. In the event the Landlord consents, as aforesaid, the Tenant agrees that the erection of any such signs shall be in accordance with all applicable laws, orders, rules and regulations of any governmental or municipal agency having jurisdiction thereof. In the event the Landlord or the Landlord's representatives shall deem it necessary to remove any such sign or signs in order to paint the said demised premises or the building wherein same is situated or make any other repairs, alterations or improvements in or upon said demised premises or building or any part thereof, the Landlord shall have the right to do so, providing the same be removed and replaced at the Landlord's expense, whenever the said repairs, alterations or improvements shall be completed.

74th. Tenant shall not use or suffer the premises to be used in any manner so as to create an

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 230 of 320

existence of or any failure by Tenant to comply with any environmental law now or hereafter in effect. The term "Hazardous Materials", as used herein, shall mean and include all potentially hazardous materials, including without limitation radon, asbestos, and asbestos containing materials.

(b) Tenant covenants and agrees that at any and all times during the term of this Lease Tenant shall be responsible for compliance with any federal, state, county, local, or municipal law, statute, ordinance, code, regulation or administrative recommendation pertaining to Hazardous Materials (including without limitation any requirements pertaining to the cleanup, removal, and/or encapsulation of any Hazardous Materials that may be in or at the premises or may have emanated therefrom). Tenant shall, at Tenant's sole cost and expense, undertake any and all steps which may be required for compliance as aforesaid regardless of whether Tenant had installed said Hazardous Materials or that same existed at the premises prior to Tenant's occupancy of same. In addition, Tenant shall be solely responsible for restoring and repairing any damage to the premises caused by or resulting from such compliance, e.g. the replacement of any ceiling tiles or insulation with comparable products not containing any Hazardous Materials.

(c) Tenant shall indemnify and save harmless the Landlord, Landlord's agents, servants and employees, from and against all claims and demands whether for injuries to persons or loss of life, or damage to property, related to or arising in any manner whatsoever out of the clean-up, removal and/or encapsulation of Hazardous Materials or occasioned wholly or in part by any act or omission of (or failure to comply with legal requirements by) Tenant, Tenant's agents, contractors, employees, servants and licensees. In the event Landlord shall, without fault on Landlord's part, be made a party to any litigation or administrative proceedings commenced by or against Tenant, then Tenant shall protect and hold Landlord harmless and shall pay all costs, expenses and attorneys fees incurred or paid by Landlord in connection with such litigation. The preceding notwithstanding, Tenant shall not be responsible for any preexisting condition.

(d) In the event Tenant fails to comply as aforesaid with the clean-up, removal, and/or encapsulation of Hazardous Materials when so required within the period of time permitted or promulgated, then in such event Landlord may undertake said work, but shall not be obligated to do so. Should Landlord undertake said work required by Tenant as aforesaid, then in such event, Landlord shall render a statement to Tenant for the cost and expense of undertaking said work plus a charge of twenty (20%) percent for administrative costs and expenses, which statement shall be paid by Tenant as additional rent within ten (10) days of receipt thereof. Failure of Tenant to undertake compliance as aforesaid shall constitute a material default under this Lease for which Landlord shall have all rights and remedies, including without limitation the right to terminate this Lease and the right to hold Tenant responsible for the entire cost of compliance as aforesaid and for all of Landlord's damages resulting from Tenant's failure to so comply.

(e) The provisions of this Paragraph shall survive the expiration or earlier termination of this Lease, and the Tenant shall require any approved  assignee or approved sub-Tenant of the
premises to agree expressly in writing to comply with all the provisions of this Paragraph.

75th. For the purposes of this Lease, the transfer of stock by any of the stockholders of the tenant corporation, (if applicable )other than among themselves, shall be deemed an assignment of this Lease. Landlord agrees not to unreasonably withhold Landlord's consent to such transfer of stock provided the following provisions are complied with:

a) That at the time of each such transfer of stock Tenant is not in default under any of the terms            and conditions required to be performed by Tenant under this lease.

same, the Tenant shall institute and maintain a duct cleaning service in the premises at Tenant's own expense, and install necessary fire extinguishers.

77th. The Tenant agrees that Tenant shall make all plumbing repairs to the demised premises. The Tenant further agrees that Tenant shall also be responsible for and shall pay for the cost and expense of cleaning and clearing all blockages and stoppages to the sewer line servicing the demised premises, provided the blockages and stoppages are caused by the Tenant.

78th. In the event that any rental payment is not received by the Landlord by the 10th day of the month in which same is due, the Tenant shall pay the Landlord as a late charge six (6%) percent of the rental payment so overdue, along with the rental payment.

79th. The Tenant may install an awning at the demised premises over the storefront.

80th. It is understood and agreed that Tenant shall reimburse Landlord to the extent of eighteen (33%) percent of any bill received by Landlord from The City of New York for restoring and/or improving the sidewalks and curbs at the premises known as 161 Saratoga Avenue Brooklyn NY 11233.

81st. The Tenant accepts the demised premises in their current state and condition, or as commonly termed "AS IS".

Tenant shall, at Tenant's own cost and expense, do all work necessary at the demised premises required to be done for the business to be conducted by Tenant ("Tenant's Work"). Tenant agrees, prior to commencing any structural alterations, non-structural alterations, additions, improvements, changes, installations or other construction, including Tenant's initial construction of Tenant's store to:

(i)     engage an architect licensed in the State of New York to prepare plans ("Tenant's Plans") showing Tenant's Work;

(ii)    deliver to Landlord true copies of all final plans and specifications. Landlord shall not unreasonably withhold Landlord's consent to such final plans and specifications.

(Hi)   make application to the Building Department of the City of New York and any other governmental departments or agencies to secure those permits, approvals, and consents, which are required for Tenant's Work (the "Governmental Approvals").

Prior to commencing any alterations, additions, improvements, changes, installations or other construction, whether structural, non-structural or otherwise, Tenant shall deliver to Landlord a copy of the building permit or like governmental approval and upon completion Tenant shall deliver a copy of all certificates, approvals and permits which are required pursuant to applicable law.

Tenant agrees that Tenant's work shall be done in a first-class workmanlike manner in accordance with all rules and regulations of governmental agencies. Tenant agrees to cause Tenant's contractors and subcontractors to carry worker's compensation, general liability, personal and property damage insurance, including builder's risk insurance on an "all risk" basis as shall be reasonably required by  Landlord naming Landlord ,its managing agent and mortgagees as additional insureds as their interest may appear.

82nd. The Tenant shall not, during the term of this lease or any extended term of this lease, install, keep or maintain any video arcade machines at the demised premises.

83rd . The Tenant shall not be permitted to install air conditioning equipment through the transom over the front door.

(1)  Cause the dumpsters used by Tenant to be washed out with such freauencv as Landlord determines.The cost incurred by Landlord in connection therewith shall be reimbursed by Tenant to Landlord as adittional rent within ten(ten) days after demand thereof.

(2) Retain such exterminating and pest control services as Landlord may deem appropriate to exterminate pests at the premises.

All costs incurred by the Landlord in connection therewith as set forth in (1) and (2) 2)  shall be reimbursed by Tenant to Landlord as additional rent within ten (10) days after demand therefore.

85th .  If the tenant defaults in any term, condition, or obligation pursuant to the lease which is not a monetary obligation , then the tenant shall have a period of 20 days to cure the default upon written notice by the landlord of the default. The tenant, upon curing the default, will give notice of the cure to the landlord and will either allow the landlord immediate access to inspect the condition if necessary or provide the landlord with any appropriate paperwork or certificates.

86th.  The Tenant herein is a corporation whose principal is Apolinar Collado (hereinafter "Principal"). The Principal personally guarantees to Owner the payment of all Base Rent and additional rent for the demised premises not paid by Tenant until the date Tenant or Tenant's assigns or subtenants surrender possession of the Premises to Landlord in accordance with the provisions of the Lease.

By : _____
             Apolinar Collado

By: _____
             Kermit Card

covenant shall be conditioned upon the retention of title to the premises by the Landlord.

*And it is mutually understood and agreed*  that the covenants and agreements contained in the within lease shall be binding upon the parties hereto and upon their respective successors, heirs, executors and administrators.

In Witness Wherefore the parties have interchangably set their hand and seals (or caused these presents to be signed by their proper corporate officers (if applicable) and caused their proper corporate seal to be affixed as of this 6th Day of April 2010

Signed, sealed and delivered in the presence of

By : _____
Apolinar Collado

By: _____
Kermit Card

# EXHIBIT 27

POWR

## *POWER OF ATTORNEY*

I, Ella Rubina Card, residing at P.O. Box 99, Hanover, PA 17331, hereby appoint Kenneth L. Swenson of P.O. Box 99, Hanover, PA 17331 and in the event that Kenneth L. Swenson is unable or unwilling to act as my agent, I appoint Cindy Rubina Card of 161 Saratoga Ave, Brooklyn, New York 11233 in his place instead.

I hereby revoke any and all powers of attorney and special powers of attorney that previously have been signed by me.

My Agent shall have full power and authority to act on my behalf. This power and authority shall authorize my Agent to manage and conduct all of my affairs and to exercise all of my legal rights and powers, including all rights and powers that I may acquire in the future. My Agent's powers shall include, but not be limited to, the power to:

1. Open, maintain or close bank accounts (including, but not limited to, checking accounts, savings accounts, and certificates of deposit), brokerage accounts, retirement plan accounts, and other similar accounts with financial institutions.

    a. Conduct any business with any banking or financial institution with respect to any of my accounts, including, but not limited to, making deposits and withdrawals, negotiating or endorsing any checks or other instruments with respect to any such accounts, obtaining bank statements, passbooks, drafts, money orders, warrants, and certificates or vouchers payable to me by any person, firm, corporation or political entity.

    b. Add, delete or change beneficiaries to any financial accounts I own including insurance policies, annuities, retirement accounts, payable on death savings or checking accounts or other investments,

    c. Perform any act necessary to deposit, negotiate, sell or transfer any note, security, or draft of the United States of America, including U.S. Treasury Securities.

    d. Have access to any safe deposit box that I might own, including its contents.

2. Sell, exchange, buy, invest, or reinvest any assets or property owned by me. Such assets or property may include income producing or non-income producing assets and property.

3. Purchase and/or maintain insurance and annuity contracts, including life insurance upon my life or the life of any other appropriate person.

4. Take any and all legal steps necessary to collect any amount or debt owed to me, or to settle any claim, whether made against me or asserted on my behalf against any other person or entity.

## NOT APPLICABLE FOR PIN NUMBER

Book 2460 Page 8604

Page 1 of 8

5. Enter into binding contracts on my behalf.

6. Exercise all stock rights on my behalf as my proxy, including all rights with respect to stocks, bonds, debentures, commodities, options or other investments.

7. Maintain and/or operate any business that I may own.

8. Employ professional and business assistance as may be appropriate, including attorneys, accountants, and real estate Agents.

9. Sell, convey, lease, mortgage, manage, insure, improve, repair, or perform any other act with respect to any of my property (now owned or later acquired) including, but not limited to, real estate and real estate rights (including the right to remove tenants and to recover possession). This includes the right to sell or encumber any homestead that I now own or may own in the future.

10. Prepare, sign, and file documents with any governmental body or agency, including, but not limited to, authorization to:

    a. Prepare, sign and file income and other tax returns with federal, state, local, and other governmental bodies.

    b. Obtain information or documents from any government or its agencies, and represent me in all tax matters, including the authority to negotiate, compromise, or settle any matter with such government or agency.

    c. Prepare applications, provide information, and perform any other act reasonably requested by any government or its agencies in connection with governmental benefits (including medical, military and social security benefits), and to appoint anyone, including my Agent, to act as my "Representative Payee" for the purpose of receiving Social Security benefits.

11. To create, sign, modify or revoke any trust agreements or other trust documents in an attempt to manage or create a trust that was created for my benefit or the benefit of my dependants, heirs or devisees. This shall include the creation, modification or revocation of any inter vivos, family living, irrevocable or revocable trusts.

12. Subject to other provisions of this document, my Agent may disclaim any interest, which might otherwise be transferred or distributed to me from any other person, estate, trust, or other entity, as may be appropriate. However, my Agent may not disclaim assets to which I would be entitled; if the result is that the disclaimed assets pass directly or indirectly to my Agent or my Agent's estate.

13. Have access to my healthcare and medical records and statements regarding billing, insurance and payments.

Page 2 of 8

This Power of Attorney shall grant broad authority to the Agent(s) under Power of Attorney, including the ability to give away all your property while you are alive or to substantially change how your property is distributed at your death.  The powers and duties of an agent are explained more fully in 20 PA C.S. CH 56. The listing of specific powers is not intended to limit or restrict the powers granted in this Power of Attorney in any manner.

Any power or authority granted to my Agent(s) under this document shall be limited to the extent necessary to prevent this Power of Attorney from causing, (i) my income to be taxable to my Agent, (ii) my assets to be subject to a general power of appointment by my Agent, or (iii) my Agent to have any incidents of ownership with respect to any life insurance policies that I may own on the life of my Agent.

My Agent shall not be liable for any loss that results from a judgment error that was made in good faith. However, my Agent shall be liable for willful misconduct or the failure to act in good faith while acting under the authority of this Power of Attorney. A successor Agent shall not be liable for acts of a prior Agent.

My Agent shall not be entitled to any compensation, during my lifetime or upon my death, for any services provided as my Agent. My Agent shall not be entitled to reimbursement of expenses incurred as a result of carrying out any provision of this Power of Attorney.

My Agent shall provide an accounting for all funds handled and all acts performed as my Agent as required under state law or upon my request or the request of any authorized personal representative, fiduciary or court of record acting on my behalf.

This Power of Attorney and the ADDENDUM TO THE POWER OF ATTORNEY FOR HEALTH CARE ,shall become effective immediately, and shall not be affected by my subsequent disability or lack of mental competence, but rather, shall continue as provided in Act No. 26 of 1982 (20 Pa. C.S.A. Section 5605, as amended).  My death shall not revoke or terminate the agency of my said attorney-in-fact or other person as provided herein, if, without actual knowledge of my death, my said attorney-in-fact or other person has acted in good faith under this Power of Attorney as provided in Act No. 26 of 1982 (20 Pa. C.S.A. Section 5605, as amended).

I hereby revoke, rescind and declare "null and void" any prior Power-of-Attorney which I may have previously executed.

IN WITNESS WHEREOF, I have hereinto set my hand and seal this 14th day of February 2018.

WITNESSES:

Ella Rubina Card
Ella Rubina Card

Page 3 of 8

COMMONWEALTH OF PENNSYLVANIA }ss:
COUNTY OF YORK }ss:

On the 14th day of February in the year 2018 before me, the undersigned, a Notary Public in and for said State, personally appeared Ella Rubina Card, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed this instrument.

_____
Notary Public

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
RICKI J. SMITH, Notary Public
West Manchester Twp., York County
My Commission Expires May 24, 2020

My commission expires May 24, 2020

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

**ACKNOWLEDGEMENT**

I, Kenneth L Swenson have read the attached Power of /Attorney and am the person identified as the agent for the principal.  I hereby acknowledge that in the absence of a specific provision to the contrary in the Power of Attorney or in 20 Pa.C.S. when I act as agent:

I shall act in accordance with the principal's reasonable expectations to the extent actually known by me and, otherwise, in the principal's best interest, act in good faith and act only within the scope of authority granted to me by the principal in the power of attorney.

 I shall keep the assets of the principal separate from my assets.

 I shall exercise reasonable caution and prudence.

 I shall keep a full and accurate record of all actions, receipts and disbursements on behalf of the principal.

_____  _____2.14.18_____
Kenneth L. Swenson       Date

Page 5 of 8

## ACKNOWLEDGEMENT

I, Cindy R Card have read the attached Power of /Attorney and am the person identified as the agent for the principal.  I hereby acknowledge that in the absence of a specific provision to the contrary in the Power of Attorney or in 20 Pa.C.S. when I act as agent:

I shall act in accordance with the principal's reasonable expectations to the extent actually known by me and, otherwise, in the principal's best interest, act in good faith and act only within the scope of authority granted to me by the principal in the power of attorney.

I shall keep the assets of the principal separate from my assets.

I shall exercise reasonable caution and prudence.

I shall keep a full and accurate record of all actions, receipts and disbursements on behalf of the principal.

_Cindy R. Card_
Cindy R Card

_2-14-18_
Date

Page 6 of 8

## ADDENDUM TO THE POWER OF ATTORNEY FOR HEALTH CARE

If I am in a terminal condition, a persistent vegetative state, or have advanced dementia or other similar mental incapacity or have a permanent disability that prevents me from communicating my wishes, I direct my Power of Attorney for Health Care to carry out my wishes. My wishes include:

Circle One

Agree (Disagree)    Do not use feeding tubes, including stomach tubes, nasogastric tubes, which are placed down the nose, or intravenous feedings, except to increase my comfort or reduce my pain.

Agree (Disagree)    Do not perform any surgical procedures, except to increase my comfort or reduce my pain. Do not use antibiotics, except to increase my comfort or reduce my pain.

Agree (Disagree)    Do not do any testing which may cause me any distress, except to increase my comfort or reduce my pain.

Agree (Disagree)    Do not do any radiation or chemotherapy, except to increase my comfort or reduce my pain.

Agree (Disagree)    Do not use any resuscitation or advanced life support. This includes machines to help breathing or medications to maintain the heart and blood pressure.

Agree (Disagree)    Do not do kidney dialysis, either peritoneal or hemodialysis.

Agree (Disagree)    Err on the side of over-medication rather than under-medication for pain, even if taking such may result in my death. For me, the goal of pain management is total relief of pain regardless of the risks.

(Agree) Disagree    Be an active advocate as my Power of Attorney for Health Care. Do not simply give in to decisions that physicians make. Ask questions and understand proposals, challenge assumptions and be prepared to say no to care which I would not want and to demand care that I would want.

Agree (Disagree)    Remember that I want to be an organ and tissue donor. If the requirements for organ donation conflict with my wishes above, I direct that such actions be taken so as to preserve organ function and permit organ donation to occur.

Describe the level of disability you are willing to accept    _N. A_

Other thoughts    _N. A._

| | |
|---|---|
| Signature of Principal _Ella Rubina Leard_ | Date _2/14/18_ |
| Signature of Witness Number 1 | Date _2/14/18_ |
| Signature of Witness Number 2 | Date _2/14/18_ |

As used in this Addendum, I intend that the following terms have the following meanings:

Page **7** of **8**

Terminal Condition: This is an incurable condition, caused by injury or illness, that will cause death in the near future, so that life sustaining procedures only prolong the dying process.

Persistent Vegetative State: This is an incurable condition in which one loses the ability to think, speak and move purposefully but the heartbeat and breathing continue. Periods of sleep and wakefulness occur.

Advanced Dementia/Senility: This is severe incurable, progressive brain damage caused by strokes, injury, infection or Alzheimer's Disease, that leads to the loss of the ability to communicate with people, to recognize family and friends, and to provide for one's needs.

POWER OF ATTORNEY FOR HEALTH CARE

Page 8 of 8



*YORK COUNTY RECORDER OF DEEDS*
*28 EAST MARKET STREET*
*YORK, PA 17401*

*Laura Shue - Recorder*
*Bradley G. Daugherty - Deputy*

**Instrument Number - 2018008962**
**Recorded On 3/2/2018 At 3:07:39 PM**
* **Instrument Type - POWER OF ATTORNEY**
**Invoice Number - 1269578**
* **Grantor - CARD, ELLA RUBINA**
* **Grantee - SWENSON, KENNETH L**
**User - BLR**
* **Customer - ELLA RUBINA CARD**

Book - 2460   Starting Page - 8604
* Total Pages - 9

* Received By:  COUNTER

* **FEES**

| | |
|---|---|
| STATE WRIT TAX | $0.50 |
| RECORDING FEES | $21.00 |
| COUNTY ARCHIVES FEE | $2.00 |
| ROD ARCHIVES FEE | $3.00 |
| TOTAL PAID | $26.50 |

I Certify This Document To Be
Recorded In York County, Pa.



*Recorder of Deeds*

*THIS IS A CERTIFICATION PAGE*
### PLEASE DO NOT DETACH
*THIS PAGE IS NOW PART OF THIS LEGAL DOCUMENT*

* - Information denoted by an asterisk may change during the verification process and may not be reflected on this page.

Book: **2460** Page: **8612**

# EXHIBIT 28

KENT SHINBACH, M. D.
14 EAST 75TH STREET
NEW YORK, NEW YORK 10021
—
TELEPHONE (212) 744-7100

February 14, 2018

Certificate of Mental Capacity

Please be advised that I am a Board-Certified Psychiatrist and licensed to practice Medicine

in the State of New York (License No. 095856).

On February 5, 2018, Ella Card was brought to my office by her daughter to undergo an

evaluation of her mental status with regard to mental capacity to manage her affairs.

Ms. Card is a 79-year-old woman, born on July 6, 1938. Ms. Card had no hesitation in

explaining to me that a Guardianship for the management of her financial affairs had been granted

over her objection. She proceeded to specify her assets including properties in Brooklyn and in

Belize. As well, she enumerated her income sources and their approximate amounts. Ms. Card

went on to designate individuals whom she would choose to manage and inherit her estate if she

Ella Card's Certificate of Mental Capacity     1

were incapacitated or deceased. She, furthermore, indicated to me that she was under no duress in

making these decisions.

On Mental Status Evaluation, Ms. Card was an alert, well-oriented woman appearing to be

her stated age. She displayed intact memory, both recent and remote with no suggestion of

confusion at any point in this interview. Her judgment was within normal limits. Essentially, I find

her mental status, as well, to be within normal limits in all parameters for her age.

In conclusion, Ms. Card demonstrated fully intact mental capacity for the purpose of

directing the maintenance and ultimate disposition of her estate in her own best interests.


Kent D. Shinbach, MD

Psychiatrist

Ella Card's Certificate of Mental Capacity    2

# ALL OTHER EVALUATIONS THROUGHOUT THE YEARS DEEMING ELLA CARD COMPETENT BY <u>MEDICAL DOCTORS</u>

October 29, 2011

The Honorable Judge Barros
Probate Court
Brooklyn, NY

RE:        Case # 100016/11
Patient:    Ella Card
DOB:        7/6/1938

Dear Honorable Judge Barros,

Pursuant to this matter before the court on suggestion of capacity for Ms. Ella Card, I performed a psychiatric evaluation of Ella Card on 10/29/2011 for 90 minutes, as requested by the family. No medical records were reviewed prior to the time of evaluation. Ella Card is a 73 year old right handed black female who presents for evaluation for restoration of capacity. Ms. Card states she was forced into a guardianship because her sons were upset with her, that she would not give them money. Ms. Card states they were both corrections officers, that both lost their jobs due to drug abuse. Ms. Card further states that the court just wants to take her and her husbands' hard earned money, that I am absolutely aware of what is happening and have testified in Washington about what this court is doing to me and my family. Ms. Card stated that she lives with her granddaughter Faith Card in Brooklyn, NY and is very happy living with her. Ms. Card states that she has a great relationship with her daughter Cindy and her other daughter LaDonna that is a Physician's Assistant and that there was never a need for a guardian, other than to steal her money.

**Past Psychiatric History**
Denied as per patient

**Past Medical History**
History of Diabetes x 10 years, on insulin for the past 2 years

**Past Surgical History**
1999 triple heart by-pass surgery

**Medications**
Insulin x 3 years, Nitroglycerin Patch x 12 hrs per day, Glyburide 5mg BID, Metropolol 25mg QD, Enalpril 2.5 mg QD, Lantis 25 units daily.

**Family History**
Mother and three sisters have diabetes, one brother deceased, alcoholic liver disease, one brother deceased heart attack

**Religion**
Pentecostal

**Developmental History**

The patient was born in Belize, She is the oldest of the three sisters but younger than her two brothers, she started working at age 16 in the clerical field. She started college immediately, came to the United States in 1966 where she got her Masters Degree in Education and started teaching for the Brooklyn School District and taught for about 39 years.

**Social History**

Patient emphatically denied any tobacco, alcohol or drug use. She has stated she has been a widow for about 10 years, as per patient. She also related that from this marriage she had four children 2 boys and 2 girls.

**Mental Status Examination**

Ms. Card is a 73 year old right handed black female who was pleasant and cooperative with the interviewer. She was well dressed, neatly groomed and did not appear to be in any distress. She was alert and oriented to person, place, month and year. She maintained good eye contact throughout the interview. Her speech was spontaneous. Her mood was "OK, I am not depressed" and her affect was congruent. Her thought processes were plenty. Thought content was negative for delusional material or psychosis. She denied suicidal or homicidal ideas, intent or plan. Memory- 3/3 immediate and 3/3 recent. Ms. Card was able to do serial 7's and was able to do serial 3's as well. She was able to name a pen, a watch and the wristband. When asked the difference between a bird and a plane, she said, "The difference is the heights of flight vary greatly between the two. The bird is free flowing but the airplane has a motor and must be guided." When asked the similarities she said "They both have wings; they both fly and land." When asked what is meant by the following proverb, "People who live in glass houses should not throw stones," she said, "You should not try to hurt someone, because in turn you could be hurting yourself." When asked if she has ever heard the saying, "You can lead a horse to water but you can't make him drink," she responded, "You could lead someone to someplace, but you cannot force them to indulge or participate in what you bring to their attention." Her insight and judgment are excellent.

**Diagnosis**

Although no records were available, however, after the evaluation I had the pleasure to speak with Ms. Card's daughter, Ladonna Card, who is a Physician's Assistant and verified all medications and history was correct. My evaluation of Ms. Card reveals intact short and long term memory with no deficits. The patient's language was totally fluent, the patient did not have difficulty naming objects, and in my evaluation there were no disturbances in executive functioning, for example planning, organizing, sequencing and abstracting. The patient had no problems with serial 7's and serial 3's. The patient had no problems with organizing and planning, gave a good history of her present illness, medicines and past surgery. Diagnosis, normal 73 year old with no cognitive deficits.

**Assessment**

In my view, Ella Card is able to make informed decisions regarding her:

1. Right to marry
2. Right to vote

3. Right to personally apply for government benefits
4. Right to seek or retain employment
5. Right to contract
6. Right to sue and assist in the defense of suits of any nature against her
7. Right to make decisions affecting her social environment or social aspects of her life
8. Right to determine her residence
9. Right to consent to medical treatment
10. Right to travel
11. Right to manage or dispose of property or make a gift or disposition of property
12. Patient does not drive

This patient seems to be well cared for and states, "She is happy that her granddaughter Faith is living with her." Ms. Card's two daughters, Cindy and Ladonna are very close with their mother and have a very strong relationship. Ms. Card has been a Brooklyn School Teacher for 39 years and has built a large estate with smart investments. Therefore, it is my opinion that Ella Card is absolutely competent in making her own decisions and is not in need of a guardian.

Sincerely,

Robert Sarhan, MD

cc:
Richard S. Weisman  Esq.
Weisman & Calderon LLC
6 Gramatan Avenue
Suite 206
Mount Vernon, NY  10550

May 12, 2012

The Honorable Judge Barros
Probate Court
Brooklyn, NY

RE:        Case # 100016/11
Patient:   Ella Card
DOB:       7/6/1938

Dear Honorable Judge Barros,

The family asked me to reevaluate Ms. Ella Card for a more recent mental evaluation. I will incorporate part of my history from the last report completed on 10/29/2011, and complete a physical and mental evaluation today, since the history of this case has not changed. Pursuant to this matter before the court on suggestion of capacity for Ms. Ella Card, I performed another 90 minute evaluation today May 12, 2012 at 2:00 P.M.

Ella Card is a 73 year old right handed black female who was well dressed, well groomed and with a sense of humor. Ella Card was frustrated about what is going on, however, this would be a normal response to a person such as Ella Card who worked hard her entire life, invested her money wisely and who again was fully competent today May 12, 2012. Ella Card keeps in touch with her daughters daily and is well aware what is going in her court case.

In the previous history, Ms. Card stated she was forced into a guardianship because her sons were upset with her, that she would not give them money. Ms. Card stated they were both corrections officers, that both lost their jobs due to drug abuse. Ms. Card further stated that the court just wants to take her and her husbands' hard earned money that I am absolutely aware of what is happening and have testified in Washington about what this court is doing to me and my family. In this evaluation, Ms. Card additionally states that she now lives in Belize and was forced to leave the United States because of this "…illegal and unlawful guardianship." Ms. Card states that "all of my constitutional, civil and human rights have been violated" and she refuses to ever again live in a country that will allow such egregious behavior to take place. Ms Card states that she has "…met hundreds of people and read thousands of stories about others who have gone through the same thing." Ms Card states that "slavery" and the "holocaust" is alive and well in America. Ms Card says she came here to "…fulfill the American Dream that has now become a nightmare." Ms. Card states that "Never again will I ever live in America." Ms. Card says that she "…wants the estate planning that she effectuated to remain in place and her assets turned over to her daughter, Cindy Card." Ms. Card states that she "…made these plans understanding the ramifications of her actions and in no way shape or form was manipulated, intimidated or coerced by her daughter Cindy Card or anyone else." Ms. Card states that she has articulated this in Washington to Congressman Ted Poe, Senator Amy Klobuchar's officials, the *Washington Examiner*, the Gloria Minott radio show, Justice Barros in the Brooklyn Supreme Court, LaDonna and Faith Card and to other family and friends.   She also relayed this to Kristine Mooney and Lisa Freedman, on February 26, 2011 when they came to her home at 161 Saratoga Avenue during a home visit. Ms. Card states that it is "…my property and assets and I can give them to anyone I choose to." Ms. Card states that she has a great relationship with her daughter Cindy and her other daughter LaDonna that is a Physician's Assistant and that there was never a need for a guardian, other than to steal her money.

**Past Psychiatric History**
Denied

**Past Medical History**
History of Diabetes x 10 years, on insulin for the past 2 years

**Past Surgical History**
1999 triple heart by-pass surgery

**Medications**
Insulin x 3 years, Nitroglycerin Patch x 12 hrs per day, Glyburide 5mg BID, Metropolol 25mg QD, Enalpril 2.5 mg QD, Lantis 25 units daily.

**Family History**
Mother and three sisters have diabetes, one brother deceased, alcoholic liver disease, one brother deceased heart attack

**Religion**
Pentecostal

**Developmental History**
The patient was born in Belize, She is the oldest of the three sisters but younger than her two brothers, she started working at age 16 in the clerical field. She started college immediately, came to the United States in 1966 where she got her Masters Degree in Education and started teaching for the Brooklyn School District and taught for about 39 years.

**Social History**
Patient denied any tobacco, alcohol or drug use. She has stated she has been a widow for about 10 years, as per patient. From her only marriage she had four children 2 boys and 2 girls.

**Mental Status Examination**
Ms. Card is a 73 year old right handed black female who was pleasant and cooperative. She was well dressed, neatly groomed and did not appear to be in any distress. She was alert and oriented to person, place, month and year. She maintained good eye contact and her speech was spontaneous. Her mood was good, she stated, "I am not depressed" and her affect was congruent. Her thought processes were plenty. Thought content was negative for delusional material or psychosis. She denied suicidal or homicidal ideas, intent or plan. Memory- 3/3 immediate and 3/3 recent. Ms. Card was able to do serial 7's and was able to do serial 3's. She was able to name a watch, pen and cell phone. When asked, what were the similarities and differences between a bird and a plane, Ms. Card stated, "a bird is an animal and a plane is a man made mechanical machine. However, she said, "their similarities are they both have wings and can fly." When asked what is meant by the proverb, people who lives in glass houses should not throw stones. Ella stated, "You should not try to hurt someone, because in turn you could be hurting yourself." When asked if she has ever heard the saying, "You can lead a horse to water but you can't make him drink," she responded, "You could lead someone to someplace, but you cannot force them to indulge or participate in what you bring to their attention." Her insight and judgment are excellent.

**Diagnosis: Normal 73 year old woman with no cognitive deficits.**

Again, although no records were available, after the evaluation, I spoke to Ladonna Card, who is a Physician's Assistant and verified all medications were the same. My evaluation of Ms. Card reveals intact short and long term memory with no deficits. The patient's language was totally fluent, the patient did not have difficulty naming objects, and in my evaluation there were no disturbances in executive functioning, for example planning, organizing, sequencing and abstracting. The patient had no problems with serial 7's and serial 3's. The patient had no problems with organizing and planning, gave a good history of her present illness, medicines and past surgery. Diagnosis, normal 73 year old with no cognitive deficits.

**Assessment**

In my view, Ms. Card is able to make informed decisions regarding her:

1. Right to marry
2. Right to vote
3. Right to personally apply for government benefits
4. Right to seek or retain employment
5. Right to contract
6. Right to sue and assist in the defense of suits of any nature against her
7. Right to make decisions affecting her social environment or social aspects of her life
8. Right to determine her residence
9. Right to consent to medical treatment
10. Right to travel
11. Right to manage or dispose of property or make a gift or disposition of property
12. Patient does not drive

This patient seems to be well cared for and states, "She was very happy living with her granddaughter Faith, till all these legal issues started." Cindy and Ladonna are very close with their mother and have a very strong relationship. Ms. Card has been a Brooklyn School Teacher for 39 years and has built a large estate with smart investments. Therefore, it is my opinion that Ella Card is absolutely competent in making her own decisions and is not in need of a guardian for her person or property.

Sincerely,

Robert Sarhan, MD

# Dr. Pedro Arriaga

# 2604 Mercy Lane
Tel: 22-3968/6254971
Belize City

March 5, 2013

### TO WHOM IT MAY CONCERN
### Re: Ella Rubina Card
### Age: 74 years

This is to certify that the above mentioned person was medically evaluated today. This patient was found to be alert and oriented. Ms. Card displays a clear capacity and ability to make decisions on her own behalf.

Any consideration given to this patient in this regard will be greatly appreciated.

Sincerely,

Dr. Pedro Arriaga
Internal Medicine

Dr. Pedro Arriaga
2604 Mercy Lane
Belize City, Belize C.A.
Tel: 223-3968 / Cell: 625-4971

EXHIBIT L

# Certificate of Capacity

For the benefit of: Ella Card

Prepared by Dr. Kent Shinbach

<u>Medical Certificate of Capacity</u>

By my signature below, I attest that I have this day evaluated Ella Card, who was born on 07/06/1938  and, in my professional opinion, find her to be fully mentally capacitated at this time by virtue of:

- The current medical condition of the patient who is in a normal state of health for a person of her age.  The patient has no significant physical, emotional or mental health conditions that impair or diminish her capacity.

- The patient is observed to demonstrate normal and full, age appropriate cognitive ability, perception, attention, long and short term memory, motor skills, language skills, visual/spatial processing, motor and executive functioning.

- The functional state of the patient is unimpaired, unrestricted and appropriate for her current living arrangements in general society. Appropriate resources for support are available if needed.

- The patient is able to assess and evaluate any potential risks to her physical, emotional and financial well being. She has the ability to make rational decisions and to resist undue influence by others.

- The patient's values, the ethical moral and traditional aspects of the patient's daily life and preferences for her own way of life are well defined and not currently threatened, impaired or diminished.

- The patient requires no rehabilitation or other interventions at this time.

Signed this 5<u>Th</u> day of _August_, 2015

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 253 of 320

# EXHIBIT 29

**P586** — Assignment of lease by tenant, with assumption, plain english format: 11-98

Blumberg Excelsior, Inc., Publisher, NYC 1001.
www.blumberg.com

## ASSIGNMENT AND ASSUMPTION OF LEASE

The parties agree as follows:

**Date:** March 23rd, 2012
**Parties:** Assignor: Delta Deli NY Corp
Address: 161 Saratoga Ave, Brooklyn NY 11233

Assignee: Saratoga Deli & Grocery Corp
Address: 161 Saratoga Avenue, Brooklyn NY 11233

If there are more than one Assignor or Assignee, the words "Assignor" and "Assignee" shall include them.

**Lease assigned:** The Lease which is assigned herein is indentified as follows:
Landlord : Kermit Card
Tenant  : Delta Deli NY Corp
Date  : May 4th, 2010    Premises: 161 Saratoga Ave, Brooklyn NY 11233

*(This Lease was recorded on _____ in the office of the _____ of the County of _____ in liber _____ of conveyances at page _____ .)*

**ideration:** Assignor has received   Ten and 00/100---------------------
($ 10.00  ) dollars
and other good and valuable consideration for this Assignment.

**signment:** Assignor assigns to the Assignee all the Assignor's right, title and interest in  a) the Lease and  b) the security deposit, if any, stated in the Lease.

**sumption:** Assignee agrees to pay the rent promptly and perform all of the terms of the Lease as of the date of this Assignment. Assignee assumes full responsibility for the Lease as if Assignee signed the Lease originally as Tenant.

**ndemnity:** Assignee agrees to indemnify and hold Assignor harmless from any legal actions, damages and expenses, including legal fees that the Assignor may incur arising out of the Lease.

**Benefit to landlord:** Assignee agrees that the obligations assumed shall benefit the landlord named in the Lease as well as the Assignor.

**Assignor's tatements:** Assignor states that Assignor has the right to assign this Lease and that the premises are free and clear of any judgments, executions, liens, taxes and assessments.

**Assignee's statement:** Assignee states that Assignee has read the Lease and has received the original or an exact copy of the Lease.

**ccessors.** This assignment is binding on all parties who lawfully succeed to the rights or take the place of the Assignor or Assignee.

*This Lease* Made the  4Th  day of  May ,2010 between Kermit Card  of 155

Saratoga Avenue Brooklyn NY 11233  herein referred to as LANDLORD , and  DELTA DELI NY CORPORATION  a domestic corporation having its principal place of business at 161 Saratoga Avenue, Brooklyn NY 11233  herein jointly ,severally and collectively referred as TENANT

*Witnesseth:* The Landlord hereby leases to the Tenant the following premises: the store known as 161 Saratoga Avenue Brooklyn NY 11233  togeather with one half of the cellar underneath

for the term of  TEN (10) YEARS

to commence from the        1st  day of  June,    2010      and to end on the 31St day of May  2020 to be used and occupied only for a grocery store .The store shall not advertize itself other than a grocery  store nor promote the sale of other than groceries

upon the conditions and covenants

following

1st That the Tenant shall pay the annual rent of

SEE RIDER ATTACHED HERETO FOR RENTAL PROVISIONS

said rent to be paid in equal monthly payment in advance on the  1st   day of each and every month during the term aforesaid, as follows:

SEE RIDER ATTACHED HERETO FOR RENTAL PROVISIONS

2nd. That the Tenant shall take good care of the premises and shall ,at the Tenant's own cost and expense make all repairs

to inside of premises

and at the end or other expiration of the term, shall deliver up the demised premises in good order or condition, damages by the elements excepted.

3rd. That the Tenant shall promptly execute and comply with all statutes, ordinances, rules, orders, regulations and requirements of the Federal, State and Local Governments and of any and all their Departments and Bureaus applicable to said premises, for the correction, prevention, and abatement of nuisances or other grievances, in, upon, or connected with said premises during said term; and shall also promptly comply with and execute all rules, orders and regulations of the New York Board of Fire Underwriters, or any other similar body, at the Tenant's own cost and expense,

4th. That the Tenant, successors, heirs, executors or administrators shall not assign this agreement, or underlet or underlease the premises, or any part thereof, or make any alterations on the premises, without the Landlord's consent in writing; or occupy, or permit or suffer the same to be occupied for any business or purpose deemed disreputable or extra-hazardous on account of fire, under the penalty of damages and forfeiture, and in the event of a breach thereof, the term herein shall immediately cease and determine at the option of the Landlord as if it were the expiration of the original term.

5th. Tenant must give Landlord prompt notice of fire, accident, damage or dangerous or

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 255 of 320

rent with no adjustment. The cost of the repairs will be added rent.

Landlord has the right to demolish or rebuild the Building if there is substantial damage by fire or other casualty. Landlord may cancel this Lease within 30 days after the substantial fire or casualty by giving Tenant notice of Landlord's intention to demolish or rebuild. The Lease will end 30 days after Landlord's cancellation notice to Tenant. Tenant must deliver the Premises to Landlord on or before the cancellation date in the notice and pay all rent due to the date of the fire or casualty. If the Lease is cancelled Landlord is not required to repair the Premises or Building. The cancellation does not release Tenant of liability in connection with the fire or casualty. This Section is intended to replace the terms of New York Real Property Law Section 227.

6th. The said Tenant agrees that the said Landlord and the Landlord's agents and other representatives shall have the right to enter into and upon said premises, or any part thereof, at all reasonable hours for the purpose of examining the same, or making such repairs or alterations therein as may be necessary for the safety and preservation thereof.

7th. The Tenant also agrees to permit the Landlord or the Landlord's agents to show the premises to persons wishing to hire' or purchase the same; and the Tenant further agrees that on and after the sixth month, next preceding the expiration of the term hereby granted, the Landlord or the Landlord's agents shall have the right to place notices on the front of said premises, or any part thereof, offering the premises "To Let" or "For Sale", and the Tenant hereby agrees to permit the same to remain thereon without hindrance or molestation.

8th. That if the said premises, or any part thereof shall be deserted or become vacant during said term, or if any default be made in the payment of the said rent or any part thereof, or if any default be made in the performance of any of the covenants herein contained, the Landlord or representatives may re-enter the said premises by force, summary proceedings or otherwise, and remove all persons therefrom, without being liable to prosecution therefor, and the Tenant hereby expressly waives the service of any notice in writing of intention to re-enter, and the Tenant shall pay at the same time as the rent becomes payable under the terms hereof a sum equivalent to the rent reserved herein, and the Landlord may rent the premises on behalf of the Tenant, reserving the right to rent the premises for *a* longer period of time than fixed in the original lease without releasing the original Tenant from any liability, applying any moneys collected, first to the expense of resuming or obtaining possession, second to restoring the premises to a rentable condition, and then to the payment of the rent and all other charges due and to grow due to the Landlord, any surplus to be paid to the Tenant, who shall remain liable for any deficiency.

9th. Landlord may replace, at the expense of Tenant, any and all broken glass in and about the demised premises. Landlord may insure, and keep insured, all plate glass in the demised premises for and in the name of Landlord. Bills, for the premiums therefor shall be rendered by Landlord to Tenant at such times as Landlord may elect, and shall be due from, and payable by Tenant when rendered, and the amount thereof shall be deemed to be, and be paid as, additional rental. Damage and injury to the said premises, caused by the carelessness, negligence or improper conduct on the part of the said Tenant or the Tenant's agents or employees shall be repaired as speedily as possible by the Tenant at the Tenant's own cost and expense.

10th. That the Tenant shall neither encumber nor obstruct the sidewalk in front of, entrance to, or halls and stairs of said premises, nor allow the same to be obstructed or encumbered in any manner.

11th. The Tenant shall neither place or cause or allow to be placed ,any sign or signs whatsoever at ,in or about to the entrance to said premises or any other part of same ,except in or at such place or places as may be indicated by the Landlord and consented by the Landlord in writing.'"

12th. That the Landlord is exempt from any and all liability for any damage or injury to

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 256 of 320

and be superior and prior in lien of this lease, irrespective of the date of recording and the Tenant agrees to execute without cost, any such instrument which may be deemed necessary or desirable to further effect the subordination of this lease to any such mortgage or mortgages, and a refusal to execute such instrument shall entitle the Landlord, or the Landlord's assigns and legal representatives to the option of cancelling this lease without incurring any expense or damage and the term hereby granted is expressly limited accordingly.

**15**th. The Tenant has this day deposited with the Landlord the sum of **$ 2000.00** as security for the full faithful performance by the Tenant of all the terms, covenants and conditions of this lease 'upon the Tenant's part to be performed, which said sum shall be returned to the Tenant after the time fixed as the expiration of the term herein, provided the Tenant has fully and faithfully carried out all of said terms, covenants and conditions on Tenant's part to be performed. In the event of a bona fide sale, subject to this lease, the Landlord shall have the right to transfer the security to the vendee for the benefit of the Tenant and the Landlord shall be considered released by the Tenant from all liability for the return of such security; and the Tenant agrees to look to the new Landlord solely for the return of the said security, and it is agreed that this shall apply to every transfer or assignment made of the security to a new Landlord.

**16**th. That the security deposited under this lease shall not be mortgaged, assigned or encumbered by the Tenant without the written consent of the Landlord.

**17**th. It is expressly understood and agreed that in case the demised premises shall be deserted or vacated, or if default be made in the payment of the rent or any part thereof as herein specified, or if, without the consent of the Landlord, the Tenant shall sell, assign, or mortgage this lease or if default be made in the performance of any of the covenants and agreements in this lease contained on the part of the Tenant to be kept and performed, or if the Tenant shall fail to comply with any of the statutes, ordinances, rules, orders, regulations and requirements of the Federal, State and Local Governments or of any and all their Departments and Bureaus, applicable to said premises, or if the Tenant shall file or there be filed against Tenant a petition in bankruptcy or arrangement, or Tenant be adjudicated a bankrupt or make an assignment for the benefit of creditors or take advantage of any insolvency act, the Landlord may, if the Landlord so elects, at any time thereafter terminate this lease and the term hereof, on giving^ to the Tenant five days' notice in writing of the Landlord's intention so to do, and this lease and the term hereof shall expire and come to an end on the date fixed in such notice as if the said date were the date originally fixed in this lease for the expiration hereof. Such notice may be given by mail to the Tenant addressed to the demised premises.

**18**th. Tenant shall pay to Landlord the rent or charge, which may, during the demised terra, be assessed or imposed for the water used or consumed in or on the said premises, whether determined by meter or otherwise, as soon as and when the same may be assessed or imposed, and will also pay the expenses for the setting of a water meter in the said premises should the latter be required. Tenant shall pay Tenant's proportionate part of the sewer rent or charge imposed upon the building. All such rents or charges or expenses shall be paid as additional rent and shall be added to the next month's rent thereafter to become due.

**19**th. That the Tenant will not nor will the Tenant permit undertenants or other persons to do anything in said premises, or bring anything into said premises, or permit anything to be brought into said premises or to be kept therein, which will in any way increase the rate of fire insurance on said demised premises, nor use the demised premises or any part thereof, nor suffer or permit their use for any business or purpose which would cause an increase in the rate of fire insurance on said building, and the Tenant agrees to pay on demand any such increase.

**20**th. The failure of the Landlord to insist upon a strict performance of any of the terms, conditions and covenants herein, shall not be deemed a waiver of any rights or

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 257 of 320

22nd . If after default in payment of rent or violation of any other provision of this lease, or upon the expiration of this lease, the Tenant moves out or is dispossessed and fails to remove any trade fixtures or other property prior to such said default, removal, expiration of lease, or prior to the issuance of the Gnat order or execution of the warrant, then and in that event, the said fixtures and property shall be deemed abandoned by the said Tenant and shall become the property of the Landlord.

23rd . In the event that the relation of the Landlord and Tenant may cease or terminate by reason of the re-entry of the Landlord under the terms and covenants contained in this lease or by the ejectment of the Tenant by summary proceedings or otherwise, or after the abandonment of the premises by the Tenant, it is hereby agreed that the Tenant shall remain liable and shall pay in monthly payments the rent which accrues subsequent to the re-entry by the Landlord, and the Tenant expressly agrees to pay as damages for the breach of the covenants herein contained, the difference between the rent reserved and the rent collected and received, if any, by the Landlord during the remainder of the unexpired term, such difference or deficiency between the rent herein reserved and the rent collected if any, shall become due and payable in monthly payments during the remainder of the unexpired term, as the amounts of such difference or deficiency shall from time to time be ascertained; and it is mutually agreed between Landlord and Tenant that the respective parties hereto shall and hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties against the other on any matters whatsoever arising out of or in any way connected with this lease, the Tenant's use or occupancy of said premises, and/or any claim of injury or damage.

24th .   The Tenant waives all rights to redeem under any law of the State of New York.

25th . This lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in nowise be affected, impaired or excused because Landlord is unable to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repairs, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of governmental preemption in connection with a National Emergency or in connection with any rule, order or regulation of any department or subdivision thereof of any governmental agency or by reason of the condition of supply and demand which have been or are affected by war or other emergency.

26th . No diminution or abatement of rent, or other compensation, shall be claimed or allowed for inconvenience or discomfort arising from the making of repairs or improvements to the building or to its appliances, nor for any space taken to comply with any law, ordinance or order of a governmental authority. In respect to the various "services," if any, herein expressly or impliedly agreed to be furnished by the Landlord to the Tenant, it is agreed that there shall be no diminution or abatement of the rent, or any other compensation, for interruption or curtailment of such "service" when such interruption or curtailment shall be due to accident, alterations or repairs desirable or necessary to be made or to inability or difficulty in securing supplies or labor for the maintenance of such "service" or to some other cause, not gross negligence on the part of the Landlord. No such interruption or curtailment of any such "service" shall be deemed a constructive eviction. The Landlord shall not be required to furnish, and the Tenant shall not be entitled to receive, any of such "services" during any period wherein the Tenant shall be in default in respect to the payment of rent. Neither shall there be any abatement or diminution of rent because of making of repairs, improvements or decorations to the demised premises after the date above fixed for the commencement of the term, it being understood that rent shall, in any event, commence to run at such date so above fixed.

27th . Landlord shall not be liable for failure to give possession of the premises upon commencement date by reason of the fact that premises are not ready for occupancy or because a prior Tenant or any other person is wrongfully holding over or is in wrongful possession, or for any other reason. The rent shall not commence until possession is given or is available, but the term herein shall not be extended.

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 258 of 320

*Rider*

1ˢᵗ.   Rental Provisions

That the Tenant shall pay the annual rent of

$ 24,000.00  commencing June 1, 2010 and terminating May 31,2011
$ 24,000.00  commencing June 1,2011 and terminating May 31,2012
$ 25,200.00  commencing June 1,2012  and terminating May 31,2013
$ 26,460.00  commencing June 1,2013  and terminating May 31,2014
$ 27,783.00  commencing June 1,2014  and terminating May 31,2015
$ 29,172.00  commencing June 1,2015  and terminating May 31,2016
$ 30,630.60  commencing June 1,2016  and terminating May 31,2017
$ 32,161.80  commencing June 1,2017  and terminating May 31,2018
$ 33,768.00  commencing June 1,2018  and terminating May 31,2019
$ 35,448.00  commencing June 1,2019  and terminating May 31,2020
$ 37,224.00  commencing June 1,2020 and terminating May 31,2021

said rent to be paid in equal monthly payments in advance on the first day of each and every month during the term aforesaid, as follows:

$ 2,000.00  commencing June 1, 2010 and terminating May 31,2011
$ 2,000.00  commencing June 1,2011 and terminating May 31,2012
$ 2,100.00  commencing June 1,2012  and terminating May 31,2013
$ 2,205.00  commencing June 1,2013  and terminating May 31,2014
$ 2,315.25  commencing June 1,2014  and terminating May 31,2015
$ 2,431.00  commencing June 1,2015 and terminating May 31,2016
$ 2,552.55  commencing June 1,2016 and terminating May 31,2017
$ 2,680.15  commencing  June 1,2017 and terminating May 31,2018
$ 2,814.00  commencing  June 1,2018 and terminating May 31,2019
$ 2,954.00  commencing June 1,2019  and terminating May 31,2020
$ 3,102.00  commencing  June 1,2020 and terminating  May 31,2021

For the first two years of the rental agreement the base rent will remain at $ 2000.00 monthly. Commencing on June 1,2012 the rent will  increase at the rate of 5% per annum as outlined in the above particulars.

28ᵗʰ. Tenant agrees to exonerate, save harmless, protect, defend and indemnify the Landlord or any owner of the demised premises from and against any and all losses, damages, claims, suits or actions, judgments and costs, which may arise or grow out of any injury to or death of persons or damage to property in any manner whatsoever arising out of the acts or omissions of, or use by Tenant, Tenant's agents, servants, employees, guests or customers of the demised premises.

29ᵗʰ. Tenant agrees to procure and keep in force during the term of this Lease for Tenant's own benefit and for the benefit of Landlord, a comprehensive general public liability insurance policy in standard form protecting Tenant and Landlord against any liability whatsoever occasioned by accident or disaster on or about the demised premises or any appurtenances thereto. Such comprehensive general public liability insurance policy shall be written by a good and solvent company, licensed by the Superintendent of Insurance of the State of New York, with limits of liability of not less than $1,000,000.00 bodily injury for one (1) person in one (1) accident, occurrence and/or $1,000,000.00 bodily injury for two (2) or more persons in one (1) accident or occurrence, and property damage insurance in the amount of $400,000.00. The Landlord and Tenant shall be named as insured in such policy. Should additional liability insurance be obtained by

next rent day after such payment.

Tenant shall observe and comply with the requirements of all policies of general public liability insurance and shall not violate or permit to be violated any of the conditions of the said general public liability insurance policy.

30th. Tenant agrees to procure and keep in force during the term of this Lease an insurance policy in standard form covering all the plate glass in and about the demised premises. Such plate glass insurance policy shall be written by a good and solvent company, licensed by the Superintendent of Insurance of the State of New York. The Landlord and Tenant shall be named as insured in such policy. A copy of said plate glass insurance policy shall be delivered to Landlord by Tenant prior to the commencement date of this Lease and thereafter at least fifteen (15) days prior to the expiration of any such insurance policy.

All premiums on such policies shall be paid by the Tenant when due. In the event, however, that the Tenant should fail to pay any such premium when due and exhibit proof of such payment to the Landlord within ten (10) days after the due date, if requested to do so by the Landlord, the Landlord may pay the amount of such premium and the amount so advanced by the Landlord with interest thereon at the then legal rate from the date of payment shall be considered additional rent, and shall be due and payable with said interest with the next installment of rent becoming due on the next rent day after such payment.

Tenant shall observe and comply with the requirements of all policies of plate glass insurance and shall not violate or permit to be violated any of the conditions of the said plate glass insurance policy.

31st.   All policies of insurance provided for in this Lease shall contain, if available, a provision. that the insurance company at least ten (10) days prior to cancellation and/or renewals must notify the Landlord accordingly.

32nd. Tenant shall throughout the term of this Lease pay all and any utility charges for utilities used at the demise premises, including, but not limited to, electricity, telephone, gas, fuel, etc. It is the understanding and intention of the parties hereto that Landlord leases the demised premises to Tenant without any services of any kind.

33rd. Tenant shall, at Tenant's own cost and expense and upon Tenant's own responsibility, apply for and obtain any necessary permits and other licenses for the use, conduct and maintenance of the business to be conducted in the demised premises. The Tenant shall also pay all fees in connection with any licenses or permits required by the local municipal authority for any equipment or machinery at the demised premises whether owned by the Landlord or the Tenant.

34th. Tenant shall, at all times during the term of this Lease, at Tenant's sole cost and expense, promptly comply with all present and future laws, orders and regulations issued or promulgated by the Environmental Protection Administration and of any other governmental or quasi governmental agency, whether of federal, state, city, county, town, village or other municipal level, regulating or otherwise asserting jurisdiction over air or other ecological environmental pollutants.

35th. Any notice by either party to the other shall be in writing and shall be deemed to be duly given only if mailed by certified mail in a postpaid envelope, return receipt requested, addressed; (a) If to Tenant, at the demised premises; (b) If to Landlord, at the address set forth hereinabove, or at any such other address as Landlord may from time to time designate by notice given to Tenant.

36th. The Tenant shall pay an annual common area maintenance charge of $0.00 per annum.

37th. Neither Landlord nor Landlord's agents have made any representations or promises with respect to the physical condition of the building, the land upon which it is erected or the demised premises, the rents, leases, expenses of operation or any other matter or nothing affecting or

**38th.** In the event that the New York Board of Fire Underwriters or the Insurance Services Office of New York or any bureau, department or official of the federal, state, city, county, town or village government requires or recommends the installation of a Sprinkler System either in the cellar and/or grade floor of the building known as 161 Saratoga Avenue Brooklyn NY 11233  the Tenant herein expressly agrees to pay all cost associated with such installation and hookup . Such charge is hereby fixed at (100%) percent.

In the event that the Landlord decides to install a Sprinkler System either in the cellar and/or grade floor of the building known as 161 Saratoga Avenue Brooklyn NY 11233  the Tenant herein expressly agrees to pay fifty percent of cost associated with such installation and hookup . Such charge is hereby fixed at (50%) percent.

Anything elsewhere in this Lease to the contrary notwithstanding, if the New York Board of Fire Underwriters or the Insurance Services Office of New York or any bureau, department or official of the federal, state, city, county, town or village government requires or recommends any changes, modifications, alterations, or additional sprinkler heads or other equipment be made or supplied in an existing sprinkler system by reason of Tenant's business, or the location of partitions, trade fixtures, or other contents in the demised premises, or if any sprinkler system changes, modifications, alterations, additional sprinkler heads or other such equipment, become necessary to prevent the imposition of a penalty or change against the full allowance for a sprinkler system in the fire insurance rate set by the Insurance Services Office of New York or by any fire insurance company, Tenant shall, at Tenant's own cost and expense, promptly make such sprinkler system installations, changes, modifications, alterations, and supply additional sprinkler heads or other equipment as required whether the work involved shall be structural or non-structural in nature.

**39th.** The Tenant shall pay an annual water charge of $-0- in advance. The Tenant acknowledges that he is responsible to  install a sub-meter at the demised premises at Tenants own cost and expense if required by landlord . In the event that the Landlord shall install a sub-meter at the demised premises the Tenant shall pay for all associated installation charges .If tenant pays water charges based on a sub-meter the Tenant shall in addition at the time the water charges are paid, pay the applicable New York City sewer charged to the Landlord then being charged by the City of New York on its water bill. All sewer charges, whether they be an annual sewer water charge of $-0- or water charges registered on a sub-meter and the accompanying sewer charge, shall be deemed additional rent.

**40th**. Landlord agrees not to unreasonably withhold Landlord's consent to the assignment of the within Lease upon the following terms and conditions:

    a)  That at the time of such assignment Tenant is not in default under any of the terms and
        conditions required to be performed by Tenant under this Lease.

    b)  That there is forwarded to Landlord an executed duplicate original of the Assignment of
        Lease in proper form for recording, together with an agreement by the assignee assuming
        all of the terms, covenants and conditions of this Lease to be performed by Tenant.

    c)  That there is deposited with Landlord an additional two month's security for each and every
        assignment of this lease.  Two (2) month's additional security deposit shall be deemed to
        be $ 4,000.00.

    d)  That Landlord shall be paid by the assignor the sum of $500.00 as a processing fee.

**41st**  a) The term "real estate taxes" shall mean all taxes and assessments levied, assessed or

period thereof, , which amount shall be considered the base year real estate tax for the purposes of this paragraph.   The provisions of this paragraph shall apply whether the increase in taxation results from a higher tax rate or an increase in the assessed valuation of the entire premises, or both.   A copy of the real estate tax bill shall be sufficient evidence to establish the amount of such real estate taxes and for calculation of the amount to be paid by Tenant. Said sum due Landlord shall be paid as additional rent and shall be collectible as such in the month following the submission of Landlord's bill therefor.

        c)   The amount of the base year real estate taxes paid by Landlord during the base year shall be used in the computation of the amount of additional rent until the amount of the base year
real estate taxes payable by Landlord during the base year shall be finalized by legal proceedings,
settlement or otherwise.   In the event of a reduction of the base year real estate taxes by legal
proceedings, settlement or otherwise, the reduced amount of such base year real estate taxes shall
thereafter determine the amount of additional rent payable by Tenant, pursuant to subdivision b). The
additional rent theretofore paid or payable hereunder shall be recomputed on the basis of such
reduction of the base year real estate taxes.   The Tenant shall pay to Landlord any deficiency
between the amount of such additional rent as theretofore computed and the amount thereof due as a
result of such reduction of the base year real estate taxes. Such sum shall be collectible as additional
rent in the month following the submission of Landlord's bill therefore.

        d)   If Landlord shall have the real estate taxes reduced for any year prior to the Tenant making
payment of additional rent for that year, the Tenant shall include in such payment of additional rent
fifty  (50%) percent of the expenses (including attorney's and appraiser's fees) incurred by Landlord in connection with any such application, proceeding, settlement or otherwise.

42nd. Notwithstanding any expiration or termination of this Lease prior to the lease expiration date (except in the case of a cancellation by mutual agreement) Tenant's obligation to pay any and all additional rent under this Lease shall continue and shall cover all periods up to the lease expiration date.

43rd. In addition to the regular rent payments, any sum to which the Landlord may be entitled, pursuant to any provision of this Lease, or as a result of the operation of any provision of this Lease from the Tenant, shall be payable as additional rent and shall be collectible with the next succeeding month's rent. If Tenant shall default in the observance or performance of any term or covenant on Tenant's part to be observed or performed under or by virtue of any of the terms or provisions in any paragraph of this Lease, then, unless otherwise provided elsewhere in this Lease, Landlord may immediately or at any time thereafter and without notice perform the same for the account of Tenant, and if Landlord makes any expenditures or incurs any obligations for the payment of money in connection therewith including, but not limited to, attorneys' fees in instituting, prosecuting or defending any action or proceeding such sums paid or obligations incurred with interest and costs shall be deemed to be additional rent hereunder and shall be paid by Tenant to Landlord within five (5) days of rendition of any bill or statement to Tenant therefore.

44th. The Tenant shall keep fire extinguishers at the demised premises in conformity with the requirements and recommendations of the Insurance Services Office of New York.

45th. If by reason of the use of the demised premises by Tenant, the rates for the insurance of the

47th. Tenant agrees that Tenant shall keep the sidewalk adjacent to the demised premises clean at all times and shall remove therefrom all rubbish, snow and ice whenever same is present, it being understood that the same is not the obligation of Landlord.

48th. Tenant agrees that Tenant shall keep the cellar at the demised premises free from any accumulation of rubbish, paper and other refuse and shall use same only for the storage of machinery , as is permitted by law.

In the event that the Tenant uses the cellar for the storage of machinery  said machinery and shall be placed on pallets, which pallets shall have a clearance of at least 8" from the cellar floor. All machinery  stored in the cellar shall be at least 18" from the cellar ceiling.

49th. In the event that any legal proceedings are hereafter instituted by Landlord against Tenant, Tenant assumes and agrees to pay to Landlord any expenses, costs, reasonable attorney's fees, marshal's fees, etc. that may be incurred by Landlord incidental to and arising out of such legal proceedings.

50th  Land lord shall not be required to furnish any service or equipment for the removal of rubbish or refuse from the demised premises, but may, nevertheless require Tenant to have such rubbish and refuse removed.

51st. No merchandise, boxes, receptacles or articles or fixtures of any kind, nature or description are to be placed or stored at or upon the front, side or rear of the demised premises, it being the intention of Landlord to require Tenant to conduct Tenant's business solely within the demised premises.

52nd. Landlord shall not be held liable for any damage or injury to any property, merchandise, stock of goods, fixtures, furniture or decorations, or to any person or persons at any time in the demised premises or building, from steam, gas, electricity or from water, rain, snow or ice, which may escape, leak or seep into, issue or flow from any part of said building of which the demised premises are a part of or from the pipes or plumbing works of the same or from the street or cellar or sub-surface or from any other place or quarter unless Landlord has received written notice from Tenant and has not remedied the problem within a reasonable period of time; and Tenant hereby agrees not to hold Landlord liable in any way therefore whatsoever.

53rd. Tenant hereby represents and agrees that Tenant will not at any time bring into, keep, store, use or permit anywhere in the demised premises any loose, exposed or open fluid, chemical substance or material of an inflammable or volatile, combustible or explosive character or having or creating any noxious or objectionable odors or fumes and this provision is hereby expressly made a conditional limitation of this Lease.

54th. Should the demised premises become infested with vermin or rodents, Tenant agrees, at Tenant's own cost and expense, to have such condition remedied within five (5) days after written notice and demand shall have been made by Landlord. In the event that Tenant fails to comply with such notice, Landlord shall have the right (but not be obligated to do so) to have this work performed by a fumigating or exterminating concern and to charge the cost of such work to Tenant, which shall be collectible as additional rent and shall be payable with the next succeeding month's rent.

55th. In the event any payment under this Lease shall be made in the form of a check from any other person, firm or corporation other than named in this Lease, the acceptance of same by Landlord shall not, under any circumstances, be deemed recognition of  a sub-letting or an assignment of this Lease regardless of the number of times that such payment shall be made by such other person, firm or corporation.

56th. It is mutually agreed by and between Landlord and Tenant that the respective parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by

shall be construed as requiring Landlord to make interior repairs or to impose any additional obligations upon Landlord not specifically provided for in this Lease.

58th. It is understood and agreed that Tenant shall, at Tenant's own cost and expense, provide and pay for Tenant's own heat. Tenant shall also install his own heating system in the demised premises and shall be solely responsible for and make all repairs and replacements thereto , whenever same are needed. However, the heating system and all its component parts shall, at all times, remain the property of Landlord including all replacements made thereto by Tenant.

Where oil or gas is the energy source used to fire the boiler to heat the demised premises, Tenant shall, at Tenant's own cost and expense, at the end of each heating season arrange to have the boiler, flue pipe and chimney cleaned and vacuumed to remove all accumulated ash and carbon deposits.

Where a forced hot air furnace is used to heat the demised premises, the Tenant, at Tenant's own cost and expense ,shall change all air filters on  a regular basis during the heating season.

59th. Tenant represents that Tenant has not dealt with any broker, agent or finder on Tenants behalf in consummating the transaction described in this Lease or in introducing the parties to each other in connection therewith and Tenant has no knowledge of any broker, agent or finder or any person or entity who is entitled or may claim to be entitled to a commission or fee in connection with the transaction described in this Lease. (Unless Landlord and Tenant have acknowledged that an agent was used)The Tenant agrees to indemnify and hold the Landlord harmless from and against any claims, demands, causes of action, losses, damages, liabilities, obligations, costs, charges and attorney's fees or expenses which arise by reason of a claim for commission or fee on account of this transaction described in this Lease made by any broker provided it is finally adjudicated by a Court of competent jurisdiction that a commission or fee is due to such broker, agent, finder or other person by reason of their having dealt with the Tenant or having introduced the Tenant to the Landlord in connection with the transaction described in this Lease.

60th. All installations, additions, hardware, non-trade fixtures and improvements, temporary or permanent, which may be made or installed by either of the parties hereto in or upon the demised premises and which are in any manner attached to the floors, walls, roof, ceilings, doors, or windows shall be the Landlord's property and shall, upon termination of the term by lapse of time, or otherwise, remain upon and be surrendered with the demised premises as part thereof, all without compensation, allowance or credit to Tenant provided, however, that if prior to such termination or within ten (10) days thereafter Landlord so directs by notice to Tenant, Tenant shall promptly remove the installations, additions, hardware, non-trade fixtures and improvements which were placed in the demised premises by Tenant and which are designated in the notice failing which Landlord may remove the same and Tenant shall pay the cost and expense thereof. Upon termination of the term of this Lease or of Tenant's right to possession, Tenant shall surrender to Landlord at the place where rent is payable all keys for the demised premises. Tenant shall prior to any such termination of the term of this Lease or of Tenant's right to possession, remove from the demised premises all Tenant's furniture, trade fixtures and other personal property of every kind whatsoever not becoming Landlord's property as hereinbefore specified, and in default of such removal by Tenant, all such property, and every interest Tenant in the same, shall be conclusively presumed to have been conveyed by Tenant to Landlord under this Lease as a bill of sale without compensation, allowance, or credit to Tenant. Tenant shall, upon such termination of the term of this Lease or of Tenant's right to possession, return to Landlord the demised premises in a "broom clean" condition, ordinary wear and tear excepted and all equipment and fixtures comprising a part therein in good repair and condition, ordinary wear and tear excepted.

61st. The Tenant covenants not to use the buildings on the demised premises for any illegal or unlawful purpose. Tenant shall not at any time use or occupy the demised premises in violation of the Certificate of Occupancy issued for the building.

and deliver to Landlord, written and unconditional waivers of mechanic's liens upon the real property
in which the demised premises are located, for all work, labor and services to be performed and materials to be furnished in connection with such work, signed by all contractors, sub-contractors, material men and laborers to become involved in such work. Notwithstanding the foregoing, if any mechanic's lien is filed against the demised premises, or the building of which the same forms a part,
for work claimed to have been done for, or materials furnished to Tenant, whether or not done pursuant to this paragraph the same shall be discharged by Tenant within ten(10) days therafter ,at Tenants own cost and expense, by filing the bond required by law.

63rd. This lease is subject and subordinate to all ground or underlining leases and to all mortgages which may now or hereafter affect such leases or the real estate property of which the demised premises are part and to all renewals, modifications ,consolidations ,replacements and extension of any such underlying leases and mortgages. This clause shall be self-operative and no further instrument of subordination shall be required by any ground or underlying lease or by any mortgagee, affecting any lease or the real property of which the demised premises are a part. In confirmation of such subordination, Tenant shall execute promptly any certificate that owner may request.

64th. Tenant covenants and agrees that at all times Tenant's use of electric current shall not exceed the capacity of the existing main electric service to the building, or lines, meters and circuit panels directly relating to and feeding the demised premises. The Tenant may not use any electrical equipment which, in Landlord's opinion, reasonably exercised, will overload such installations or interfere with the use thereof by other tenants of the building. The change at any time of the character of electric service shall in no wise make Landlord liable or responsible to Tenant, for any loss, damages or expenses which Tenant may sustain.

65th. This Lease and the obligation of Tenant to pay rent hereunder and perform all of the other covenants and agreements hereunder on part of Tenant to be performed shall in no wise be affected, impaired or excused because Landlord is unable to fulfill any of Landlord's obligations under this Lease or to supply or is delayed in supplying any service expressly or impliedly to be supplied or is unable to make, or is delayed in making any repair, additions, alterations or decorations or is unable to supply or is delayed in supplying any equipment or fixtures if Landlord is prevented or delayed from so doing by reason of strike or labor troubles or any cause whatsoever including, but not limited to, government preemption in connection with a National Emergency or by reason of any rule, order or regulation of any department or subdivision thereof of any government agency or by reason of the conditions of supply and demand which have been or are affected by war or other emergency.

66th. If the Tenant continues in possession of the demised premises after the expiration of this Lease without having renewed the same or without having entered into a new lease, the Tenant shall thereafter be deemed to be a Tenant from month to month on all of the terms and conditions set forth in this Lease, except as to the duration thereof.

67th. The Tenant shall take appropriate action to eliminate any criticism or comply with any recommendation with respect to Tenant's use of the demised premises which any of Landlord's insurance carriers may reasonably make to keep Landlord's insurance in effect. In the event Tenant shall fail to comply herewith, after written notice from Landlord, within the time allowed by said insurance company to keep Landlord's insurance in effect and/or to keep the then current rate, Landlord may take action under Paragraph No. 17 of this Lease to enforce Landlord's rights and/or in the alternative or as additional relief, may do what is necessary to eliminate or comply therewith and in such event, may charge Tenant with the cost of same as additional rent.

68th. Tenant shall, without charge at any time and from time to time, within ten (10) days after request by Landlord:

    a) Certify by written instrument, duly executed, acknowledged and delivered, to any

iii)   the date, if any, to which the rental and other charges hereunder have been paid in advance.

69th.  If the landlord or any successor in interest  be an individual, joint venture , tenancy in common, co-partnership, unincorporated association ,or other unincorporated aggregate of individuals ( all of which are referred to below ,individually and collectively, as an "unincorporated landlord" ) ,then ,anything elsewhere to the contrary notwithstanding ,Tenant shall look solely to the estate and property of such unincorporated landlord in the Entire Taxpayer for the satisfaction of Tenant's remedies for the collection of a judgment (or other judicial process) requiring the payment of money by Landlord in the event of any default or breach by Landlord with respect to any of the terms, covenants and conditions of the Lease to be observed and/or performed by Landlord, and no other property or assets of such unincorporated Landlord shall be subject to the levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies.

70th. Should there be any conflict between any provisions in the printed portion of this Lease and those contained in the typewritten portion thereof, then the terms, covenants and conditions in the typewritten portion shall be controlling hereunder.

71st.    a) In amplification of Paragraph No. 2 of this Lease, and in addition thereto, the Tenant agrees that, at Tenant's sole cost and expense, and in a manner satisfactory to the Landlord, the Tenant shall keep, put, replace and maintain the demised premises and all Tenant's equipment, fixtures, motors, appurtenances, installations and improvements, and every part thereof (except for repairs which the Landlord is required to make as hereinafter set forth) in good repair, good working order and good condition and which shall be deemed to include, but not exclusively, plumbing, the drains, the heating system and piping, air-conditioning system, electrical fixtures and systems, whether the same be interior, exterior, ordinary as well as extraordinary, foreseen or unforeseen.

b) It is the intention of the parties and the parties do hereby agree that the sole repairs which the Landlord shall make to the demised premises shall be structural repairs to the exterior walls of the building, the foundation, and the roof, provided, however, that the said repairs are not occasioned, caused or required by reason of the Tenant's operation of Tenant's business in the demised premises, or by Tenant's fixtures and/or equipment, or by a break-in or an attempted break-in to the demised premises, or by reason of any act or acts of commission or omission of the Tenant, Tenant's employees or any licensees, or visitor of the Tenant; in which event such repairs shall be made by the Tenant. All other repairs and replacements shall be made by the Tenant at Tenant's own cost and expense. Doors, glass windows and storefronts shall not be deemed to be part of the exterior walls, and any repairs or replacements thereto shall be made by the Tenant.

72nd. This provision omitted

73rd. Tenant shall have the right to erect a sign upon the parapet at the front of the demised premises, provided, however, that the plans for the size, location and type of sign shall first be submitted to Landlord for Landlord's consent, which consent Landlord agrees not to unreasonably withhold. In the event the Landlord consents, as aforesaid, the Tenant agrees that the erection of any such signs shall be in accordance with all applicable laws, orders, rules and regulations of any governmental or municipal agency having jurisdiction thereof. In the event the Landlord or the Landlord's representatives shall deem it necessary to remove any such sign or signs in order to paint the said demised premises or the building wherein same is situated or make any other repairs, alterations or improvements in or upon said demised premises or building or any part thereof, the Landlord shall have the right to do so, providing the same be removed and replaced at the Landlord's expense, whenever the said repairs, alterations or improvements shall be completed.

74th. Tenant shall not use or suffer the premises to be used in any manner so as to create an

existence of or any failure by Tenant to comply with any environmental law now or hereafter in effect. The term "Hazardous Materials", as used herein, shall mean and include all potentially hazardous materials, including without limitation radon, asbestos, and asbestos containing materials.

(b) Tenant covenants and agrees that at any and all times during the term of this Lease Tenant shall be responsible for compliance with any federal, state, county, local, or municipal law, statute, ordinance, code, regulation or administrative recommendation pertaining to Hazardous Materials (including without limitation any requirements pertaining to the cleanup, removal, and/or encapsulation of any Hazardous Materials that may be in or at the premises or may have emanated therefrom). Tenant shall, at Tenant's sole cost and expense, undertake any and all steps which may be required for compliance as aforesaid regardless of whether Tenant had installed said Hazardous Materials or that same existed at the premises prior to Tenant's occupancy of same. In addition, Tenant shall be solely responsible for restoring and repairing any damage to the premises caused by or resulting from such compliance, e.g. the replacement of any ceiling tiles or insulation with comparable products not containing any Hazardous Materials.

(c) Tenant shall indemnify and save harmless the Landlord, Landlord's agents, servants and employees, from and against all claims and demands whether for injuries to persons or loss of life, or damage to property, related to or arising in any manner whatsoever out of the clean-up, removal and/or encapsulation of Hazardous Materials or occasioned wholly or in part by any act or omission of (or failure to comply with legal requirements by) Tenant, Tenant's agents, contractors, employees, servants and licensees. In the event Landlord shall, without fault on Landlord's part, be made a party to any litigation or administrative proceedings commenced by or against Tenant, then Tenant shall protect and hold Landlord harmless and shall pay all costs, expenses and attorneys fees incurred or paid by Landlord in connection with such litigation. The preceding notwithstanding, Tenant shall not be responsible for any preexisting condition.

(d) In the event Tenant fails to comply as aforesaid with the clean-up, removal, and/or encapsulation of Hazardous Materials when so required within the period of time permitted or promulgated, then in such event Landlord may undertake said work, but shall not be obligated to do so. Should Landlord undertake said work required by Tenant as aforesaid, then in such event, Landlord shall render a statement to Tenant for the cost and expense of undertaking said work plus a charge of twenty (20%) percent for administrative costs and expenses, which statement shall be paid by Tenant as additional rent within ten (10) days of receipt thereof. Failure of Tenant to undertake compliance as aforesaid shall constitute a material default under this Lease for which Landlord shall have all rights and remedies, including without limitation the right to terminate this Lease and the right to hold Tenant responsible for the entire cost of compliance as aforesaid and for all of Landlord's damages resulting from Tenant's failure to so comply.

(e) The provisions of this Paragraph shall survive the expiration or earlier termination of this Lease, and the Tenant shall require any approved assignee or approved sub-Tenant of the
premises to agree expressly in writing to comply with all the provisions of this Paragraph.

75th. For the purposes of this Lease, the transfer of stock by any of the stockholders of the tenant corporation, (if applicable )other than among themselves, shall be deemed an assignment of this Lease. Landlord agrees not to unreasonably withhold Landlord's consent to such transfer of stock provided the following provisions are complied with:

a) That at the time of each such transfer of stock Tenant is not in default under any of the terms            and conditions required to be performed by Tenant under this lease.

same, the Tenant shall institute and maintain a duct cleaning service in the premises at Tenant's own expense, and install necessary fire extinguishers.

77th. The Tenant agrees that Tenant shall make all plumbing repairs to the demised premises. The Tenant further agrees that Tenant shall also be responsible for and shall pay for the cost and expense of cleaning and clearing all blockages and stoppages to the sewer line servicing the demised premises, provided the blockages and stoppages are caused by the Tenant.

78th. In the event that any rental payment is not received by the Landlord by the 10th day of the month in which same is due, the Tenant shall pay the Landlord as a late charge six (6%) percent of the rental payment so overdue, along with the rental payment.

79th. The Tenant may install an awning at the demised premises over the storefront.

80th. It is understood and agreed that Tenant shall reimburse Landlord to the extent of eighteen (33%) percent of any bill received by Landlord from The City of New York for restoring and/or improving the sidewalks and curbs at the premises known as 161 Saratoga Avenue Brooklyn NY 11233.

81st.  The Tenant accepts the demised premises in their current state and condition, or as commonly termed "AS IS".

Tenant shall, at Tenant's own cost and expense, do all work necessary at the demised premises required to be done for the business to be conducted by Tenant ("Tenant's Work"). Tenant agrees, prior to commencing any structural alterations, non-structural alterations, additions, improvements, changes, installations or other construction, including Tenant's initial construction of Tenant's store to:

    (i)    engage an architect licensed in the State of New York to prepare plans ("Tenant's Plans") showing Tenant's Work;

    (ii)   deliver to Landlord true copies of all final plans and specifications. Landlord shall not unreasonably withhold Landlord's consent to such final plans and specifications.

    (Hi)  make application to the Building Department of the City of New York and any other governmental departments or agencies to secure those permits, approvals, and consents, which are required for Tenant's Work (the "Governmental Approvals").

Prior to commencing any alterations, additions, improvements, changes, installations or other construction, whether structural, non-structural or otherwise, Tenant shall deliver to Landlord a copy of the building permit or like governmental approval and upon completion Tenant shall deliver a copy of all certificates, approvals and permits which are required pursuant to applicable law.

Tenant agrees that Tenant's work shall be done in a first-class workmanlike manner in accordance with all rules and regulations of governmental agencies. Tenant agrees to cause Tenant's contractors and subcontractors to carry worker's compensation, general liability, personal and property damage insurance, including builder's risk insurance on an "all risk" basis as shall be reasonably required by  Landlord naming Landlord ,its managing agent and mortgagees as additional insureds as their interest may appear.

82nd. The Tenant shall not, during the term of this lease or any extended term of this lease, install, keep or maintain any video arcade machines at the demised premises.

83rd . The Tenant shall not be permitted to install air conditioning equipment through the transom over the front door.

(1) Cause the dumpsters used by Tenant to be washed out with such freauencv as Landlord determines.The cost incurred by Landlord in connection therewith shall be reimbursed by Tenant to Landlord as aditional rent within ten(ten) days after demand thereof.

(2) Retain such exterminating and pest control services as Landlord may deem appropriate to exterminate pests at the premises.

All costs incurred by the Landlord in connection therewith as set forth in (1) and (2) 2)  shall be reimbursed by Tenant to Landlord as additional rent within ten (10) days after demand therefore.

85th . If the tenant defaults in any term, condition, or obligation pursuant to the lease which is not a monetary obligation , then the tenant shall have a period of 20 days to cure the default upon written notice by the landlord of the default. The tenant, upon curing the default, will give notice of the cure to the landlord and will either allow the landlord immediate access to inspect the condition if necessary or provide the landlord with any appropriate paperwork or certificates.

86th. The Tenant herein is a corporation whose principal is Apolinar Collado (hereinafter "Principal"). The Principal personally guarantees to Owner the payment of all Base Rent and additional rent for the demised premises not paid by Tenant until the date Tenant or Tenant's assigns or subtenants surrender possession of the Premises to Landlord in accordance with the provisions of the Lease.

By : _Apolinar A Collado_
Apolinar Collado

By: _Kermit Card_
Kermit Card

covenant shall be conditioned upon the retention of title to the premises by the Landlord.

*And it is mutually understood and agreed*  that the covenants and agreements contained in the within lease shall be binding upon the parties hereto and upon their respective successors, heirs, executors and administrators.

In Witness Whereof the parties have interchangably set their hand and seals (or caused these presents to be signed by their proper corporate officers (if applicable) and caused their proper corporate seal to be affixed as of this 6th Day of April 2010

Signed, sealed and delivered in the presence of

By : _____
            Apolinar Collado

By: _____
            Kermit Card

# EXHIBIT 30

 Rick Black <cearrick@gmail.com>
To: Kimberly George
Cc: Erica Wood, Lorie Slutsky, Michelle Chen, Pamela Teaster

 Sat, Dec 21, 2019 at 9:50 AM



Dear Ms. George,

Thank you for the wonderful update on all the altruistic things The Vera Institute's "The Guardianship Project" is doing for the incapacitated, indigent, and alone in New York City. I am following up on your offer made to me at your event in September that you would be releasing ward Ella Card.

A hearing was held in early December where TGP attorneys indicated a willingness to transfer the guardianship and her assets to an alternative professional guardian but The Vera Institute continues to hold her assets and billed another $45,000 in fees against her estate. Since the family has provided all care for Ella for years and maintained her assets at their expense Ella, her family and my expectation was a dismissal.

The Vera Institute has not seen Ella Card in 8 years. You have not allowed her to enjoy her pension, income, or assets in 8 years. She has not been a New York resident in 8 years. A $1,000 month payment does not qualify as care and is completely inappropriate given Ella's net worth and income and that The Vera Institute and Ms. Card's guardianship has only brought pain and suffering to Ella and her family.

During this Holiday season I hope as the director of TGP you see it in your heart to finally release Ella Card to enjoy the rest of her days without interference from Vera Institute and the courts of New York. Ella is not incapacitated, indigent(yet), or alone so she shouldn't be in your program anyway.

Please consider what is in Ella Card's expressed and best interests during this Holiday Season and finally do the right thing.

Regards,
Rick Black
Exec. Dir. - CEAR
(804) 564-5330
501(c)(3)
https://www.cearjustice.org
https://m.facebook.com/CEARRICK

48

# EXHIBIT 31



# EXHIBIT 32

## NOTICE TO CEASE AND DESIST

February 14, 2020

UNITED STATES CERTIFIED MAIL,

RETURN RECEIPT REQUESTED

& REGULAR MAIL

Finkel & Fernandez LLP

Attn: Julie Stoil Fernandez, Esq

16 Court Street, Suite 1007
Brooklyn, New York 11241

Dear Ms. Fernandez:

This letter is to advise you that you are not permitted on the property where I am staying, or any property I own, or where I may be living or working. If you do come on my property or the property where I am working or own, the police will be notified and criminal charges will be pursued. In addition, any attempt to contact me at my home, place of work, or any other location where I may be, either in person, by third party (which includes giving messages), in writing (including e-mail and text), by telephone, or by any other means (including voicemail), as well as Facebook, will be considered harassment and criminal charges will be pursued. You are not to contact my friends or relatives about me, or to give messages, as that will be considered Harassment, and criminal charges will be filed.

Harassment, which includes striking, kicking, shoving, alarming, or seriously annoying another person is punishable by up to 90 days in prison and a fine of $300.00. Harassment by Communication is also a crime. It is punishable by up to one year imprisonment, or a $2,500.00 fine. Stalking is engaging in a course of conduct or repeatedly committing an act toward another person, including following that person without proper authority, with the intent to place that person in fear of bodily injury or to cause substantial emotional distress to that person. An offense of stalking constitutes a misdemeanor in the first degree.

A copy of this letter is being sent to you by regular United States Mail and by United States Certified Mail. A copy of this is also being sent to local police departments.

This letter will be followed up by a Protection From Abuse (PFA) order.

Sincerely,

*Ella Card*

Ella Card

cc:

Brooklyn 73rd Precinct Police, 1470 E New York Ave, Brooklyn, NY 11212

NYC Police Department, 301 Gold St Ste 2, Brooklyn, NY 1120

Hanover Borough Police Department, Penn Township Police Department

# NOTICE TO CEASE AND DESIST

February 14, 2020

UNITED STATES CERTIFIED MAIL,
RETURN RECEIPT REQUESTED

& REGULAR MAIL

Mr. Raymond Card Jr.
124 Shetland Pl

Warners, NY 13164

Dear Mr. Card:

This letter is to advise you that you are not permitted on the property where I am staying, or any property I own, or where I may be living or working. If you do come on my property or the property where I am working or own, the police will be notified and **criminal charges will be pursued.** In addition, any attempt to contact me at my home, place of work, or any other location where I may be, either in person, by **third party** (which includes giving messages), in writing (including e-mail and text), by telephone, or by any other means (including voicemail), as well as Facebook, will be considered **harassment and criminal charges will be pursued.** You are not to contact my friends or relatives about me, or to give messages, as that will be considered **Harassment, and criminal charges will be filed.**

Harassment, which includes striking, kicking, shoving, alarming, or seriously **annoying another person** is punishable by up to **90 days in prison** and a fine of $300.00. **Harassment by Communication is also a crime.** It is punishable by up to one year imprisonment, or a $2,500.00 fine. **Stalking** is engaging in a course of conduct or repeatedly committing an act toward another person, including following that person without proper authority, with the intent to place that person in fear of bodily injury or to cause substantial emotional distress to that person. An offense of stalking constitutes a **misdemeanor in the first degree.**

A copy of this letter is being sent to you by regular United States Mail and by United States Certified Mail. A copy of this is also being sent to local police departments.

This letter will be followed up by a Protection From Abuse (PFA) order.

Sincerely,

*Ella Card*

Ella Card

cc:

Onondaga County Sheriff's Office, 407 S State St, Syracuse, NY 13202
Hanover Borough Police Department, Penn Township Police Department

# NOTICE TO CEASE AND DESIST

February 14, 2020

UNITED STATES CERTIFIED MAIL,
RETURN RECEIPT REQUESTED

& REGULAR MAIL

Mr. Kermit Card
208 Commack Rd

Deer Park, NY 11729

Dear Mr. Card:

This letter is to advise you that you are not permitted on the property where I am staying, or any property I own, or where I may be living or working. If you do come on my property or the property where I am working or own, the police will be notified and **criminal charges will be pursued.** In addition, any attempt to contact me at my home, place of work, or any other location where I may be, either in person, by **third party** (which includes giving messages), in writing (including e-mail and text), by telephone, or by any other means (including voicemail), as well as Facebook, will be considered **harassment** and **criminal charges will be pursued.** You are not to contact my friends or relatives about me, or to give messages, as that will be considered **Harassment, and criminal charges will be filed.**

Harassment, which includes striking, kicking, shoving, alarming, or **seriously annoying another person** is punishable by up to **90 days in prison** and a fine of $300.00. **Harassment by Communication is also a crime.** It is punishable by up to one year imprisonment, or a $2,500.00 fine. **Stalking** is engaging in a course of conduct or repeatedly committing an act toward another person, including following that person without proper authority, with the intent to place that person in fear of bodily injury or to cause substantial emotional distress to that person. An offense of stalking constitutes a **misdemeanor in the first degree.**

A copy of this letter is being sent to you by regular United States Mail and by United States Certified Mail. A copy of this is also being sent to local police departments.

This letter will be followed up by a Protection From Abuse (PFA) order.

Sincerely,

*Ella Card*

Ella Card

cc:

Suffolk County Police Department, 555 Rte 109, West Babylon, NY 11704
Hanover Borough Police Department, Penn Township Police Department

# EXHIBIT 33

Ella R. Card
155 Saratoga Ave
Brooklyn, NY 11233

February 2011

Kermit Raymond Harrison Card
208 Commack Road
Deer Park, NY 11729

Dear Kermit Card:

This letter is written to confirm, as a final reminder, that your authority over my affairs has been relinquished.

Although your Power of Attorney has been relinquished, you have continued to operate as though it remains in effect. At this point, I require that you immediately:

- Provide me the original lease signed by Mr. Leopoldo Estevez, owner/manager of Delta Deli, on my property at 161 Saratoga Avenue,
- Stop collecting rent on my behalf,
- Send February 1st, 2011 rent to me,
- Return to me any deposit Mr. Estevez gave to you,
- Stop checking my bank accounts, credit cards, and any other personal financials related to my affairs, (I consider this a gross violation of my privacy),
- Stop visiting me with company without my invitation,
- Stop misleading attorneys, police, detectives (or anyone) who represent my affairs that you are representing and acting on my behalf in any way,
- Stay out of my personal and private business.

I consider these actions as harassment and am informing you that if you do not comply with the terms of this letter, I will immediately take appropriate legal action against you. In addition, the law considers these actions "elder abuse" and "harassment". I will seek to protect myself and take any necessary legal action against you for these acts.

Regards,

*Ella R. Card*

Ella R. Card

SEPTEMBER 29TH, 2010

THIS IS TO GIVE NOTICE THAT EFFECTIVE IMMEDIATELY THAT KERMIT
CARD OF 208 COMMACK ROAD, DEER PARK NEW YORK 11729 IS NO
LONGER IN CHARGE OF ANY BUSINESS IN ACCORDANCE WITH 161
SARATOGA AVENUE. ALL CORRESPONDENCES, OR AGREEMENT ARE
DEEMED INVALID AS OF SEPTEMBER 29TH, 2010 IN ACCORDANCE WITH THE
ENCLOSED DOCUMENTS.
ANY & ALL FURTHER RENTS, OTHER MONETARY AGREEMENTS,
CORRESPONDENCES OR DISCUSSIONS REGARDING THIS PROPERTY
SHOULD BE ADDRESSED DIRECTLY TO ME, ELLA CARD, OF 155 SARATOGA
AVENUE, BROOKLYN, NY, 11233, OR ANY OTHER AGENT I DEEM
NECESSARY AS PER ANY VERBAL OR WRITTEN AUTHORIZATIONS.
FAILURE TO COMPLY WITH THIS NOTICE, AS OWNER OF SAID PROPERTY
AT 161 SARTOGA, WILL BE DEEMED AS NULLIFICATION OF ANY PREVIOUS
AGREEMENTS BY LAW.

SINCERELY,

*Ella Card*

ELLA CARD

**JACQUELINE L. GARRETT**
**NOTARY PUBLIC-STATE OF NEW YORK**
**No. 01GA6189330**
**Qualified in New York County**
**My Commission Expires June 23, 2012**
*Jacqueline L. Garrett* 9/29/2010

# EXHIBIT 33A

10/16/2020   15:07 galaxycell                                        (FAX)547350841?        P.016/018

Ella R. Card
155 Saratoga Ave
Brooklyn, NY 11233

February 2011

Kermit Raymond Harrison Card
208 Commack Road
Deer Park, NY 11729

Dear Kermit Card:

This letter is written to confirm, as a final reminder, that your authority over my affairs has been relinquished.

Although your Power of Attorney has been relinquished, you have continued to operate as though it remains in effect.  At this point, I require that you immediately:

- Provide me the original lease signed by Mr. Leopoldo Estevez, owner/manager of Delta Deli, on my property at 161 Saratoga Avenue,
- Stop collecting rent on my behalf,
- Send February 1st, 2011 rent to me,
- Return to me any deposit Mr. Estevez gave to you.
- Stop checking my bank accounts, credit cards, and any other personal financials related to my affairs, (I consider this a gross violation of my privacy),
- Stop visiting me with company without my invitation,
- Stop misleading attorneys, police, detectives (or anyone) who represent my affairs that you are representing and acting on my behalf in any way,
- Stay out of my personal and private business.

I consider these actions as harassment and am informing you that if you do not comply with the terms of this letter, I will immediately take appropriate legal action against you.  In addition, the law considers these actions "elder abuse" and "harassment".  I will seek to protect myself and take any necessary legal action against you for these acts.

Regards,

*Ella R. Card*

Ella R. Card

# EXHIBIT 33B

=====================================================

DECLARATION OF TRUST

made as of February ___, 2011

by

Ella Card, by Kermit Card, her attorney-in-fact

Grantor

and

Kermit Card, La Donna Card and Raymond H. Card, Jr.

Trustees

Name of Trust: Ella Card 2011 Trust

=====================================================

**TABLE OF CONTENTS**

ARTICLE FIRST - Payments During Grantor's Life
ARTICLE SECOND - Successor Beneficiaries
ARTICLE THIRD - Minors or Incompetents
ARTICLE FOURTH - Irrevocability
ARTICLE FIFTH - Powers of Trustees
ARTICLE SIXTH - Appointment of Trustees
ARTICLE SEVENTH - Trustees Decisions Conclusive
ARTICLE EIGHTH - Simultaneous Death
ARTICLE NINTH - Rights Not Assignable
ARTICLE TENTH - Construction
ARTICLE ELEVENTH - Binding Effect
ARTICLE TWELFTH - Short Name

<u>**DECLARATION OF TRUST**</u>

**DECLARATION OF TRUST**, made as of this          day of February, 2011, among ELLA CARD, by KERMIT CARD, her attorney-in-fact, having an address at 155 Saratoga Avenue, Brooklyn, New York 11233, as grantor (hereinafter referred to as the "Grantor"), and KERMIT CARD, having an address at 208 Commack Road, Deer Park, New York 11729, La DONNA CARD, having an address at 100 Debs Place, Apt. 16C, Bronx, New York 10475 and RAYMOND H. CARD, JR., having an address at 124 Shetland Place, Warners, New York 13164, as trustees (hereinafter collectively referred to as the "Trustee").

**W I T N E S S E T H:**

**WHEREAS**, the Grantor desires to create an irrevocable trust in the amount of Ten Dollars ($10.00), together with such monies, securities and other assets as the Trustees hereafter may hold or acquire hereunder (said amount and other monies, securities and assets, together with any additions thereto received pursuant to the Grantor's last will and testament or otherwise, being hereinafter referred to as the "trust estate"), for the purposes and upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the covenants herein contained and other valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Grantor hereby irrevocably transfers and delivers to the Trustees as and for the trust estate the sum of Ten Dollars ($10.00), to hold the same, and any other property which the Trustees hereafter may acquire, **IN TRUST**, for the purposes and upon the terms and conditions hereinafter set forth:

**ARTICLE FIRST**
<u>**Payments During Life of Grantor**</u>

A.          The Trustees shall hold, manage, invest and reinvest the trust estate, shall collect the income therefrom, and shall (i) pay the net income to or for the benefit of the Grantor, during the life of the Grantor, in monthly installments or (ii) accumulate said income as part of the Trust Estate, or as otherwise directed by the Grantor.

The Trustee shall have no right to invade the principal of the Trust Estate for the benefit of the Grantor or Grantor=s spouse, if any.  The Grantor directs that the provisions of New York E.P.T.L. ' 7-1.6, or any successor statute thereto, shall not be available to require any invasion of principal by the Trustee or any Court.

B.          Residential Trust Property

The Trustee is authorized and directed to retain in the Trust any premises which the Grantor shall occupy as her residence.  The Grantor shall have the right to occupy said premises for residential purposes.  The Grantor must notify the Trustee when she no longer desires to occupy such

3

premises as her residence.  When the Grantor has either vacated such premises or resided elsewhere for a continuous period of six (6) months, then the Trustee, at the Trustee's sole and absolute discretion, may sell and convey such premises, at public or private sale, at such time and price and upon such terms and conditions, including credit, as the Trustee may determine.  Any purchaser of real property (including cooperative apartment) owned by this Trust shall be entitled to rely on the authority of the Trustee to sell such real property.  The net proceeds of such sale shall be added to the Trust and shall be considered principal in its entirety, to be invested and reinvested in the discretion of the Trustee as part of the Trust Estate.

During the period that such premises shall be held for the use and occupancy of the Grantors, all taxes, insurance, assessments, repaired and other charges necessary to maintain such premises shall be paid by the Grantor.  However, Grantor shall not be required to pay rent for the use of such premises.

If said premises shall be damaged by fire or other event which shall have caused damage to the premises, provided such damage shall be covered by insurance, the Trustee shall cause said premises to be rebuilt and/or restored to its original state.  If the Grantor shall waive such reconstruction or restoration, then said premises, as they then exist shall be sold and the net proceeds of said sale any insurance proceeds shall be added to the Trust and shall be added to the Trust and shall be considered principal in its entirety, to be invested and reinvested in the discretion of the Trustee as a part of the Trust Estate.

The Grantor hereby reserves any present or future right to any real estate tax exemptions (including but not limited to senior citizen, disability, veterans and STAR exemptions).

## ARTICLE SECOND
### Successor Beneficiaries

Upon the death of the Grantor,  the Trustee, in the sole and absolute discretion, may pay directly or acquire by purchase, exchange or otherwise, certain assets from either the estate of the Grantor to provide said estate with cash to pay (i) the funeral expenses of the Grantor, (ii) any and all death taxes imposed upon the estate, (iii) court filing fees of a probate or administration proceeding and any and all legal and accounting fees related to the estate, and (iv) the amount, if any, required to satisfy the cash bequests made in a Will by the Grantor.

The Trustee shall have no duty to (i) determine the accuracy or propriety of any amount or sum; (ii) see to the application of any sum paid, or other property delivered, to the Executor of the Grantor; or (iii) withhold distribution of any asset, except as may be limited by other paragraphs of this Trust.

## DISTRIBUTION UNDER LIMITED POWER OF APPOINTMENT

Upon the death of the Grantor, the Trustee shall pay and distribute the remaining trust estate in accordance with said Grantor=s limited power of appointment exercised by said Grantor=s will, submitted for probate in the County of Grantor=s residence within ninety (90) days of said Grantor=s death, specifically referring to this paragraph, to appoint all or any portion of the principal and any

4

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 282 of 320

accumulated and accrued income of this Trust to a class of beneficiaries limited to the grantor=s children, grandchildren, or relatives by blood but excluding the Grantor=s spouse and his family members.  In no event, can the limited power of appointment be exercised by the Grantor through the creation of another power, whether general, non-general or limited.

**DISTRIBUTION IN DEFAULT OF EXERCISE OF POWER OF APPOINTMENT**

In the event that the Grantor has not exercised the limited power of appointment conferred upon the Grantor above, then upon the death of the Grantor, the Trustee pay and distribute the balance of the Trust Estate to Kermit Card, La Donna Card, Raymond H. Card, Jr. and Cindy Card, <u>per stirpes</u>.

**ARTICLE THIRD**
<u>**Distributions To Minors Or Incompetents**</u>

In any case in which the Trustees are authorized or directed by any provision of this Agreement to pay or distribute income or principal to any person who shall be a minor or incompetent, the Trustees, in their absolute discretion and without authorization of any court, may pay or distribute the whole or any part of such income or principal to such minor or incompetent personally, or may apply the whole or any part thereof directly to the health, education, maintenance or support of such minor or incompetent, or may pay or distribute the whole or any part thereof to the guardian, committee, conservator or other legal representative, wherever appointed, of such minor or incompetent or to the person with whom such minor or incompetent may from time to time reside, or in the case of a minor, may pay or distribute the whole or any part thereof to a custodian for such minor under any gifts to minors or transfers to minors act.  Evidence of such payment or distribution or the receipt therefor by the person to whom any such payment or distribution is made shall be a full discharge of the Trustees from all liability with respect thereto, even though the Trustees may be such person.

The Trustees, in their absolute discretion, may defer payment or distribution of any or all income or principal to which a minor may be entitled until such minor shall attain the age of twenty-one (21) years, or to make such payment or distribution at any time and from time to time, during the minority of such minor, holding the whole or the undistributed portion thereof as a separate fund vested in such minor but subject to the power in trust hereby given to the Trustees to administer and invest such fund and to use the income or principal thereof for the benefit of such minor as if such fund were held in trust hereunder.  No bond or other security and no periodic accounts shall be required with respect to such fund, and the same shall be subject to commission as if it were a separate trust fund.  The Trustees shall pay and distribute any balance of such fund to such minor when such minor shall attain the age of twenty-one (21) years.  Except as is herein above provided, if such minor shall die before attaining the age of twenty-one (21) years, the Trustees shall pay and distribute such balance to the executors, administrators or legal representatives of the estate of such minor.

The word "minor", wherever used in this Article THIRD, shall mean any person who has not attained the age of twenty-one (21) years.

5

## ARTICLE FOURTH
### Irrevocability

This Agreement and the trusts created hereunder are irrevocable. The Grantor shall execute such further instruments as shall be necessary to vest the Trustees with full title to the property which is the subject of this Agreement.

## ARTICLE FIFTH
### Powers of Trustees

In the administration of any property at any time forming a part of the trust estate, including accumulated income, and in the administration of any trust created hereunder, the Trustees, in addition to and without limitation of the powers conferred on trustees under the New York Estates, Powers and Trusts Law, as amended or any successor thereto, or otherwise provided by law, shall have the following powers to be exercised in the absolute discretion of the Trustees, except as otherwise expressly provided in this Agreement:

(a)  To retain such property for any period, whether or not the same is of the character permissible for investments by fiduciaries under any applicable law, and without regard to the effect any such retention may have upon the diversity of investments;

(b)  To sell, transfer, exchange, convert or otherwise dispose of, or grant options with respect to, such property, at public or private sale, with or without security, in such manner, at such times, for such prices, and upon such terms and conditions as the Trustees may deem advisable;

(c)  To invest and reinvest in common or preferred stocks, securities, limited liability companies, investment trusts, mutual funds, regulated investment companies, bonds and other property, real or personal, foreign or domestic, including any undivided interest in any one or more common trust funds, whether or not such investments be of the character permissible for investments by fiduciaries under any applicable law, and without regard to the effect any such investment may have upon the diversity of investments;

(d)  To render liquid the trust estate or any trust created hereunder in whole or in part, at any time and from time to time, and to hold unproductive property, cash or readily marketable securities of little or no yield for such period as the Trustees may deem advisable;

(e)  To lease any such property beyond the period fixed by statute for leases made by fiduciaries and beyond the duration of any trust created hereunder;

(f)  To join or become a party to, or to oppose, any reorganization, readjustment, recapitalization, foreclosure, merger, voting trust, dissolution, consolidation or exchange,

6

and to deposit any securities with any committee, depository or trustee, and to pay any fees, expenses and assessments incurred in connection therewith, and to charge the same to principal, and to exercise conversion, subscription or other rights, and to make any necessary payments in connection therewith, or to sell any such privileges;

(g)  To form one or more corporations or limited liability companies, alone or with any person, in any jurisdiction, and to transfer assets to any new or existing corporation or limited liability company in exchange for stock or membership interests; to form one or more partnerships with any person in any jurisdiction, to have any trust or a nominee be a general or limited partner, and to transfer assets to any new or existing partnership as a capital contribution; to enter into one or more joint ventures or associations with any person in any jurisdiction, and to commit assets to the purposes of those ventures or associations; and to retain as an investment for any period any securities, partnership interests or other assets resulting from any such actions;

(h)  To vote in person at meetings of stock or security holders and adjournments thereof, and to vote by general or limited proxy with respect to any stock or securities;

(i)  To hold stock and securities in the name of a nominee without indicating the trust character of such holding, or unregistered or in such form as will pass by delivery, or to use a central depository and to permit registration in the name of a nominee;

(j)  To initiate or defend, at the expense of the trust estate, any litigation relating to this Agreement or any property of the trust estate which the Trustees consider advisable, and to pay, compromise, compound, adjust, submit to arbitration, sell or release any claims or demands of the trust estate or any trust created hereunder against others or of others against the same as the Trustees may deem advisable, and to make any payments in connection therewith which the Trustees may deem advisable;

(k)  To borrow money for any purpose from any source, including any trustee at any time acting hereunder, and to secure the repayment of any and all amounts so borrowed by mortgage or pledge of any property;

(l)  To purchase from the legal representatives of the estate of the Grantor (or the estate of the Grantor's wife) or from the trustees of any trust established by the Grantor (or by the Grantor's wife) any property constituting a part of such estate or trust at its fair market value and to make loans for adequate consideration to such legal representatives or trustees, upon such terms and conditions as the Trustees may determine in their absolute discretion;

(m)  To carry insurance of the kinds and in the amounts which the Trustees consider advisable, at the expense of the trust estate, to protect the trust estate and the Trustees personally against any hazard;

(n)  To make distribution of the trust estate or of the principal of any trust created hereunder in cash or in kind, or partly in kind, and to cause any distribution to be

7

composed of cash, property or undivided fractional shares in property different in kind from any other distribution, and to determine the fair valuation of the property so allocated, with or without regard to the tax basis; to hold the principal of separate trusts in a consolidated fund and to invest the same as a single fund; to split trusts for purposes of allocating GST exemptions (within the meaning of Section 2642(a) of the Internal Revenue Code); and to merge any trusts which have substantially identical terms and beneficiaries, and to hold them as a single trust;

(o)  To employ and pay the compensation of accountants, attorneys, experts, investment counselors, custodians, agents and other persons or firms providing services or advice, irrespective of whether the Trustees may be associated therewith; to delegate discretionary powers to such persons or firms; and to rely upon information or advice furnished thereby or to ignore the same, as the Trustees in their discretion may determine;

(p)  To change the situs and/or governing law of any trust hereunder to any State the Trustees from time to time may deem desirable, and to take such further actions, including without limitation the amendment to the terms of the trust, as may be necessary or advisable to effectuate such change;

(q)  To execute and deliver any and all instruments or writings which it may deem advisable to carry out any of the foregoing powers; and

(r)  To exercise all such rights and powers and to do all such acts and enter into all such agreements as persons owning similar property in their own right might lawfully exercise, do or enter into.

(s)  The Trustee shall administer this trust according to its terms, even if such terms conflict with NY E.P.T.L. ' 11-2.3(b)(5)(A) as amended and further the Trustee shall not have the power to elect the optional uni-trust provisions as created under NY E.P.T.L. ' 11-2.4.

Except as otherwise provided herein, the Trustees may determine, when there is reasonable doubt or uncertainty as to the applicable law or the relevant facts, which receipts of money or other assets should be credited to income or principal, and which disbursements, commissions, assessments, fees and other expenses should be charged to income or principal. The proceeds from the sale, redemption or other disposition, whether at a profit or loss, and regardless of the tax treatment thereof, of any property constituting principal, shall normally be dealt with as principal, but the Trustees may allocate a portion of any such proceeds to income if the property disposed of produced no income or substantially less than the current rate of return on trust investments, or if the Trustees shall deem such action advisable for any other reason. The Trustees may (but are not directed to) allocate receipts and disbursements between income and principal in accordance with the New York Estates, Powers and Trusts Law, as amended and in effect from time to time. The preceding provisions of this paragraph shall not be deemed to authorize any act by the Trustees which may be a violation of any law prohibiting the accumulation of income.

8

No person who deals with any Trustee hereunder shall be bound to see to the application of any asset delivered to such Trustee or to inquire into the authority for, or propriety of, any action taken or not taken by such Trustee.  This Agreement, however, shall not be construed to permit any person to deal with the trust estate for less than adequate consideration, to borrow without adequate interest or adequate security, to exercise any power of administration in a nonfiduciary capacity, or otherwise to act in such manner as to cause the Grantor to be treated as the owner of the trust estate or any part thereof.

Notwithstanding anything to the contrary contained herein, no individual Trustee who is also a beneficiary hereunder shall have any right, power, duty or discretion hereunder concerning the Trust Estate, if such right, power, duty or discretion conferred upon said Trustee under this Agreement is determined to be a general power of appointment under Section 2041 of the Internal Revenue Code of 1986, as amended, which would cause any assets of the Trust Estate to be included in the estate of said Trustee at death, Any such right, power, duty or discretion with such effect shall be null and void with respect to said Trustee.  In such event, any other Trustee shall have the full authority to act.

No Trustee shall be liable for acts or omissions in administering the trust estate or any trust created by this Agreement, except for that Trustee's own actual fraud, gross negligence or willful misconduct.  If any Trustee becomes liable as Trustee to any other person who is not a beneficiary in connection with any matter not within the Trustee's control and not due to the Trustee's actual fraud, gross negligence or willful misconduct, such Trustee shall be fully indemnified and held harmless by the trust estate and any trust created hereunder giving rise to such liability, as the case may be, against and in respect of any damages that such Trustee may sustain, including without limitation attorneys' fees.

The Trustees are authorized, but not required, to accept any property transferred to the Trustees by any person during such person's lifetime or by such person's last will and testament.  Any property so transferred to, and accepted by, the Trustees shall become a part of such trust or trusts created by this Agreement as such person shall direct and may be commingled with the other property in the trust or trusts to which such property has been added and shall be held, administered and disposed of as a part of such trust or trusts.

## ARTICLE SIXTH
### Appointment of Trustees

The Grantor hereby appoints Kermit Card, La Donna Card and Raymond H. Card, Jr., as Trustees hereunder.  If any of my Trustees is unable or unwilling to serve as Trustee, then the remaining Trustees may act without appointment of any replacement or successor Trustee.

The Trustee shall have the right to resign at any time by giving written notice to the then income beneficiaries of each trust created hereby, or if none of the income beneficiaries of a trust are sui juris, to the persons sui juris who would be entitled to a share of the principal of such trust if it were then to terminate.  If upon such resignation no Trustee remains in office, such resignation shall not be effective until the Grantor, or if the Grantor is unable to do so, a court of competent jurisdiction, has appointed a successor Trustee.  The expenses of the accounting of a resigning Trustee shall be a proper charge against such trust.

9

The term "Trustees" wherever used herein shall mean the trustee or trustees in office from time to time. Any such trustee shall have the same rights, powers, duties, authority and privileges, whether or not discretionary, as if originally appointed hereunder.

No bond, surety or other security shall be required of any Trustee acting hereunder for the faithful performance of the duties of Trustee, notwithstanding any law of any State or other jurisdiction to the contrary.

### ARTICLE SEVENTH
### Decisions of Trustees Are Conclusive

The determination of the Trustees in respect of the amount of any discretionary payment of income or principal from any trust established hereunder, and of the advisability thereof, shall be final and conclusive on all persons, whether or not then in being, having or claiming any interest in such trust, and upon making any such payment, the Trustees shall be released fully from all further liability or accountability therefor.

The right of any beneficiary to any payment of income or principal shall in every case be subject to any charge or deduction which the Trustees may make against the same under the authority granted to the Trustees by any law or by this Agreement.

### ARTICLE EIGHTH
### Simultaneous Death

If any beneficiary under this Agreement shall die simultaneously with any other person upon whose death such beneficiary shall become entitled to receive either income or principal under this Agreement, or in such circumstances as to render it difficult or impracticable to determine who predeceased the other, then for purposes of this Agreement such beneficiary shall be deemed to have predeceased such other person. The provisions of this Agreement shall be construed as aforesaid, notwithstanding the provisions of any applicable law establishing a different presumption of order of death or providing for survivorship for a fixed period as a condition of inheritance of property.

### ARTICLE NINTH
### Rights of Beneficiaries Are Not Assignable

No disposition, charge or encumbrance on the income or principal of any trust established hereunder shall be valid or binding upon the Trustees. No beneficiary shall have any right, power or

10

authority to assign, transfer, encumber or otherwise dispose of such income or principal or any part thereof until the same shall be paid to such beneficiary by the Trustees. No income or principal shall be subject in any manner to any claim of any creditor of any beneficiary or liable to attachment, execution or other process of law prior to its actual receipt by the beneficiary.

## ARTICLE TENTH
### Construction

The validity and construction of this Agreement and the trusts created hereunder shall be governed by the laws of the State of New York.

Any provision herein which refers to a statute, rule, regulation or other specific legal reference which is no longer in effect at the time said provision is to be applied shall be deemed to refer to the successor, replacement or amendment to such statute, rule, regulation or other reference, if any, and shall be interpreted in such a manner so as to carry out the original intent of said provision.

Wherever used in this Agreement and the context so requires, the masculine shall include the feminine and the singular shall include the plural, and vice versa.

The captions in this Agreement are for convenience of reference, and they shall not be considered when construing this Agreement.

If under any of the provisions of this Agreement any portion of the trust estate would be held in trust beyond a date twenty-one years after the death of the last survivor of the Grantor, his wife, and the beneficiaries hereunder now in being, or such later date permitted by the rule against perpetuities applicable in the State of New York; then, upon such date, the trust of such portion shall terminate and the principal, and any unpaid income thereof, shall be paid and distributed to the person or persons then living who would have been entitled to receive the income therefrom had the trust continued, in the proportions to which they would have been so entitled.

## ARTICLE ELEVENTH
### Binding Effect

This Agreement shall extend to and be binding upon the heirs, executors, administrators, successors and assigns of the undersigned Grantor and upon the Trustees acting hereunder.

## ARTICLE TWELFTH
### Short Name

This Agreement and the trusts created hereunder may be referred to, in any other instrument, by the name: "Ella Card 2011 Trust". Any transfers to this Agreement or any trust hereunder may refer to the aforesaid name or to "Kermit Card, La Donna Card and Raymond H. Card, Jr., as Trustees under the Ella Card 2011 Trust", with or without specifying any change in Trustees.

11

**IN WITNESS WHEREOF**, this Agreement has been duly executed as of the date first above written.

_____
Ella Card by Kermit Card, her attorney-in-fact
Grantor


_____
Kermit Card
Trustee


_____
La Donna Card
Trustee


_____
Raymond H. Card, Jr.
Trustee

12

STATE OF NEW YORK, COUNTY OF KINGS, ss.

On the _____ day of February, 2011, before me, the undersigned notary public, personally appeared Kermit Card, as attorney-in-fact for Ella Card, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK, COUNTY OF _____, ss.

On the _____ day of February, 2011, before me, the undersigned notary public, personally appeared La Donna Card, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK, COUNTY OF KINGS, ss.

On the _____ day of February, 2011, before me, the undersigned notary public, personally appeared Kermit Card, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

13

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

STATE OF NEW YORK, COUNTY OF                              , ss.

On the _____ day of February, 2011, before me, the undersigned notary public, personally appeared Raymond H. Card, Jr., personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

14

**MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL**

Page 292 of 320

# EXHIBIT 34



161 Saratoga Avenue
Brooklyn, NY 11233

2 March 2011

Ella Card
155 Saratoga Avenue
Brooklyn, NY 11233

Dear Ella Card;

This letter is to thank you for your generous contributions of $6,611 to ▮▮▮▮▮▮▮▮▮▮▮▮ for the
year of 2010.   It is because of people like you that help keep our organization meeting needs of animals
we have taken into refuge.

Please use this letter as your 2010 tax contribution to a non-profit organization portion of your taxes.

Thank you for your continued support!

# EXHIBIT 35

October 29, 2011

The Honorable Judge Barros
Probate Court
Brooklyn, NY

RE:         Case # 100016/11
Patient:    Ella Card
DOB:        7/6/1938

Dear Honorable Judge Barros,

Pursuant to this matter before the court on suggestion of capacity for Ms. Ella Card, I performed a psychiatric evaluation of Ella Card on 10/29/2011 for 90 minutes, as requested by the family. No medical records were reviewed prior to the time of evaluation. Ella Card is a 73 year old right handed black female who presents for evaluation for restoration of capacity. Ms. Card states she was forced into a guardianship because her sons were upset with her, that she would not give them money. Ms. Card states they were both corrections officers, that both lost their jobs due to drug abuse. Ms. Card further states that the court just wants to take her and her husbands' hard earned money, that I am absolutely aware of what is happening and have testified in Washington about what this court is doing to me and my family. Ms. Card stated that she lives with her granddaughter Faith Card in Brooklyn, NY and is very happy living with her. Ms. Card states that she has a great relationship with her daughter Cindy and her other daughter LaDonna that is a Physician's Assistant and that there was never a need for a guardian, other than to steal her money.

**Past Psychiatric History**
Denied as per patient

**Past Medical History**
History of Diabetes x 10 years, on insulin for the past 2 years

**Past Surgical History**
1999 triple heart by-pass surgery

**Medications**
Insulin x 3 years, Nitroglycerin Patch x 12 hrs per day, Glyburide 5mg BID, Metropolol 25mg QD, Enalpril 2.5 mg QD, Lantis 25 units daily.

**Family History**
Mother and three sisters have diabetes, one brother deceased, alcoholic liver disease, one brother deceased heart attack

**Religion**
Pentecostal

**Developmental History**

The patient was born in Belize, She is the oldest of the three sisters but younger than her two brothers, she started working at age 16 in the clerical field. She started college immediately, came to the United States in 1966 where she got her Masters Degree in Education and started teaching for the Brooklyn School District and taught for about 39 years.

**Social History**

Patient emphatically denied any tobacco, alcohol or drug use. She has stated she has been a widow for about 10 years, as per patient. She also related that from this marriage she had four children 2 boys and 2 girls.

**Mental Status Examination**

Ms. Card is a 73 year old right handed black female who was pleasant and cooperative with the interviewer. She was well dressed, neatly groomed and did not appear to be in any distress. She was alert and oriented to person, place, month and year. She maintained good eye contact throughout the interview. Her speech was spontaneous. Her mood was "OK, I am not depressed" and her affect was congruent. Her thought processes were plenty. Thought content was negative for delusional material or psychosis. She denied suicidal or homicidal ideas, intent or plan. Memory- 3/3 immediate and 3/3 recent. Ms. Card was able to do serial 7's and was able to do serial 3's as well. She was able to name a pen, a watch and the wristband. When asked the difference between a bird and a plane, she said, "The difference is the heights of flight vary greatly between the two. The bird is free flowing but the airplane has a motor and must be guided." When asked the similarities she said "They both have wings; they both fly and land." When asked what is meant by the following proverb, "People who live in glass houses should not throw stones," she said, "You should not try to hurt someone, because in turn you could be hurting yourself." When asked if she has ever heard the saying, "You can lead a horse to water but you can't make him drink," she responded, "You could lead someone to someplace, but you cannot force them to indulge or participate in what you bring to their attention."  Her insight and judgment are excellent.

**Diagnosis**

Although no records were available, however, after the evaluation I had the pleasure to speak with Ms. Card's daughter, Ladonna Card, who is a Physician's Assistant and verified all medications and history was correct. My evaluation of Ms. Card reveals intact short and long term memory with no deficits. The patient's language was totally fluent, the patient did not have difficulty naming objects, and in my evaluation there were no disturbances in executive functioning, for example planning, organizing, sequencing and abstracting. The patient had no problems with serial 7's and serial 3's. The patient had no problems with organizing and planning, gave a good history of her present illness, medicines and past surgery. Diagnosis, normal 73 year old with no cognitive deficits.

**Assessment**

In my view, Ella Card is able to make informed decisions regarding her:

1. Right to marry
2. Right to vote

3.  Right to personally apply for government benefits
4.  Right to seek or retain employment
5.  Right to contract
6.  Right to sue and assist in the defense of suits of any nature against her
7.  Right to make decisions affecting her social environment or social aspects of her life
8.  Right to determine her residence
9.  Right to consent to medical treatment
10. Right to travel
11. Right to manage or dispose of property or make a gift or disposition of property
12. Patient does not drive

This patient seems to be well cared for and states, "She is happy that her granddaughter Faith is living with her." Ms. Card's two daughters, Cindy and Ladonna are very close with their mother and have a very strong relationship. Ms. Card has been a Brooklyn School Teacher for 39 years and has built a large estate with smart investments. Therefore, it is my opinion that Ella Card is absolutely competent in making her own decisions and is not in need of a guardian.

Sincerely,

Robert Sarhan, MD

cc:
Richard S. Weisman  Esq.
Weisman & Calderon LLC
6 Gramatan Avenue
Suite 206
Mount Vernon, NY  10550

May 12, 2012

The Honorable Judge Barros
Probate Court
Brooklyn, NY

RE:         Case # 100016/11
Patient:    Ella Card
DOB:        7/6/1938

Dear Honorable Judge Barros,

The family asked me to reevaluate Ms. Ella Card for a more recent mental evaluation. I will incorporate part of my history from the last report completed on 10/29/2011, and complete a physical and mental evaluation today, since the history of this case has not changed. Pursuant to this matter before the court on suggestion of capacity for Ms. Ella Card, I performed another 90 minute evaluation today May 12, 2012 at 2:00 P.M.

Ella Card is a 73 year old right handed black female who was well dressed, well groomed and with a sense of humor. Ella Card was frustrated about what is going on, however, this would be a normal response to a person such as Ella Card who worked hard her entire life, invested her money wisely and who again was fully competent today May 12, 2012. Ella Card keeps in touch with her daughters daily and is well aware what is going in her court case.

In the previous history, Ms. Card stated she was forced into a guardianship because her sons were upset with her, that she would not give them money. Ms. Card stated they were both corrections officers, that both lost their jobs due to drug abuse. Ms. Card further stated that the court just wants to take her and her husbands' hard earned money that I am absolutely aware of what is happening and have testified in Washington about what this court is doing to me and my family. In this evaluation, Ms. Card additionally states that she now lives in Belize and was forced to leave the United States because of this "…illegal and unlawful guardianship." Ms. Card states that "all of my constitutional, civil and human rights have been violated" and she refuses to ever again live in a country that will allow such egregious behavior to take place. Ms Card states that she has "…met hundreds of people and read thousands of stories about others who have gone through the same thing." Ms Card states that "slavery" and the "holocaust" is alive and well in America. Ms. Card says she came here to "…fulfill the American Dream that has now become a nightmare." Ms. Card states that "Never again will I ever live in America." Ms. Card says that she "…wants the estate planning that she effectuated to remain in place and her assets turned over to her daughter, Cindy Card." Ms. Card states that she "…made these plans understanding the ramifications of her actions and in no way shape or form was manipulated, intimidated or coerced by her daughter Cindy Card or anyone else." Ms. Card states that she has articulated this in Washington to Congressman Ted Poe, Senator Amy Klobuchar's officials, the *Washington Examiner*, the Gloria Minott radio show, Justice Barros in the Brooklyn Supreme Court, LaDonna and Faith Card and to other family and friends.     She also relayed this to Kristine Mooney and Lisa Freedman, on February 26, 2011 when they came to her home at 161 Saratoga Avenue during a home visit. Ms. Card states that it is "…my property and assets and I can give them to anyone I choose to." Ms. Card states that she has a great relationship with her daughter Cindy and her other daughter LaDonna that is a Physician's Assistant and that there was never a need for a guardian, other than to steal her money.

**Past Psychiatric History**
Denied

**Past Medical History**
History of Diabetes x 10 years, on insulin for the past 2 years

**Past Surgical History**
1999 triple heart by-pass surgery

**Medications**
Insulin x 3 years, Nitroglycerin Patch x 12 hrs per day, Glyburide 5mg BID, Metropolol 25mg QD, Enalpril 2.5 mg QD, Lantis 25 units daily.

**Family History**
Mother and three sisters have diabetes, one brother deceased, alcoholic liver disease, one brother deceased heart attack

**Religion**
Pentecostal

**Developmental History**
The patient was born in Belize, She is the oldest of the three sisters but younger than her two brothers, she started working at age 16 in the clerical field. She started college immediately, came to the United States in 1966 where she got her Masters Degree in Education and started teaching for the Brooklyn School District and taught for about 39 years.

**Social History**
Patient denied any tobacco, alcohol or drug use. She has stated she has been a widow for about 10 years, as per patient. From her only marriage she had four children 2 boys and 2 girls.

**Mental Status Examination**
Ms. Card is a 73 year old right handed black female who was pleasant and cooperative. She was well dressed, neatly groomed and did not appear to be in any distress. She was alert and oriented to person, place, month and year. She maintained good eye contact and her speech was spontaneous. Her mood was good, she stated, "I am not depressed" and her affect was congruent. Her thought processes were plenty. Thought content was negative for delusional material or psychosis. She denied suicidal or homicidal ideas, intent or plan. Memory- 3/3 immediate and 3/3 recent. Ms. Card was able to do serial 7's and was able to do serial 3's. She was able to name a watch, pen and cell phone. When asked, what were the similarities and differences between a bird and a plane, Ms. Card stated, "a bird is an animal and a plane is a man made mechanical machine. However, she said, "their similarities are they both have wings and can fly." When asked what is meant by the proverb, people who lives in glass houses should not throw stones. Ella stated, "You should not try to hurt someone, because in turn you could be hurting yourself." When asked if she has ever heard the saying, "You can lead a horse to water but you can't make him drink," she responded, "You could lead someone to someplace, but you cannot force them to indulge or participate in what you bring to their attention." Her insight and judgment are excellent.

**Diagnosis: Normal 73 year old woman with no cognitive deficits.**

Again, although no records were available, after the evaluation, I spoke to Ladonna Card, who is a Physician's Assistant and verified all medications were the same. My evaluation of Ms. Card reveals intact short and long term memory with no deficits. The patient's language was totally fluent, the patient did not have difficulty naming objects, and in my evaluation there were no disturbances in executive functioning, for example planning, organizing, sequencing and abstracting. The patient had no problems with serial 7's and serial 3's. The patient had no problems with organizing and planning, gave a good history of her present illness, medicines and past surgery. Diagnosis, normal 73 year old with no cognitive deficits.

**Assessment**

In my view, Ms. Card is able to make informed decisions regarding her:

1. Right to marry
2. Right to vote
3. Right to personally apply for government benefits
4. Right to seek or retain employment
5. Right to contract
6. Right to sue and assist in the defense of suits of any nature against her
7. Right to make decisions affecting her social environment or social aspects of her life
8. Right to determine her residence
9. Right to consent to medical treatment
10. Right to travel
11. Right to manage or dispose of property or make a gift or disposition of property
12. Patient does not drive

This patient seems to be well cared for and states, "She was very happy living with her granddaughter Faith, till all these legal issues started." Cindy and Ladonna are very close with their mother and have a very strong relationship. Ms. Card has been a Brooklyn School Teacher for 39 years and has built a large estate with smart investments. Therefore, it is my opinion that Ella Card is absolutely competent in making her own decisions and is not in need of a guardian for her person or property.

Sincerely,

Robert Sarhan, MD

# EXHIBIT 36
## EXHIBIT A

Social Security Administration
IMPORTANT INFORMATION

SOCIAL SECURITY
3RD FLOOR

195 MONTAGUE ST
BROOKLYN, NY 11201
Date: 04/07/2011
Number: 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

106    RP

VERA INSTITUTE OF JUSTICEPO
BOX 2-5106

BROOKLYN, NY 11202

We are returning the attached application you submitted to us requesting to be payee for ELLA RUBINA CARD for your records.

We stored the information you submitted with this request electronically so there is no reason for us to retain a paper copy.

IMPORTANT REMINDER

Penalty of Perjury

You declared under penalty of perjury that you examined all the information on your request and it is true and correct to the best of your knowledge. You were told that you could be held liable under law for providing false statements.

IF YOU HAVE ANY QUESTIONS

If you have any questions, you may call, write or visit any Social Security office. If you call or visit this office, please have this letter with you and ask  for------,--------_____. The telephone number where I can be reached is 877-531-4725. We can answer most questions over the phone. Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly.

Manager

April 7, 2011, 10:48
PAGE   1

CAN/HUN

BOAN          TOP/GS/CC           SG-SSA-11
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A    063-42 1550     NPO/Y/SEL

WAC106

### REQUEST TO BE SELECTED AS PAYEE

I request that the Social Security Benefits for ELLA RUBINA CARD be paid to
VERA INSTITUTE OF JUSTICE as representative payee.

ELLA RUBINA CARD needs a payee because she LEGALLY INCAPACITATED.

I would be the best payee for ELLA RUBINA CARD because I am her guardian.

I will know about ELLA RUBINA CARD'S needs because COURT ORDER.

### INFORMATION ABOUT THE PERSON FOR WHOM YOU ARE APPLYING

ELLA RUBINA CARD lives alone.

ELLA RUBINA CARD has no relatives or close friends who live with or are
interested in being her representative payee.

ELLA RUBINA CARD does not owe VERA INSTITUTE OF JUSTICE any money and we do not
expect her to in the future.

I am ELLA RUBINA CARD's legal guardian. I was appointed on March 16, 2011
because LEGALLY INCAPACITATED.

### INFORMATION ABOUT PAYEE APPLICANT

I represent VERA INSTITUTE OF JUSTICE. Our Employer Identification Number is
13-1941627.

VERA INSTITUTE OF JUSTICE'S mailing address is PO  BOX 2-5106, BROOKLYN, NY,
11202.

Our business location is PO  BOX 2-5106, BROOKLYN, NY, 11202.

ELLA RUBINA CARD lives at APT 3L, 155 SARATOGA AVE, BROOKLYN, NY, 11233.

My telephone number is (347) 296-1874.

  I do not have a bank account.

I do not want a Direct Express Account.

          I/my organization:
          o  Must use all payments made to me/my organization as the representative payee for the
             claimant's current needs or (if notcurrently needed) save them for his/her future needs.
          o  May be held liable for repayment if I/my organization
             misuses the payments or if I/my organization am/is at fault for any
             overpayment of benefits.
          o  May be punished under Federal law by fine, imprisonment or

April 7, 2011, 10:48
PAGE  2

CAN/HUN                 BOAN          TOP/GS/CC              SG-SSA-11
                     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      NPO/Y/SEL
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A

both if I/my organization am/is found guilty of misuse of Social
Security or SSI benefits.

I/my organization will:
o  Use the payments for the claimant's current needs and save any currently unneeded
   benefits for future use.
o  File an accounting report on how the payments were used, and make all supporting records
   available for review if requested by the Social Security Administration.
o  Reimburse the amount of any loss suffered by any claimant due to misuse of Social
   Security or SSI funds by me/my organization.
o  Notify the Social Security Administration when the claimant dies, leaves my/my
   organization's custody or otherwise changes his/her living arrangements or he/she is no longer
   my/my organization's responsibility.
o  Comply with the conditions for reporting certain events
   (listed on the attached sheet(s) which I/my organization will keep
   for my/my organization's records) and for returning checks the
   claimant is not due.
o  File an annual report of earnings if required.
o  Notify the Social Security Administration as soon as I/my organization can no longer act as
   representative payee or the claimant no longer needs a payee.

I know that anyone who makes or causes to be made a false statement
or representation of material fact relating to a payment under the
Social Security Act commits a crime punishable under Federal law by
fine, imprisonment or both. I affirm that all information I have
given in this document is true.

Signature_____
Date_____
Please print your name and title
Name_____
Title_____

CAN/HUN          BOAN          TOP/GS/CC          SG-SSA-11
                 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   NPO/Y/SEL
063-42 1550A

YOU MUST NOTIFY THE SOCIAL SECURITY ADMINISTRATION PROMPTLY IF ANY OF THE FOLLOWING EVENTS OCCUR AND PROMPTLY RETURN ANY PAYMENT TO WHICH THE CLAIMANT IS NOT ENTITLED:

o  the claimant DIES (Social Security entitlement ends the month before the month the claimant dies);
o  the claimant MARRIES, if the claimant is entitled to child's, widow's, mother's, father's, widower's, or parent's benefits, or to wife's or husband's benefits as a divorced wife/husband, or to special age 72 payments;
o  the claimant's marriage ends in DIVORCE or ANNULMENT, if the claimant is entitled to wife's, husband's or special age 72 payments;
o  the claimant's SCHOOL ATTENDANCE CHANGES, if the claimant is age 18 or over and entitled to child's benefits as a full time student;
o  the claimant is entitled as a STEPCHILD AND THE PARENTS DIVORCE (benefits terminate the month after the month the divorce becomes final);
o  the claimant is under FULL RETIREMENT AGE (FRA) and WORKS for more than the annual limit (as determined each year) or for more than the allowable limit (for work outside the United States);
o  the claimant receives a GOVERNMENT PENSION or ANNUITY or the amount of the annuity changes;
o  the claimant leaves your custody or care or otherwise CHANGES ADDRESS;
o  the claimant NO LONGER HAS A CHILD IN CARE, if he/she is entitled to benefits because of caring for a child under age 16 or who is disabled;
o  the claimant is CONFINED TO JAIL, PRISON, PENAL INSTITUTION OR CORRECTIONAL FACILITY;
o  the claimant is CONFINED TO A PUBLIC INSTITUTION by court order inconnection with a crime.
o  the claimant has an UNSATISFIED FELONY WARRANT (or in jurisdictions that do not define crimes as felonies, a crime punishable by death or imprisonment exceeding 1 year) issued for his/her arrest;
o  the claimant is VIOLATING a condition of probation or parole under State or Federal law.

IF THE CLAIMANT IS RECEIVING DISABILITY BENEFITS, YOU MUST ALSO REPORT IF:

o  the claimant's MEDICAL CONDITION IMPROVES;
o  the claimant STARTS WORKING;
o  the claimant applies for or receives WORKER'S COMPENSATION BENEFITS, Black Lung Benefits from the Department of Labor, or a public disability benefit;
o  the claimant is DISCHARGED FROM THE HOSPITAL (if now hospitalized).

IF THE CLAIMANT IS RECEIVING SPECIAL AGE 72 PAYMENTS, YOU MUST ALSO REPORT IF:

o  the claimant or spouse becomes ELIGIBLE FOR PERIODIC GOVERNMENTAL PAYMENTS, whether from the U.S. Federal government or from any State or local government;
o  the claimant or spouse receives SUPPLEMENTAL SECURITY INCOME or PUBLIC ASSISTANCE CASH BENEFITS;
o  the claimant or spouse MOVES outside the United States (the 50 states, the District of Columbia and the Northern Mariana Islands)

April 7, 2011, 10:48
PAGE   4

CAN/HUN

BOAN          TOP/GS/CC          SG-SSA-11
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A      063 42-1550      NPO/Y/SEL

IN ADDITION TO THESE EVENTS ABOUT THE CLAIMANT, YOU MUST ALSO NOTIFY US IF:

○ YOU change your address;
○ YOU are convicted of a felony or any offense under State or Federal law which results in imprisonment for more than one year;
○ YOU have an UNSATISFIED FELONY WARRANT (or in jurisdictions that do not define crimes as felonies, a crime punishable by death or imprisonment exceeding 1 year) issued for your arrest.

BENEFITS MAY STOP IF ANY OF THE ABOVE EVENTS OCCUR. You should read the informational booklet we will send you to see how these events affect benefits. You may make your reports by telephone, mail or in person.

---

REMEMBER:

○ payments must be used for the claimant's current needs or saved if not currently needed;
○ you may be held liable for repayment of any payments not used for the claimant's needs or of any overpayment that occurred due to your fault;
○ you must account for benefits when so asked by the Social Security Administration. You will keep records of how benefits were spent so you can provide us with a correct accounting;
○ to tell us as soon as you know you will no longer be able to act as representative payee or the claimant no longer needs a payee.

Keep in mind that benefits may be deposited directly into an account set up for the claimant with you as payee. As soon as you set up such an account, contact us for more information about receiving the claimant's payments using direct deposit.

THE PRIVACY AND PAPERWORK REDUCTION
ACTS

we are required by section 205(j) and 205(a) of the Social Security Act to ask you to give us the information on this form. This information is needed to determine if you are qualified to serve as representative payee. Although responses to these questions are voluntary, you will not be named representative payee unless you give us the answers to these questions.

Sometimes the law requires us to give out the facts on this form without your consent. We must release this information to another person or government agency if Federal law requires that we do so or to do the research and audits needed to administer or improve our representative payee program.

We may also use the information you give us when we match records by computer. Matching programs compare our records with those of other Federal, State or local government agencies. Many agencies may use matching programs to find or prove that a person qualifies for benefits paid by Federal government. The law allows us to do this even if you do not agree to it.

These and other reasons why information about you may be used or given out are explained in the Federal Register. If you want to learn more about this, contact any Social Security office.

April 7, 2011, 10:48
PAGE    5

CAN/HUN          BOAN          TOP/GS/CC          SG-SSA-11
063 42-1550A     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   NPO/Y/SEL

We invite you to visit our website at www.socialsecurity.gov on the
Internet tofind general information about Social Security. If you have
any specific questions, you may call us toll-free at 1-800-772-1213, or
call your local Social Security office at 877-531-4725. We can answer
most questions over the phone. If you are deaf or hard of hearing, you
may call our TTY number
1-800-325-0778. You can also write or visit any Social Security
office. Theoffice that serves your area is located at:

SOCIAL
SECURIT
Y3RD
FLOOR

195
MONTAGUE
ST
BROOKLYN,
NY 11201

If you do call or visit an office, please have this letter with you.
It willhelp us answer your questions. Also, if you plan to visit an
office, you maycall ahead to make an appointment. This will help us
serve you more quickly when you arrive at the office.

SSA OFFICE 106

7

# EXHIBIT 37



# EXHIBIT 38

**FILED**
HARRISBURG, PA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**
**CASE NO. 1:21-CV-01288**

SEP 1 5 2021

PER_____ ꩜꩜

DEPUTY CLERK

ELLA CARD, KEN SWENSON, individually
and as next friend of Ella Card, CINDY CARD
individually and as next friend of Ella Card,
LADONNA CARD individually and as next
friend of Ella Card, FAITH CARD individually
and as next friend of Ella Card

Plaintiffs, v.

DEFENDANTS: THE VERA INSTITUTE OF JUSTICE;
NICHOLAS TURNER President of the Vera Institute and
in individual capacity; JOHN HOLT Attorney for the Vera
Institute and in individual capacity; KIMBERLY
GEORGE Director for the Vera Institute and in individual
capacity; LAURA NEGRON Former Director for the
Vera Institute and in individual capacity; LISA
FRIEDMAN, ESQ Court Evaluator and in individual
capacity; ALEXANDRA SCHONFELD Court Evaluator
and in individual capacity; JUDGE BETSY BARROS, as
Judge and in individual capacity; JUDGE LEON
RUCHELSMAN, as Judge and in individual capacity;
CHRISTINE MOONEY Court Appointed Attorney for
Ella Card and in individual capacity; PAUL O'BRIEN
Attorney, Falcon Rappaport & Berkman, PLLC for Ella
Card and in individual capacity; DAVID VAN
LEEUWEN Attorney, Peyrot & Associates for Petitioners
and in individual capacity; BONNIE BERNSTEIN,
Polizzotto and Polizzotto Attorney for Raymond and
Kermit Card and in individual capacity; JULIE STOIL
FERNANDEZ Attorney, Finkel & Fernandez, LLP, and in
individual capacity; RAYMOND CARD Illegal Guardian
of Property Disowned/Estranged Son of Ella Card;
KERMIT CARD Illegal Guardian of Property
Disowned/Estranged Son of Ella Card; KINGS COUNTY,
New York; Judge LAWRENCE KNIPEL, Administrative
Law Judge, STATE OF NEW YORK; NYC Health
Benefits (OLR) IRMAA, UFT, 52 Broadway, New York,
NY10004, EDDIE & ARLENE TORRES, Saratoga Deli,
Progressive General Contractors

Defendants.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

**FEDERAL REMOVAL ACTION**
**AMENDED COMPLAINT**
**COMPLAINT FOR DAMAGES**
**DEMAND FOR JURY TRIAL**

**CAUSES OF ACTION:**
1. Racial Discrimination
2. Violation of Federal Rights
   (42 USC § 1983)
3. Violation of Due Process 14th Amendment
4. Conspiracy to Interfere with Civil Rights (42 USC
   § 1985)
5. Action for Neglect to Prevent ((42 USC § 1986)
6. Conspiracy Against Rights (18 USC § 241)
7. Deprivation of Civil Rights (18 USC § 242)
8. Cruel and Unusual Punishment (8th Amendment)
9. Hobbs Act 18 USC § 1951 & 371
   Interference with commerce by threats, or
   violence, Obtaining of Property "under color of
   official right" by public officials
10. Racketeering Influence Corrupt
    Organization 18 USC § 1961-1964
11. Extrinsic Fraud on the Court FRCP 60(b)(3)
12. Right to Choose Own Counsel (6th Amendment)
13. Ineffective Assistance of Counsel (14th
    Amendment)
14. Loss of Subject Matter Jurisdiction (Mental
    Hygiene Law § 81.08[a][14]
15. Failure to provide Accommodations of Legal
    Counsel (ADA Title 2)
16. Breach of Fiduciary Duties
17. Elder Abuse & Financial Exploitation (8th
    Amendment)
18. Care Prover Deprivation of Goods NY Penal
    Law 190.65, 260.25
19. Professional Negligence
20. Declaratory Relief
21. Mail Fraud
22. Wire Fraud
23. Manifest Injustice

**Prayer for Relief**

~1~
FEDERAL REMOVAL ACTION COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

# APPENDIX A

## LIST AND DEFINITION OF FEDERAL LAWS VIOLATED AND FEDERAL CRIMES PERPETRATED BY RESPONDENT AND EXTRAJUDICIAL JUDGES

**18 U.S. Code § 2.Principals**
(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**18 U.S. Code § 3.Accessory after the fact**
   Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact. Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than 15 years.

**18 U.S. Code § 4.Misprision of felony**
   Whoever, having knowledge of the actual commission of a felony cognizable by    a court of the United States, conceals and does not as soon as possible make known the same  to  some  judge  or  other person in  civil  or military  authority  under  the United States, shall be fined under this title or imprisoned not more than three years, or both.

**18 U.S. Code § 201.Bribery of public officials andwitnesses**
(b)Whoever—
   **(2)** being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity, in return for:
   **(A)** being influenced in the performance of any official act;
   **(B)** being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
   **(C)** being induced to do or omit to do any act in violation of the official duty of such official or person;
   **(3)** directly or indirectly, corruptly gives, offers, or promises anything of value to any person, or offers or promises such person to give anything of value to  any  other person or entity, with intent to influence the testimony under oath or affirmation of such first-mentioned person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses  of Congress,  or  any agency, commission,  or  officer  authorized  by  the  laws  of the United States to hear evidence or take testimony, or with intent to influence such person to absent himself therefrom;
   **(4)** directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally or for any other person or entity in return for being influenced in testimony under oath or affirmation as a witness upon any such trial, hearing, or other proceeding, or in return for absenting himself therefrom;
   shall be fined under this title or not more than three times the monetary equivalent of the thing of value, whichever is greater, or imprisoned for not more than fifteen years, or both, and may be disqualified from holding any office of honor, trust, or profit under the United States.
   **(c)** Whoever—

**(1)** otherwise than as provided by law for the proper discharge of official duty—

**(B)** being a public official, former public official, or person selected to be a public official, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of any official act performed or to be performed by such official or person;

**(2)** directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial, hearing, or other proceeding, before any court, any committee of either House or both Houses of Congress, or any agency, commission, or officer authorized by the laws of the United States to hear evidence or take testimony, or for or because of such person's absence therefrom;

**(3)** directly or indirectly, demands, seeks, receives, accepts, or agrees to receive or accept anything of value personally for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon any such trial, hearing, or other proceeding, or for or because of such person's absence therefrom; shall be fined under this title or imprisoned for not more than two years, or both.

**18 U.S. Code § 208. Acts affecting a personal financial** interest (a) Except as permitted by subsection (b) hereof, whoever, being an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, a Federal Reserve bank director, officer, or employee, or an officer or employee of the District of Columbia, including a special Government employee, participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which, to his knowledge, he, his spouse, minor child, general partner, organization in which he is serving as officer, director, trustee, general partner or employee, or any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest—

Shall be subject to the penalties set forth in section 216 of this title.

**18 U.S. Code § 241. Conspiracy against rights**

If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.

**18 U.S. Code § 242. Deprivation of rights under color of law**

Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned

for any term of years or for life, or both, or may be sentenced to death.

**18 U.S. Code § 371.Conspiracy to commit offense or to defraud United States**

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

If, however, the offense, the commission of which is the object of the conspiracy, is a misdemeanor only, the punishment for such conspiracy shall not exceed the maximum punishment provided for such misdemeanor.

**18 U.S. Code § 373.Solicitation to commit a crime of violence**

(a) Whoever, with intent that another person engage in conduct constituting a felony that has as an element the use, attempted use, or threatened use of physical force against property or against the person of another in violation of the laws of the United States, and under circumstances strongly corroborative of that intent, solicits, commands, induces, or otherwise endeavors to persuade such other person to engage in such conduct, shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half of the maximum fine prescribed for the punishment of the crime solicited, or both; or if the crime solicited is punishable by life imprisonment or death, shall be imprisoned for not more than twenty years. (b) It is an affirmative defense to a prosecution under this section that, under circumstances manifesting a voluntary and complete renunciation of his criminal intent, the defendant prevented the commission of the crime solicited. A renunciation is not "voluntary and complete" if it is motivated in whole or in part by a decision to postpone the commission of the crime until another time or to substitute another victim or another but similar objective. If the defendant raises the affirmative defense at trial, the defendant has the burden of proving the defense by a preponderance of the evidence. (c) It is not a defense to a prosecution under this section that the person solicited could not be convicted of the crime because he lacked the state of mind required for its commission, because he was incompetent or irresponsible, or because he is immune from prosecution or is not subject to prosecution.

**18 U.S. Code § 641.Public money, property or records**

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

**18 U.S. Code § 645.Court officers generally**

Whoever, being a United States marshal, clerk, receiver, referee, trustee, or other officer of a United States court, or any deputy, assistant, or employee of any such officer, retains or converts to his own use or to the use of another or after demand by the party entitled thereto, unlawfully retains any money coming into his hands by virtue of his official relation, position or employment, is guilty of embezzlement and shall, where the offense is not otherwise punishable by enactment of Congress, be fined under this title or not more than double the value of the money so embezzled, whichever is greater, or imprisoned not more than ten years, or both; but if the amount embezzled does not exceed $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

**18   U.S.   Code § 654.Officer   or   employee   of   United   States   converting property of another**

MOTION FOR DECLATORY RELIEF AND REMOVAL AND PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER DEMAND JURY TRIAL

Whoever, being an officer or employee of the United States or of any department or agency thereof, embezzles or wrongfully converts to his own use the money or property of another which comes into his possession or under his control in the execution of such office or employment, or under color or claim of authority as such officer or employee, shall be fined under this title or not more than the value of the money and property thus embezzled or converted, whichever is greater, or imprisoned not more than ten years, or both; but if the sum embezzled is
$1,000 or less, he shall be fined under this title or imprisoned not more than one year, or both.

### 18 U.S. Code § 872.Extortion by officers or employees of the United States

Whoever, being an officer, or employee of the United States or any department or agency thereof, or representing himself to be or assuming to act as such, under color or pretense of office or employment commits or attempts an act of extortion, shall be fined under this title or imprisoned not more than three years, or both; but if the amount so extorted or demanded does not exceed $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

### 18 U.S. Code § 880.Receiving the proceeds of extortion

A person who receives, possesses, conceals, or disposes of any money or other property which was obtained from the commission of any offense under this chapter that is punishable by imprisonment for more than 1 year, knowing the same to have been unlawfully obtained, shall be imprisoned not more than 3 years, fined under this title, or both.

### 18 U.S. Code § 912.Officer or employee of the United States

Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both.

#### generally

(a)  Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully— (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; (2) makes any materially false, fictitious, or fraudulent statement or representation; or (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; shall be fined under this title, imprisoned not more than 5 years or, if the offense involves international or domestic terrorism (as defined in section 2331), imprisoned not more than 8 years, or both. If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.

### 18 U.S. Code § 1341.Frauds and swindles

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

**18 U.S. Code § 1346.Definition of "scheme or artifice to defraud"**

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

**SCHEME OR ARTIFICE TO DEFRAUD**

A scheme or artifice to deprive another of the intangible right of honest services. 18 USC; Any plan or course of action intended to deceive others, and to obtain, by false or fraudulent pretenses, representations, or promises, money or property from persons so deceived.

**What is SCHEME TO DEFRAUD - Black's Law Dictionary**

thelawdictionary.org/scheme-to-defraud

SCHEME TO DEFRAUD: a planned attempt to deceive and cheat and a conspiracy to carry out a fraud.

**18 U.S. Code § 1349.Attempt and conspiracy**

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

**18 U.S. Code § 1461.Mailing obscene or crime-inciting matter**

Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance; and—
Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of anything declared by this section or section 3001(e) of title 39 to be nonmailable, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, or knowingly takes any such thing from the mails for the purpose of circulating or disposing thereof, or of aiding in the circulation or disposition thereof, shall be fined under this title or imprisoned not more than five years, or both, for the first such offense, and shall be fined under this title or imprisoned not more than ten years, or both, for each such offense thereafter.

**18 U.S. Code § 1465.Production and transportation of obscene matters for sale or distribution**

Whoever knowingly produces with the intent to transport, distribute, or transmit in interstate or foreign commerce, or whoever knowingly transports or travels in, or uses a facility or means of, interstate or foreign commerce or an interactive computer service (as defined in section 230(e)(2) [1] of the Communications Act of 1934) in or affecting such commerce, for the purpose of sale or distribution of any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined under this title or imprisoned not more than five years, or both.

**18 U.S. Code § 1512.Tampering with a witness, victim, or an informant (a)**

**(1)** Whoever kills or attempts to kill another person, with intent to—

**(A)**prevent the attendance or testimony of any person in an official proceeding; **(B)**prevent the production of a record, document, or other object, in an official proceeding; or

**(C)**prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

**(2)** Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—

**(A)** influence, delay, or prevent the testimony of any person in an official proceeding;

**(B)** cause or induce any person to—

**(i)**        withhold testimony, or withhold a record, document, or other object, from an official proceeding;

**(ii)** alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;

**(iii)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

**(iv)** be absent from an official proceeding to which that person has been summoned by legal process; or

**(C)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings; shall be punished as provided in paragraph (3).

**(3)** The punishment for an offense under this subsection is—

**(A)** in the case of a killing, the punishment provided in sections 1111 and 1112;

**(B)** in the case of—

**(i)** an attempt to murder; or

**(ii)** the use or attempted use of physical force against any person; imprisonment for not more than 30 years; and

**(C)** in the case of the threat of use of physical force against any person, imprisonment for not more than 20 years.

(b)  Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

**(1)** influence, delay, or prevent the testimony of any person in an official proceeding;

**(2)** cause or induce any person to—

**(A)** withhold testimony, or withhold a record, document, or other object, from an official proceeding;

**(B)** alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

**(C)** evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

**(D)** be absent from an official proceeding to which such person has been summoned by legal process; or

**(3)** hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission   of   a   Federal   offense   or   a   violation   of   conditions   of   probation [1]   supervised release,,[1] parole, or release pending judicial proceedings; shall be fined under this title or imprisoned not more than 20 years, or both. **(c)**Whoever corruptly—

**(1)** alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

**(2)** otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both. **(d)**Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—

**(1)** attending or testifying in an official proceeding;

**(2)** reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation [1] supervised release,,[1] parole, or release pending judicial proceedings; **(3)**arresting or seeking the arrest of another person in connection with a Federal offense; or

**(4)**causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding; or attempts to do so, shall be fined under this title or imprisoned not more than 3 years, or both.

**(e)** In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify

truthfully. **(f)** For the purposes of this section—

**(1)** an official proceeding need not be pending or about to be instituted at the time of the offense; and

**(2)** the testimony, or the record, document, or other object need not be admissible in evidence or free of a claim of privilege.

**(g)** In a prosecution for an offense under this section, no state of mind need be proved with respect to the circumstance—

**(1**that the official proceeding before a judge, court, magistrate judge, grand jury, or government agency is before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a Federal grand jury, or a Federal Government agency; or

**(2)** that the judge is a judge of the United States or that the law enforcement officer is an officer or employee of the Federal Government or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an adviser or consultant.

**(h)** There is extraterritorial Federal jurisdiction over an offense under this section. **(i)** A prosecution under this section or section 1503 may be brought in the district in which the official proceeding (whether or not pending or about to be instituted) was intended to be affected or in the district in which the conduct constituting the alleged offense occurred.

**(j)** If the offense under this section occurs in connection with a trial of a criminal case, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

**(k)** Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.


**18 U.S.C. § 1513. Retaliating against a witness, victim, or an informant** (a)

**(1)** Whoever kills or attempts to kill another person with intent to retaliate against any person for—

**(A)** the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or

**(B)** providing to a law enforcement officer any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings, shall be punished as provided in paragraph (2).

**(2)** The punishment for an offense under this subsection is—

**(A)** in the case of a killing, the punishment provided in sections 1111 and 1112; and

**(B)** in the case of an attempt, imprisonment for not more than 30 years.

**(b)** Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—

**(1)** the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or

**(2)** any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer; or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

**(c)** If the retaliation occurred because of attendance at or testimony in a criminal case, the maximum term of imprisonment which may be imposed for the offense under this section shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case. **(d)** There is extraterritorial Federal jurisdiction over an offense under this section. **(e)** Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.

**(f)** Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

**(g)** A prosecution under this section may be brought in the district in which the official proceeding (whether pending, about to be instituted, or completed) was intended to be affected, or in which the conduct constituting the alleged offense occurred.

**18 U.S. Code § 1514. Civil action to restrain harassment of a victim or witness** (a)

**(1)** A United States district court, upon application of the attorney for the Government, shall issue a temporary restraining order prohibiting harassment of a victim or witness in a Federal criminal case if the court finds, from specific facts shown by affidavit or by verified complaint, that there are reasonable grounds to believe that harassment of an identified victim or witness in a Federal criminal case exists or that such order is necessary to prevent and restrain an offense under section 1512 of this title, other than an offense consisting of misleading conduct, or under section 1513 of this title.

**(2)**

**(A)** A temporary restraining order may be issued under this section without written or oral notice to the adverse party or such party's attorney in a civil action under this section if the court finds, upon written certification of facts by the attorney for the Government, that such notice should not be required and that there is a reasonable probability that the Government will prevail on the merits.

**(B)** A temporary restraining order issued without notice under this section shall be endorsed with the date and hour of issuance and be filed forthwith in the office of the clerk of the court issuing the order.

**(C)** A temporary restraining order issued under this section shall expire at such time, not to exceed 14 days from issuance, as the court directs; the court, for good cause shown before expiration of such order, may extend the expiration date of the order for up to 14 days or for such longer period agreed to by the adverse party. **(D)** When a temporary restraining order is issued without notice, the motion for a protective order shall be set down for hearing at the earliest possible time and takes precedence over all matters except older matters of the same character, and when such motion comes on for hearing, if the attorney for the Government does not proceed with the application for a protective order, the court shall dissolve the temporary restraining order.

**(E)** If on two days' notice to the attorney for the Government, excluding intermediate weekends and holidays, or on such shorter notice as the court may prescribe, the adverse party appears and moves to dissolve or modify the temporary restraining order, the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require.

**(F)** A temporary restraining order shall set forth the reasons for the issuance of such order, be specific in terms, and describe in reasonable detail (and not by reference to the complaint or other document) the act or acts being restrained.

**(b)**

**(1)** A United States district court, upon motion of the attorney for the Government, or its own motion, shall issue a protective order prohibiting harassment of a victim or witness in a Federal criminal case or investigation if the court, after a hearing, finds by a preponderance of the evidence that harassment of an identified victim or witness in a Federal criminal case or investigation exists or that such order is necessary to prevent and restrain an offense under section 1512 of this title, other than an offense consisting of misleading conduct, or under section 1513 of this title. **(2)** In the case of a minor witness or victim, the court shall issue a protective order prohibiting harassment or intimidation of the minor victim or witness if the court finds evidence that the conduct at issue is reasonably likely to adversely affect the willingness of the minor witness or victim to testify or otherwise participate in the Federal criminal case or investigation. Any hearing regarding a protective order under this paragraph shall be conducted in accordance with paragraphs (1) and (3), except that the court may issue an ex parte emergency protective order in advance of a hearing if exigent circumstances are present. If such an ex parte order is applied for or issued, the court shall hold a hearing not later than 14 days after the date such order was applied for or is issued.

**(3)** At the hearing referred to in paragraph (1) of this subsection, any adverse party named in the complaint shall have the right to present evidence and cross-examine witnesses.

**(4)** A protective order shall set forth the reasons for the issuance of such order, be specific in terms, describe in reasonable detail the act or acts being restrained. **(5)** The court shall set the duration of effect of the

protective order for such period as the court determines necessary to prevent harassment of the victim or witness but in no case for a period in excess of three years from the date of such order's issuance. The attorney for the Government may, at any time within ninety days before the expiration of such order, apply for a new protective order under this section, except that in the case of a minor victim or witness, the court may order that such protective order expires on the later of 3 years after the date of issuance or the date of the eighteenth birthday of that minor victim or witness.

**(c)**Whoever knowingly and intentionally violates or attempts to violate an order issued under this section shall be fined under this title, imprisoned not more than 5 years, or both.

  **(d)**

  **(1)** As used in this section—

  **(A)** the term "course of conduct" means a series of acts over a period of time, however short, indicating a continuity of purpose;

  **(B)** the term "harassment" means a serious act or course of conduct directed at a specific person that—

  **(i)** causes substantial emotional distress in such person; and

  **(ii)** serves no legitimate purpose;

  **(C)** the term "immediate family member" has the meaning given that term in section 115 and includes grandchildren;

  **(D)** the term "intimidation" means a serious act or course of conduct directed at a specific person that—

  **(i)** causes fear or apprehension in such person; and

  **(ii)** serves no legitimate purpose;

  **(E)** the term "restricted personal information" has the meaning give [1] that term in section 119;

  **(F)** the term "serious act" means a single act of threatening, retaliatory, harassing, or violent conduct that is reasonably likely to influence the willingness of a victim or witness to testify or participate in a Federal criminal case or investigation; and **(G)**the term "specific person" means a victim or witness in a Federal criminal case or investigation, and includes an immediate family member of such a victim or witness.

  **(2)** For purposes of subparagraphs (B)(ii) and (D)(ii) of paragraph (1), a court shall presume, subject to rebuttal by the person, that the distribution or publication using the Internet of a photograph of, or restricted personal information regarding, a specific person serves no legitimate purpose, unless that use is authorized by that specific person, is for news reporting purposes, is designed to locate that specific person (who has been reported to law enforcement as a missing

person), or is part of a government-authorized effort to locate a fugitive or person of interest in a criminal, antiterrorism, or national security investigation.


**18 U.S. Code § 1519.Destruction, alteration, or falsification of records in Federal investigations and bankruptcy**
Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

 25 CFR § 11.420 - Tampering with records. A person commits a misdemeanor if, knowing that he or she has no privilege to do so, he or she falsifies, destroys, removes or conceals any writing or record, with purpose to deceive or injure anyone or to conceal any wrongdoing.

    1663. PROTECTION OF GOVERNMENT PROPERTY -- PROTECTION OF
PUBLIC RECORDS AND DOCUMENTS The taking of a public record or document is prohibited by 18 U.S.C. § 641. The destruction of such records may be reached under 18 U.S.C. § 1361. In both instances, however, proving a $100 loss, the prerequisite to a felony conviction, may be difficult. Thus, neither of these statutes adequately protects government records. The necessary measure of protection for government documents and records is provided by 18 U.S.C. § 2071. Section 2071(a) contains a broad prohibition against destruction of government records or attempts to destroy such records.

**18 U.S. Code § 1621. Perjury generally**

Whoever—

(1)      having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true; or

(2) in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code, willfully subscribes as true any material matter which he does not believe to be true;

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined under this title or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.


**18 U.S. Code § 1622. Subornation of perjury**

Whoever procures another to commit any perjury is guilty of subornation of perjury, and shall be fined under this title or imprisoned not more than five years, or both.


**18 U.S. Code § 1623. False declarations before grand jury or court**

**(a)** Whoever under oath (or in any declaration, certificate, verification, or statement under penalty of perjury as permitted under section 1746 of title 28, United States Code) in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration or makes or uses any other information, including any book, paper, document, record, recording, or other material, knowing the same to contain any false material declaration, shall be fined under this title or imprisoned not more than five years, or both.


**18 U.S. Code § 1951. Interference with commerce by threats or violence**

(a)    Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both. (b)As used in this section— (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining. (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.


**18 U.S.C.§ 1962(b) It** shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.


**42 U.S. Code § 1983. Civil action for deprivation of rights**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

**42 U.S. Code § 1985 (2)OBSTRUCTING JUSTICE; INTIMIDATING PARTY, WITNESS, OR JUROR**

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so

**42 U.S.C. § 1986:**

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

**Retaliation:**

42 U.S. Code § 12203.Prohibition against retaliation and coercion (a)RETALIATION No person shall discriminate against any individual because

such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter. (b)INTERFERENCE, COERCION, OR INTIMIDATION It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

### PUBLIC CORRUPTION. COLOR OF LAW AND HUMAN RIGHT VIOLATIONS

The actions of these judges are far worse than individual acts or white collar crimes. The crimes perpetrated by these judges are public corruption, perpetrated under "color of law" and constitute massive human rights violations.

1. **Several statutes, mostly codified in Title 18 of the USC, provide for federal prosecution of public corruption:**

   a. the Hobbs Act (enacted 1934),

   b. the mail and wire fraud statutes (enacted 1872),

   c. the honest services fraud provision,

   d. the Travel Act (enacted 1961),

   e. the Racketeer Influenced and Corrupt Organizations Act (RICO) (enacted 1970)

   f. the federal official bribery and gratuity statute, 18 U.S.C. § 201 (enacted 1962),

   g. the Foreign Corrupt Practices Act (FCPA) 15 U.S.C. § 78dd (enacted 1977),

h.  and the federal program bribery statute, 18 U.S.C. § 666 (enacted 1984)

2.  **"Color of law" includes violations under 18 U.S.C. § 241.Conspiracy against rights;  18      U.S.C. § 242.**
    **Deprivation     of     rights   under   color   of   law;   18**
    U.S.C. § 1951.Interference with commerce by threats or violence.

3.  **Human rights violations:**

   **28 U.S. Code § 509B**. Section to enforce human rights laws

   (a)   Not later than 90 days after the date of the enactment of the Human Rights Enforcement Act of 2009,
   the Attorney General shall establish a section within the Criminal Division of the Department of Justice
   with responsibility for the enforcement of laws against suspected participants in serious human rights
   offenses.

   (b)  The section established under subsection (a) is authorized to—

   **(1)**  take appropriate legal action against individuals suspected of participating in serious human rights
   offenses;

   **(2)**  coordinate any such legal action with the United States Attorney for the relevant jurisdiction.

   (c)   The Attorney General shall, as appropriate, consult with the Secretary of Homeland Security and the
   Secretary of State.

   (d)   In determining the appropriate legal action to take against individuals who are suspected of
   committing serious human rights offenses under Federal law, the section shall take into consideration the
   availability of criminal prosecution under the laws of the United States for such offenses or in a foreign
   jurisdiction that is prepared to undertake a prosecution for the conduct that forms the basis for such
   offenses.

   (e)   The term "serious human rights offenses" includes violations of Federal criminal laws relating to
   genocide, torture, war crimes…

**18 U.S.C. § 2340 - U.S. Code - Crimes and Criminal Procedure - Definitions**
   **(1)** "torture" means an act committed by a person acting under the color of law specifically intended to inflict
   severe physical or mental pain or suffering (other than pain or suffering incidental to lawful sanctions) upon
   another person within his custody or physical control.